**No. 23-55478**

In the

# United States Court of Appeals
## For the Ninth Circuit

———————————

ALEXANDRIA MOSLEY; REJOYCE KEMP; BERENICE CISNEROS; BRUCE PARKER,

*Plaintiffs-Appellants*,

v.

WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Southern District of California, San Diego
Honorable Dana M. Sabraw, Chief District Judge
Honorable Allison H. Goddard, Magistrate Judge
Case No. 3:22-cv-01976-DMS-AHG

———————————

**ANSWERING BRIEF OF APPELLEES**

———————————

Alicia A. Baiardo
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1973

Amy Morrissey Turk
MCGUIREWOODS LLP
101 West Main Street
Suite 9000
Norfolk, VA 23510
T: (757) 640-3700

*(Counsel continued on following page)*

Paul M. Chappell  
McGuireWoods LLP  
2000 McKinney Avenue  
Suite 1400  
Dallas, TX 75201  
T: (214) 932-6472

Matthew A. Fitzgerald  
McGuireWoods LLP  
Gateway Plaza  
800 East Canal Street  
Richmond, VA 23219  
T: (804) 775-4716

*Counsel for Appellees Wells Fargo & Company and Wells Fargo Bank, N.A.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Under Federal Rule of Appellate Procedure 26.1(a), Wells Fargo & Company and Wells Fargo Bank, N.A. make the following disclosure:

1.    Wells Fargo Bank, N.A. is a national banking association organized under the laws of the United States and is a wholly owned subsidiary of Wells Fargo & Company.

2.    Wells Fargo & Company is a publicly traded corporation organized under the laws of Delaware.  No other publicly held corporation owns 10% of Wells Fargo & Company's stock.


Dated: August 11, 2023                 */s/ Matthew A. Fitzgerald*
                                                    Matthew A. Fitzgerald

                                                    *Counsel for Appellees Wells Fargo &*
                                                    *Company and Wells Fargo Bank, N.A.*

i

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION..........................................................4

STATEMENT OF THE CASE .................................................................5

SUMMARY OF ARGUMENT ...............................................................14

STANDARD OF REVIEW ....................................................................16

ARGUMENT ......................................................................................16

I. The PA Order is not subject to judicial review because it is interlocutory.................................................................................16

    A. Interlocutory arbitration orders are generally reviewable only after a final award, and no extreme circumstance exception applies.........................................................................17

    B. Wells Fargo never agreed that the PA Order is "final" for judicial review. ...........................................................21

    C. This is not a "class arbitration gateway" issue..................24

        1. The PA Order does not impose "class" arbitration.................24

        2. Regardless, the "class arbitration gateway" cases are off-point here.................................................................27

II. Alternatively, the Arbitration Agreements send this dispute to arbitration.................................................................................31

    A. The parties "clearly and unmistakably" delegated arbitrability to the arbitrator. ...................................................32

    B. Even if the court addresses the issue, the carve-out does not apply—this case seeks no "provisional or ancillary remedy." ..........37

        1. The plain text of the arbitration agreement requires a 'provisional or ancillary remedy.' ...........................................38

        2. Case law applying similar language supports the district court's ruling. ......................................................39

        3. Claimants do not seek a 'provisional or ancillary remedy.' ....41

CONCLUSION ...................................................................................43

STATEMENT OF RELATED CASES .....................................................43

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aerojet-Gen. Corp. v. Am. Arb. Ass'n*,
    478 F.2d 248 (9th Cir. 1973) ..................................................................18

*Archer & White Sales, Inc. v. Henry Schein, Inc.*,
    935 F.3d 274 (5th Cir. 2019) .........................................................39, 40

*Blue Cross Blue Shield of Mass. v. BCS Ins. Co.*,
    671 F.3d 635 (7th Cir. 2011) ..................................................................18

*Bosack v. Soward*,
    586 F.3d 1096 (9th Cir. 2009) ..............................................................23

*Capriole v. Uber Technologies, Inc.*,
    7 F.4th 854 (9th Cir. 2021) ...........................................................40, 41

*Caremark LLC v. Chickasaw Nation*,
    43 F.4th 1021 (9th Cir. 2022) .......................................................33, 37

*Fortune, Alsweet & Eldridge, Inc. v. Daniel*,
    724 F.2d 1355 (9th Cir. 1983) ..............................................................21

*Green Tree Fin. Corp.-Alabama v. Randolph*,
    531 U.S. 79 (2000) ..................................................................................23

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019) .......................................................................35, 36

*Johnmohammadi v. Bloomingdale's, Inc.*,
    755 F.3d 1072 (9th Cir. 2014) ................................................................4

*Lagstein v. Certain Underwriters at Lloyd's*,
    607 F.3d 634 (9th Cir. 2010) ...........................................................4, 20

*Marselian v. Wells Fargo & Co.*,
    514 F. Supp. 3d 1166 (N.D. Cal. 2021)................................................33

*Millmen Loc. 550 v. Wells Exterior Trim*,
    828 F.2d 1373 (9th Cir. 1987) .......................................................18, 23

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ............................................................32

*Momot v. Mastro*,
652 F.3d 982 (9th Cir. 2011) .........................................................32, 33

*Nghiem v. NEC Electronic, Inc.*,
25 F.3d 1437 (9th Cir. 1994) .........................................................20, 21

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) .......................................15, 33, 36, 37

*P & P Indus., Inc. v. Sutter Corp.*,
179 F.3d 861 (10th Cir. 1999) ............................................................23

*Rainwater v. Nat'l Home Ins. Co.*,
944 F.2d 190 (4th Cir. 1991) .............................................................24

*Rent-A-Ctr. W., Inc. v. Jackson*,
561 U.S. 63 (2010) ..............................................................................33

*Shivkov v. Artex Risk Sols., Inc.*,
974 F.3d 1051 (9th Cir. 2020) ......................................................24, 28

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ......................................................................28, 29

*Stover v. Experian Holdings, Inc.*,
978 F.3d 1082 (9th Cir. 2020) ...........................................................16

*In re Sussex*,
781 F.3d 1065 (9th Cir. 2015) ....................................16, 18, 19, 22, 28

*Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*,
609 F.3d 975 (9th Cir. 2010) ...............................................39, 40, 41

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) ...........................................................19

*Viking River Cruises, Inc. v. Moriana*,
142 S. Ct. 1906 (2022) .......................................................................25

iv

*Wilson v. Wells Fargo & Co.*,
   No. 3:20-CV-2307, 2022 WL 4125220 (S.D. Cal. Sept. 9, 2022) .......................6

*Wilson v. Wells Fargo & Co.*,
   No. 3:20-CV-2307, 2021 WL 1853587 (S.D. Cal. May 10, 2021) ...............5, 33

*Yates v. United States*,
   574 U.S. 528 (2015) ....................................................................................39

*Zoller v. GCA Advisors, LLC*,
   993 F.3d 1198 (9th Cir. 2021) ....................................................................16

**Statutes**

9 U.S.C. § 10 ...........................................................................................20, 22, 29

Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.* .......................................4, 5

15 U.S.C. § 1693m...............................................................................................4, 42

28 U.S.C. § 1291 ..................................................................................................23

28 U.S.C. § 1331 ..............................................................................................4, 42

Cal. Civ. Proc. Code § 128.7 ...............................................................................12

**Other Authorities**

11 Williston on Contracts § 32.6 (4th ed.)...............................................................39

12 C.F.R. § 1005.1 *et seq.* ........................................................................................5

12 C.F.R. § 1005.17 ............................................................................................4, 6

Black's Law Dictionary (11th ed. 2019) ...............................................................38

Order, *Sutton v. Wells Fargo Bank, N.A.*,
   No. 5:21-CV-1695, Dkt. 24 (N.D. Cal. filed June 29, 2021) ...........................33

Andrew J. Pincus et al.,
   Mass Arbitration Shakedown: Coercing Unjustified Settlements
   (U.S. Chamber of Commerce Institute for Legal Reform, ed., February
   2023) ........................................................................................................10

## **INTRODUCTION**

This Court should deny the latest efforts by Alexandria Mosley, Rejoyce Kemp, Berenice Cisneros, and Bruce Parker ("Claimants") to seek mid-stream relief from arbitration in court. The district court properly compelled this matter back to arbitration, and this Court should affirm.

Claimants are just four out of more than 3,900 individuals who have filed near-identical individual demands against Wells Fargo with the American Arbitration Association ("AAA"). Situations like this trigger the AAA's Supplementary Rules for Multiple Case Filings, and counsel for both sides agreed to use those rules. The Supplementary Rules grant a Process Arbitrator authority to decide administrative issues, including AAA filing requirements.

As it received more and more demands brought on behalf of various individuals, Wells Fargo identified a pattern. The demands often did not come with sufficient information even to identify the individual as a customer of Wells Fargo. In an attached form, in the blank space to list their account numbers, claimants wrote things like "Not sure", "N/A", "Not giving my account", "i don't have one", "None", and "idk." SER-96–108. Filings like these suggested that plaintiffs' counsel, the McCune Law Group, or MLG, was not performing due diligence to assess whether its clients had any legitimate dispute with Wells Fargo at all.

1

Wells Fargo sought relief. It asked the Process Arbitrator to require MLG to provide basic information to allow Wells Fargo to determine whether the individuals were indeed customers, had enrolled in the debit card overdraft protection service, and paid an overdraft fee. After full briefing and a hearing, the Process Arbitrator partially granted Wells Fargo's request ("PA Order").

The PA Order required MLG to re-submit demands on behalf of its clients and provide information establishing that each claimant has a dispute with Wells Fargo and to meet those same requirements on a go-forward basis. Unhappy with the relief granted in the PA Order, MLG refused to abide by its terms and instead filed a complaint in federal district court. The district court properly granted Wells Fargo's motion to compel arbitration.

Claimants' opening brief mainly contends that the PA Order imposes "class-wide procedure" and that Wells Fargo has stonewalled arbitration. The facts bely these fantasies. The PA Order creates no class—it requires individual, separate compliance by each Claimant here and each of the thousands of others too. Meanwhile, any "delay" in arbitration, Op. Br. 11, came from Claimants' own five-month detour to the district court. Wells Fargo has not refused to arbitrate. In fact, it has paid every fee AAA has billed—more than $501,000 so far.

Even if the PA Order *were* subject to judicial review, there is nothing improper about it. The underlying dispute is about whether Wells Fargo violated

federal regulations requiring certain disclosures and customer opt-in before assessing overdraft fees on one-time debit card and ATM transactions. The PA Order simply requires each claimant to give their Wells Fargo account number and state facts showing both enrollment in Wells Fargo's debit card overdraft protection service and that they paid an overdraft fee assessed under that service—facts necessary to make out a claim. All the needed information would be apparent on the face of any claimant's bank account statements. SER-110 (a redacted statement that shows an account number, enrollment in the debit card overdraft protection service by a checked box, and any overdraft fee paid in the statement period).

No Claimant here says they cannot provide the information that the PA Order requires. In fact, they clearly can. In their federal-court filing, the four Claimants specifically alleged that they are Wells Fargo customers and noted exactly when each enrolled in the debit card overdraft protection service, the date they paid an overdraft fee, and how much it was. 2-ER-212–13.

The Process Arbitrator refused to force Wells Fargo to keep paying hundreds of thousands of dollars in initiation fees to arbitrate overdraft issues against claimants who gave their account numbers as "not sure," "none," or "don't have one" and who repeated pure boilerplate language rather than describe any

3

individual claim or amount at issue.  The PA Order essentially says Claimants and MLG have no right to file demands frivolous on their face.

If the Claimants object to the PA Order, they are welcome to disobey it and proceed to a final arbitration award.  MLG's ethical obligations will continue to attach should they decide on this route.  They then can come to court and argue that the arbitral award is "completely irrational" or "exhibits a manifest disregard of law." *Lagstein v. Certain Underwriters at Lloyd's*, 607 F.3d 634, 641 (9th Cir. 2010) (describing the standard for reviewing an arbitral award).

The district court rightly held that this entire mid-arbitration detour to federal court was improper.

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1693m.  2-ER-215.  The federal question was whether Wells Fargo violated Regulation E, 12 C.F.R. § 1005.17, under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*.  *See* 2-ER-232–33 (alleging violations of federal law).

The district court granted Wells Fargo's motion to compel arbitration, denied the preliminary injunction motion as moot, and dismissed the case without prejudice.  1-ER-10.  Appellate jurisdiction exists because the order is final under *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014)

("[A]n order compelling arbitration and dismissing the action" is "immediately appealable," including when it is "without prejudice").

## STATEMENT OF THE CASE

The Claimants who are the plaintiffs-appellants in this case are just four of more than 3,900 current claimants in arbitration against Wells Fargo. All are represented by MLG, and all allege that Wells Fargo's debit card overdraft protection service violates federal Regulation E.[1] The core dispute arose years before this case was filed.

**Plaintiffs' counsel MLG loses the first individual arbitration.** MLG began in November 2020 by filing a putative class action against Wells Fargo. *See Wilson v. Wells Fargo & Co.*, No. 3:20-CV-2307, Dkt. 1 (S.D. Cal. filed Nov. 25, 2020) (alleging that overdraft rules and fees violate the Electronic Funds Act, 15 U.S.C. § 1693 *et seq.* and its implementing Regulation E, 12 C.F.R. § 1005.1 *et seq.*). Under its customer agreement, which includes the same arbitration agreement at issue here, Wells Fargo moved to compel individual arbitration. The district court compelled arbitration. *Wilson v. Wells Fargo & Co.*, No. 3:20-CV-2307, 2021 WL 1853587, at *4 (S.D. Cal. May 10, 2021).

In arbitration, Wells Fargo prevailed. The arbitrator drafted a 50-page final

---

[1] Wells Fargo has different overdraft protection programs. The specific service relevant to Regulation E and to this case is called "debit card overdraft protection service," or "DCOS." For simplicity this brief refers to it as "overdraft service."

award concluding that Wells Fargo "complied with Reg. E."  SER-70; SER-64 (holding in detail that Wells Fargo lawfully explained its overdraft service to customers in adequately clear terms).  MLG did not object to the final award in *Wilson*, and the district court confirmed it.  *Wilson v. Wells Fargo & Co.*, No. 3:20-CV-2307, 2022 WL 4125220 (S.D. Cal. Sept. 9, 2022) (Order Granting Motion to Lift Stay and Confirm Arbitration Award).

**MLG recruits people to make claims against Wells Fargo.**  Meanwhile, MLG set out to collect more claimants.  MLG solicited clients through advertising on its website.  SER-11–12.  MLG advertised that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" as a claimant against Wells Fargo.  SER-11–12; SER-116.  MLG used that broad advertisement to solicit clients even though Regulation E applies only to specific types of overdraft charges for customers enrolled in Wells Fargo's overdraft service—those related to ATM and one-time debit card transactions.  *See* 12 C.F.R. § 1005.17.  Customers who paid overdraft fees on other types of transactions could not have a Regulation E claim against Wells Fargo.  MLG's advertising targeted them anyway.

MLG's advertising also invited the public to inflict harm on Wells Fargo through the sheer procedure of mass arbitration.  SER-11–12.  MLG's advertising noted that each arbitration filed forces Wells Fargo to pay "a whopping $4,000.00,

not including their attorneys' fees." SER-11–12; SER-119. MLG's advertising stated that "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts." SER-11–12; SER-119. The obvious implication was that having an actual meritorious claim was beside the point. Consumers could "hit" Wells Fargo "where it hurts" simply by signing up with MLG and filing a claim. SER-11–12; SER-119.

Hundreds, and eventually thousands, of people signed up. Among them were Alexandria Mosley, Rejoyce Kemp, Berenice Cisneros, and Bruce Parker. Each was a Wells Fargo customer with a checking account. 2-ER-212–13. As an accountholder, each had accepted the Wells Fargo Deposit Account Agreement, which included an Arbitration Agreement.

**The Arbitration Agreements.** The Arbitration Agreements require that any "dispute between you and Wells Fargo" be resolved in arbitration. 2-ER-65. They define "dispute" as "any unresolved disagreement between Wells Fargo and you." 2-ER-65. "Dispute" specifically "may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement." 2-ER-65. The Arbitration Agreements add that "[i]f this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable." 2-ER-65. The Arbitration Agreements also specify that the parties may go to court if "provisional or ancillary

7

remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver" become necessary. 2-ER-66. Finally, the Arbitration Agreements also provide that the AAA will administer each arbitration under its Consumer Arbitration Rules and that "[n]either Wells Fargo nor you will be entitled to join or consolidate disputes" as a "representative or member of a class." 2-ER-66.

**Thousands of people file near-identical arbitral demands.** As they admit, Mosley, Kemp, Cisneros, and Parker "submitted their claims to AAA in the first instance." Op. Br. 5. So did many hundreds of others. As of September 6, 2022, MLG had submitted more than 2,200 demands. SER-131.

The thousands of demands were virtually identical. The only differences were the names and addresses of each claimant. SER-146; SER-152. Every demand was identical in the areas where the demand form asked each claimant to "[b]riefly explain the dispute" and where it asked to "[s]pecify the amount of money in dispute." SER-146; SER-152. Each demand also attached an identical Statement of Claims. SER-148–50; SER-154–56. In short, every demand seeks "statutory damages and return of overdraft fees collected in violation of Regulation E." SER-148–50; SER-154–56.

Given the large number of filings, AAA informed MLG and Wells Fargo that the Supplementary Rules would apply. All parties agreed. Op. Br. 8 (acknowledging that all agreed); SER-10; SER-76–79. MLG even affirmatively

requested that certain demands filed against Wells Fargo "be consolidated and otherwise subject to AAA's Supplementary Rules for Multiple Case Filings." SER-8–9; SER-75.

The Supplementary Rules were created to "streamline the administration of large volume filings," and "are intended to provide parties and their representatives with an efficient and economical path toward the resolution of multiple individual disputes." 2-ER-182. The Supplementary Rules provide for the appointment of a Process Arbitrator to decide "administrative issue(s) for all of the cases included in the Multiple Case Filing," including filing requirements, fee payments, and any other issue arising out of the multiple case filing. 2-ER-185 (MC-6(b), MC-6(d)(i), (ii), and (iii)). All acknowledge that the "main feature" of the agreed Supplementary Rules is to "bifurcate the arbitration process" into administrative issues, decided by a Process Arbitrator, followed by individual merits hearings before Merits Arbitrators. Op. Br. 8-9. AAA appointed the Honorable Anita Rae Shapiro to serve as Process Arbitrator. SER-81.

AAA then began invoicing Wells Fargo for the initial administrative filing fees associated with the arbitration demands. SER-9–10. So far, AAA has invoiced Wells Fargo eight times for a total amount of $501,075.00. SER-9–10; SER-84–91. These invoices include fees for the arbitrations of Mosley, Kemp, Cisneros, and Parker. SER-9–10. Wells Fargo has timely paid every invoice.

9

SER-9–10; SER-93.

As Wells Fargo was paying these fees, it reviewed the demands. SER-10. The bank's review suggested that many claimants never agreed to participate in the overdraft service—a prerequisite for any Regulation E claim. SER-10. In some cases, Wells Fargo could not find any checking account associated with the claimant at all. SER-10. Some demands also came with forms in which claimants had written, where their bank account numbers should go: "XXX…", "99999999", "Not sure", "N/A", "[the claimant's last name]", "xxxxxxxxxxxxx", "Blank", "Not giving my account", "i don't have one", "None", "0000000000", and "idk." SER-96–108.

**The Process Arbitrator enters the PA Order.** At this point, it became clear that MLG's overly aggressive advertising was a success, and that MLG was not performing its ethically required due diligence in performing client screening.[2] Under the Supplementary Rules, Wells Fargo sought relief from the Process Arbitrator. SER-12–13. Wells Fargo asked the Process Arbitrator to require MLG to provide basic information in the demands. SER-12–13; SER-123 (pointing out that "Hundreds of these demands . . . have been filed on behalf of individuals

---

[2] *See* Andrew J. Pincus et al., MASS ARBITRATION SHAKEDOWN: COERCING UNJUSTIFIED SETTLEMENTS 3 (U.S. Chamber of Commerce Institute for Legal Reform, ed., February 2023) (noting the risks of "amass[ing] a large 'inventory' of claimants," including "abusive practices" like filing claims on behalf of people who are clearly ineligible for relief).

[who] . . . have no account with Wells Fargo, were not enrolled in the Wells Fargo overdraft program at issue, or were assessed no overdraft fees"). Wells Fargo urged that "these unlawful and non-compliant demands appear to be the result of counsel's false advertising and failure to conduct basic required investigations of the claims asserted." SER-123.

The motion was fully briefed and the Process Arbitrator held an oral hearing. MLG opposed Wells Fargo's request that MLG be required to provide basic information about its clients' claims. But MLG never denied that AAA's Supplementary Rules applied. SER-13–14.

On October 27, 2022, the Process Arbitrator entered the PA Order. SER-14–15; 2-ER-191. The PA Order required each existing claimant to file and serve an amended demand. SER-14–15; 2-ER-191. It also required all demands to "specifically plead, 1) each Claimant's Wells Fargo account number for the account at issue, 2) facts to establish that each Claimant was enrolled in [Wells Fargo's overdraft service] during the time period at issue and 3) facts sufficient to establish that each Claimant incurred overdraft fees in connection with transactions covered by Regulation E." SER-14–15; 2-ER-191. This information would be obvious on the face of a customer's bank account statement. SER-110–11 (a redacted bank account statement making clear that it contains the customer's account number, any overdraft fees assessed during the statement period, and a

check box showing whether or not the customer is enrolled in "overdraft service").

The Process Arbitrator also ordered that an attorney of record for each claimant sign each amended claim, or a spreadsheet containing the relevant information, citing California Code of Civil Procedure § 128.7.  SER-14–15; 2-ER-191.[3]  The PA Order stayed the invoicing of AAA fees until the demands met these requirements.  2-ER-191.

**Claimants sue and the district court compels arbitration.**  In December 2022, on behalf of only four claimants Mosley, Kemp, Cisneros, and Parker ("Claimants"), MLG sued Wells Fargo in the Southern District of California.  2-ER-205–36.  For each Claimant, the complaint alleged their enrollment in the overdraft service and a specific overdraft fee on a certain date.  2-ER-212–13.  Notably, the complaint itself "provided the information required by the PA Order."  1-ER-9.

The complaint alleged that Wells Fargo's overdraft service practices violate Regulation E and state consumer protection law.  2-ER-222–28.  The complaint also alleged that Wells Fargo breached the Arbitration Agreements because of

---

[3] California Code of Civil Procedure Section 128.7 provides that an attorney who submits any paper certifies that "[i]t is not being presented primarily for an improper purpose… [t]he claims, defenses, and other legal contentions therein are warranted by existing law…[and] "[t]he allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."  Cal. Civ. Proc. Code § 128.7(b).

AAA's entry of the PA Order.  2-ER-230–31.

As in *Wilson*, Wells Fargo moved to compel the case to arbitration.  Again, the district court granted Wells Fargo's motion to compel arbitration.  1-ER-2–10.  The court ruled that the PA Order was not subject to judicial review.  It also ruled—again as in *Wilson*—that the Arbitration Agreements "clearly and unmistakably" delegated arbitrability to the arbitrator, and that Claimants were not seeking "provisional or ancillary" relief, and thus fell outside the carve-out provision in their Arbitration Agreements.  1-ER-6–10.  This appeal followed.

**Arbitration continues.**  Meanwhile, the arbitration process has continued.  After the district court's ruling, the Process Arbitrator held a status conference.  During the conference, the Process Arbitrator determined that MLG had not complied with the PA Order.  Second PA Order (attached hereto as Exhibit 1).

On June 14, 2023, the Process Arbitrator entered a Second PA Order, to enforce the PA Order.  *See* Exh. 1 at 1-2.  Accordingly, the Second PA Order sets several due dates for compliance with the PA Order.  For Claimants here, the due date is August 14, 2023.  *Id.*  The Second PA Order states that the PA Order "is still in full force and effect" with the amendments requiring compliance with by certain dates.  *Id.*

The second PA Order further held that claimants who do not comply with the PA Order "are precluded from presenting certain evidence at their individual

arbitration hearing." *Id.* Specifically, those who do not comply with the Second PA Order cannot present evidence that they 1) had a Wells Fargo account number for the account in issue, 2) were enrolled in Wells Fargo's overdraft service during the period in issue, or 3) incurred any overdraft fees for which they were wrongly charged. *Id.* Any claimant "whose attorney of record has failed to sign an Amended Claim as required by California Code of Civil Procedure section 128.7 are also precluded from presenting this evidence." *Id.* The Second PA Order dismisses no one's claims. *Id.*

## SUMMARY OF ARGUMENT

This Court should affirm, and can do so on any of three independent grounds.

I.    The PA Order is not subject to judicial review because it is interlocutory. Interlocutory arbitration rulings are generally only reviewable after a final arbitration award, which has not happened here. Claimants here admit that they voluntarily filed their demands in arbitration. They then agreed to be bound by the Supplementary Rules. Claimants willingly litigated administrative issues in front of a Process Arbitrator for many months. When the Process Arbitrator required them to amend their demands, Claimants refused to comply with the PA Order, tried to circumvent the ruling, and ultimately filed the complaint in this case in court. The law seldom allows such a shift to court in the middle of arbitration.

Claimants have made no argument that would justify allowing it here.

II.    Alternatively, the Arbitration Agreements return this case to arbitration, for two separate reasons.

First, the Arbitration Agreements delegate arbitrability to the arbitrator.  The parties here clearly "dispute" who should interpret the Arbitration Agreement to decide whether the claims here must go to arbitration.  The Arbitration Agreement "clearly and unmistakably" delegates "disagreement[s] about this Arbitration Agreement's meaning, application, or enforcement" to the arbitrator.  2-ER-65. *See also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013) (rejecting the exact argument Claimants make here).

Second, if the court even reaches this issue, the carve-out provision in the Arbitration Agreement does not apply.  The carve-out provision allows parties to go to court to seek "provisional or ancillary remedies such as injunctive relief."  2-ER-66.  But Claimants seek no "provisional or ancillary" remedy here.  Instead, they have sued Wells Fargo for breach of the Arbitration Agreement and for violating Regulation E and state consumer protection law.  Claimants even concede that two of these three claims are the same ones they made months ago in arbitration.  Op. Br. 17.

**STANDARD OF REVIEW**

This Court reviews de novo the decision to grant or deny a motion to compel arbitration and the interpretation and meaning of a contract provision.  *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1085 (9th Cir. 2020).  "The district court's factual findings are reviewed for clear error."  *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1200 (9th Cir. 2021).

**ARGUMENT**

**I.    The PA Order is not subject to judicial review because it is interlocutory.**

Courts rarely intervene in ongoing arbitration.  In the Ninth Circuit, the rule is that "judicial review prior to the rendition of a final arbitration award should be indulged, *if at all*, only in the most extreme cases."  *In re Sussex*, 781 F.3d 1065, 1072 (9th Cir. 2015) (emphasis in original).

Here, Claimants filed a 3-count complaint.  They concede that the second and third counts "re-allege the substantive claims [they] sought relief for in their arbitration demands."  Op. Br. 17.  Claimants argue that their first count is "independent" of the arbitration.  *Id.*  But in fact, the first count is about Wells Fargo's alleged conduct *in the arbitration itself.*  2-ER-230–31.  Claimants allege that Wells Fargo breached the arbitration agreement by "bury[ing] them under endless red tape, delay tactics, and burden," imposing collective action procedures, and refusing to pay arbitration fees.  2-ER-230–31.  These are all clear references

to the PA Order.  In short, Count I is about procedures happening inside an ongoing arbitration.  And Counts II and III admittedly re-state the same claims pending in that arbitration.

Thus, Claimants seek an interlocutory review of their ongoing arbitration. They are in court because they are unhappy with the procedures set in the PA Order.  But the PA Order is interlocutory—it certainly does not make any final disposition of anyone's claim.  The district court properly refused to entertain this case, and this Court should affirm on this ground alone.

### A. Interlocutory arbitration orders are generally reviewable only after a final award, and no extreme circumstance exception applies.

The PA Order is an interlocutory order about filing requirements.  As the district court correctly held, "the PA Order deals with procedure, namely pleading and filing requirements, to provide an orderly process for the [arbitrations]—all based on [Process Arbitrator] Shapiro's interpretation of the Supplementary Rules to which the parties agreed."  1-ER-9–10.  The PA Order instructs claimants what basic information AAA will require from them to process their demand against Wells Fargo, consistent with the AAA Consumer Rules.  By no stretch of the imagination is the PA Order a "final" order that ends arbitration and opens the door to post-arbitration judicial review.  No Claimant had yet lost their claim against Wells Fargo when they filed this lawsuit.  (And they still have not).

As the district court ruled, the PA Order is interlocutory.  The "PA Order is

not a 'final' order . . . and is not subject to judicial review." 1-ER-9–10. *See*

*Millmen Loc. 550 v. Wells Exterior Trim*, 828 F.2d 1373, 1374 (9th Cir. 1987)

(holding that an arbitrator's decision deciding liability, but not yet deciding the

remedy, was not "final" and not yet reviewable in court).

    A wall of case law bars courts from reviewing interlocutory arbitration

orders. In *Sussex*, this Court pointed out that "the majority of our sister circuits

expressly preclude any mid-arbitration intervention." 781 F.3d at 1073 (citing the

Sixth Circuit, which collected cases from six other circuits). "Review of an

arbitration proceeding comes at the beginning or the end, but not in the middle."

*Id.* (quoting *Blue Cross Blue Shield of Mass. V. BCS Ins. Co.*, 671 F.3d 635, 638

(7th Cir. 2011)). Interventions of any kind mid-arbitration would inherently

frustrate the purpose of arbitration, adding "the expense and delay of extended

court proceedings." *Id.* at 1072.

    The Ninth Circuit noted in *Sussex* that it had "c[o]me quite close" to "a

blanket rule precluding intervention in an ongoing arbitration" proceeding. *Id.* at

1073. Yet long ago, this Court reserved the "remote possibility" of a theoretical

"extreme case" in which withholding immediate judicial review would "cause

severe irreparable injury" from an "error that cannot effectively be remedied on

appeal from the final judgment" and which would "result in manifest injustice."

*Id.* (citing *Aerojet-Gen. Corp. v. Am. Arb. Ass'n*, 478 F.2d 248 (9th Cir. 1973)).

That "remote possibility" has proven "remote" indeed. The *Sussex* Court stated that in the forty-two years after *Aerojet*, the Ninth Circuit never approved a district court intervening mid-arbitration. *Id.* at 1073 ("we . . . never subsequently approved of such an intervention"). The Ninth Circuit then rejected intervention in *Sussex* in 2015, and Claimants cite no case since in which this Court has approved a mid-arbitration intervention. Wells Fargo is unaware of any.

In fact, Claimants do not even *argue* that *Aerojet*'s "extreme circumstances" exception applies. So they have waived this point. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1129-30 (9th Cir. 2012) ("arguments not raised by a party in its opening brief are deemed waived").

Even if this Court were to consider the "extreme circumstances" exception, it does not apply here. In *Sussex*, this Court rejected "extreme circumstances" when a party to arbitration asserted that the arbitrator was biased.[4] This Court reasoned that even if the arbitrator *were* improperly biased, the "cost and delay" involved in finishing the arbitration were no reason for judicial intervention. *Sussex*, 781 F.3d at 1075. The Court noted that "mere cost and delay" is no different from the "injury a party wrongfully denied summary judgment experiences when forced to go to trial," and that such injury is "manifestly inadequate to justify a mid-arbitration intervention, regardless of the size and early

---

[4] Claimants make no allegations of bias here.

19

stage of the arbitration." *Id.* This Court's conclusion was so clear that it *granted mandamus* to overrule the district court, which had entertained the bias arguments mid-arbitration.

As in *Sussex*, all of Claimant's objections here seem to boil down to cost and delay. Op. Br. 1, 9, 11, 17, 39. And this Court in *Sussex* envisioned a clear path for cases like this—that unhappy arbitration parties should proceed to finality inside arbitration and seek review after that. Thus, Claimants' recourse is to proceed forward and, if they choose to, violate the PA Order and accept their eventual evidentiary sanctions under the Second PA Order. If and when they lose, they can challenge the final arbitration award in court. *See* 9 U.S.C. § 10 (allowing vacatur of arbitration awards under certain narrow circumstances); *Lagstein*, 607 F.3d at 641 (describing the standard for reviewing an arbitral award).

Nor does it matter that Claimants filed this action as a *new* federal case during their arbitration. This Court has rejected the same tactic. In *Nghiem v. NEC Electronic, Inc.*, Mr. Nghiem voluntarily filed his claim in arbitration, as did Claimants here. 25 F.3d 1437 (9th Cir. 1994). Before any final award was issued, Nghiem filed the same claims in court and began denying the authority of the arbitrator, as do Claimants here.

The Ninth Circuit affirmed the dismissal of Nghiem's case. The *Nghiem* Court concluded that "once a claimant submits to the authority of the arbitrator and

pursues arbitration, he cannot suddenly change his mind and assert lack of authority. Nghiem is bound by the arbitrator's decision." 25 F.3d at 1440. It did not matter that Nghiem changed his mind before the final award of the arbitrator. *Id.* (citing *Fortune, Alsweet & Eldridge, Inc. v. Daniel*, 724 F.2d 1355, 1357 (9th Cir. 1983) ("It would be unreasonable and unjust to allow Daniel to challenge the legitimacy of the arbitration process, in which he had voluntarily participated over a period of several months, shortly before the arbitrator announced her decision.")).

The same principle applies here. As in *Nghiem*, Claimants voluntarily began arbitration, made filings, and presented briefing and argument to the Process Arbitrator. When they were unhappy with the interlocutory PA Order, they sought to change paths and bring their claims in court instead—both the identical substantive claims active in the arbitration and one new claim to complain about the arbitration process itself. As in *Nghiem*, the courts should not entertain this tactic.

Because the PA Order is an interlocutory arbitration ruling and because no "extreme circumstances" justify intervention mid-arbitration, the PA Order is not now subject to judicial review.

### B. Wells Fargo never agreed that the PA Order is "final" for judicial review.

Claimants contend that Wells Fargo has agreed that the PA order is "final."

Op. Br. 38.  They suggest that therefore the PA Order is reviewable in court.  *Id.*  This argument fails.

To be sure, the Supplementary Rules say that Process Arbitrator orders are "final and binding upon the parties and Merits Arbitrator(s)."  2-ER-186 (MC-6(j), MC-6(k)).  In an exchange of letters after the PA Order, Wells Fargo quoted Rule MC-6 in arguing to AAA executives that *they* should not interfere with the PA Order.  2-ER-196.  Rule MC-6 simply requires parties and merits arbitrators to respect the decisions of process arbitrators in setting the process for arbitration going forward.

Rule MC-6 says nothing about judicial review.[5]  Thus, Wells Fargo quoting the rule also said nothing about judicial review.  *Contra* Op. Br. 38-39.  In fact, Wells Fargo has uniformly opposed judicial review.  SER-178–82 ("[T]he Court cannot review the PA Order, and Plaintiffs' dispute must be compelled to arbitration.").

The PA Order is not "final" in the judicial-review sense.  There is no "mutual, *final*, and definite award upon the subject matter submitted" under the FAA.  9 U.S.C. § 10(a)(4) (emphasis added).  Again, no Claimant has yet lost or

---

[5] Even if Rule MC-6 did address judicial review, AAA has no authority to determine when an order is reviewable in court.  *Sussex*, 781 F.3d at 1071 (noting that the FAA sets forth when an order from an arbitral tribunal is reviewable by a court).

won her claim against Wells Fargo.  The arbitrators at AAA are not finished with any Claimant's demand.

The "finality" envisioned in the FAA parallels the "final decision" rule in 28 U.S.C. § 1291.  *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 86 (2000) ("Because the FAA does not define 'a final decision with respect to an arbitration' or otherwise suggest that the ordinary meaning of 'final decision' should not apply, we accord the term its well-established meaning."); *see also Bosack v. Soward*, 586 F.3d 1096 (9th Cir. 2009) (reviewing a series of interim arbitration awards after the "Final Award").  For all of the same reasons driving the § 1291 finality requirement, no *process order* instructing Claimants what to include in their individual arbitration demands is "final" for immediate judicial review.

Claimants suggest that the terms "final and binding" standing alone create a right to immediate judicial review.  Op. Br. 38-39.  None of the cases Claimants cite support that idea.  *Id.* at 39 n.91 (citing cases).  In those cases, the courts envisioned reviewing arbitration awards after they were truly final—that is, after the arbitrator was finished.  *See Millmen*, 828 F.2d at 1375 (applying a "final and binding" standard under the Labor Management Relations Act and finding an arbitrator ruling on liability but not yet on remedy was not final and not yet reviewable); *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867 (10th Cir. 1999)

(review after final arbitration award of $112,000 in damages); *Rainwater v. Nat'l Home Ins. Co.*, 944 F.2d 190, 192-94 (4th Cir. 1991) (review after a final arbitration award finding an insurer liable for repairing a home).  The cases do not support reviewing an interim procedural award like the PA Order here.

### C.     This is not a "class arbitration gateway" issue.

Claimants next point out that courts generally decide whether an arbitration agreement allows class arbitration.  Op. Br. 33; *see also Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1064-65 (9th Cir. 2020).  From this, Claimants assert (1) that they are being forced into class arbitration here, and (2) that therefore, this Court should intervene mid-arbitration to address whether that is proper. Claimants are wrong on both counts.

### 1.     The PA Order does not impose "class" arbitration.

The PA Order does not create a class arbitration.  On the contrary, the PA Order requires every Claimant—separately, and individually—to state their bank account number and assert simple facts showing that they were enrolled in the overdraft service and that they paid an overdraft fee.  2-ER-191 ("Claimants are *each* ordered to file and serve an Amended Claim [containing this information].") (emphasis added).  The PA Order requires, as part of each separate claim, "*each* Claimant's Wells Fargo account number," "facts to establish *each* Claimant was enrolled" in the overdraft service, and "facts sufficient to establish that *each*

Claimant incurred overdraft fees." 2-ER-191 (emphasis added). The PA Order sets a structure in which each of thousands of claimants against Wells Fargo may go forward to present their individual claims. It requires only the most basic statement of relevant facts from each present and future claimant at the start of their arbitration. None of this creates a class arbitration.

The Supreme Court recently outlined what actual class procedures involve, both in court and in arbitration. In *Viking River Cruises, Inc. v. Moriana*, the Court held that "class action procedure allows courts to use a representative plaintiff's individual claim as a basis to 'adjudicate claims of multiple parties at once, instead of in separate suits.'" 142 S. Ct. 1906, 1920 (2022). The Court pointed out that "class judgments bind absentees" on the merits and preclude absent class members from bringing their own claims. *Id.* In turn, adjudicating absent people's claims creates "problems of notice, due process, and adequacy of representation that render class arbitration inconsistent with arbitration's traditionally individualized form." *Id.* at 1921.

None of these concerns are present here. No claimant litigates on behalf of others and no binding-on-the-merits or preclusion of claimants without their participation will occur. The PA Order does not create a class. Rather, it requires each individual claimant to meet certain simple filing requirements before moving forward with an individual arbitration hearing. 2-ER-191. The PA Order simply

says that anyone who wants to make a claim against Wells Fargo based on alleged overdrafts needs to identify their bank account number and assert facts necessary to support the basic outline of their claim. That's it.

Claimants argue that the PA Order "gr[inds] proceedings to a halt," "threatens to obliterate thousands of claims without even the semblance of a hearing," hinders confidentiality, adds the "high stakes of class action litigation," and threatens due process. Op. Br. 35-37. The PA Order does none of these things.

First, the PA Order does not halt proceedings or dispose of any claim without a hearing. It simply stayed the "invoicing of AAA fees" for each Claimant until they comply. 2-ER-191. From the beginning, any Claimant wishing to proceed quickly simply needed to state three basic facts (bank account number, overdraft service enrollment, and an overdraft fee paid) and have their attorney sign it. 2-ER-191. Then the individual claimant case will proceed. Any claimant who refuses to do this can proceed anyway, though under evidentiary sanctions, as the Second PA Order makes clear. Exh. 1 at 1-2.

Second, there are no due process issues here. In fact, even claimants who refuse to so much as *allege* the basic facts that they must later *prove* can still go forward with their claims. Exh. 1 at 1-2. Everyone will get a merits hearing. It cannot possibly threaten due process to rule that people who make a claim against

the bank but who refuse to *allege* their bank account numbers, enrollment, or actual overdraft fees are barred at the merits from later *proving* those facts. And again, all of this is on an individual—not class—basis.

Third, Claimants' concern about confidentiality is puzzling. The PA Order invites MLG to provide a single spreadsheet with each claimant's basic facts, but does not require it. 2-ER-191. Claimants are more than welcome to submit individual demands with the required supplemental information. Nor is it clear, whether done separately or in one spreadsheet, why anyone's confidentiality would be threatened inside a private arbitration process.

Each present and future claimant remains headed toward an individual arbitration on the merits of her claim. The outcome of each arbitration will depend on the facts of each case, including whether the claimant had a Wells Fargo account, whether she was enrolled in Wells Fargo's overdraft service, whether she incurred overdraft fees as a result of enrollment in this service, what Regulation E required, and whether Wells Fargo's procedures satisfied the law. The allegation that the PA Order imposes "class-wide arbitration procedures" is false. *Contra* Op. Br. 11.

### 2. Regardless, the "class arbitration gateway" cases are off-point here.

Even if the PA Order created class procedure—which it does not—no basis exists for reviewing it in court now. Claimants cite two precedents they say

support immediate review: *Shivkov v. Artex Risk Solutions*, 974 F.3d 1051 (9th Cir. 2020) and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010). But no matter what the PA Order does, neither case supports Claimants.

First, *Shivkov* held that "the availability of class arbitration is a gateway question for a court to presumptively decide." 974 F.3d at 1065. *Shivkov* began as a putative class action in court. *Id.* at 1058. The district court sent the case to arbitration, and as part of its threshold ruling, it ordered the arbitration to occur on an individual basis. *Id.* This Court affirmed. It held that the district court, as part of considering the threshold motion to compel, properly ruled that the arbitration should be individual, not class, arbitration.

*Shivkov* said nothing suggesting that a district court should intervene mid-arbitration to comment on supposed class procedures.

Unlike in *Shivkov*, here, the Claimants voluntarily began in arbitration. There was no initial filing or dispute over arbitration in the district court. Thus, *Shivkov* did not need to, and did not, question the basic rule that courts address arbitration issues "at the beginning or the end, but not in the middle," of arbitration. *Sussex*, 781 F.3d at 1073.

Second, Claimants rely on *Stolt-Nielsen*, 559 U.S. at 684-88. It is true that in *Stolt-Nielsen*, the parties managed to orchestrate an arbitrator's ruling about class arbitration and then obtain judicial review right away. But the path the

parties took is very different from the one Claimants try here.

In *Stolt-Nielsen*, the case began as a putative class action in court. 559 U.S. at 667. Eventually, the parties made a *separate* agreement to arbitrate whether class arbitration was proper under their original contract. After arbitrating the issue through to a stand-alone "partial final award," the arbitrators stayed the proceeding to facilitate judicial review. One of the parties then petitioned to vacate the arbitrator's award on the ground that it exceeded the arbitrator's power and was issued "in 'manifest disregard' of the law." *Id.* at 669 (citing 9 U.S.C. § 10(a)(4)). The case proceeded to the Second Circuit and the Supreme Court to review the district court's conclusion that the arbitrators had manifestly disregarded the law. *Id.* at 672 n.3 (assuming the "manifest disregard" standard applied, and finding it satisfied). The Supreme Court ultimately held petitioners to a "high hurdle" but found that the arbitration panel exceeded its powers. *Id.* at 671-72.[6]

This case is nothing like *Stolt-Nielsen*. Here, there is no separate agreement about class arbitration, no stand-alone arbitration "partial final award," no agreed stay of arbitration, no concurrence from the arbitrators to allow immediate review, and no petition to vacate the award under the FAA's high standard.

---

[6] Even then, Justice Ginsburg dissented, for Justices Stevens and Breyer. They would have rejected judicial review because the "partial final award" was still interlocutory. *Stolt-Nielsen*, 559 U.S. at 692 (Ginsburg, J., dissenting) ("No decision of this Court, until today, has ever approved immediate judicial review of an arbitrator's decision as preliminary as the 'partial award' made in this case.").

Instead, this is a new case. Claimants position it as a breach of contract case, alleging that the PA Order violates the arbitration agreement. This case also re-files in court the same claims that Claimants already chose to file in arbitration. Claimants here do not seek to vacate any arbitration "partial final award." Nor do they even mention the FAA standards for vacatur or argue that the Process Arbitrator manifestly disregarded the law. *Stolt-Nielsen* provides no path to review here.

Finally, this case is different from *Stolt-Nielsen* and *Shivkov* for another broad reason. Counsel for Claimants specifically agreed to the Supplementary Rules. In fact, MLG *asked* AAA to apply its Supplementary Rules. SER-8 (noting that counsel for Claimants had submitted a letter seeking to ensure that 13 more of their cases were added to 500 that were already subject to the Supplementary Rules); SER-75 ("we request that all of these cases be consolidated and otherwise subject to AAA's Supplementary Rules for Multiple Case Filings"). The Supplementary Rules specify that they exist "to streamline the administration of large volume filings" and to provide "an efficient and economical path toward the resolution of multiple individual disputes." 2-ER-182. In turn, the Supplementary Rules called for the appointment of the Process Arbitrator, who later issued the PA Order.

After requesting the Supplementary Rules framework, and submitting to the

Process Arbitrator within that framework, Claimants cannot now complain about the procedure the Process Arbitrator settled on.

*       *

For these reasons, this Court should affirm—and can stop its analysis here. Claimants chose to initiate claims against Wells Fargo in arbitration. Their counsel then agreed to Supplementary Rules that help organize high-volume arbitration demands. They then voluntarily engaged with the assigned Process Arbitrator through briefing and an oral hearing for many months without objection. When the Process Arbitrator issued an interlocutory order they did not like, it was only then that Claimants abruptly pivoted to court.

At this point, no matter what their arbitration agreements say, Claimants cannot abandon their arbitration demands midstream and jump to the judicial forum. They cannot do it to re-start their substantive arbitration claims in court (Counts II and III). Nor can they do it to complain about how they are being treated on an interlocutory basis inside the arbitration they started (Count I).

The district court rightly returned this case to arbitration.

## II. Alternatively, the Arbitration Agreements send this dispute to arbitration.

Given the choices that Claimants have made, it does not matter now whether their arbitration agreements would send these issues to arbitration in the first instance. Thus, the arguments below only matter if this Court decides to entertain

31

what Claimants and their counsel have done—start an arbitration, proceed thousands of claims and many months into it, and then jump to court when they dislike an interlocutory order. If the Court thinks all of that is fine—then, even still, under the Arbitration Agreements, the district court properly compelled this case to arbitration, for two independent reasons.

First, the Arbitration Agreements delegate disputed arbitrability issues to the arbitrator. Second, even if the court *could* address arbitrability, the Arbitration Agreements send this dispute to arbitration.

### A. The parties "clearly and unmistakably" delegated arbitrability to the arbitrator.

The parties dispute arbitrability. Wells Fargo contends that the Arbitration Agreements send all "disputes" between these parties to arbitration. Claimants seem to concede that their counts II and III belong in arbitration. Op. Br. 17. But they argue that Count I falls into a carve-out provision, and so can be brought in court. Wells Fargo denies that the carve-out applies.

The first question is who should resolve this dispute. "Whether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise.*" *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016). Multiple Ninth Circuit cases have found that the parties "clearly and unmistakably" delegated arbitrability to the arbitrator in their contracts. *E.g.*, *Mohamed*, 848 F.3d at 1208; *Momot v. Mastro*, 652 F.3d

32

982, 988 (9th Cir. 2011); *Oracle*, 724 F.3d at 1072; *Caremark LLC v. Chickasaw Nation*, 43 F.4th 1021, 1034 (9th Cir. 2022).

When arbitration agreements state that the arbitrator will decide the scope, meaning, application, or enforcement of the arbitration agreement, that delegation serves as a "mini-arbitration agreement, nested within a larger one." *Caremark*, 43 F.4th at 1029. "The FAA operates on this additional arbitration agreement just as it does on any other." *Id.* (quoting *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010)).

Here, the Arbitration Agreement states that AAA "will hear the dispute between Wells Fargo and you." 2-ER-65. It defines "dispute" as "any unresolved disagreement between Wells Fargo and you." 2-ER-65. To clarify, it adds that a "dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement." 2-ER-65. On the same page, the Arbitration Agreement also states that "[i]f this Arbitration Agreement is in dispute, the arbitrator will decide whether it is enforceable." 2-ER-65.

The district court correctly ruled that "these provisions 'clearly and unmistakably' delegate gateway issues of arbitrability to the arbitrator." 1-ER-7.[7]

---

[7] Other recent trial court opinions, analyzing the same arbitration agreement in different cases, have agreed. *Wilson*, 2021 WL 1853587, at *3 (Sabraw, J.); *Sutton v. Wells Fargo Bank, N.A.*, No. 5:21-CV-1695, Dkt. 24 (N.D. Cal. filed June 29, 2021) (van Keulen, M.J.); *see also Marselian v. Wells Fargo & Co.*, 514 F. Supp. 3d 1166, 1175 (N.D. Cal. 2021) (Gilliam, J.).

Thus, the district court properly compelled arbitration.

First, Claimants argue that the Arbitration Agreement contains "no delegation clause at all." Op. Br. 26. They ignore that the agreement sends "disputes" to arbitration and in the very next sentence defines "disputes" as "any unresolved disagreement between Wells Fargo and you." 2-ER-65. Claimants obviously have an "unresolved disagreement" with Wells Fargo about whether the claims they filed in court are arbitrable or fall into a carve-out provision. Thus, this particular "dispute" does indeed "include a disagreement about this Arbitration Agreement's meaning, application, or enforcement." 2-ER-65. The arbitrator will thus decide the "meaning" and "application" of the carve-out provision.

Second, Claimants say that the district court "reached several different conclusions" about delegation. Op. Br. 27-28 (recounting several successive sentences on one page of the district court's opinion, 1-ER-7). That is false. In fact, the district court quoted each relevant clause of the arbitration agreement and decided that they "clearly and unmistakably" delegated the current "dispute" to the arbitrator. 1-ER-7.

Third, any suggestion that the word "may" somehow makes the arbitrability clause uncertain or conditional fails. Op. Br. 27 n.50. The district court read the clause in the clear and natural way. The arbitration agreement defines arbitration: "an impartial third party will hear the dispute between Wells Fargo and you and

provide a decision." 2-ER-65. It then defines "dispute": "any unresolved

disagreement." 2-ER-65. Then it provides examples of disputes: they "may also

include a disagreement about this Arbitration Agreement's meaning, application,

or enforcement." 2-ER-65. If anything, the examples provide *clarity*—clear

notice that a disagreement over the "meaning, application, or enforcement" of the

arbitration agreement qualifies as a "dispute" subject to arbitration. And to finish

off any possible lack of clarity, the agreement adds that "if this Arbitration

Agreement is in dispute," then "the arbitrator will decide" whether it requires

arbitration of a certain dispute or not. 2-ER-65.

Fourth, Claimants assert that the carve-out provision itself undermines

delegation here. Op. Br. 29-31. Claimants suggest that the courts should take a

peek at the carve-out provision, assess whether it actually carves out Count I or

not, and then use that analysis to question the clarity of the delegation provision.

There are at least two problems with this argument.

One problem is that analyzing the carve-out provision at this stage puts the

cart before the horse. The issue here is whether the court or the arbitrator should

judge whether the carve-out provision applies to Count I. What a court might think

about whether the carve-out applies has nothing to do with whether the court

should be the one deciding it. *See Henry Schein, Inc. v. Archer & White Sales,*

*Inc.*, 139 S. Ct. 524, 527-28 (2019) (holding that a court must send arbitrability

questions to an arbitrator if the parties agreed to do so, even if the arbitrability dispute is "wholly groundless"). As the Supreme Court held, "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein*, 139 S. Ct. at 528.

In other words, even if Claimants were right and the carve-out provision plainly did apply to Count I, the Arbitration Agreement requires the arbitrator to make that decision, not a court. *Henry Schein*, 139 S. Ct. at 530 (holding that even if "the arbitrator will inevitably conclude that the dispute is not arbitrable and then send the case back to the district court," that provides no reason to withhold it from the arbitrator in the first instance).

The second problem with Claimants' argument is that on-point precedent rejects it. In *Oracle*, 724 F.3d at 1076, as here, the question was whether the parties had "clearly and unmistakably" agreed to arbitrate arbitrability. This Court held that, by incorporating AAA/UNCITRAL rules into their agreement, the parties *had* "clearly and unmistakably" agreed to arbitrate arbitrability. *Id.* at 1075. Oracle, however, argued that "a carve-out provision in the parties' arbitration clause expresses their intent that a court would decide arbitrability." *Id.* The carve-out applied to certain categories of claims, which Oracle contended were at issue.

This Court held that "Oracle's argument conflates the *scope* of the

arbitration clause, i.e., which claims fall within the carve-out provision, with the question of *who* decides arbitrability." *Oracle*, 724 F.3d at 1076. "The decision that a claim [falls within the carve-out clause] constitutes an arbitrability determination, which the parties have clearly and unmistakably delegated to the arbitrator by incorporating the UNCITRAL rules." *Id*. In sum, "when a tribunal decides that a claim falls within the scope of a carve-out provision, it necessarily decides arbitrability." *Id.*

The *Oracle* Court's ruling is on-point and controls here. Exactly as in *Oracle*, Claimants contend that the court should interpret the carve-out clause and use that analysis to undermine the delegation clause. As *Oracle* held, that "collapses two separate questions into one." 724 F.3d at 1076. Under *Oracle*, no matter the scope of the carve-out provision, that question is for the arbitrator. *Id. See also Caremark, LLC*, 43 F.4th at 1030 (compelling arbitration and holding that "all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance."). The district court properly compelled arbitration.

### B. Even if the court addresses the issue, the carve-out does not apply—this case seeks no "provisional or ancillary remedy."

Alternatively, even if the Court decides to consider arbitrability, the carve-out provision does not apply. The carve-out provision provides that the parties may go to court to "[o]btain provisional or ancillary remedies such as injunctive

relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction."  2-ER-66.

Claimants argue that this carve-out provision is broad, and allows them to bring *any* claim seeking *any* injunctive relief in court at *any* time.  Op. Br. 19-20, 23, 24 n.37.  This argument fails, under both the text of the agreement and precedent.

### 1.    The plain text of the arbitration agreement requires a 'provisional or ancillary remedy.'

As a matter of plain text, the arbitration agreement allows courts to entertain only "provisional or ancillary remedies," among which can be "injunctive relief." 2-ER-66.  The ordinary meaning of "provisional remedy" is "a temporary remedy awarded before judgment and pending the action's disposition, such as a [TRO], a prejudgment receivership, or an attachment.  Such a remedy is intended to maintain the status quo by protecting a person's safety or preserving property." Black's Law Dictionary (11th ed. 2019) (defining "provisional remedy").

This dictionary definition fits perfectly onto the text of the Arbitration Agreement, which even lists similar examples—"injunctive relief, attachment, garnishment, or appointment of a receiver" of "provisional or ancillary remedies." 2-ER-66.  Claimants' view that any injunctive relief is always proper would read key language ("provisional or ancillary remedies") out of the contract.

Claimants also ignore the surrounding examples: "attachment, garnishment,

or appointment of a receiver." 2-ER-66. Those surrounding words all refer to ancillary maneuvers, separate from the merits of a case, designed to preserve, protect, or recover assets at issue. They also inform the meaning of "injunctive relief" as limited to "provisional or ancillary remedies." 11 Williston on Contracts § 32.6 (4th ed.) ("the meanings of particular words may be indicated or controlled by associated words"); *Yates v. United States*, 574 U.S. 528, 543 (2015) ("we rely on the principle of *noscitur a sociis*—a word is known by the company it keeps— to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words").

The plain meaning of the carve-out provision here allows courts to entertain only "provisional or ancillary remedies"—that is, "interim relief . . . necessary to preserve the status quo and the meaningfulness of the arbitration process." 1-ER-7 (quoting *Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010)).

## 2. Case law applying similar language supports the district court's ruling.

The most similar precedents show that the carve-out allows only "provisional or ancillary remedies," not any imaginable request for an injunction. 2-ER-66; 1-ER-7.

Claimants contend that the Fifth Circuit's decision on remand from the Supreme Court in *Schein* is the most similar. Op. Br. 23 (citing *Archer & White*

*Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274 (5th Cir. 2019)).  But in that case, the carve-out language was far broader.

The Fifth Circuit interpreted an agreement providing that "[a]ny dispute arising under or related to this Agreement (except for actions seeking injunctive relief …), shall be resolved by binding arbitration."  *Henry Schein*, 935 F.3d at 277.  The Fifth Circuit held that this broadly carved out all "*actions* seeking injunctive relief."  *Id.* at 283-84 (emphasis added) (rejecting arguments that the carve-out was limited to "claims" for injunctive relief, or limited to actions seeking solely injunctive relief).  The carve-out was so broad that it allowed any action, of any kind, that sought injunctive relief to be brought in court and not arbitration.  *Id.*

The contract language in *Schein* is a far cry from "provisional or ancillary remedies such as injunctive relief."  No wording in *Schein* limits or defines "injunctive relief" the way that "provisional and ancillary remedies" does here.

As the district court understood, *Toyo Tire*, 609 F.3d at 981, and *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854 (9th Cir. 2021) are far more on-point.

In *Toyo Tire*, the Ninth Circuit interpreted a rule that allowed courts to handle "interim or conservatory measures" around arbitration.  The *Toyo Tire* Court held that the district court could support arbitration by entertaining "an injunction to preserve the status quo."  609 F.3d at 980.  After all, Toyo had shown a need for interim measures, because it was at risk of losing its customers before

40

relief in arbitration was possible. *Id.* The Ninth Circuit concluded that "interim or conservatory measures" allowed the court to enter "interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process." *Id.* at 980-81 (adding that this rule aligned with many circuits' precedents allowing courts to "issue equitable relief in aid of arbitration").

Other cases follow the same reasoning. In *Capriole*, the Ninth Circuit agreed that the district court properly compelled arbitration without considering a request for injunctive relief. The contract in that case stated that courts could grant "temporary or preliminary injunctive relief," but only if necessary to preserve the status quo. 7 F.4th at 868. The request for injunctive relief in *Capriole* was far broader, and the courts rightly rejected it.

*Toyo Tire* and *Capriole*'s rationale applies just as well here. *Contra* Op. Br. 22-24. "Interim or conservatory measures" in *Toyo Tire*, and "temporary or preliminary injunctive relief" in *Capriole*, mean the same thing as "provisional or ancillary remedies such as injunctive relief" in this contract. The district court aptly understood this. 1-ER-7.

### 3. Claimants do not seek a 'provisional or ancillary remedy.'

Claimants do not seriously contend that what they sought in court was "provisional or ancillary" by any ordinary meaning of those words. The district

court correctly ruled that what Claimants seek is no "provisional or ancillary remedy."  1-ER-8.

Claimants seek adjudication in court of three substantive issues.  First, whether Wells Fargo breached the arbitration agreement (Count I, 2-ER-230–31).  Second, whether Wells Fargo violated Regulation E (Count II, 2-ER-232–33).  And third, whether Wells Fargo violated the California unfair business practices statute by violating Regulation E (Count III, 2-ER-233–35).  Claimants even alleged jurisdiction based on the ultimate merits of the case—the alleged violation of Regulation E creating a federal question.  2-ER-215 (citing 28 U.S.C. § 1331 and 15 U.S.C. § 1693m as the bases for federal jurisdiction).

The claims brought to court are the entire dispute.  As the district court found, the first claim "invites the Court to provide relief sought in Plaintiffs' second and third causes of action," which in turn go "directly to the merits"—no provisional or ancillary remedy.  1-ER-8.  And the merits claims are the same ones that Claimants long ago submitted to arbitration.  1-ER-8 ("To provide such relief, the Court would have to determine the merits of the dispute that Plaintiffs have already submitted to arbitration" and "the authority of the arbitral tribunal.").

Even viewing the first Count and Claimants' request for an injunction in isolation, it is not "provisional or ancillary."  Claimants asked the court to "enjoin[] enforcement of [the PA Order]" or to "stay arbitration altogether, pending a

hearing on the merits to decide if Defendants . . . have violated their agreement with Plaintiffs." SER-191. Claimants wanted to be "release[d] . . . from the arbitration agreement" in order to "proceed in court." SER-199. At bottom, Claimants are unhappy with an interlocutory order from the arbitrator, and want it reversed.

That requested relief has little in common with preserving the status quo to ensure that arbitration is meaningful. It is nothing like "preventing the loss of assets before and during arbitration, enforcing judgments, and securing property after arbitration." Op. Br. 21. Instead, Claimants sought to either change the course of arbitration in the middle, or just cut it off and move their dispute to court. The district court correctly rejected that maneuver. 1-ER-7–8.

## CONCLUSION

This Court should affirm.

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Wells Fargo is unaware of any related cases.

Dated: August 11, 2023

Respectfully submitted,

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald
MCGUIREWOODS LLP
Gateway Plaza

800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
F: (804) 698-2251
mfitzgerald@mcguirewoods.com

Amy Morrissey Turk
MCGUIREWOODS LLP
101 West Main Street
Suite 9000
Norfolk, VA 23510
T: (757) 640-3700
F: (757) 640-3942
aturk@mcguirewoods.com

Alicia A. Baiardo
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1973
F: (415) 844-1916
abaiardo@mcguirewoods.com

Paul M. Chappell
MCGUIREWOODS LLP
2000 McKinney Avenue
Suite 1400
Dallas, TX 75201
T: (214) 932-6472
F: (214) 273-7473
pchappell@mcguirewoods.com

*Counsel for Appellees Wells Fargo &
Company and Wells Fargo Bank, N.A.*

44

# Exhibit 1



AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

# ORDER

Case Number: 01-22-0001-6396

Individual Consumers
-vs-
Wells Fargo & Co.
Wells Fargo Bank, N.A.

A conference call was held with Process Arbitrator Anita Rae Shapiro on June 8, 2023, from 10:00 AM – 10:50 AM and Claimants' Attorney Richard D. McCune and Respondents' Attorney Amy Turk to discuss the status of compliance with the Arbitrator's October 27, 2022, Order. AAA Staff member Sophia Parra was present.

During a conference call on November 30, 2022, Claimants' Attorney stated he was filing a pleading with the Federal District Court challenging the Process Arbitrator's Order granting, in part, Respondents' Motion for a More Definitive Statement. Claimants had failed to comply with the October 27, 2022, Order.

On May 1, 2023, the Federal District Court ruled on competing motions, granting Respondents' Motion to Compel Arbitration and denying Claimants' Motion for a Preliminary Injunction. On May 26, 2023, Claimants filed a Notice of Appeal from the Federal District Court's denial of their Motion for a Preliminary Injunction. The Arbitration has not been stayed.

It was determined during the June 8, 2023, conference call that Claimants had failed to comply with the Process Arbitrator's October 27, 2022, Order.

The AAA Supplemental Rules for Multiple Case Filings apply to the cases in this Arbitration. The AAA Consumer Rules also apply to these cases. The Supplementary Rules supplement the Consumer Rules, which are applicable to these cases, unless inconsistencies exist, in which case the Supplementary Rules take precedence over the Consumer Rules. (Supplementary Rule MC-1(a).)

Consumer Rule R-23 states, "The arbitrator may issue any orders necessary to enforce the provisions of rules R-21 and R-22 …including, but not limited to…(d) in the case of willful non-compliance with any order issued by the arbitrator…excluding evidence and other submissions…" AAA Rule R-21, subsection c, states "The arbitrator shall promptly issue written orders that state the arbitrator's decisions made during or as a result of the preliminary management hearing."

The Process Arbitrator's October 27, 2022, Order is still in full force and effect with the following amendments: 1) Claimants are Ordered to comply with the October 27, 2022, Order for all Claimants for whom the Respondent has paid the AAA administrative fees to AAA on or by August 14, 2023, 2) Claimants are Ordered to comply with the October 27, 2022, Order for all Claimants added to this case before June 14, 2023, for whom Respondents have not paid the administrative fees by September 13, 2023 and 3) Claimants are Ordered to comply with the October 27, 2022 Order for all Claimants added to this case after June 13, 2023, when they are added to this case.

Any Claimants who have not complied with the October 27, 2022, Order as supplemented in this Order, are precluded from presenting any evidence that they 1) had a Wells Fargo account number for the account in issue, 2) they were enrolled in DCOS during the time period in issue and 3) incurred any overdraft fees for which they were wrongly charged. Any Claimants whose attorney of record has failed to sign an Amended Claim as required by California Code of Civil Procedure section 128.7 are also precluded from presenting this evidence. As stated in the October 27, 2022, Order, in lieu of filing and serving a separate Amended Claim for each Claimant, one spreadsheet

1

signed by an attorney of record for Claimants may be filed and served for all Claimants if it includes the ordered information for each Claimant.

When Claimants' attorney complies with the October 27, 2022, Order and this Order and files the Amended Claims or spread sheet, the unique identifier must be included for each Claimant.

June 14, 2023

Date

Hon. Anita Rae Shapiro, Arbitrator

## **CERTIFICATE OF COMPLIANCE**

1.     I hereby certify that this brief complies with the type-volume limitations of 9th Cir. R. 32-1(a) and Federal Rule of Appellate Procedure 32(a)(7) because the brief contains 9,471 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point size Times New Roman font.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Appellees Wells Fargo &*
*Company and Wells Fargo Bank, N.A.*

45

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 11, 2023, the foregoing was filed with the

Clerk of the United States Court of Appeals for the Ninth Circuit using the

appellate CM/ECF system, which will also serve counsel of record.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

*Counsel for Appellees Wells Fargo &
Company and Wells Fargo Bank, N.A.*
