**No. 23-55478**

In the

# United States Court of Appeals
## For the Ninth Circuit

_____

ALEXANDRIA MOSLEY; REJOYCE KEMP; BERENICE CISNEROS; BRUCE PARKER,

*Plaintiffs-Appellants*,

v.

WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of California, San Diego
Honorable Dana M. Sabraw, Chief District Judge
Honorable Allison H. Goddard, Magistrate Judge
Case No. 3:22-cv-01976-DMS-AHG

_____

**VOLUME I OF I – SUPPLEMENTAL EXCERPTS OF RECORD OF APPELLEES**

_____

Alicia A. Baiardo
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
T: (415) 844-1973

Amy Morrissey Turk
MCGUIREWOODS LLP
101 West Main Street
Suite 9000
Norfolk, VA 23510
T: (757) 640-3700

*(Counsel continued on following page)*

Paul M. Chappell
McGuireWoods LLP
2000 McKinney Avenue
Suite 1400
Dallas, TX 75201
T: (214) 932-6472

Matthew A. Fitzgerald
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

*Counsel for Appellees Wells Fargo & Company and Wells Fargo Bank, N.A.*

## INDEX

| Docket Number | Document | Page |
|---|---|---|
| | **Volume I of I** | |
| 22 | Declaration of Alicia A. Baiardo in Support of Defendants' Motion to Compel Arbitration | SER5 |
| 22-2 | Exhibit B to Declaration – *Wilson* Final Award with Findings of Fact & Conclusions of Law | SER22 |
| 22-8 | Exhibit H to Declaration – April 25, 2022 MLG Letter | SER73 |
| 22-10 | Exhibit J to Declaration – July 12, 2022 AAA Letter | SER76 |
| 22-11 | Exhibit K to Declaration – July 29, 2022 AAA Letter | SER80 |
| 22-12 | Exhibit L to Declaration – Invoices | SER83 |
| 22-13 | Exhibit M to Declaration – February 3, 2023 Email from AAA to Wells Fargo | SER92 |
| 22-14 | Exhibit N to Declaration – Authorizations | SER96 |
| 22-15 | Exhibit O to Declaration – Redacted Bank Statement | SER109 |
| 22-16 | Exhibit P to Declaration – June 30, 2022 Screen Capture of MLG's Advertising | SER114 |
| 22-17 | Selected Excerpts of Exhibit Q to Declaration – September 7, 2022 Wells Fargo Memorandum and Exhibits | SER122 |
| | September 7, 2022 Wells Fargo Memorandum | SER123 |
| | Excerpts of Exhibit B to Memorandum – Demand and Statement of Claims | SER145 |

|  | Excerpts of Exhibit C to Memorandum – Demand and Statement of Claims | SER151 |
| 21-1 | Defendants' Memorandum of Points and Authorities in Support of Motion to Compel Arbitration | SER157 |
| 13 | Notice of Motion and Plaintiffs' Motion for Preliminary Injunction | SER190 |
| 13-1 | Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction | SER194 |

1  **MCGUIREWOODS LLP**
   Alicia A. Baiardo SBN #254228
2  abaiardo@mcguirewoods.com
   Jenny Yi SBN #314540
3  jyi@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
4  San Francisco, CA 94111-3821
   Telephone: 415.844.9944
5
   Amy Morrissey Turk (*pro hac vice*)
6  VA SBN #44957
   aturk@mcguirewoods.com
7  101 West Main Street, Suite 9000
   Norfolk, VA 23510
8  Telephone: 757.640.3700

9  Joel S. Allen *(pro hac vice)*
   TX SBN #00795069
10 jallen@mcguirewoods.com
   Paul M. Chappell *(pro hac vice)*
11 TX SNB # 24097489
   pchappell@mcguirewoods.com
12 2000 McKinney Ave, Suite 1400
   Dallas, TX 75201
13 Telephone: 214.932.6400

14 [Additional counsel listed on last page]

15 *Attorneys for Defendants*
   *Wells Fargo Bank, N.A. and Wells Fargo & Co.*
16

17 UNITED STATES DISTRICT COURT

18 SOUTHERN DISTRICT OF CALIFORNIA

19 ALEXANDRIA MOSELY, REJOYCE
   KEMP, BERENICE CISNEROS,
20 BRUCE PARKER, individually,

21          Plaintiffs,

22          vs.

23 WELLS FARGO & CO., WELLS
   FARGO BANK, N.A., and DOES 1
24 through 5,

25          Defendants.

26

27

28

| | |
|---|---|
| CASE NO. 3:22-cv-01976-DMS-AGS | |
| The Hon. Dana M. Sabraw | |
| **DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION** | |
| Courtroom: 13A | |
| Hearing Date: March 3, 2023 | |
| Complaint Filed: December 13, 2022 | |

1.     I am an attorney licensed to practice in the state of California and a member of the law firm of McGuireWoods LLP, counsel for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co.  I have personal knowledge of the facts set forth herein and if called as a witness could and would testify competently to these facts under oath.

2.     On November 25, 2020, McCune Law Group ("MLG") filed a class action complaint on behalf of Mosanthony Wilson ("Wilson") and all others similarly situated, alleging that Wells Fargo violated the requirements of the Federal Electronic Funds Act ("EFTA"), its implementing regulation at 12 C.F.R. ¶ 1005.1, *et seq.* ("Regulation E") and California Business & Professions Code § 17200, *et seq.* ("California UCL"). *See Wilson v. Wells Fargo & Co.*, Case No. 3:20-cv-02307-RBM-WVG, 2022 WL 4125220, at *1 (S.D. Cal. Sept. 9, 2022).  Wells Fargo moved to compel Wilson's dispute to arbitration on an individual basis, as required by the arbitration agreement between Wilson and Wells Fargo (the "Wilson Motion to Compel"). A true and correct copy of the Wilson Motion to Compel is attached hereto as **Exhibit A**. The Court granted Wells Fargo's motion to compel, and in doing so concluded that the language of the Deposit Account Agreement stating that "any 'disagreement about this Arbitration Agreement's meaning, application or enforcement' must be decided by an arbitrator" showed that the "parties agreed to arbitrate gateway issues of arbitrability." *Wilson v. Wells Fargo & Co.*, No. 20-CV-2307-DMS-WVG, 2021 WL 1853587, at *2-3 (S.D. Cal. May 10, 2021). Thereafter, the case was resolved in arbitration, and the arbitrator found that Wilson did not prove his claims for violation of Regulation E and violation of the California UCL and held that Wells Fargo was the prevailing party in the matter (the "Wilson Final Award").[1]

---

[1] Notably, it took only 314 days from the date MLG filed Wilson's arbitration demand until the Wilson Final Award was entered.

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION

**SER6**

A true and correct copy of the Wilson Final Award is attached hereto as **Exhibit B**. The Court confirmed the Wilson Final Award without objection.

3. As the *Wilson* arbitration was nearing completion, MLG filed arbitration demands against Wells Fargo on behalf of 13 individual claimants ("13 Demands"). Shortly thereafter, on April 13, 2022, MLG began its mass arbitration[2] campaign against Wells Fargo by filing 497 additional arbitration demands against the bank with AAA. The additional demands (including Plaintiffs' Arbitration Demands) were virtually identical, and included the following, identical statement in the portion of the demand form requiring the claimant to briefly explain the dispute: "Claimant seeks statutory damages and return of overdraft fees collected in violation of

---

[2] A number of law firms have implemented a new strategy in response to class action waivers called "mass arbitration." In "mass arbitrations," a law firm gathers the claims that would have been part of the class action through solicitation efforts and assert them individually in arbitration through usually identical demands on behalf of individuals. *See* 1 Alt. Disp. Resol. § 8:22 (4th ed.). Most arbitration agreements require that defendants pay the majority of the administrative fees—which can result in the defendant having to pay millions of dollars in initial administrative filing fees before any ruling on the merits of the dispute have been litigated, much less resolved. *See, e.g., Uber Tech., Inc., v. Am. Arbitration Ass'n, Inc.*, 2022 WL 1125962, at *31 (N.Y.A.D. 1 Dept.) (No. 655549/21) (discussing AAA's intent to invoice Uber more than $91 million in connection with mass arbitration campaign consisting of 31,560 boilerplate arbitration demands); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1064 (N.D. Cal. 2020) (discussing AAA's invoice of nearly $12 million in administrative fees to DoorDash in connection with mass arbitration campaign); Mem. of Law in Supp. of Def. Chegg, Inc.'s Mot. for Clarification or Modification of the Court's April 27, 2020 Order at 16-18, *Lyles v. Chegg, Inc.*, No. 1:19-cv-03235-RDB (D. Md. Aug. 4, 2020), ECF No. 26 (discussing AAA's charging over $7 million in filing fees as part of mass arbitration campaign). As a result of this fee structure, there is the potential for abuse where the plaintiff-side law firm attempts to force high-dollar settlements from businesses that have nothing to do with the merits of the alleged claims, but instead are driven by the desire to avoid the costs the defendant must incur to pay for arbitration itself. *See* Br. of the Chamber of Com. of the U.S. as *Amicus Curiae* in Supp. of Defs.-Appellants and Reversal at 9-18, *MacClelland v. Cellco P'ship*, No. 22-16020 (9th Cir. Nov. 28, 2022).

---

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION

Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E." True and correct copies of Plaintiffs' Arbitration Demands are attached hereto as **Exhibits C-F**. (Plaintiff Berenice Cisneros' demand states that his name is "Bernice". The Complaint filed in this matter misspelled Plaintiff Alexandria Mosley's name as Mosely as acknowledged in Dkt. 13-1.) Filed with each demand was an identical "Statement of Claims,"[3] wherein MLG does not specify which state consumer fraud law or statutory section applies to the claimant's arbitration, but states that the "Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws." *See id.*

4.     On April 22, 2022, AAA informed MLG and counsel for Wells Fargo via letter (the "April 22nd AAA Letter") that the additional demands would be subject to AAA's Supplementary Rules for Multiple Case Filings (the multiple case filing dispute is referred to herein as the "MCF"). A true and correct copy of the April 22nd AAA Letter is attached hereto as **Exhibit G**. The parties and AAA agreed that the 13 Demands should be treated as part of the MCF as well. On April 25, 2022, MLG sent a letter to AAA wherein it stated that "[a]lthough not filed simultaneously with our recent multi case filing, ***we request that all of these cases be consolidated and otherwise subject to AAA's Supplementary Rules for Multiple Case Filings pursuant to Rule MC-1(c) thereto***" (the "April 25th MLG Letter"). (Emphasis added). A true and correct copy of the April 25th MLG Letter is attached hereto as **Exhibit H**.

---

[3] On September 29, 2022, MLG began to arbitrarily change the statement of claims it files with its clients' demands to include additional claims (for example, a claim based on an authorized positive, settle negative ("APSN") theory). The demands and statement of claims filed by MLG on behalf of the four Plaintiffs in this action, however, only assert a violation of Regulation E. *See* **Exhibits C-F** (Plaintiffs' Arbitration Demands).

On May 6, 2022, Wells Fargo sent a letter to AAA responding to the April 25th MLG Letter stating that it did not object to the implementation of the Supplementary Rules, but that it expected AAA to abide by the arbitration agreements between the parties (the "May 6th Wells Fargo Letter"). A true and correct copy of the May 6th Wells Fargo Letter is attached hereto as **Exhibit I**.

5. Since that time, MLG has continued to file individual arbitration demands in tranches even after the filing of the Complaint and Motion for Preliminary Injunction. The total number of individual arbitration demands MLG has filed with AAA against Wells Fargo as of February 1, 2023 is 3,365. AAA confirmed receipt of each tranche of demands to MLG and Wells Fargo and has continued to treat all these filings as part of the MCF subject to the Supplementary Rules. At no point in time prior to the entry of the PA Order did MLG object to AAA's application of the Supplementary Rules.

6. On July 12, 2022, AAA informed the parties that AAA's Consumer Rules ("Consumer Rules") and Supplementary Rules would apply to the MCF (the "July 12th AAA Letter"). A true and correct copy of the July 12th AAA Letter is attached hereto as **Exhibit J**. On July 29, 2022, AAA confirmed via letter the appointment of the Honorable Anita Rae Shapiro to serve as Process Arbitrator for AAA dispute (the "July 29th AAA Letter"). A true and correct copy of the July 29th AAA Letter is attached hereto as **Exhibit K**. At no point in time in writing or orally did MLG object to AAA's application of the Supplementary Rules to the MCF until the filing of this lawsuit.

7. After AAA determined the MCF would be governed by the Supplementary Rules, it began invoicing Wells Fargo for the initial administrative filing fees associated with the demands filed by MLG. Thus far, AAA has invoiced Wells Fargo on eight separate occasions (April 22, 2022, May 6, 2022, May 18, 2022, June 23, 2022, July 18, 2022, August 12, 2022, October 7, 2022, and October 26, 2022) for a total amount of $501,075.00 in initial administrative filing fees

(collectively, the "Invoices"). True and correct copies of the Invoices are attached hereto as **Exhibit L**. These fee payments include invoiced fees for Plaintiffs' arbitrations. Wells Fargo has timely paid each of the Invoices, and has no outstanding or unpaid invoices with AAA. A true and correct copy of a February 3, 2023 email from AAA to Wells Fargo confirming that all the Invoices have been paid and that Wells Fargo does not have any outstanding unpaid invoices from AAA is attached hereto as **Exhibit M**.

8. Soon after MLG began its mass arbitration campaign against Wells Fargo, it became clear to Wells Fargo that MLG was not performing adequate due diligence to confirm that claimants (1) had enrolled in Wells Fargo's Debit Card Overdraft Service ("DCOS") (i.e., the overdraft program that is the focus of the claims in the MCF)—a pre-requisite to bringing their claims; (2) had incurred any overdraft fees subject to Regulation E; or (3) in some cases, even had an account with Wells Fargo. Additionally, along with its clients' arbitration demands, MLG was also submitting an "authorization" form for many claimants purporting to request the release of certain account documents. These authorizations provided the date that the individual retained MLG to represent them in arbitration against Wells Fargo, the claimant's name, address, email, and a place for the claimant to provide their Wells Fargo account number. The authorizations submitted by MLG, however, established MLG's blatant failure to vet its clients' claims. This included, for example, claimants listing their Wells Fargo account numbers as: "i don't have one"; "Idk"; "xxxxxxxxxx"; "XXX…"; "Not giving my account"; "None"; "999999999"; "N/A"; "[claimant's last name]"; "Not sure"; "Blank"; "000000000". True and correct copies of the above-described authorizations are attached hereto as **Exhibit N**.

9. Further, Wells Fargo's preliminary review of the demands filed by MLG indicated that many claimants never even agreed to participate in DCOS. Indeed, in some cases, Wells Fargo has been unable to find any checking account associated with the claimants. MLG tries to avoid its basic pleading obligations by suggesting

that this information is solely within Wells Fargo's possession. However, whether a claimant has opted into DCOS can be answered by a cursory review of the claimant's bank statement, which specifies if the claimant is enrolled in the service. A true and correct copy of a redacted bank statement is attached hereto as **Exhibit O**. The bank statements further itemize every transaction, including transactions covered by Regulation E which resulted in an overdraft fee. *See id.* Importantly, with the information currently being provided by MLG, Wells Fargo is forced to conduct multiple searches to identify the proper claimant that cost inordinate amounts of time and money, and the results of such searches cannot provide Wells Fargo information with any level of confidence as to its accuracy. This information cannot be outside of MLG's grasp, either—MLG's advertising specifically requests that individuals seeking to qualify as claimants for arbitration against Wells Fargo submit a Wells Fargo bank statement to MLG for review. *See Overdraft Fee Claims Against Wells Fargo*,  https://mccunewright.com/overdraft-fee-claims-against-wells-fargo/  (last visited February 3, 2023) ("If you are a Wells Fargo customer who has been victimized by unfair overdraft fees, contact our team to see if you qualify to recover your money. To qualify quickly, submit your most current Wells Fargo bank statement to our team.").

10.　It appears that many claimants found their way to MLG through advertising on MLG's website. MLG's advertising has evolved over time but at one point claimed that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" to join the mass arbitration campaign against Wells Fargo, and then went on to explain that each arbitration it files forces Wells Fargo to pay "a whopping $4,000.00, not including their attorneys' fees!" Thus, MLG explained, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts." A true and correct copy of a screen capture of MLG's advertising taken on June 30, 2022 is attached hereto as **Exhibit P**. The

advertisement also stated that in June 2022, MLG, while "representing hundreds of clients who have been charged unfair overdraft fees in arbitrations against Wells Fargo," "secured the return of **all overdraft fees charged within the past year plus a $1000.00 penalty** for every client." MLG did not secure any result for any of its clients in arbitration concerning overdraft fees against Wells Fargo in June 2022. Indeed, the only June 2022 arbitration MLG was handling against Wells Fargo related to overdraft fees was the Wilson matter which was decided for Wells Fargo.

11.     MLG's failure to perform due diligence into its clients' claims prior to filing demands on their behalf (along with MLG's expressed intent to "hit" Wells Fargo "where it hurts") caused Wells Fargo, pursuant to AAA's rules, to raise the issue of the insufficiency of information provided in the demands with the Process Arbitrator during an initial conference call on August 24, 2022. Wells Fargo pointed out that MLG's method of procuring clients and filing demands had likely resulted in hundreds of demands being filed on behalf of individuals with no legitimate claims against Wells Fargo, thereby requiring Wells Fargo to pay hundreds of thousands of dollars in nonrefundable filing fees for arbitrations involving individuals who may have never enrolled in the overdraft program at issue, never been assessed an overdraft fee subject to Regulation E during an actionable limitations period, or who may never have even had an account with Wells Fargo.

12.     On the call, the Process Arbitrator recognized the issues being raised by Wells Fargo and questioned whether certain basic information regarding each claimant's individual dispute with Wells Fargo would be helpful to the efficient and economical administration of all claims. In doing so, the Process Arbitrator opined that claimants' current demands could be amended—and future demands be required—to meet the basic information required of a demand which is set forth in the Consumer Rules so that information establishing legitimate claims was provided. MLG requested briefing on the topic, arguing that the Process Arbitrator lacked the

1  jurisdiction and authority to rule on the issue. The Process Arbitrator granted the
2  briefing request and set a briefing schedule for the parties.

3        13.    On September 7, 2022, Wells Fargo submitted a memorandum to the
4  Process Arbitrator requesting that she, pursuant to Supplementary Rules MC-6(d)(i),
5  (ii), and (v), enter an order requiring claimants to provide basic information about
6  each dispute prior to proceeding through the arbitration process (the "September 7th
7  Wells Fargo Memo"). A true and correct copy of the September 7th Wells Fargo
8  Memo is attached hereto as **Exhibit Q**. Therein, Wells Fargo explained in detail the
9  issues stemming from MLG's misleading solicitations and failure to conduct due
10 diligence. Wells Fargo also requested that, to protect the integrity of the dispute, MLG
11 be required to supply in each demand: "(a) the Claimant's Wells Fargo checking
12 account number for the account issue, (b) sufficiently pled facts establishing that the
13 Claimant was enrolled in the overdraft service at issue, (c) sufficiently pled facts
14 establishing that the Claimant incurred overdraft fees in connection with transactions
15 covered by Regulation E, (d) identification of the specific state law(s) under which
16 Claimants assert claims (statutory or common law), and (e) …the amount of money
17 in dispute." Wells Fargo also requested that AAA's invoicing of fees and arbitrator
18 compensation related to the demands or arbitrations be stayed until the demands were
19 amended to meet these requirements. The September 7th Wells Fargo Memo provided
20 support in the Consumer and Supplemental Rules for making this request. *See Id.* at
21 §§ II.C, III.B, III.C, III.D).  Wells Fargo did not request, either in its briefing or at a
22 hearing, that the Process Arbitrator impose requirements under California Code of
23 Civil Procedure section 128.7.

24       14.    MLG filed its response on September 21, 2022 (the "MLG September
25 21st Response Memo"), and Wells Fargo filed its reply on October 5, 2021 (the
26 "October 5th Wells Fargo Reply Memo"). True and correct copies of the MLG
27 September 21st Response Memo and the October 5th Wells Fargo Reply Memo are
28 attached hereto as **Exhibits R and S**.

---

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO
COMPEL ARBITRATION

15.     On October 18, 2022, the Process Arbitrator held an oral argument on the matter. At no time during oral argument or during the briefing of this issue did MLG take the position that the Supplementary Rules did not apply to the MCF. The parties also discussed whether MLG would withdraw any claims in light of a potential order requiring additional information and the Process Arbitrator suggested using a spreadsheet as a simpler method for handling all the claims filed to date.

16.     On October 27, 2022, the Process Arbitrator entered an order regarding Wells Fargo's request (the "PA Order"). A true and correct copy of the PA Order is attached hereto as **Exhibit T**. The PA Order granted in part and denied in part Wells Fargo's request. It then went on to order each claimant to file and serve an amended demand for all claims filed before October 27, 2022—and required all demands filed thereafter to— "specifically plead, 1) each Claimant's Wells Fargo account number for the account at issue, 2) facts to establish each Claimant was enrolled in DCOS during the time period at issue and 3) facts sufficient to establish that each Claimant incurred overdraft fees in connection with transactions covered by Regulation E." *Id*. The PA Order also ordered that an attorney of record for claimants sign each amended claim as required by California Code of Civil Procedure section 128.7 or, in lieu of filing and serving a separate amended claim for each claimant, file one spreadsheet signed by an attorney of record for claimants including all the ordered information for each claimant. *Id.* The PA Order specifically stated that "claimants are not ordered; 1) to file Amended Claims specifying which state laws have been violated or 2) allege the specific amount of overdraft fees each Claimant was wrongly charged." The PA Order also stated that the "invoicing of AAA fees is stayed for all Claims that have not already been invoiced and for all new Claims filed with AAA until the [specificity] requirements [ ] have been satisfied." *Id.* Neither the Process Arbitrator nor AAA has stated that the PA Order requires that ***all*** claimants meet the PA Order's requirements prior to any individual claimant's arbitration moving forward. MLG did not previously raise this with the Process Arbitrator or AAA. Wells Fargo has

consistently stated its intent and willingness to move forward with MLG's clients' individual arbitrations as soon as an individual client files an amended demand meeting the PA Order's requirements. *See, e.g.,* Wells Fargo letter to AAA dated January 4, 2023 (the "January 4th Wells Fargo Letter"). A true and correct copy of the January 4th Wells Fargo Letter is attached hereto as **Exhibit U**.

17.     Shortly after the PA Order was entered, MLG made clear that it would not abide by its terms. In a letter addressed to AAA's President and Chief Executive Office and Senior Vice President, General Counsel, and Corporate Secretary, stated its intention to challenge the arbitration agreement in a federal court filing (the "November 2nd MLG Letter"). A true and correct copy of the November 2nd MLG Letter is attached hereto as **Exhibit V**. MLG then requested that AAA executives "voluntarily stay application of" the PA Order pending its forthcoming federal filing. *See id.*

18.     On November 8, 2022, Wells Fargo responded to MLG's letter by pointing out that the request to stay the PA Order was improper, as the Supplementary Rules explicitly provide the Process Arbitrator exclusive jurisdiction to decide the subject of the PA Order and state that "[r]ulings by the Process Arbitrator will be final and binding upon the parties" (the "November 8th Wells Fargo Letter"). A true and correct copy of the November 8th Wells Fargo Letter is attached hereto as **Exhibit W**. MLG replied to the November 8th Letter by informing AAA that although ***its claimants "consent to AAA arbitration pursuant to AAA rules,"*** it would move forward with filing claims with AAA that did not abide by the PA Order and would also file an action in federal court (the "November 10th MLG Letter").  A true and correct copy of the November 10th MLG Letter is attached hereto as **Exhibit X**.

19.     On November 15, 2022, AAA sent a letter to the parties addressing MLG's objection to the PA Order (the "November 15th AAA Letter"). A true and correct copy of the November 15th AAA Letter is attached hereto as **Exhibit Y**. Therein, AAA informed the parties that it would not be issuing an invoice for further

---

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION

case management fees for any matters until claimants filed and served amended claims as required by the PA Order. *Id.* MLG has continued to file demands on behalf of new claimants that fail to meet the requirements of the PA Order. Accordingly, on November 22, 2022, Wells Fargo wrote to AAA asking it to confirm that, pursuant to the PA Order, no fees would be invoiced until the improperly submitted demands contained the information provided in the PA Order (the "November 22nd Wells Fargo Email"). A true and correct copy of the November 22nd Wells Fargo Email is attached hereto as **Exhibit Z**. AAA responded by requesting that the parties address the issue during a scheduled November 30, 2022 status conference with the Process Arbitrator (the "November 23rd AAA Email"). A true and correct copy of the November 23rd AAA Email is attached hereto as **Exhibit AA**.

20.     At the November 30, 2022 status conference, the Process Arbitrator asked the parties to discuss how compliance with the PA Order was being handled. MLG informed the Process Arbitrator that it had not complied with the PA Order, and stated its intention to challenge the PA Order in a federal district court. MLG also informed the Process Arbitrator and Wells Fargo that it intended to continue to submit new claims that did not meet the requirements of the PA Order. Wells Fargo then reiterated the Process Arbitrator's authority to rule on the matters in the PA Order and that under the Supplementary Rules, rulings by the Process Arbitrator are final and binding. The Process Arbitrator stated that invoicing of fees would be stayed until the PA Order is complied with, and ordered the parties to notify AAA within fifteen days of any order entered by a federal court regarding the matter. On December 1, 2022, the Process Arbitrator entered an order memorializing the status conference (the "December 1st PA Order"). A true and correct copy of the December 1st PA Order is attached hereto as **Exhibit BB**.

21.     On December 8, 2022, Wells Fargo wrote to AAA objecting to MLG's submission of demands on December 7, 2022, which did not meet the PA Order's filing requirements, and requested confirmation that the improperly submitted

1    demands did not warrant imposition of AAA fees (the "December 8th Wells Fargo
2    Letter"). A true and correct copy of the December 8th Wells Fargo Letter is attached
3    hereto as **Exhibit CC**.

4         22.    On December 9, 2022, MLG wrote AAA asking it to confirm whether
5    all of the demands submitted after the PA Order were deemed filed by AAA (the
6    "December 9th MLG Email"). A true and correct copy of the December 9th MLG
7    Email is attached hereto as **Exhibit DD**. AAA responded on December 13, 2022,
8    stating that given MLG's forthcoming federal filing challenging the PA Order, it
9    would await further direction from the district court as to how the arbitrations should
10   or should not proceed (the "December 13th AAA Email"). A true and correct copy of
11   the December 13th AAA Email is attached hereto as **Exhibit EE**.

12        23.    On December 13, 2022, MLG filed the Complaint in this matter. The
13   Complaint was filed on behalf of four individuals involved in the MCF and alleges
14   that each Plaintiff was enrolled in Wells Fargo's DCOS and was charged an overdraft
15   fee subject to Regulation E. MLG did not serve the Complaint on AAA.

16        24.    Plaintiffs have each submitted an arbitration demand against Wells Fargo
17   as part of MLG's mass arbitration campaign (collectively, "Plaintiffs' Arbitration
18   Demands"). *See* **Exhibits C-F** (Plaintiffs' Arbitration Demands). Plaintiffs Alexandra
19   Mosley and Bruce Parker submitted their arbitration demands on April 11, 2022.
20   Plaintiff Rejoyce Kemp submitted her arbitration demand against Wells Fargo on July
21   19, 2022. Plaintiff Berenice Cisneros submitted his arbitration demand against Wells
22   Fargo on August 12, 2022. Like the other arbitration demands submitted as part of
23   MLG's mass arbitration campaign against Wells Fargo, Plaintiffs' Arbitration
24   Demands are virtually identical, include identical statements when required to briefly
25   explain the dispute, and include virtually identical "Statement of Claims" that do not
26   specify which state consumer fraud law or statutory section applies to Plaintiffs'
27   arbitrations. *See id.* As all of the Plaintiffs' demands were submitted prior to MLG

28

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO
COMPEL ARBITRATION

**SER17**

1  beginning to add APSN claims on September 29, 2022, none of their demands assert
2  a claim based on an APSN theory.

3  　　　　25.　　On January 4, 2023, AAA reached out to the parties asking for a status
4  update on the federal filing (the "January 4th AAA Email"). A true and correct copy
5  of the January 4th AAA Email is attached hereto as **Exhibit FF**. That same day, Wells
6  Fargo provided a detailed response to AAA and the Process Arbitrator *See* **Exhibit U**
7  (January 4th Wells Fargo Letter). The January 4th Wells Fargo Letter provided a
8  timeline of events since the PA Order was entered, restated the PA Order's
9  requirements, and noted MLG's refusal to comply with the PA Order and its
10 continued submission of non-compliant demands. Wells Fargo then discussed the
11 Complaint and pointed out that the federal filing was only brought on behalf of four
12 individuals. Most notably, Wells Fargo informed AAA that, given the limited scope
13 of the Complaint, Wells Fargo was "prepared to move forward with all claimant
14 arbitrations" other than the Plaintiffs "as soon as those Claimants provide the
15 information required in" the PA Order.  Wells Fargo asked that MLG advise it and
16 AAA if MLG objected to moving forward with arbitrations for other claimants and
17 the grounds for such objection. MLG responded to the January 4th AAA Email by
18 providing the case name and case number of this lawsuit, but did not address the
19 January 4th Wells Fargo Letter or its request related to moving forward with
20 arbitrations for claimants other than the Plaintiffs (the "January 5th MLG Email"). A
21 true and correct copy of the January 5th MLG Email is attached hereto as **Exhibit GG**.
22 On January 13, 2023, AAA reiterated that, in light of the December 1st Order and the
23 litigation between the parties regarding the enforceability of the PA Order, it would
24 / / /
25 / / /
26 / / /
27 / / /
28

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO
COMPEL ARBITRATION

1  wait the further direction from the District Court as to how the arbitrations should or

2  should not procced (the "January 13th AAA Email"). A true and correct copy of the

3  January 13th AAA Email is attached hereto as **Exhibit HH**.

4

5        I declare under penalty of perjury under the laws of the State of California that

6  the foregoing is true and correct.

7        Executed this 3rd day of February 2023, in San Francisco, California.

8

9                    By: */s/ Alicia A. Baiardo*

10                       Alicia A. Baiardo

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Additional Counsel from Title Page:

2   **TROUTMAN PEPPER**
3   **HAMILTON SANDERS LLP**
    Jessica R. Lohr (SBN #302348)
4   jessica.lohr@troutman.com
    11682 El Camino Real, Suite 400
5   San Diego, CA 92130
    Telephone: 858-509-6044

6   Jason D. Evans (*pro hac vice*)
7   NC SBN #27808
    jason.evans@troutman.com
8   Joshua D. Davey (*pro hac vice*)
    NC  SBN #35246
9   joshua.davey@troutman.com
    301 S. College St., 34th Floor
10   Charlotte, NC 28202
    Telephone: 704-998-4050

11   *Attorneys for Defendant Wells Fargo Bank, N.A. and Wells Fargo & Co.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION

**SER20**

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on February 3, 2023 I electronically filed the foregoing

3

document entitled **DECLARATION OF ALICIA A. BAIARDO IN SUPPORT**

4

**OF DEFENDANTS' MOTION TO COMPEL ARBITRATION** with the Clerk

5

of the Court for the United States District Court, Southern District of California

6

using the CM/ECF system and served a copy of same upon all counsel of record via

7

the Court's electronic filing system.

8

9

*/s/ Alicia A. Baiardo*
Alicia A. Baiardo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALICIA A. BAIARDO IN SUPPORT OF DEFENDANTS' MOTION TO
COMPEL ARBITRATION

# **Exhibit B**



AMERICAN
ARBITRATION
ASSOCIATION® | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**American Arbitration Association**
**Consumer Arbitration Rules**
**Final Award**

Case Number: 01-21-0016-4036

Mosanthony Wilson
v.
Wells Fargo & Co., Wells Fargo Bank, N.A

## FINAL AWARD WITH FINDINGS OF FACT & CONCLUSIONS OF LAW

I, Arbitrator Janice L. Sperow, the undersigned, having been designated in accordance with the arbitration agreement entered into by the above-named parties, having been duly appointed and sworn, and having heard the proof and allegations of the Parties, Mosanthony Wilson (hereinafter claimant) having been represented by Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP and Wells Fargo & Co., Wells Fargo Bank, N.A (hereinafter respondent) having been represented by Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP at an in-person hearing held on June 23, 2022, and having read the written evidentiary submissions in the matter do hereby AWARD as follows:

## THE PARTIES & CLAIMS

Respondent is a national bank. Claimant is a banking customer with both checking and savings accounts with respondent. Claimant pled two causes of action: (1) violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, *et seq.*; and (2) violation of California's Unfair Competition Law (UCL), California Business & Professions Code § 17200, *et. seq.* See Comp. ¶¶ 86-92, 93-101. Claimant bases both claims on respondent's overdraft fees, practices, policies, and disclosures. See id.

## PROCEDURAL HISTORY

### The Underlying Lawsuit

Claimant initially filed this case as a lawsuit in the Southern District of California on November 25, 2020, alleging that respondent violated the UCL and the EFTA. Claimant sought class certification, disgorgement, injunctive relief, statutory damages, civil penalties, interest, costs, and attorneys' fees. See id. at VIII. Prayer for Relief.

### Arbitration Agreement

As part of the account opening process, respondent issued claimant a copy of its terms and conditions for its services, called the Consumer Account Agreement (CAA). Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on

the date claimant first filed a claim against respondent. Joint Factual Stipulation, dated 6/22/22, at ¶ 4 (Stip.). The CAA governs the parties' relationship and requires arbitration of disputes between claimant and respondent:

> **Arbitration Agreement between you and Wells Fargo**
> If you have a dispute, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.

CAA at 4 (original bold). The CAA broadly defines dispute as:

> Any unresolved disagreement between Wells Fargo and you. A dispute may also include a disagreement about this Arbitration Agreement's meaning, application, or enforcement.

Id. The CAA excluded small claims court, but no other, matters:

> **Wells Fargo and you each agrees to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

Id. (original bold).

## Motion to Compel Arbitration

Based upon this provision, respondent moved to dismiss the litigation and to compel arbitration. The court granted the motion and stayed the litigation pending arbitration. The court referred the gateway issues of McGill's application, arbitrability of the claims, and interpretation of the parties' agreement to the arbitrator. See Order Granting Defendants' Motion to Compel Arbitration, dated 5/8/21.

## The Arbitration

Incorporating his complaint, claimant filed a demand and initiated this arbitration on September 3, 2021 before the American Arbitration Association (AAA), the forum identified in the parties' agreement. See Demand, undated. Respondent answered on November 21, 2021, denying the allegations and asserting several threshold legal issues. See Answer, dated 11/21/21. The AAA assigned the case to the undersigned Arbitrator pursuant to the parties' arbitration agreement.

Pursuant to Rule 21 of the AAA's Consumer Arbitration Rules, the Arbitrator held a Preliminary Hearing and Initial Arbitration Case Management Conference (CMC) via telephone conference on January 10, 2022. At the CMC, the parties disputed several gateway issues on which they requested briefing and early adjudication. The Arbitrator granted their requests and set a briefing schedule. See Order, dated 1/11/22. After the CMC, the parties submitted their briefs, met and conferred on several issues, agreed on some, and continued to dispute others. The parties and the Arbitrator therefore held a second CMC (CMC2) on February 1, 2022 to identify the remaining disputed issues and to set a briefing schedule. See CMC2 Order, dated 2/1/22. The parties thereafter agreed to bifurcate claimant's request for attorneys' fees from the claims' merits. See CMC3 Order, dated 3/16/22.

2

**SER24**

**The Pre-Hearing Motions**

After CMC2, the parties agreed upon the arbitrability of claimant's claims, the enforceability of their arbitration agreement, and the individualized nature of this arbitration. Id. They continued to disagree on the timeliness of claimant's claims under the applicable statutes of limitations (SOL) and the tolling of same, if any; and the Arbitrator's authority to issue public injunctive relief (PIR). Id. Accordingly, the Arbitrator permitted full briefing on both issues.

**Motion to Dismiss Claims**

Respondent moved to dismiss on SOL grounds on February 18, 2022. Claimant opposed the motion on March 8, 2022, to which respondent replied on March 15, 2022. The Arbitrator and the parties held a hearing on the motion on March 16, 2022. The parties presented their arguments and responded to the Arbitrator's questions, after which they submitted the matter. The Arbitrator held that claimant's filing of his federal complaint on November 25, 2020 tolled the SOL pursuant to California Code of Civil Procedure § 1281.12 from November 25, 2020 until 30 days after the court's May 8, 2021 grant of respondent's motion to compel arbitration, namely June 8, 2021. Conversely, the Arbitrator found claimant's EFTA claim and derivative UCL claim untimely to the extent they rely upon fees charged more than one year before November 25, 2020, namely November 25, 2019. See SOL Order, dated 3/21/22.

Consequently, the Arbitrator dismissed with prejudice all EFTA claims based upon alleged violations or fees pre-dating November 25, 2019, dismissed with prejudice all UCL claims based upon alleged violations or fees pre-dating November 25, 2016, and dismissed without prejudice all UCL claims based upon alleged violations or fees between November 26, 2016 and November 25, 2019. Id. The Arbitrator further found all EFTA and UCL claims based upon alleged violations or fees on or after November 25, 2019 timely. Id.

**Motion to Dismiss PIR Request**

Claimant sought injunctive relief in this arbitration. The parties disputed whether claimant sought private or public injunctive relief, or both, and whether their arbitration agreement authorizes the Arbitrator to issue PIR. At the parties' request, the Arbitrator permitted briefing on the following issues: (1) does claimant seek PIR; (2) if so, in what forum or fora does the arbitration agreement authorize PIR as a remedy; (3) if only a court may issue PIR, does the Arbitrator have authority to issue findings on the appropriateness of such relief in this case or must the court issue such findings; (4) does McGill apply here and if so, to what extent; and (5) any other legal issues raised by the parties with respect to the issuance of PIR. See Order, dated 2/1/22.

The parties filed opening briefs on these issues on February 18, 2022, opposition briefs on March 8, 2022, and reply briefs on March 15, 2022. The parties and the Arbitrator held a hearing on the issues on March 16, 2022. See CMC3 Order, dated 3/16/22. The Arbitrator held that the parties' arbitration agreement empowers her to consider, rule upon, and award, if appropriately proven, public injunctive relief in this arbitration. See PIR Order, dated 3/24/22.

**Rule 33 Dispositive Motion**

On May 2, 2022, respondent requested leave to file a dispositive motion on the legal questions governing this case. The Arbitrator found that respondent satisfied its Rule 33 burden and that the

3

motion would likely narrow the issues for hearing and therefore granted the request. Respondent filed a dispositive motion on May 16, 2022, which claimant opposed on May 31, 2022. Respondent submitted a reply brief on June 13, 2022. Both parties submitted supporting exhibits. The Arbitrator held a hearing on the motion on June 16, 2022, at which both parties argued their positions and responded to the Arbitrator's questions. See DM Order, dated 6/18/22.

Respondent moved to dispose of the claims under the safe harbor provision and as Reg. E compliant. It also sought to bar claimant's derivative UCL claim, to limit claimant's damages to $420.00, and to dismiss claimant's PIR request as moot. The Arbitrator denied in part and granted in part respondent's motion. The Arbitrator held that claimant may not recover damages, if any, incurred as a result of overdraft fees imposed after November 25, 2020 and that he must establish detrimental reliance to sustain Reg. E damages beyond disgorgement or restitution of incurred fees. The Arbitrator reserved judgment on the availability of consequential damages and denied the remainder of the motion.

**Motion to Exclude Expert Opinion**

On June 13, 2022, respondent moved to exclude the testimony and report of claimant's expert Arthur Olsen. Specifically, respondent objected to Expert Olsen's opinions in three areas: (1) a summation of the total number of Reg.-E specific overdrafts incurred by claimant during the statute of limitations period; (2) a calculation of the amount of non-Reg. E overdrafts incurred by claimant under a "cascading damages" theory; and (3) the balance respondent used to assess overdrafts. See Expert Order, dated 6/14/22. Claimant countered that respondent's objections should be addressed at hearing. See id. The Arbitrator denied respondent's motion as to the first and second opinions and granted the motion as to the third opinion subject to its use as impeachment or rebuttal. Id.

**Discovery Motions**

In addition to the above motions, the Arbitrator entered a stipulated protective order and ruled on motions to compel information exchange, to request a hearing subpoena, and to compel inspection. See CMC4 Order, dated 5/2/22; CMC 5 Order 5/5/22, and Customer Kit Order, dated 6/14/22. The Arbitrator granted claimant's motion for the issuance of a hearing subpoena for Jose Garcia, the former respondent banker who assisted claimant in opening his account. See CMC5 Order, dated 5/5/22. The Arbitrator granted several requests for the production of documents, a verified statement, and depositions. See CMC4 Order, dated 5/2/22; CMC5 Order, dated 5/5/22. The Arbitrator also granted claimant's motion for inspection of respondent's 2013 new account kit subject to respondent's right to maintain custody. See Customer Kit Order, dated 6/14/22.

**THE HEARING**

The Arbitrator held the Final Pre-Hearing Conference (FPHC) via teleconference on June 21, 2022. At the FPHC, the Arbitrator ordered the parties to submit a notice of damages and a notice of defenses. See FPHC Order, dated 6/21/22. The parties filed their respective notices on June 21, 2022. The Arbitrator also granted claimant's request for leave to amend his demand to conform to the evidence and respondent's request for leave to file an answer to the amended claim. Id. Claimant filed his amended claim on June 21, 2022 (First Am. Comp.), and respondent filed its answer on June 22, 2022. (Ans.) In preparation for the arbitration hearing, the parties also submitted witness lists, exhibit lists, CACI, core exhibits, deposition testimony, key authorities,

4

chronology, list of issues to be adjudicated, list of defenses, damages summary, exhibits, and pre-hearing briefs on June 21-22, 2022.

On June 22, 2022, respondent filed an objection to claimant's amended claim as untimely and prejudicial and a conditional answer subject to its objection. Respondent also objected to several of claimant's exhibits, specifically documents related to a prior litigation in which respondent was a party (Gutierrez), consent orders in cases in which respondent was a party, C31 containing case summaries, and one consent decree in which respondent apparently was not a party (TD). The Arbitrator overruled the objection as to C31 as merely a demonstrative of selected cases but granted respondent's motion to accept respondent's counter demonstrative. As to the other objections, the Arbitrator reserved decision.

At hearing, the Arbitrator admitted all exhibits proffered by claimant (C1- C43) and by respondent (R1- R34) into evidence subject to the Arbitrator's right to accord them the appropriate weight and probative value, if any, given their materiality and reliability. The Arbitrator also admitted by joint stipulation the 2020 CAA as C44 and the new customer account kit coversheet as R35 into evidence.

The parties and the Arbitrator held the in-person hearing June 23, 2022. Richard McCune and Emily Kirk of the Law Offices of McCune Wright Arevalo LLP represented claimant, and Joshua Davey and Mary Grob of Troutman Pepper Hamilton Sanders LLP represented respondent. Respondent representative Katie Krajeck and summer associate, Brandon Keshish, from claimant's counsel, also attended the hearing. Court reporter, Dalia Smith of Esquire, transcribed the proceedings.

Claimant called claimant, expert witness Arthur Olsen, and respondent's person most knowledgeable (PMK) witness Nelson by deposition as his witnesses; respondent called business execution consultant Wendy Hernandez and claimant by deposition as its witnesses. All witnesses testified upon oath under penalty of perjury; the Arbitrator afforded both parties a full opportunity to examine, cross-examine, redirect, and recross each witness as well as to ask additional questions after the Arbitrator asked questions. Both parties presented opening and closing statements. The Arbitrator received copies of the power point presentations used by the parties during the opening and closing statements as demonstratives. The Arbitrator did not request post-hearing briefing. After the hearing, the Arbitrator read and considered each exhibit, deposition admission, pre-hearing submission, and the complete testimony of each witness, in rendering this award.

**Arbitrator Authority & Jurisdiction**

In resolving the parties' dispute, the Arbitrator must implement their agreement unless legally unenforceable. In addition to any inherent powers available by law or conferred by the AAA Consumer Arbitration Rules, the parties' arbitration agreement explicitly authorizes the Arbitrator to:

- Hear the parties' disputes, including disagreements about the arbitration agreement's meaning, application, or enforcement;
- Provide a final and enforceable decision;
- Determine the agreement's enforceability if the parties dispute the agreement;
- Decide disputes based upon applicable law, including any statutes of limitation; and

5

**SER27**

- Award to either party "any award or relief provided for by law."

CAA at 4; see also AAA Consumer Rules 14(a)-(b), 23, 37 & 44.

The parties confirmed jurisdiction before the Arbitrator and the AAA in the initial CMC. See Order, dated 1/11/22; see also CMC2 Order, dated 2/1/22. The Arbitrator further finds that she has jurisdiction over this dispute pursuant to the parties' arbitration agreement which encompasses all disputes. See CAA at 4. By agreement, the parties requested findings of fact and conclusions of law as the form of award. See CMC4 Order, dated 5/2/22. Accordingly, the Arbitrator herein adjudicates all issues raised by the parties in the form of detailed findings of fact and conclusions of law. This Final Award will satisfy this requirement.

## FACTUAL BACKGROUND, CHRONOLOGY, & FINDINGS OF FACT

### Respondent's Overdraft Services

Respondent offers checking accounts with debit cards as one of its services. R26 at ¶ 2. Customers deposit funds into checking accounts which they spend by writing checks, authorizing a money transfer, withdrawing money at an automatic teller machine (ATM), authorizing recurring transactions, and by purchasing a one-time transaction by debit card. Id. at ¶ 3. Some transactions, like an ATM withdrawal, present for payment at essentially the same time a customer uses his debit card; others, like a paper check, present for payment sometime after the customer initiates the transaction. Id. Respondent determines if it will pay the transaction by examining the customer's "available balance." Id. at ¶ 4; R1 at 24, 28-29; Hernandez Testimony (T); accord Olsen T.

Respondent defines available balance as the most current record of funds available for withdrawal from the customer's account. R26 at ¶ 4; Hernandez T; R1 at 2 (words with special meanings), 24 (determining your account's available balance). To calculate available balance, respondent adjusts for all posted transactions, all holds, and for all unposted pending transactions, but does not include pending checks, Automated Clearing House (ACH) transfers, and recurring debit card transactions. R26 at ¶ 4; Hernandez T; R1 at 2, 24. Respondent pays the transaction if the customer's available balance sufficiently covers the amount when presented for payment. R26 at ¶ 5. If the available balance will not cover the transaction, respondent then decides whether to decline the transaction or pay the transaction by overdraft. Id.

Respondent determines whether to decline or pay based partially upon the type of overdraft services the customer has associated with his checking account. Id. at ¶ 6. Respondent offers several different overdraft-related services. Id. Respondent automatically provides all checking accounts with its standard overdraft practices, which permit it to optionally pay checks, ACH, or automatic recurring payment transactions that exceed the customer's available balance. Id. at ¶ 7; Hernandez T. The standard overdraft service does not apply to ATM or one-time debit card transactions. R26 at ¶ 7.

Customers may also choose to enroll in respondent's "Overdraft Protection" service, which allows them to link a savings or credit account to their checking account and authorize respondent to transfer funds from those accounts into their checking account to cover an otherwise overdraft transaction. Id. at ¶ 8. Respondent also offers its Debit Card Overdraft Services (DCOS), which, unlike the standard overdraft service, specifically covers ATM and one-time debit card

6

**SER28**

transactions. Id. at ¶ 9; Hernandez T. Customers may select or cancel DCOS participation at any time. Hernandez T; R26 at ¶ 9. Respondent charges a $35 overdraft fee as part of both its standard plan and DCOS. R26 at ¶ 10.

**Claimant's Account**

Claimant opened a Wells Fargo checking account on May 17, 2013 by applying in person in a branch office. Stip. at ¶¶ 1-2; Wilson T; R2; R26 at ¶ 11. As part of the account opening process, respondent issued claimant a copy of its CAA. R2 (acknowledging receipt of the CAA); Stip. at ¶ 2 (authentic claimant signature); Hernandez T. Claimant agreed to be bound by its provisions effective 2013 and thereafter as amended by respondent. R2; Stip. at ¶ 4. The CAA governs the parties' relationship. Stip. at ¶ 4; R1. The parties agree that the 2020 version of the CAA controls in this case, as it constitutes the effective CAA on the date claimant first filed a claim against respondent. Stip. at ¶ 4; C44. At the time he opened his checking account, claimant also became enrolled in respondent's optional DCOS effective May 21, 2013. Hernandez T; R5; R26 at ¶ 14.

Since then, respondent assessed claimant several overdraft fees on debit card and ATM transactions. Hernandez T; see R7-21; accord Olsen T. On some of those occasions, respondent assessed claimant an overdraft fee based upon its available balance metric, which it would not have assessed if respondent used a different metric, such as the ledger or daily ending balance. Olsen T; C38-39. On some of those occasions, respondent also assessed claimant a subsequent overdraft fee because respondent's prior overdraft fee caused claimant's available balance to become negative. Olsen T (cascading effect); C38-39. Between November 25, 2019 and November 25, 2020, respondent charged claimant fourteen (14) overdraft fees on ATM and nonrecurring debit card transactions for a total of $385 in fees after reversals. Olsen T; Stip. at ¶ 11. Claimant opted out of DCOS on April 5, 2022. Wilson T; R26 at ¶ 16; R34.

**Respondent's 2013 Opt In Process**

The parties could not present definitive evidence based upon personal knowledge of exactly how claimant became enrolled in DCOS because only two individuals actively participated in the process: claimant and the banker who assisted him on May 17, 2013 (claimant's special needs son was present but did not actively participate). Wilson T. Claimant does not remember most of the events that day nine years ago, and the banker no longer works for respondent. Wilson T; Hernandez T. However, claimant did credibly testify to the few events he remembered, and respondent's reliable business records demonstrated the process the bank followed in 2013 when claimant opened his account.

Respondent's Disclosure

In 2013 when claimant opened his account, respondent used a trifold pamphlet, entitled "*Customer Overdraft Services* Choices to help you manage your checking account" as its disclosure to comply with Reg. E. Hernandez T; Nelson Dep. at 53-54, 61; R26 at ¶ 12; R3 (original italics). Respondent provided new customers the disclosure as part of a customer new account kit containing multiple required banking disclosures and documents. Hernandez T; see R35. Respondent brought a hard copy of the applicable 2013 customer new account kit, including the 2012 DCOS disclosure brochure, to the hearing for inspection.

Upon inspection, the Arbitrator finds that the 2013 kit consisted of a two-pocket folder with

7

**SER29**

documents contained under the flap of each side. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent numbered each unique type of document contained in the kit. Arbitrator inspection; <u>see</u> R35. The 2012 disclosure brochure was the first document under the left flap and consisted of eight pages (CNS8058). Arbitrator inspection; <u>accord</u> Hernandez T. The left side also contained a required privacy notice, a quick start guide, and a guide to common checking account fees. Arbitrator inspection; <u>accord</u> Hernandez T. Under the right flap, the kit contained a welcome letter, the applicable CAA in booklet form, a direct deposit advance service agreement and product guide in booklet form, and a customer account fee and information schedule booklet. Arbitrator inspection; <u>accord</u> Hernandez T; <u>see generally</u> Nelson Dep. at 37.

A third-party vendor pre-assembled all customer new account disclosure kits offsite, placed a bright lime green banker's instruction sheet on the top of the folder, shrink-wrapped the folder with the instruction sheet on top, and delivered the packets to respondent's marketing department. Hernandez T. The marketing department then distributed the packets unopened to each branch for use with customers. <u>Id.</u> The branches maintained the kits in their original wrapping in the vault until ready to use. <u>Id.</u> The banker would open the shrink-wrapped packet at the time he assisted the customer in opening a new account and follow the instructions. <u>Id.</u> Each kit had a unique serial number. Arbitrator inspection; <u>accord</u> Hernandez T. Respondent provided the kit and its contents only to individuals desiring to open a checking account with the bank. Hernandez T. The general public could not obtain the kit upon request but could obtain the information contained in the kit in branch brochures available to anyone walking into the bank. <u>Id.</u>  The Arbitrator finds that the hard copy 2013 customer new account kit and the included 2012 brochure inspected during the hearing authentically represents respondent's new customer account disclosure kit and Reg. E DCOS disclosure in effect and in use by respondent in 2013.

The 2012 DCOS brochure consisted of a cover and title "*Consumer Overdraft Services* Choices to help you manage your checking account" with a picture of a customer working over her checking account with a computer and calculator. C3; R3 (original italics).  The first page of the brochure is virtually identical to the Reg. E Model Form A-9:

<span style="color:red">Important things you should know</span>

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:

8

**SER30**

• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our <u>standard overdraft practices</u>:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

C3; R3 (original coloration and bold). The brochure continued:

<span style="color:red">Control of your accounts is in your hands</span>

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

<span style="color:blue">What is an overdraft</span>?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

<span style="color:blue">How to avoid overdrafts</span>

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit

9

card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

## You've got options

Optional services that may offer protection to avoid overdrafts

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service**[3]

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

10

**SER32**

Please see back panel of brochure for additional details.  Lift to open

C3; R3 (original colors and emphasis). The pamphlet also included charts comparing the overdraft protection plan and the DCOS. C3; R3. It illustrated the different outcomes when a customer charges a $125 to a $100 account balance depending on if the customer has enrolled in no overdraft service, the overdraft protection plan, the DCOS, or the overdraft protection plan plus DCOS. Id. The pamphlet identified some tools for customers to use to monitor their account:

### Free tools to help you manage your account

Wells Fargo makes it easy for you to monitor your spending, to check account activity, and to make transfers to cover your transactions.

#### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

#### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance[1] before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

C3; R3 (original coloration). The brochure also included a portrayal of a customer using a Wells Fargo ATM machine. C3; R3. The back page explained the footnotes and fine print in smaller lettering. It also identified the version by date and internal document number.

### How can we help?

If you have questions or want more Information about our overdraft services:

[contact information in English, Spanish, and for the hearing impaired]

1 This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant.
2 You can link an eligible Wells Fargo savings and a credit card account to your checking account. One overdraft protection transfer or advance fee will be charged each day an overdraft protection transfer/ advance occurs. The fee for overdraft protection transfers from a savings account is $12.50. For more information about overdraft protection in connection with your credit card account, please see your account terms and conditions.
3 Not available for certain accounts such as Teen Checking, SM Opportunity

11

**SER33**

Checking,® and Savings.
4 Subject to the bank's funds availability policy.
5 Your mobile carrier's message and data rates may apply.

6 **About Overdrafts and Overdraft Fees**
• Our overdraft fee, whether the overdraft is by check, ATM withdrawal, debit card transaction or other electronic means, is $35 except for accounts that are maintained in the states below:
– For AK customers: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $31 per item.
– For CA customers: $25 per item on the first day you are overdrawn in the preceding 12-month period. Otherwise, our overdraft fee is $35 per item.

•You will be charged no more than 4 overdraft and returned item fees per day. You must immediately bring your account to a positive balance

• The payment of transactions into overdraft is discretionary and the bank reserves the right not to pay. For example, the bank typically does not pay overdrafts if your account is not in good standing or you have had excessive overdrafts

• Debit card transactions that you have established for recurring payment (such as utilities or club memberships) may continue to be authorized at our discretion, even if you do not sign up for Debit Card Overdraft Service

The information contained in this brochure is subject to change. Certain products not available in all states. Please see the applicable account agreements for the current terms and conditions.
© 2012 Wells Fargo Bank, N. A. All rights reserved. Member FDIC. CNS8058 (09/12)

C3; R3 (original emphasis, deemphasis, and coloring).

<u>The In Branch Opt In Process</u>

In 2013, a customer entering a branch office to open a checking account with respondent would work with a banker to complete an account application. See C1; R2; Hernandez T; accord Claimant T. The banker would typically write down the customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T; accord Claimant T. The customer's signature acknowledges that he received the CAA, privacy policy, and the direct deposit guide, among other things, but does not mention overdrafts or available balance. Hernandez T; Nelson Dep. at 40-44; C1; R2. The banker would list his own name, employee number, the date, branch number, and internal branch mailing address. Nelson Dep. at 35-36; C1; R2. The banker then would scan the application into the archival system as well as enter the data into respondent's database. Nelson Dep. at 38-40. The banker could optionally work directly in the database as he worked with the new customer. Nelson Dep. at 40.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track

12

**SER34**

which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. During the account opening process, the banker would offer the new client other services offered by respondent, including the DCOS. Nelson Dep. at 44; Hernandez T. Unlike the checking account, the DCOS did not have a written application. Instead, according to respondent's protocol, the banker would proceed through various steps to obtain consumer consent. Hernandez T; see R35.

The banker's instruction sheet provided the steps:

**Effective 10/13**
**ENGLISH**
Pre-assembled
**Consumer New Account Disclosure Kit** (NAK)



**ACTION ITEMS**:

| | |
|---|---|
| 1. **Remove** this Banker Instruction Sheet | |
| + | |
| 2. **Enter** the Consumer Disclosure NAK serial number on SVP | |
| + | |
| 3. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … | |
| + | |
| 4. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. | |
| + | |
| 5. **Provide** Deposit Rate Sheet (if applicable) | |

R35 (original bold, coloration, and shading; extra details omitted). The instructions also listed the new account kit's contents on the bottom of the sheet. Id.

Respondent's written procedures in effect in 2013 also required the banker to give the customer the kit including "the required DCOS disclosures" and review it with the customer before enrolling in DCOS. Hernandez T; R35; R26 at ¶ 13; R4. The procedures specifically directed the banker to use the brochure. R4. Respondent's computer system also included a verification field, which asked the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer.

13

Exhibit C, Page 83

Hernandez T; R4.

The written protocols also advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4. The banker would ask if the customer wished to enroll into DCOS and recorded the customer's verbal response as "yes" or "no" directly into the database. Hernandez T; R4. The customer did not have to personally verify his response in writing; instead, the banker logged the customer's selections for him. Hernandez T; R4. If the customer enrolled in DCOS, respondent instructed the banker to give the customer the immediate written confirmation of DCOS enrollment, which printed out automatically in the branch. R4; Hernandez T. The computer program would prevent the banker from proceeding to the next screen until he printed out the confirmation letter. Hernandez T; Nelson Dep. at 48-49, 55; see, e.g., C13; R6. The confirmation letter advised the customer of his right to opt out of the service at any time. Hernandez T; see, e.g., C13; R6.

The customer's bank statements would thereafter reflect DCOS enrollment with a checkmark in the overdraft services row under the applicable account options, unless and until the customer revoked the service. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement would also list a summary of overdraft fees assessed during that period as well as a year-to-date total. Hernandez T; R7-20. The statements also contain a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advises customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id.

**Respondent's Current Opt In Process**

Respondent currently follows much the same process with some significant differences. Hernandez T. First, respondent implemented a new Reg. E disclosure form on May 9, 2022. See C12; R25; Hernandez T.  Second, respondent no longer uses the full trifold DCOS brochure. Hernandez T. Third, respondent requires customers who choose to enroll in DCOS to acknowledge their verbal consent in writing. Id.; see, e.g., R34.

Similarities

For customers opening new accounts in the branch, a banker still meets with the customer to personally discuss their options and desired services. Hernandez T. The banker still opens and then hands the customer a shrink-wrapped new account kit with several documents inside a folder. Id. The DCOS disclosure remains the first document in the folder under the left flap. Id. The banker continues to implement respondent's new account opening protocols, review the DCOS disclosure with the customer, and to log the customer's information and responses into respondent's SVP system. Id. The banker also continues to obtain the customer's verbal consent to DCOS enrollment. The banker still hands the customer a confirmation letter in the branch at the time of account opening and DCOS enrollment. Id. The monthly statements continue to show overdraft fee totals and how to question, dispute, or complain about respondent's fees. Id.

The New Disclosure

14

Before enrollment, however, the banker hands the customer a new Reg. E disclosure, which became effective May 9, 2022. Hernandez T; C12; R25. Respondent's 2022 disclosure consists of a single page which parallels both the Model Form A-9 and the left inside flap of its 2012 disclosure brochure except in these material respects: (1) it modified the definition of overdraft; (2) it added a definition of available balance; and (3) it is a single page standalone disclosure, no longer contained in an 8-page brochure. Compare R3 with R25; accord Hernandez T; Arbitrator Inspection. Respondent discontinued the use of a brochure as its Reg. E disclosure, opting instead to use a single page modelled on Reg. E's Model Consent Form A-9 but customized to explicitly reflect its use and definition of available balance. Hernandez T; R25. The new 2022 disclosure defines an overdraft as:

> When you do not have enough available money in your account to cover a transaction (based on your account's available balance)[1] but we pay it anyway."

R25. The 2012 disclosure defined an overdraft as:

> When you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Comparing the two definitions, the Arbitrator finds that respondent added two references to the customer's available balance as shown in red:

> When you do not have enough *available* money in your account to cover a transaction (*based on your account's available balance*)[1] but we pay it anyway.

Compare R3 with R25 (colored emphasis added). Respondent also added a definition of available balance in footnote 1 to explain how it uses the term:

> Available balance is the most current record we have about the funds that are available for your use or withdrawal. It includes all deposits and withdrawals that have been posted to your account, then adjusts for any holds on recent deposits and any pending transactions that are known to the Bank. This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant. For more information on how we calculate your available balance, please refer to the Deposit Account Agreement.

R25; accord Hernandez T.

This definition is new to the 2022 disclosure; the 2012 disclosure did not include this definition. Compare R3 with R25; accord Hernandez T. The 2013 CAA included the first sentence of this 2022 definition in its definition of available balance under the section on terms with special meaning, and the CAA section entitled "Determining your *available balance*" included a complete breakdown of how respondent calculated available balance. R1 at 2, 24. Likewise, the governing 2020 CAA includes the first sentence of the 2022 definition under the section defining terms with special meaning and a complete breakdown of the available balance calculation under the section entitled "How do we determine your account's available balance?" C44 at 1, 26.

15

**SER37**

Respondent also changed the 2012 sentence "we <u>do</u> authorize and pay overdrafts for the following types of transactions" to the 2022 version "we <u>may</u> authorize and pay overdrafts for the following types of transactions." <u>Compare</u> C11 <u>with</u> C12. Respondent now underlines and adds these words in the 2022 version:

> which means we <u>do not guarantee</u> that we will authorize and pay any type of transaction. If we do <u>not</u> authorize and pay an overdraft, your transaction will be declined or returned unpaid

<u>Compare</u> C11 <u>with</u> C12. Respondent also reduced its daily cap on overdraft fees from four to three. <u>Compare</u> C11 <u>with</u> C12.

<u>Written Consent</u>

After the banker reviews the new 2022 disclosure with the customer, he still obtains the customer's verbal consent or declination to enroll in the DCOS program. Hernandez T.  Now, however, if the customer chooses to enroll, the banker also requires the customer to sign a customized summary computerized form acknowledging affirmative consent to enroll in DCOS. <u>See, e.g.</u>, R34. After explaining how to add DCOS if desired, the 2022 version now adds this sentence: "You can remove the service at any time." <u>Compare</u> C11 <u>with</u> C12.

## LEGAL ANALYSIS, FACTUAL FINDINGS, & LEGAL CONCLUSIONS

The parties present compelling, yet markedly different, versions of the events underlying this case. Claimant presents a typical customer confused about, if not misled by, respondent's unfair and illegal overdraft practices and fees, which no one explained, about which he received no documents, to which he did not consent, and about which he complained. Conversely, respondent projects a bank offering customers transparent lawful services, clearly described in its compliant model disclosures, which its business records confirm claimant received as part of his new account kit and in which respondent voluntarily enrolled and used for many years without complaint, objection, or revocation until this arbitration.

**Claimant's Causes of Action**

**<u>EFTA</u>**

In his first cause of action, claimant alleges that respondent violated Reg. E, 12 C.F.R. § 1005.17, when it charged claimant overdraft fees on ATM and one time debit card transactions without first complying with Reg. E's mandatory customer opt in protections. <u>See</u> First Am. Comp. at ¶¶ 15-19. Specifically, claimant seeks the adjudication of the following issues with respect to his EFTA claim:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements?
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service?
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time?
- Did Claimant give affirmative consent in a manner satisfying Regulation E?
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion?

16

**SER38**

- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E?
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires?
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E?
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document?
- Is Claimant entitled to damages for Wells Fargo's violations of federal law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. In addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this claim:

- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement.
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22. The Arbitrator will analyze each of these issues.

### The Reg. E Framework

Congress enacted EFTA as part of the Consumer Credit Protection Act along with other consumer-protection statutes like the Truth in Lending Act (TILA). Pub. L. No. 95-630 § 2001, 92 Stat. 3641 (1978). Under the EFTA, Congress charged the Federal Reserve Board (FRB), and later the Consumer Financial Protection Bureau (CFPB), with promulgating regulations to carry out EFTA's purposes. 15 U.S.C. § 1693b(a)(1); see also id. § 1693a(4). The EFTA requires financial institutions to disclose the terms and conditions of electronic fund transfers involving consumer accounts "in accordance with the regulations of the" FRB and now CFPB. Id. § 1693c(a). The FRB adopted Reg. E to implement this congressional mandate.

Before the development of electronic fund transfer (EFT) systems, banks generally provided overdraft coverage for check transactions only. See Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). When a bank customer overdrew her account by writing a check in an amount that exceeded the amount of funds in the account, her financial institution applied its discretion in deciding whether to honor the customer's draft, in effect extending a small line of credit to its customer and imposing a small fee for the convenience. Id. Online banking transformed how financial institutions handled overdrafts and overdraft fees. New EFT systems provided customers with more ways to make payments from their accounts, including ATM withdrawals, debit card transactions, online purchases, and transfers to other accounts. Id. Most financial institutions chose to extend their overdraft coverage to all EFT transactions. Some further decided to cover automatically all overdrafts their customers might generate from their EFTs. Id. These changes reduced costs from manually reviewing individual transactions and furthered "consistent treatment of consumers." Id. at 59,033-34. But they sometimes created an unexpected cost to consumers: financial institutions generally assessed a flat fee each time an overdraft occurred,

17

sometimes charging additional fees—for each day an account remained overdrawn, for example, or incrementally higher fees as the number of overdrafts increased. <u>Id.</u> at 59,033.

In 2009, the FRB amended Reg. E to prohibit overdraft fees for ATM and nonrecurring, one-time debit card transactions, unless the consumer opts in and affirmatively consents to the bank's overdraft services after a full, clear, accurate, and readily understandable disclosure of the bank's specific program in a standalone document. <u>See</u> 12 C.F.R. § 1005.17(b); Elec. Fund Transfers, Final Rule, 74 Fed. Reg. 59,033-36 (November 17, 2009). Reg. E permits a civil damages action for failure to comply with its requirements. <u>See</u> 15 U.S.C. § 1693m(a). Reg. E contains a safe harbor provision, however, which precludes liability for "any failure to make disclosure in proper form" if the bank "utilized an appropriate model clause issued by the Bureau or the Board." <u>Id.</u> at § 1693m(d)(2).

## Account Balance Definition

Financial institutions use different types of accounting methods to determine a checking account's balance at any given moment, including for example, ending daily balance, collected balance, available balance, statement balance, and ledger balance. <u>See generally</u> Olsen T; Hernandez T; Nelson Dep. at 23-28. The collected balance includes funds received from other banks, such as wire transfers and deposited checks, but excludes pending transactions. Nelson Dep. at 27-28. The ending daily balance, ledger, or statement balance represents the checking account balance at the end of the day's processing period. <u>Id.</u> at 23; Hernandez T; Olsen T.

Banks typically use the ledger or available balance to determine overdrafts. <u>See, e.g.</u>, R5 (reflecting claimant's ledger and available balance on his SVP profile); FDIC 2019 Statement (banks generally use ledger or available balance to assess overdraft fees); <u>Tims v. LGE Cmty. Credit Union</u>, 935 F.3d 1228, 1235 (11th Cir. 2019); <u>Chambers v. NASA Fed. Credit Union</u>, 222 F. Supp. 3d 1, 6 (D.D.C. 2016). The ledger balance represents the nominal amount of money in the account without reflecting any pending transactions or holds; it factors in only the settled transactions in determining the account balance. Nelson Dep. at 24; CFPB, Winter 2015 Supervisory Highlights 8. The available balance represents the funds immediately available for use; it calculates the account balance by including both settled and authorized, but unsettled, transactions, pending debits, and deposit holds. CFPB, Winter 2015 Supervisory Highlights 8; <u>Salls v. Digital Federal Credit Union</u>, 349 F. Supp. 3d 81, 85 (D. Mass. 2018). Put another way, the ledger balance includes only settled transactions, whereas the available balance includes authorized but unsettled transactions. <u>See</u> CFPB, Supervisory Highlights 8 (Winter 2015). The two balances may sometimes be the same, <u>see, e.g.</u>, R5, but often they are not. When they differ, the available balance is usually lower than the ledger balance. Olsen T; Hernandez T; <u>Salls</u>, 349 F. Supp. 3d at 85.

For instance, when an accountholder deposits a check, banks generally make only a portion of that check available immediately, with the remainder held for a certain time period while the funds clear. <u>See</u> R1 (funds availability and deposit holds sections). The account's ledger balance might reflect the full amount of the deposit right away, but the available balance would include only the immediately available portion of the check. Or, as another example, when an accountholder uses his or her debit card to make a purchase in a store or online, a point-of-sale transaction, the merchant might place a "credit hold" on those funds, with the actual debit against the account occurring one or two days later when the transaction settles. Hernandez T. The account's ledger balance would not reflect the transaction until it actualizes or settles, but the available balance

18

**SER40**

would reflect the transaction "credit hold" immediately. See, e.g., R7-20 (reflecting different transaction authorization and settlement dates).

An "overdraft" is a banking term describing a deficit in a bank account caused by drawing more money than the account holds. See Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009); Tims, 935 F.3d at 1234. Section 1005.17(a) defines "overdraft service" as a service under which a financial institution assesses a fee or charge on a consumer's account for paying a transaction when the consumer has "insufficient or unavailable" funds in the account. 12 C.F.R. § 1005.17(a). Banking laws do not dictate how a bank calculates an overdraft fee. Thus, banks can choose to impose overdraft fees after someone withdraws more than their ledger balance or their available balance. Or they can elect not to charge overdraft fees at all. Problems arise when a customer uses her account based upon her ledger balance but the bank calculates overdrafts based upon available balance. Thus, a customer may use funds from her checking account believing she has sufficient funds based upon the ledger balance but nevertheless incurs an overdraft fee because she did not have sufficient funds using the available balance. Problems also arise when a customer did not realize that he could incur an overdraft fee on ATM and debit card transactions at all.

To address this problem of customer-perceived "surprise" or unexpected fees, the Legislature amended Reg. E in 2009 to impose strict disclosure and consent rules intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions." See 74 Fed. Reg. at 59,035-36. While the amendments cured many problems, they did not end all customer confusion.

Many banks followed the required procedures and issued the required forms but did not fully explain which method they used to calculate overdraft fees, thereby still leaving customers unaware or confused. Other banks adopted Reg. E's model forms in order to describe their overdraft policies, but customers still could not understand if "enough money" in their account meant ledger or available balance in the absence of further explanation. As a result, some customers felt deceived or misled when they incurred overdraft fees because they believed they had sufficient funds in their accounts. See Chambers, 222 F. Supp. 3d at 6 (customers can be misled or deceived when banks do not disclose the metric they use). In response, customers have filed lawsuits and arbitrations throughout the country challenging many financial institutions' Reg. E compliance. See id. at 5-6 (describing Reg. E history and citing early Reg. E disclosure lawsuits). Claimant bases his claims on this issue.

**Regulation E Allegations**

Claimant alleges respondent violated Reg. E by failing to (1) include the required Reg. E notice; (2) substantially track Model Consent Form A-9; (3) provide the notice to claimant; (4) segregate the notice; (5) provide a reasonable consent opportunity; (6) remove impermissible extraneous information from the disclosure; (7) obtain claimant's affirmative consent; (8) document enrollment with claimant's signature; (9) use a scripted explanation of respondent's services; and by failing to (10) disclose its policies accurately, clearly, and in readily understandable language. See First Am. Comp. at ¶¶ 4-8, 15-19. Respondent argues that claimant creates nonexistent Reg. E requirements and that it satisfied Reg. E's actual requirements in every respect. But first it procedurally objects to claimant's standing to object to a disclosure he neither received nor read and to his "eve of trial" amended complaint as prejudicial, untimely, and contrary to his original

19

complaint.

Amendment

Respondent objected to and moved to prohibit claimant's amended claim dated June 22, 2022. Respondent stressed the unfairness of permitting claimant to amend his claim on the eve of hearing. Respondent also avers that claimant learned no new facts but instead had all the information he needed at the outset of this arbitration to amend his claim.

Claimant filed this arbitration on September 3, 2021. Respondent filed its answer on November 24, 2021. Respondent attached to its answer as exhibit C a copy of the actual 2012 disclosure it used during the relevant timeframe. Hence, as of that date, claimant knew he had attached the wrong document to his complaint. Claimant could have and should have sought leave to amend his claim at that time, seven months ago.

Claimant, however, proffers that he did not know the import of the attachment or that respondent would rely on that brochure to the exclusion of the single page document attached to his complaint until respondent submitted its first draft stipulation on March 4, 2022. Claimant thereafter sought a PMK deposition to verify the use of the brochure as the only 2012 disclosure, which claimant took on May 19, 2022 after a discovery order. After the deposition, the parties briefed respondent's dispositive motion based solely on the 2012 brochure's Reg. E compliance. Claimant notified respondent at the hearing on that motion of his intent to amend his claim after the decision on respondent's motion.

The Arbitrator finds that claimant did learn new information during the course of the case's information exchange warranting amendment. For example, claimant learned that (1) respondent provided the 2012 disclosure as part of a new account kit containing other documents, (2) respondent obtained customer consent verbally, and that (3) the banker checked the consent confirmation for the customer, among others. While the Arbitrator believes that claimant could and should have sought leave to amend his claim as soon as he learned this new information, courts generally permit parties to move to amend to conform to proof even during or after trial. See, e.g., Fed. R. Civ. Pro. 15(b).

The Arbitrator further finds that respondent did not suffer prejudice from the amendment because it alleged no new facts unknown to respondent, only new legal arguments based upon information respondent knew all along. As to the inconsistencies between claimant's original and amended complaints, the Arbitrator refers to FRCP 8(d)(3), which entitles parties to plead inconsistent facts in support of inconsistent theories of recovery, so long as they legitimately are uncertain what the evidence will show. See Chambers, 222 F. Supp. 3d at 16. Finally, the Arbitrator finds that the amendment serves the adjudication of the dispute's merits because it refocused the parties and the evidence on the correct disclosure, opt in procedure, and documentation process actually used in 2013 when claimant opened his account. Accordingly, the Arbitrator overrules respondent's objection to claimant's amended claim as untimely, prejudicial, and inconsistent.

Standing

To satisfy Article III's standing requirements, claimant must show that he suffered a concrete, particularized, actual, and not hypothetical injury in fact, fairly traceable to respondent's challenged action which a favorable decision could redress. Friends of the Earth, Inc. v. Laidlaw Env't Servs.

20

(TOC), Inc., 528 U.S. 167, 180–81 (2000). Respondent's standing challenge centers on the injury and traceability requirements because it avers the 2012 disclosure could not have harmed claimant when, by his own admission, he never received it.

The Arbitrator finds this standing challenge misconceives claimant's alleged injury. The regulators designed Reg. E to provide consumers with sufficient clarity about their banks' overdraft programs to make an informed choice about whether to join. See 12 C.F.R. § 1005.4(a)(1). The essence of claimant's claim is that the bank violated Reg. E because it did not afford him that choice, either by explaining the program to him, giving him the required notice, or using clear descriptions. In claimant's view, the language respondent used to describe its program – whether verbally or in the disclosure – did not match the reality of its available balance use and that, had someone clearly explained it to him, he could have declined enrollment and avoided costly overdraft fees. See Fludd v. South State Bank, No. 2:20-CV-1959-BHH, 2021 WL 4691587, at *4 (D.S.C. Oct. 7, 2021). The Arbitrator concludes that claimant has met his burden to establish a traceable concrete injury sufficient to confer standing and therefore overrules respondent's objection.

Regulation E Requirements

Reg. E implements the EFTA, which protects individual consumer rights by providing "a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund … transfer systems." 15 U.S.C. § 1693b (2015). Reg. E governs how financial institutions obtain an accountholder's consent to charge overdraft fees on ATM and nonrecurring debit card transactions. 12 C.F.R. § 1005.17. Specifically, Reg. E provides:

> (1) General. Except as provided under paragraph (c) of this section, a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution:
>
> (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service;
>
> (ii) Provides a reasonable opportunity for the consumer to affirmatively consent, or opt in, to the service for ATM and one-time debit card transactions;
>
> (iii) Obtains the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one-time debit card transactions; and
>
> (iv) Provides the consumer with confirmation of the consumer's consent in writing, or if the consumer agrees, electronically, which includes a statement informing the consumer of the right to revoke such consent.

12 C.F.R. §1005.17(b)(1).

Reg. E further provides guidance for the content and form of the mandatory opt-in notice. All disclosures must be "clear and readily understandable." 12 C.F.R. § 1005.4(a)(1); see also 15 U.S.C. § 1693c (requiring financial institutions to make disclosures "in accordance with the regulations of the" CFPB "in readily understandable language"). Opt-in notices must be

21

**SER43**

"substantially similar to" the A-9 Model Consent Form and include the following information:

(1) Overdraft service.

A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.

(2) Fees imposed.

The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.

(3) Limits on fees charged.

The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.

(4) Disclosure of opt-in right.

An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and

(5) Alternative plans for covering overdrafts.

If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d). Doing away with the practice of automatic customer enrollment in overdraft services, Reg. E thus requires financial institutions to secure consumers' "affirmative consent" to overdraft services through an opt-in notice, "substantially similar" to Model Consent Form A-9, which describes the institution's overdraft services in clear and readily understandable terms in a separate standalone disclosure. 12 C.F.R. § 1005.17.

A financial institution may not charge an overdraft fee on ATM and nonrecurring debit transactions unless it complies with each of these Reg. E requirements. 12 C.F.R. §1005.17(b)(1). Further, the Arbitrator must interpret Reg. E broadly and liberally "in favor of the consumer" to effectuate its remedial purpose. Clemmer v. Key Bank Nat'l Ass'n, 539 F.3d 349, 350 (6th Cir. 2008); Fludd, 2021 WL 4691587, at *14; Gunter v. United Fed. Credit Union, Case No. 3:15-cv-00483-MMD-WGC, 2017 WL 4274196, at *3 (D. Nev. Sept. 25, 2017); Bultemeyer v.

22

**SER44**

<u>Fitness All</u>., LLC, No. CV-12-2619-PHX-LOA, 2014 WL 667585, at *3 (D. Ariz. Feb. 20, 2014). The Arbitrator examines respondent's compliance with each of these requirements.

**<u>Required Notice Content</u>**

The Arbitrator finds that respondent's 2012 disclosure contained the Reg. E required content.

<u>Brief Description</u>

The disclosure included a "brief description of the financial institution's overdraft service" because it explained the three different types of overdraft protection the bank offered in 2013: the standard overdraft services, which automatically applied to all checking accounts; the overdraft services plan, which allowed a customer to prevent an overdraft by linking a related savings or credit account; and the DCOS, which permitted a customer to cover overdrafts on ATM and one-time debit card transactions. <u>See</u> R3; Hernandez T. It also illustrated its description and some of the differences in those plans through an example using the same $125 transaction drawn on a $100 available balance under each of the different plans. <u>See</u> R3.

<u>Fees</u>

The Arbitrator finds that the 2012 disclosure also described the types of transactions for which the bank would charge an overdraft fee and the dollar value of that fee, which in the case of the standard and DCOS overdrafts was $35. R3. The brochure explained that the DCOS applied to ATM and one-time debit card transactions and not recurring transactions; the standard protection covered "bounced" checks, ACH, and recurring transactions. <u>Id.</u> It informed the customer that the bank would charge an overdraft fee each time it covered a transaction up to four overdraft fees per day maximum. <u>Id.</u> The comparison chart clearly described the costs involved for each overdraft service offered by respondent. <u>Id.</u>

<u>Opt in Right</u>

The 2012 pamphlet also explained the customer's right to elect to opt in to DCOS or not and explained multiple ways to add the service if desired along with the required telephone number, online website link, and in person options. <u>Id.</u> The brochure explicitly explained that the customer must "want" respondent to authorize overdrafts on ATM and one time debit transactions and choose to opt in, unlike the standard protection in which the bank automatically enrolls each new customer. <u>Id.</u> The comparison chart also advised that customers do not have to enroll in both or either of the protection plans. <u>Id.</u>

<u>Alternative Plans</u>

The 2012 disclosure also informed customers of alternative plans for covering overdrafts, such as linking another account, permitting a declination of the transaction, or depositing a covering amount before the end of the day posting. <u>Id.</u> As another alternative, the brochure also offered customers tips on how to completely avoid overdraft fees, including free monitoring tools, such as online banking, text banking, and low balance alerts.

In sum, the Arbitrator denies claimant's assertion that the disclosure did not include the required notice and concludes that respondent's 2012 disclosure included all the mandatory components

23

**SER45**

required by 12 C.F.R. § 1005.17(d): (1) the service description; (2) the fees imposed; (3) fee limits; (4) the opt-in right; and (5) alternative plans for covering overdrafts. See R3.

## Substantially Similar

Section 1005.17(b)(1)(i) requires respondent to use a notice format "substantially similar" to Model Consent Form A-9. 12 C.F.R. § 1005.17(d). Claimant challenges the 2012 disclosure as dissimilar to Model Consent Form A-9 because respondent's disclosure consists of an eight-page brochure rather than a single page notice as drafted by the FRB after several rounds of consumer testing. Id. § 1005.17(d); 74 Fed. Reg. at 59,036. The Arbitrator disagrees.

Model Consent Form A-9 does not address which account balance calculation method a financial institution should use to determine whether a transaction results in an overdraft. See 12 C.F.R. pt. 1005, app. A; Tims, 935 F.3d at 1235; Chambers, 222 F. Supp. 3d at 6. Accordingly, the regulators expected banks to customize the notice to accurately describe their services as long as they also included the required content. Indeed, not customizing the form to reflect the bank's actual services could subject it to liability. See Tims, 935 F.3d at 1245. Consequently, the courts have allowed banks to include additional explanation, when necessary for accuracy, because Reg. E only demands substantial similarity, not exact duplication. See, e.g., Walbridge v. Northeast Credit Union, 299 F. Supp. 3d 338, 348 (D. N.H. 2018); Gunter, 2017 WL 4274196, at *3; Smith v. Bank of Haw., 2017 WL 3597522, *1, *8 (D. Haw. April 13, 2017); Ramirez v. Baxter Credit Union, 2017 WL 118859, *1, *7-8 (N.D. Cal. January 12, 2017); Pinkston-Poling v. Advia Credit Union, 2017 WL 5153218, *1, *3 (W.D. Mich. April 20, 2017).

Here, respondent virtually copied the single page model form as the first page of its disclosure. Compare R3 with Model Consent Form A-9. The rest of the brochure then describes its different overdraft services, how they work, how they compare, and how to avoid overdrafts completely. While perhaps more illustrative than other disclosures, the brochure specifically describes and explains respondent's overdraft services. The Arbitrator agrees with the majority of courts permitting banks to include additional explanation in an effort to accurately portray the customers' overdraft options and therefore finds respondent's 2012 disclosure "substantially similar" to Model Consent Form A-9.

## Disclosure Receipt

Claimant argues that he never received the 2012 disclosure at all. He specifically looked for all documents related to respondent in his four-drawer dresser where he keeps all his important documents and did not find anything. Wilson T. The Arbitrator agrees that, if respondent never gave claimant the 2012 disclosure but enrolled him in DCOS anyway, it would have violated Reg. E. See Chambers, 222 F. Supp. 3d at 16.

The Arbitrator finds claimant credible and believes that he looked for the documents but could not locate them. Nevertheless, even fully crediting claimant's testimony, the Arbitrator finds that claimant did not sustain his burden to prove by a preponderance of the evidence that respondent did not disclose its overdraft practices to him as Reg. E requires. The only individuals who definitively know what transpired when claimant opened his account are claimant, his son, and the banker who assisted him. Claimant does not remember the legally significant events of that day, his special needs son understandably did not testify, and the banker no longer works for respondent. Wilson T; Hernandez T. With no direct evidence based upon personal knowledge,

24

the Arbitrator must examine and weigh the circumstantial evidence. Here, the weight of the circumstantial evidence shows more likely than not that respondent delivered the required notice to claimant.

Respondent explained that the 2012 disclosures inside the 2013 brochures arrived at the branches from the marketing department via a third-party vendor who placed them inside a pre-assembled and shrink-wrapped folder containing the entire new customer account kit. Hernandez T. The branches then stored the sealed kits in the vault until needed for a customer. Id. The banker would not open the shrink-wrapped packet until the time he assisted the customer in opening a new account and then followed the instructions listed on the lime green cover sheet. Id.; R35.

Claimant specifically remembers physically walking into a branch office to open a checking account for the purpose of automatically depositing his monthly government check. Wilson T. While he does not recall the banker's name, he remembers meeting with a banker who helped him open the account that day. Id. Claimant agreed that he verbally provided information to the banker, although he does not recall the details. Id. He agrees that he signed the new account application. Id.; see also R2.

The account application corroborates claimant's memory as it displays claimant's personal information entered in someone else's handwriting but the acknowledgement signed by claimant. Wilson T; R2. The account application hence replicates respondent's 2013 opt in process for walk in new customers. See Hernandez T. In 2013, the banker would typically write down a walk-in customer's verbal information on the application form and then submit it to the customer for signature. Nelson Dep. at 35; Hernandez T. The customer's signature would acknowledge that he received the CAA, privacy policy, and the direct deposit guide, among other things. Hernandez T; Nelson Dep. at 40-44; C1; R2.

Pursuant to respondent's 2013 protocols, the banker would also open the shrink-wrapped new consumer account disclosure kit, remove the banker instruction sheet, and then follow the instructions. Hernandez T; R35. Before giving the kit to the customer, the banker recorded the specific serial number of that kit on the customer's application form so respondent could track which customer received which kit. Hernandez T; C1; R2; Nelson Dep. at 36-37. Again, the application in this case mirrors this practice: it shows the unique serial number of a new customer account kit and claimant's signature acknowledging his receipt of the CAA, privacy notice, and direct deposit guide, all of which the Arbitrator's physical inspection of the hard copy 2013 kit confirmed as included as part of the kit. It seems unlikely that claimant would have received only parts of the kit and not others.

While claimant correctly points out that his signature did not acknowledge receipt of the 2012 disclosure, the evidence credibly establishes that the disclosure was part of the kit. The banker instructions specifically list the disclosure as one of its contents. See R35. Respondent credibly testified that the kits all included the disclosure at the time. Hernandez T. Further, respondent did not prepare the kits itself; instead, it used an outside vendor whose job consisted of assembling and sealing the kits for uniformity. See id.

The instruction sheet also delineated mandatory steps for the banker to follow, including to review the DCOS disclosure with the new customer, which would be difficult to accomplish if the kit did not include the disclosure. Specifically, the instruction sheet required the banker to:

25

**SER47**

| 6. **Remove** this Banker Instruction Sheet |
| + |
| 7. **Enter** the Consumer Disclosure NAK serial number on SVP |
| + |
| 8. **Review/Provide** the Consumer New Account Disclosure Kit and applicable addenda from Forms Online … |
| + |
| 9. **Review** Debit Card Overdraft Services Brochure (CNS8058) with your customer. Record customers preferences in SVP. |

R35 (original bold and shading; extra details omitted).

Respondent's credible contemporaneous business records show definitively that the banker completed step 7 – he entered the serial number of claimant's kit. See R2; R35. They also show that the banker completed the part of step 9 that required him to record customer preference in respondent's computer system. See R4-R5. The credible evidence thus circumstantially proves that the banker also more likely than not completed step 8 and the first part of step 9 if he definitely completed step 7 and the rest of step 9.

Further, the written instructions to the banker explicitly differentiate between the kit and the disclosure within the kit. In step 8, the instructions require the banker to review and provide the kit; whereas, step 9 requires the banker to review, but not provide, the DCOS disclosure because the customer already received it in the kit. See R35. But step 9 still separately required the banker to review the disclosure with the customer. Id.; see also Hernandez T; R35; R26 at ¶ 13; R4.

Respondent's internal practices and policies in effect in 2013 reinforce these conclusions as they also specifically directed the banker to use the brochure. R4; Hernandez T. Respondent's computer system then functioned as safeguard to make sure bankers did not forget this critical step. It included a verification field, which required the banker to verify by selecting "yes" that he had provided the "Overdraft Services brochure" to the customer. Hernandez T; R4; R26 at ¶ 13. If the banker selected no, the computer would generate an error message reminding the banker to give the brochure to the customer. Hernandez T; R4. The computer system would not allow the banker to proceed with the online process unless he verified that he had given the disclosure brochure to the new customer. Hernandez T; R4. The written protocols also stressed the legal significance of this step; it advised the banker to "keep in mind" that the brochure contained the required DCOS disclosures and needed to be given to the customer before enrolling in the program. Hernandez T; R4.

Claimant implies that the banker could have falsified compliance with all these steps and requirements because claimant does not have the kit or the disclosure. Yet documents, even important ones, can get lost or misplaced over the course of nine years, particularly when claimant moved homes in the meantime, received documents at his mother's home, and rightfully focused his attention and time on his son's welfare. See Wilson T. Moreover, respondent specifically investigated the banker's personnel file to check for reprimands, discipline, or improper conduct but found nothing other than a banker who left on his own accord to pursue other career opportunities. Hernandez T. Examining the record as a whole, the Arbitrator finds that the totality of the evidence more likely than not proves that the banker performed his duty as respondent and Reg. E required.

26

## Segregated Disclosure

Reg. E sets out procedures for how financial institutions must present their disclosures; it requires financial institutions to disclose their overdraft policies in a written notice "segregated from all other information." 12 C.F.R. §1005.17(b)(1)(i); see Tims, 935 F.3d at 1245. Claimant maintains that respondent failed to segregate the 2012 disclosure in two respects: (1) respondent included seven pages in the same document with the single page notice Reg. E requires; and (2) respondent provided the 2012 disclosure as part of a new account kit, which consisted of several separate documents.

Reg. E requires segregation to avoid financial institutions from burying overdraft fee disclosures in lengthy agreements and disclosures replete with legalese. Regulators wanted customers to be able to read a separate document just about the bank's overdraft fees and practices in order for them to make informed choices about enrollment in overdraft programs and to avoid "surprise" fees. Generally, segregate means to isolate; aggregate means to add, collect, join or group like with like, whereas segregate disassociates like from dislike. In this context, segregate means that the bank must separate its overdraft disclosures from other unrelated information, such as information about safety deposit boxes, savings accounts, wire transfers, and other bank functions and services.

The requirement does not mean that the bank cannot disclose overdraft fees with other overdraft information. On the contrary, Model Consent Form A-9 aggregates different overdraft services in one disclosure, and Reg. E requires respondent to describe its overdraft programs and alternative plans for handling overdrafts in one disclosure. Accordingly, the Arbitrator concludes that Reg. E's segregation requirement obligated respondent to provide a standalone, single document that describes its overdraft practices and policies.

Further, respondent complied when it created a standalone single document overdraft disclosure. While the model form consists of one page – and respondent's 2022 disclosure also consists of one page – nothing in Reg. E prohibits respondent from using more than a single page if necessary to describe its overdraft program. Thus, while its current shorter version looks more like the model, its former 8-page version did not violate Reg. E's segregation requirement because all the information in these eight pages contained information either required by Reg. E or used to describe respondent's overdraft practice. Finally, while Reg. E does not squarely address the issue, the Arbitrator finds no regulation, interpretation, or official comment barring respondent from containing the standalone disclosure in a folder of other required disclosures as long as the bank draws specific attention to the disclosure, permits the customer to consider it before enrollment, and obtains consent separately from other consents, as respondent's protocols required here. The Arbitrator therefore concludes that respondent complied with Reg. E's segregation requirement because it did not bury the information in other agreements and disclosures but prominently displayed the information in its own document, an eight-page brochure about overdraft fees and protections.

## Reasonable Opportunity

Reg. E also requires respondent to have provided claimant with a "reasonable opportunity" to affirmatively consent to respondent's overdraft services. 12 C.F.R. §1005.17(b)(1)(ii). Claimant asserts that respondent failed to provide him a reasonable opportunity to review DCOS information

27

**SER49**

before opting in. Under Reg. E, a consumer has a reasonable opportunity to provide affirmative consent when, among other things, "it provides reasonable methods by which the consumer may affirmatively consent." 12 C.F.R. § 1005.17, cmt.17(b)-4. The comment then lists examples of a reasonable consent opportunity: (1) a mail in form; (2) a dedicated telephone line; (3) a hand in form; and (4) electronically. Id.

Respondent explained that it provided claimant with the required reasonable opportunity because its business records show that the banker followed its 2013 procedures to review the Reg. E disclosure and overdraft services with the customer and then record the customer's verbal assent or declination. Hernandez T; Nelson Dep. at 48-49. Claimant argues that this process did not afford him a reasonable opportunity to consider his options because respondent did not first provide claimant the disclosure, second have him take the disclosure away to consider, and only then come back to deliver his decision.

The Arbitrator finds this argument inconsistent with Reg. E's official comments, which specifically permit a financial institution to provide the required notice "prior to or at account-opening." Comment 17(b)-1.iv (italics added). Reg. E thus contemplates that a bank can provide a reasonable opportunity to consent during the account opening process, rather than only during a separate process, as claimant suggests. See id. Indeed, Reg. E comments explicitly allow respondent to require its customers, like claimant, to choose whether or not to enroll in DCOS as part of its account opening process:

> A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service.

Id. Accordingly, the Arbitrator concludes both that Reg. E permitted respondent to afford claimant a reasonable opportunity to consent as part of the account opening process and that respondent's business records establish that it did so here. See Hernandez T; R2-5.

## Extraneous Information

Claimant challenges respondent's 2012 disclosure as containing impermissible extraneous information in violation of Reg. E; respondent countered that its disclosure contained only permitted information. The Arbitrator agrees that the Legislature preferred a shorter rather than longer disclosure but disagrees that respondent included impermissible information.

Reg. E discourages financial institutions from liberally adding language to opt-in agreements based on the model form. The regulation itself prohibits the inclusion of "information not specified or otherwise permitted by" the regulation's terms. 12 C.F.R. § 1005.17(d); see also id. at § 1005.17(d)(6) ("Permitted modifications and additional content"). In promulgating this section of Reg. E, the FRB plainly wanted opt-in agreements to be short and clear. See Final Rule, 74 Fed. Reg. at 59,047 (noting that the model form was edited to make it "shorter and clearer"); id. at 59,048 (describing efforts to "eliminate unnecessary language"); id. at 59,048–49 (expressing concern that additional language might "make the form lengthy," "confuse customers," or "diminish" understanding). Presumably, in part for this reason, respondent's current 2022 disclosure consists of a single page, much like the model form. See R25.

However, the disclosure's length does not determine its legality as Reg. E does not require a

28

specific page limit for disclosures. To examine its legality, the Arbitrator must examine its contents as compared to Reg. E's permissible inclusions. As noted above, section 1005.17(d)(1)-(5) describes the required content:

> **(1) Overdraft service.** A brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions.
> **(2) Fees imposed.** The dollar amount of any fees or charges assessed by the financial institution for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, including any daily or other overdraft fees. If the amount of the fee is determined on the basis of the number of times the consumer has overdrawn the account, the amount of the overdraft, or other factors, the institution must disclose the maximum fee that may be imposed.
> **(3) Limits on fees charged.** The maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit.
> **(4) Disclosure of opt-in right.** An explanation of the consumer's right to affirmatively consent to the financial institution's payment of overdrafts for ATM and one-time debit card transactions pursuant to the institution's overdraft service, including the methods by which the consumer may consent to the service; and
> **(5) Alternative plans for covering overdrafts.** If the institution offers a line of credit subject to Regulation Z (12 CFR part 1026) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 C.F.R. § 1005.17(d)(1)-(5) (original bold). Reg. E's official interpretation elaborates on these descriptions:

> 17(d) Content and Format
> 1. **Overdraft service.** The description of the institution's overdraft service should indicate that the consumer has the right to affirmatively consent, or opt into payment of overdrafts for ATM and one-time debit card transactions. The description should also disclose the institution's policies regarding the payment of overdrafts for other transactions, including checks, ACH transactions, and automatic bill payments, provided that this content is not more prominent than the description of the consumer's right to opt into payment of overdrafts for ATM and one-time debit card transactions. As applicable, the institution also should indicate that it pays overdrafts at its discretion, and should briefly explain that if the institution does not authorize and pay an overdraft, it may decline the transaction.
> 2. **Maximum fee.** If the amount of a fee may vary from transaction to transaction, the financial institution may indicate that the consumer may be assessed a fee "up to" the maximum fee. The financial institution must disclose all applicable overdraft fees, including but not limited to:
> i. Per item or per transaction fees;
> ii. Daily overdraft fees;
> iii. Sustained overdraft fees, where fees are assessed when the consumer has not repaid the amount of the overdraft after some period of time (for example, if an account remains overdrawn for five or more business days); or
> iv. Negative balance fees.

29

Exhibit C, Page 99

3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.

4. **Identification of consumer's account.** An institution may use any reasonable method to identify the account for which the consumer submits the opt-in notice. For example, the institution may include a line for a printed name and an account number, as shown in Model Form A-9. Or, the institution may print a bar code or use other tracking information. *See also* comment 17(b)-6, which describes how an institution obtains a consumer's affirmative consent.

5. **Alternative plans for covering overdrafts.** If the institution offers both a line of credit subject to Regulation Z (12 CFR part 1026) and a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state in its opt-in notice that both alternative plans are offered. For example, the notice might state "We also offer *overdraft protection plans,* such as a link to a savings account or to an overdraft line of credit, which may be less expensive than our standard overdraft practices." If the institution offers one, but not the other, it must state in its opt-in notice the alternative plan that it offers. If the institution does not offer either plan, it should omit the reference to the alternative plans.

(original bold). Section 1005.17(d)(6) identifies additional permissible modifications and inclusions:

> **(6) Permitted modifications and additional content.** If applicable, the institution may modify the content required by § 1005.17(d) to indicate that the consumer has the right to opt into, or opt out of, the payment of overdrafts under the institution's overdraft service for other types of transactions, such as checks, ACH transactions, or automatic bill payments; to provide a means for the consumer to exercise this choice; and to disclose the associated returned item fee and that additional merchant fees may apply. The institution may also disclose the consumer's right to revoke consent. For notices provided to consumers who have opened accounts prior to July 1, 2010, the financial institution may describe the institution's overdraft service with respect to ATM and one-time debit card transactions with a statement such as "After August 15, 2010, we will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below)."

12 C.F.R. § 1005.17(d)(6); (original bold).

The Arbitrator analyzed the 2013 DCOS brochure in depth and in comparison, with the regulations, interpretations, and comments and, on that basis, concludes that it contains information required and permitted by Reg. E. The first page contained all information required by Reg. E and included in the Model Consent Form A-9, and the last page explained the disclosure's terms and how to reach respondent with any questions:

30

**SER52**

<span style="color:red">Important things you should know</span>

**What you need to know about Overdrafts and Overdraft Fees**

An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have <u>standard overdraft practices</u> that come with your account.
2. We also offer overdraft protection plans, such as a link to an eligible savings account, eligible line of credit or eligible credit card, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account**?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:
• Checks and other transactions made using your checking account number
• Automatic bill payments (such as recurring debit card and ACH payments)

We will not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• ATM transactions
• Everyday debit card transactions (such as one-time debit card and ATM card purchases)

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will the bank charge if it pays my overdraft**?

Under our <u>standard overdraft practices</u>:

• We will charge you a fee of up to $**35** each time we pay an overdraft item to your account
• There is a limit of **four** overdraft and returned item fees per day

**What if I want Wells Fargo to authorize and pay overdrafts on my ATM and everyday debit card transactions**?

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please contact us at 1-877-804-4883, 24 hours a day, 7 days a week or speak to a banker at any Wells Fargo location. Or sign on to Wells Fargo Online® Banking and click the "Overdraft Services" link on the Account Activity page.

<u>See</u> R3 (original emphasis and coloration). Reg. E requires all of this content, which the model

31

**SER53**

form also includes. <u>Compare</u> Model Consent Form A-9 <u>with</u> R3.

The next page of the 2012 disclosure describes respondent's alternative overdraft plans and programs, also specifically required by Reg. E:

<span style="color:red">You've got options</span>

<span style="color:blue">Optional services that may offer protection to avoid overdrafts</span>

**Overdraft Protection**

Protect yourself from the inconvenience of declined transactions or returned ("bounced") checks. When you link one of your eligible Wells Fargo savings or credit accounts to your checking account, the bank will use available funds in your linked accounts to authorize your transactions if you don't have enough money in your checking account.

• There is no fee to sign up for this service
• If your account balance goes negative and the bank transfers money to bring your balance current, a single Overdraft Protection Transfer fee[2] will be assessed regardless of how many transactions are presented for payment that day

**Debit Card Overdraft Service**[3]

You can choose how Wells Fargo handles your ATM and everyday debit card transactions.

If you add optional Debit Card Overdraft Service to your checking account, the bank may approve (at our discretion) ATM and everyday debit card *transactions if you don't have enough money in your checking account* or linked overdraft protection accounts at the time of the transaction.

• There is no fee to sign up for this service
• If your account is negative, our standard overdraft fee of up to $35 per item[6] will apply if a covering[4] deposit or transfer is not made before the posted cutoff time the same business day

If you do not add this service, your ATM and everyday debit card transactions will be declined at the time of the transaction if you don't have enough money in your account; you will not be charged an overdraft fee if these types of transactions cause an overdraft. The service does not apply to debit card transactions you have established for recurring payments (such as utilities or club memberships). These may continue to be authorized and paid into overdraft, at our discretion, even if you do not add Debit Card Overdraft Service and our overdraft fees[6] and policies will apply.

Please see back panel of brochure for additional details.  Lift to open

<u>See</u> R3 (original coloration and emphasis). The Arbitrator finds that Reg. E specifically requires all

32

of this information because it mandates that respondent explain any alternative overdraft practices it uses in addition to its standard overdraft program.

Respondent next included explanatory comparison charts and tips to avoid overdrafts:

### Control of your accounts is in your hands

Managing your checking account is the foundation of good money management skills. Wells Fargo offers tools and services that meet your personal financial style — with ways to keep track of your account balance and choices on how to manage your account.

### What is an overdraft?

Overdrafts occur when you spend more money than you have in your checking account and the bank pays your transaction.

### How to avoid overdrafts

• **Don't spend more than you have**
Know your available balance,[1] the amount of money you can actually use.
• **Keep track of your spending**
Record every deposit and withdrawal including checks, recurring payments, debit card purchases, and cash withdrawals.
• **Don't forget outstanding transactions**
The current available balance provided by the bank may not include all transactions, such as checks or upcoming automatic payments.
• **Keep a cushion in your account**
By keeping a little extra in your checking account, you can cover any outstanding expenses that don't yet appear in your available balance, and avoid overdrafts.

### Online and mobile: You decide how to manage and track your spending

Sign up for convenient services and start managing your account via internet or mobile phone.

### Services to help avoid overdrafts

•Text Banking[5] — Check your available balance1 before you make a purchase. You can quickly request and receive information via text message.
• Mobile Banking[5] — Bank on the go, check balances and transfer funds between your Wells Fargo accounts using your phone's web browser
•Account Alerts — Stay informed. Set up a low balance alert to your email or wireless device[5]
• My Money Map — Take control of your finances with an online tool that helps you view your spending, budgeting and savings with one click

<u>See</u> R3 (original coloration and emphasis). While not required by Reg. E, the Arbitrator finds such tips permissible. The charts qualify as illustrative descriptions of respondent's overdraft programs

33

**SER55**

and how they work separately or combined. They also highlight the differences between the options, also a helpful description of its overdraft services.

The Arbitrator further finds that the tips qualify as a permissible alternative plan. Respondent essentially advises consumers how to avoid overdrafts completely – a smart alternative plan to any of its products. Indeed, rather than finding a Reg. E violation, the <u>Chambers</u> court approved of similar examples and tips as *saving* the bank from violating Reg. E with an ambiguous overdraft description:

> opt-in agreement adopts the model form's definition of an overdraft, explaining that an "overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." … The parties spill much ink disputing whether this language, viewed in isolation, refers to the actual or available balance. … But the Court need not settle that dispute, because the opt-in agreement does not use this language in isolation. In an introductory paragraph not contained in the model form, the opt-in agreement provides examples of situations that might result in an overdraft. These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance.

222 F. Supp. 3d at 15-16. The Arbitrator agrees with <u>Chambers</u>' analysis. Reg. E not only permits respondent's examples and tips; but, like the illustrations in <u>Chambers</u>, they help rescue the 2012 disclosure from impermissible ambiguity. <u>See id.</u> In sum, while the Arbitrator agrees that respondent's disclosure could have been shorter and more concise, it did not violate Reg. E by including permissible, descriptive information about its overdraft programs.

## Unscripted Discussion

Claimant avers that respondent violated Reg. E when it allowed its banker to engage in an unscripted dialogue with claimant about DCOS because it permitted the banker to unduly influence and mislead him. The Arbitrator concludes that claimant failed to sustain his burden of proof on this issue. Had claimant introduced credible evidence that the banker persuaded, misled, or tricked him into DCOS enrollment, then the Arbitrator would agree that respondent violated Reg. E. Yet claimant introduced no such evidence. Claimant testified quite forthrightly and never mentioned any efforts to influence, push, force, or cajole him into enrolling in respondent's DCOS program. Wilson T.

Further, the Arbitrator finds no regulatory provision requiring respondent to use a script or standard explanation when meeting with new checking account customers. Nor has the Arbitrator found any provision prohibiting discussions between customers and bankers about overdraft options. Indeed, claimant's position would arguably prohibit bankers from even answering customer questions unless scripted, which would run afoul of Reg. E's purpose of helping customers reach informed banking decisions. In sum, the Arbitrator concludes that respondent did not violate Reg. E by failing to follow a script because Reg. E imposes no such requirement.

## Clear and Readily Understandable

Reg. E mandates that respondent describe its overdraft program in "clear and readily understandable" language. 12 C.F.R. § 1005.4(a)(1); <u>see also</u> 15 U.S.C. § 1693c. Claimant argues

34

that respondent's disclosure lacks clarity in several respects: (1) it does not properly disclose respondent's use of available balance to calculate overdraft fees; (2) the phrase "enough money in your account" reflects ledger, not available, balance, contrary to respondent's actual practice; and (3) the use of the phrase "we pay it anyway" falsely implies that respondent uses its own money to cover an overdraft.

In short, claimant argues that respondent's 2012 disclosure misleads customers because it invites them to believe that the bank uses the ledger balance method, rather than the available balance metric it really uses. Or, at a minimum claimant argues, the disclosure is ambiguous because it does not clearly identify the methodology respondent uses to calculate an overdraft. And claimant continues, if ambiguous, the 2012 disclosure cannot satisfy Reg. E's "clear and readily understandable" mandate. See 12 C.F.R. § 205.4(a)(1).

A term is ambiguous when the parties can reasonably understand it in more than one way. Black's Law Dictionary (11th ed. 2019). In other words, the disclosure is ambiguous if it has more than one reasonable interpretation; although, importantly, it is not ambiguous simply because the parties disagree about its meaning. Chambers, 222 F. Supp. 3d at 9; see also Diamond Point Plaza Ltd. v. Wells Fargo, NA, 400 Md. 718, 929 A.2d 932, 951-52 (2007). Conversely, a contract is unambiguous when, after examining the contract as a whole and affording its words their plain meaning, the contract is capable of only one reasonable interpretation. Claimant explains that respondent's overdraft definition – When you do not have enough money in your account to cover a transaction but we pay it anyway – lacks clarity because it could ambiguously refer to either ledger or available balance.

In the motion to dismiss context, several courts have agreed with claimant and denied motions to dismiss based upon virtually identical allegations about identical disclosure language. See, e.g., Tims, 935 F.3d at 1235 (denying motion to dismiss based upon same definition of overdraft); Grenier v. Granite State Credit Union, Civil No. 21-cv-00534-LM, 2021 DNH 172 P., *1, *4 (D. New Hamp. November 8, 2021) (same); Fludd, 2021 WL 4691587, at *15 (same); Adams v. Liberty Bank, 2021 WL 3726007, *1 (D. Conn. August 23, 2021) (same); Wellington v. Empower Federal Credit Union, 533 F. Supp. 3d 64, 70-71 (N.D.N.Y. 2021) (same); Richard v. Glens Falls Nat'l Bank, 2021 WL 810218, *1, * 9 (N.D.N.Y. Mar. 3, 2021); Roy v. ESL Fed. Credit Union, 2020 WL 5849297, *1, *7 (W.D.N.Y. Sept. 30, 2020); Lussoro v. Ocean Fin. Fed. Credit Union, 456 F. Supp. 3d 474, 495-96 (E.D.N.Y. 2020); Kelly v. Cmty. Bank, N.A., Case No. 19-cv-919 MAD- CFH2020 WL 777463, at *9 (N.D.N.Y February 18, 2020) (same); Bettencourt v. Jeanne D'Arc Credit Union, 370 F. Supp. 3d 258, 262 (D. Mass. 2019) (same); Salls, 349 F. Supp. 3d at 87 (same); Walbridge, 299 F. Supp. 3d at 343 (same); Pinkston, 227 F. Supp. 3d at 856 (same); Ramirez, 2017 WL 118859, at *7 (same); Smith, 2017 WL 3597522, at *5; Gunter, 2016 WL 3457009, at *4 (same); Wodja v. Wash. State Emps. Credit Union, 2016 WL 3218832, at *2–3 (W.D. Wa. June 9, 2016) (same); In re: TD Bank, N.A., 150 F. Supp. 3d 593, 621–24 (D.S.C. 2015) (MDL); see also Roberts v. Capital One, N.A., 719 Fed. Appx. 33, 35–37, 2017 WL 5952720, at *2–*3 (2d Cir. Dec. 1, 2017) (finding term overdraft ambiguous in the absence of a clear explanation of when an overdraft occurs). Agreeing with these courts, the Arbitrator likewise denied respondent's motion to dismiss because claimant sufficiently pled a cause of action based upon the disclosure's ambiguity. See DM Order, dated 6/20/22.

Indeed, even now after the evidentiary hearing, if respondent's 2012 disclosure consisted of no further explanation than this single definition, the Arbitrator would agree with claimant that the phrase "enough money" does not adequately and unambiguously provide a "clear and readily

35

understandable" explanation of "the institution's overdraft service." 12 C.F.R. §§ 1005.4(1)(1), 1005.17(b)(1)(i); see, e.g., Tims, 935 F.3d at 1238, 1243-44 (ambiguous because could describe either the available or ledger balance calculation method which plausibly does not describe the overdraft service in a "clear and readily understandable" way); Wellington, 2021 WL 1377789, at *5; Bettencourt, 370 F. Supp. 3d at 262, 265; Walbridge, 299 F. Supp. 3d at 343; Salls, 349 F. Supp. 3d at 90; Pinkston, 227 F. Supp. 3d at 857; Walker v. People's United Bank, 305 F. Supp. 3d 365, 376 (D. Conn. 2018).

As Tims so aptly explained, when the opt in agreement "sheds no light" on what enough money in the account means, it simply raises the question of how the bank determines enough money – is it enough money to cover only settled transactions or to cover authorized but not yet settled transactions as well. 935 F.3d at 1238. In that case, the court found the use of the phrase ambiguous because neither the opt in nor account agreement articulated which method would trigger an overdraft. Id. at 1239-40.

The court then distinguished the agreements before it from those in Chambers:

> Importantly, in Chambers, the Opt-In Agreement used the phrase "available balance." In addition, the Account Agreement in Chambers contained a subsection addressing "Available Balances to Make Transactions," which linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts. Finally, the Opt-In Agreement in Chambers provided examples illustrating when an account would not have "enough money" and thus be subject to an overdraft.

> None of those factors is present in this case. The agreements here did not use the phrase "available balance"; the Account Agreement nowhere explained the mechanics of how and when [the bank] would assess overdrafts, nor linked the concept of an "available balance" to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have "enough money" to cover a transaction and thereby trigger an overdraft. Because of these three distinctions, we cannot say the Opt-In and Account Agreements in this case clearly demonstrated the parties' intent that [the bank] would use the available balance calculation method when assessing overdraft fees.

Id. at 1242; see also Lussoro, 456 F. Supp. 3d at 485-86 (distinguishing Chambers because disclosure's lack of examples permitted ambiguity); Smith, 2019 WL 404423, at *12 (if only the bank had "provided the same example in the Account Agreement, this ambiguity might have been avoided entirely"); Ramirez, 2017 WL 1064991, at *n1 (distinguishing Chambers because, unlike the disclosure before it, the Chambers opt in "conspicuously described" and illustrated when a customer might not have "enough money" to cover a transaction); Walbridge, 299 F. Supp. 3d at 345-46 (concluding based on the same three factors that the financial institution did not clearly communicate an intent to use the available balance in charging overdraft fees).

The Arbitrator finds respondent's 2012 disclosure most analogous to the opt in agreement analyzed in Chambers. In Chambers, the bank used the same language respondent did, which it pulled directly from Model Consent Form A-9 complete with the same underline:

36

> an underdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

222 F. Supp. 3d at 10 (original underline). As here, the parties in Chambers hotly disputed the meaning of the definition, the customer interpreting it as the ledger balance and the bank interpreting it as the available balance. Id. The court examined the opt in agreement as a whole and noted that the bank had used examples in the disclosure to explain different overdraft scenarios:

> [the opt in agreement] provides examples of when a customer might find herself without "enough money in [her] account to cover a transaction"— such as when she "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available."

Id. The bank also pointed out that the opt in agreement did not refer to ledger balance at all. Id. at 12. The court agreed, emphasizing that, unlike the term ledger balance, the agreement used the term available balance "in critical provisions dealing specifically with overdrafts and debit transactions—the subject matter of this case." Id. The court therefore concluded as a matter of law that

> By specifically invoking the phrase "available balance," the opt-in agreement makes clear that balance will be used in calculating overdrafts and imposing fees. There is no competing reference to an actual or ledger balance. Under the terms of the opt-in agreement, then, overdrafts are a function of the available balance … the relevant agreements unambiguously convey that the [the financial institution] will impose overdraft fees on debit transactions that overdraw the available balance. … The relevant agreements unambiguously disclose that overdraft fees would be imposed on debit transactions that overdrew her available balance. … The agreements at issue here unambiguously reveal the Credit Union's intention to impose overdraft fees when Chambers' debit transactions overdrew her available balance.

Id. at 10, 12-15, 17. The court bolstered its conclusion by citing to the customer account agreement, which also linked overdrafts to available balance even though it did not define the term. Id. at 10-11.

Here, as in Chambers, respondent took its overdraft definition directly from Model Consent Form A-9 right down to the same underline:

> An overdraft occurs when you do not have enough money in your account to cover a transaction but we pay it anyway

R3. Also as in Chambers, respondent cross-referenced the account agreement and the bank's funds availability policy and, more importantly, specifically used the term available balance in its disclosure. Id. More so than the Chambers bank, which used the term "available balance" once in its opt in agreement, respondent used the term five times in its 2012 disclosure, when it (1) explained how to avoid overdrafts by using text banking to determine the "available balance" before making a purchase; (2) compared the overdraft protection options by using a column expressly labeled "checking available balance;" (3) advised customers to "know your available balance" to avoid overdrafts; (4) reminded customers that the "available balance" may not include

37

**SER59**

Exhibit C, Page 107

all transactions; and when it (5) suggested customers keep a cushion in their accounts to cover any expenses not yet appearing in the "available balance." R3. "Available" is defined as "capable of use for the accomplishment of a purpose: immediately utilizable." Available, Webster's Third New International Dictionary 150 (2002). Thus, even the word's definition links the concepts of enough money and immediately usable.

Like the Chambers bank, respondent also used examples to illustrate its overdraft services. See R3. The examples themselves show that respondent used the available balance as its overdraft metric. See id. Finally, in lockstep with the Chambers' disclosure, respondent's 2012 disclosure never mentions ledger balance. See id. Given these similarities, Chambers provides an excellent lens through which to analyze the 2012 disclosure's clarity.

Claimant argues that even though respondent used the word "available," it did so without definition or clarity and therefore only confused the consumer further. The Arbitrator finds, however, that respondent did include a simple, layperson definition of available balance. Respondent explicitly advised customers to avoid overdrafts by knowing their available balance:

> Know your available balance,[1] the amount of money you can actually use

R3. In this clause, respondent explained that available balance is the amount of money you can actually use. Had the disclosure contained only the model form's definition of overdraft without reference to the type of balance used to determine "enough money," the Arbitrator would agree with claimant and the legion of cases finding non-customized disclosures misleading at worst and ambiguous at best. But, here, even more so than the financial institution in Chambers, respondent referred its customers not once but five times to the available balance in the same 2012 disclosure as its overdraft measure, and never once mentioned ledger balance. Under these circumstances, reviewing the 2012 disclosure as a whole, without reference to the 2013 or 2020 CAA, the Arbitrator concludes as a matter of law that respondent's 2012 disclosure complied with its Reg. E duty to explain its overdraft services in "clear and readily understandable" language.

Claimant emphasizes that the 2022 disclosure, unlike the 2012 disclosure, explicitly defines available balance and specifically references available balance in its overdraft definition. Thus, claimant suggests, the 2012 cannot be clear and readily understandable given the 2022 changes. The Arbitrator agrees that the 2022 disclosure provides more precision and greater clarity than the 2012 version. Compare R3 with R25. But it does not follow that the 2012 version was unclear simply because respondent was able to later clarify it further. On the contrary, financial institutions should strive to achieve best practices, not minimum compliance. Accordingly, the Arbitrator applauds the improvements and respondent's decision to transform a clear and readily understandable disclosure into a clearer, simpler disclosure, even easier to understand. Finally, as a matter of public policy and equity, the Arbitrator will not use respondent's compliance improvements to impose liability against it based upon its earlier compliant, *albeit* less precise, version.

## Affirmative Consent

Reg E. requires respondent to obtain the customer's "affirmative consent" to its overdraft services. See 12 C.F.R. § 1005.17(b)(1)(ii). Affirmative consent requires "plain and clear consent ... before certain acts or events, such as changes in policies that could impair an individual's rights or interests." Affirmative-Consent Requirement, Black's Law Dictionary (11th ed. 2019). Thus, if

38

**SER60**

respondent's disclosure did not adequately convey the circumstances under which it would charge overdraft fees, then it would violate Reg. E based upon lack of affirmative consent. See Tims, 935 F.3d at 1243-44; Salls, 349 F. Supp. 3d at 90.

The official comments elaborate on the opt in methods and affirmative consent requirement:

> 3. **Opt-in methods.** The opt-in notice must include the methods by which the consumer may consent to the overdraft service for ATM and one-time debit card transactions. Institutions may tailor Model Form A-9 to the methods offered to consumers for affirmatively consenting to the service. For example, an institution need not provide the tear-off portion of Model Form A-9 if it is only permitting consumers to opt-in telephonically or electronically. Institutions may, but are not required, to provide a signature line or check box where the consumer can indicate that he or she declines to opt in.
>
> 6. **Affirmative consent required.** A consumer's affirmative consent, or opt-in, to a financial institution's overdraft service must be obtained separately from other consents or acknowledgments obtained by the institution, including a consent to receive disclosures electronically. An institution may obtain a consumer's affirmative consent by providing a blank signature line or check box that the consumer could sign or select to affirmatively consent, provided that the signature line or check box is used solely for purposes of evidencing the consumer's choice whether or not to opt into the overdraft service and not for other purposes. An institution does not obtain a consumer's affirmative consent by including preprinted language about the overdraft service in an account disclosure provided with a signature card or contract that the consumer must sign to open the account and that acknowledges the consumer's acceptance of the account terms. Nor does an institution obtain a consumer's affirmative consent by providing a signature card that contains a pre-selected check box indicating that the consumer is requesting the service.

(original bold). Further, the official comments specifically address the process for obtaining affirmative consent to opt in overdraft services at the time of account opening:

> 5. **Implementing opt-in at account-opening.** A financial institution may provide notice regarding the institution's overdraft service prior to or at account-opening. A financial institution may require a consumer, as a necessary step to opening an account, to choose whether or not to opt into the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service. For example, the institution could require the consumer, at account opening, to sign a signature line or check a box on a form (consistent with comment 17(b)-6) indicating whether or not the consumer affirmatively consents at account opening. If the consumer does not check any box or provide a signature, the institution must assume that the consumer does not opt in. Or, the institution could require the consumer to choose between an account that does not permit the payment of ATM or one-time debit card transactions pursuant to the institution's overdraft service and an account that permits the payment of such overdrafts, provided that the accounts comply with § 1005.17(b)(2) and § 1005.17(b)(3).

(original bold).

39

**SER61**

Here, claimant emphasizes that respondent omitted the signature portion of Model Consent Form A-9 in its disclosure and thus did not obtain claimant's affirmative consent. He also maintains that verbal consent, if he even consented, does not satisfy Reg. E. For the reasons analyzed above, the Arbitrator concludes that Reg. E permits, but does not require, affirmative consent to be written. See generally 12 C.F.R. § 1005.17, cmt.17(b)-4 (permitting verbal telephonic consent).

Additionally, while respondent has no written record directly from claimant acknowledging his consent, its contemporaneous business records memorialize that claimant consented to DCOS enrollment. See R5; accord Hernandez T. Each monthly account statement also acknowledged with a check mark that claimant had signed up for DCOS. See R7-R20. Claimant's monthly statements contain a section on the right top identifying the account options claimant selected, such as online banking, direct deposit, or my spending report, among others. See id. One of the checkable options is "Overdraft Service." See id. Each and every one of claimant's statements, before he disenrolled in DCOS in 2022, had the overdraft service box checked, showing that he was enrolled in DCOS. See id. Each statement also showed the overdraft fees imposed that month as well as the year-to-date total. See id. Claimant could have removed or added any of the optional account services at any time. Hernandez T. In fact, he did just that for other services. Compare R7 with R12 (adding services with new checked boxes).

Likewise, claimant could have questioned the checked overdraft service box or the fees imposed if he had not consented. See also R7-R20 (explaining how to contact banker or report an error). Claimant testified that he did question the fees on a few different occasions in person at respondent's branches but remembered no specifics or details. Wilson T. His memory, by his own admission, was vague on when, where, and in what manner he voiced his concerns. Id. Respondent, on the other hand, maintains a written record of all customer complaints, which it specifically checked. Hernandez T. Respondent found no complaints logged from claimant at any time, even though it annually trains its bankers on the need and protocol to lodge customer complaints. Id. Accordingly, the Arbitrator concludes that respondent obtained claimant's affirmative consent, which he never revoked until 2022 when he disenrolled in DCOS.

The Chambers court agreed that a disclosure, like respondent's, effectively secures affirmative consent:

> These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"— explicitly make overdrafts a function of the customer's available balance. If the [bank's] aim was to secure Chambers' affirmative consent for an overdraft program based on her available balance, then the opt in agreement was effective.

222 F. Supp. 3d at 15-16.

## Signature Acknowledgement

Claimant asserts that respondent violated Reg. E because it did not obtain claimant's signature to acknowledge his DCOS enrollment. Claimant points out that respondent obtained his signature on the account application form which acknowledged his receipt of the CAA, privacy notice, and other items, but failed to include any reference to the DCOS disclosure. See R2. Respondent admits that, in 2013, it only obtained verbal consent directly from the customer, which the banker then formally acknowledged by logging the consumer's consent into the SVP computer system.

40

**SER62**

Hernandez T; R4; R5.

The Arbitrator agrees that Reg. E permits banks to require a signature and that a signature would have been more prudent for both respondent and claimant. Presumably, in part for this reason, respondent now requires its customers to acknowledge their consent with an electronic signature. See R34. Nevertheless, the Arbitrator found nothing in the regulation, interpretations, or comments that require a customer's signature, only comments that permit a signature. See, e.g., Comment 5 (bank *could* require the consumer to sign at account opening). Moreover, Reg. E expressly permits telephonic consent, which by definition, would not result in a signature. See also Comment 6 (An institution *may* obtain a consumer's affirmative consent by providing a blank signature line). Further, while respondent could have required – and now does require – a separate consent signature, respondent could not have included a written, signed consent to the DCOS disclosure as part of the account application's signature because Reg. E requires it to obtain the customer's consent "separately from other consents or acknowledgements obtained by the institution." See Comment 6; see also id. (not affirmative consent if included in contract consumer must sign to open the account). Finally, Reg. E's separate requirement to furnish the customer with a written confirmation of enrollment suggests that consent and written confirmation represent two different requirements with two different processes. As to the latter, the regulators specifically obliged banks to provide its enrolled customers with a *written* confirmation. In contrast, as to the first, the regulators required affirmative consent but did not specify written consent, as they had in the confirmation context. Compare 12 C.F.R. § 1005.17(b)(1)(iv) with 12 C.F.R. § 1005.17(b)(1). Accordingly, the Arbitrator concludes that respondent did not violate Reg. E by failing to obtain claimant's signature acknowledging his DCOS enrollment because Reg. E does not require the customer's signature.

## Confirmation

Section 1005.17 also requires a financial institution to confirm the customer's consent in writing. 12 C.F.R. § 1005.17(b)(1)(iv). Alternatively, the financial institution can confirm consent electronically with the customer's approval. Id. Under either method, the confirmation must specify the customer's right to revoke consent. Id. Claimant argued that respondent never confirmed his enrollment in writing and that, if it did, the confirmation did not include the requisite right to revoke notice.

To satisfy the confirmation requirement,

> 7. **Confirmation.** A financial institution may comply with the requirement in § 1005.17(b)(1)(iv) to provide confirmation of the consumer's affirmative consent by mailing or delivering to the consumer a copy of the consumer's completed opt-in notice, or by mailing or delivering a letter or notice to the consumer acknowledging that the consumer has elected to opt into the institution's service. The confirmation, which must be provided in writing, or electronically if the consumer agrees, must include a statement informing the consumer of the right to revoke the opt-in at any time. *See* § 1005.17(d)(6), which permits institutions to include the revocation statement on the initial opt-in notice. An institution complies with the confirmation requirement if it has adopted reasonable procedures designed to ensure that overdraft fees are assessed only in connection with transactions paid after the confirmation has been mailed or delivered to the consumer.

41

**SER63**

Comment 7 (original bold).

Respondent's contemporaneous business records show a template of the confirmation form letter used in 2013 but not a copy of claimant's actual letter. R6; Hernandez T. Respondent explained that its retention policy only lasts 7 years and therefore it no longer maintains a copy of the actual letter handed to claimant. Hernandez T. Still, as respondent demonstrated, its 2013 protocols required the banker to hand a customer who enrolled in DCOS in person, like claimant, a hard copy of the confirmation letter that printed out immediately and automatically from its computer system once the banker verified the customer's desire to enroll in DCOS. Id.; see R4-R5. Indeed, the computer system blocked the banker from proceeding with the account opening until it printed out the confirmation letter. Hernandez T. Given these contemporaneous records, the Arbitrator finds that claimant failed to sustain his burden to show respondent violated Reg. E by failing to confirm his enrollment in writing. The Arbitrator also concludes that the plain language of the confirmation letter explicitly includes the required notice of claimant's right to revoke consent at any time. See R6; accord Hernandez T.

**CONCLUSION**

Based upon the totality of the evidence, the Arbitrator rules that claimant did not prove his First Cause of Action for violation of the Electronic Fund Transfer Act (ETFA), as implemented by Federal Reserve Regulation E (Reg. E), 12 C.F.R. § 1005.1, et seq. because he failed to establish respondent's noncompliance with Reg. E. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's 2012 Overdraft Brochure satisfy Regulation E's opt-in requirements? *Yes.*
- Was Claimant's signature on his application sufficient to demonstrate his assent to join the DCOS overdraft service? *No but not determinative.*
- Did Wells Fargo satisfy Regulation E by giving Claimant a confirmation letter of being opted into the DCOS service, including a notice of his right to exit the service at any time? *Yes.*
- Did Claimant give affirmative consent in a manner satisfying Regulation E? *Yes.*
- Did Wells Fargo opt Claimant into its overdraft program using undue coercion? *No.*
- Did the fact that a Wells Fargo employee opted Claimant into the program satisfy Regulation E? *Inapplicable. The Arbitrator finds claimant opted in to DCOS, and the bank employee checked yes in respondent's system to capture claimant's verbal consent.*
- Did Wells Fargo explain its overdraft program in a clear, unambiguous, stand-alone document as Regulation E requires? *Yes.*
- Did the 2012 Overdraft Brochure contain information not permitted under Regulation E? *No.*
- Did the 2012 Overdraft Brochure accurately disclose Wells Fargo's policy for charging overdrafts on one-time debit card and ATM transactions in a stand-alone document? *Yes.*
- Is Claimant entitled to damages for Wells Fargo's violations of federal law? *No.*
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No.*
- Whether Wilson has proven that Wells Fargo violated Regulation E's disclosure requirement. *No.*
- Whether Wilson has proven that Wells Fargo violated Regulation E's reasonable opportunity requirement. *No.*
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable.*

42

- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No.*

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

## UCL

In his Second Cause of Action, claimant alleges that respondent's overdraft policies violated both the unlawful and unfair prongs of California's Unfair Competition Law California Business & Professions Code § 17200, *et. seq.* Specifically, claimant seeks adjudication of the following issues:
- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL?
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL?
- Is Claimant entitled to damages for Wells Fargo's violations of state law?
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations?

Issues to be Adjudicated from Claimant, dated 6/24/22. Similarly, in addition to its defenses, respondent identifies the following issues to be adjudicated with respect to this cause of action:

- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL.
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages."
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief.

Respondent's Issues to be Adjudicated, dated 6/22/22.

The UCL prohibits illegal business practices, which it defines, *inter alia*, as any unlawful, unfair, or fraudulent business practice. Cal. Bus. & Prof. Code § 17200. The UCL imposes strict liability, but adjudicators may use their equitable powers to dismiss a UCL claim or deny equitable relief. Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163, 179 (2000); South Bay Chevrolet v. General Motors Acceptance Corp., 72 Cal. App. 4th 861, 877 (1999).

## Economic Injury

Individual consumers have standing to sue for illegal business practices if they suffered financial loss as a result. Cal. Bus. & Prof. Code § 17204. Consumers, like claimant, must prove that the illegal practice caused them an economic injury. Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 322-23 (2011); see Mosley v. Wells Fargo Bank NA, No. 17-CV-05064- JSC, 2017 WL 5478628, at *7 (N.D. Cal. Nov. 15, 2017) (violation of Homeowner's Bill of Rights insufficient to confer UCL standing when loss of money or property not alleged).

## Causation

Claimant must also prove causation – the casual link between the illegal practice and his harm – but cannot do so if he would have suffered the same injury whether or not respondent complied with the law. Troyk v. Farmers Grp. Inc., 171 Cal. App. 4th 1305, 1349 (2009); see Townsend v. Wells Fargo Bank, N.A., No. 18-cv-07382-NC, 2019 WL 4145464, at *4 (N.D. Cal. Aug. 30, 2019)

43

(no UCL standing where plaintiffs did not establish a causal connection between bank's reporting to credit bureaus and their diminished credit rating), aff'd, No. 19-16919 (9th Cir. Dec. 16, 2020).

## Remedies

If claimant proves a violation, the statute authorizes injunctive and other equitable relief to prevent the illegal or unfair practice; and these remedies are cumulative with other remedies. Cal. Bus. & Prof. Code §§ 17203, 17205; DiCarlo v. MoneyLion, Inc., 977 F.3d 1148, 1156 (9th Cir. 2021). Claimant may not recover damages, however, as the UCL disgorges the particular property or money taken by an unfair or illegal business practice, rather than confer compensation damages. Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003); Inline, Inc. v. Apace Moving Sys. Inc., 125 Cal. App. 4th 895, 905 (2005). Claimant may not obtain disgorgement (a full refund) if he received a benefit from the product or service. See In re Tobacco Cases II, 240 Cal. App. 4th 779, 800 (2015), review denied, No. S23046 (Cal. Dec. 9, 2015). Instead, the UCL provides for injunctive relief, restitution, and civil penalties for government enforcement. Cal. Bus. & Prof. Code §§ 17203, 17206. As with the UCL's substantive provisions, the courts liberally construe its remedial provisions to fashion creative awards of injunctive or restitutionary relief. Fletcher v. Sec. Pac. Nat'l Bank, 23 Cal. 3d 442, 449 (1979).

In Cortez, the California Supreme Court held that, given UCL's equitable nature, adjudicators must weigh the equities and may take into account equitable defenses and "considerations," including laches, good faith, waiver and estoppel. 23 Cal. 4th at 180. ("A court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute."); see e.g., Pac. Coin Mgmt. v. BR Telephony Partners, No. B165217, 2006 WL 290569, at *18 (Cal. Ct. App. Feb. 8, 2006) (laches valid equitable defense to deny UCL restitution claim).

## Unlawful

A business practice is unlawful if it violates a law other than the UCL.
A UCL "unlawful" claim thus rises or falls with the underlying claim, here the EFTA. See Asencio v. Miller Brewing Co., 283 Fed. App'x 559, 561-62 (9th Cir. 2008); Ruberson v. Gerdau Reinforcing Steel, Case No. 5:19-cv-01553, 2020 WL 3891679, at *4 (C.D. Cal. Apr. 10, 2020); Sanchez v. Russell Sigler, Inc., Case No. CV 15-01350-AP (PLAx), 2016 WL 11760184, at *4 (C.D. Cal. May 31, 2016); Daugherty v. Am. Honda Motor Co., 144 Cal. App. 4th 824, 837 (2006); Bothwell v. Abbot Laboratories, Inc., 134 Cal. App. 4th 438 (2005). Here, claimant based his UCL unlawful claim on respondent's alleged Reg. E violations. Accordingly, for all the reasons analyzed above, the Arbitrator concludes as a matter of law that claimant did not prove his UCL unlawful claim because he failed to prove a violation of the underlying Reg. E claim.

## Unfair

Neither the UCL nor courts have specifically defined "unfair" for UCL purposes. Generally, courts use the "unfair" prong to redress improper business practices. See Candelore v. Tinder, Inc., 19 Cal. App. 5th 1138, 1155 (2018); see, e.g., Smith v. Chase Mortg. Credit Grp., 653 F. Supp. 2d 1035, 1045-46 (E.D. Cal. 2009) (concluding that defendant's alleged violation of internal policy provides basis for unfairness claim). The California Supreme Court, however, criticized UCL's unfairness ground as unfair to businesses who need to know with reasonable certainty what the law prohibits and permits. See Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, (1999) (establishing test in competitor cases).

44

**SER66**

Since the Cel-Tech decision, the courts have applied different tests of unfairness in consumer UCL cases, including: the "tethered test," public harm test, unconscionability test, "the balancing test," the FTC test, and Cel-Tech's competitor test. See Lozano v. AT&T Wireless Servs. Inc., 504 F.3d 718, 735, 736 (9th Cir. 2007); In re Qualcomm Litig., No. 17-cv-00108-GPC-MDD, 2017 WL 5985598, at *6-11 (S.D. Cal. Nov. 8, 2017) (recognizing unsettled test and analyzing claim under all three "primary consumer tests"); Moran v. Prime Healthcare, 3 Cal. App. 5th 1131, 1147-48 (2016).

The tethered test requires claimants to tether their UCL unfairness claim to public policy evidenced in specific constitutional, statutory, or regulatory provisions. See, e.g., Gregory v. Albertson's, Inc., 104 Cal. App. 4th 845, 854 (2002). The public harm test requires claimants to establish a causal link between the unfair practice and public harm. See, e.g., In re Firearms Cases, 126 Cal. App. 4th 959, 981 (2005). Under the unconscionability test, claimant must identify a practice that "offends an established public policy" or is otherwise "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Cappello v. Walmart Inc., 394 F. Supp. 3d 1015, 1024 (N.D. Cal. 2019).

Under the balancing test, the adjudicator weighs "the utility" of respondent's conduct against the "gravity of the harm." Davis v. HSBV Bank Nevada, N.A., 691 F.3d 1152, 1169 (9th Cir. 2012). In Camacho v. Automobile Club of So. Cal., the court applied the balancing test and required a substantial, unavoidable consumer injury, not outweighed by countervailing benefits. 142 Cal. App. 4th 1394, 1403 (2006).

## Claimant's Unfairness Claim

Claimant stresses that respondent's 2012 disclosure satisfies UCL's unfairness test because it: (1) was misleading; (2) encouraged customers to enroll in DCOS; and (3) required reliance on the banker's unscripted verbal explanation of the program. Respondent objects to this claim as untimely filed on the eve of hearing and meritless in any event.

### Timeliness

For the reasons analyzed above, the Arbitrator overrules respondent's procedural objections.

### Substantive Claim

On the merits, the Arbitrator finds claimant failed to state an unfairness claim under UCL for several independent grounds: (1) claimant cannot sustain an unfairness claim based upon lawful practices; (2) claimant's unfairness claim mimics his unlawful claim; (3) respondent's practices did not rise to the level of unfairness; (4) claimant could have avoided the consequences; (5) federal law preempts claimant's UCL claim; and (6) the Arbitrator exercises her discretion to abstain.

1. Lawful

Regardless of the test used, lawful practices cannot support a UCL unfairness claim. See Cel-Tech, 20 Cal. 4th at 183; see, e.g., Hauk v. JP Morgan Chase Bank USA, 552 F.3d 1114, 1122 (9th Cir. 2009) (safe harbor applied when bank complied with the TILA disclosure provisions); Suzuki v. Hitachi Glob. Storage Techs., Inc., No. C 06-07289 MHP, 2007 WL

45

**SER67**

2070263, at *3 (N.D. Cal. July 17, 2007) (same). For the reasons analyzed above, the Arbitrator concluded that respondent engaged in lawful practices. Accordingly, claimant cannot as a matter of law base his UCL unfair prong claim upon those practices.

2. Mimicry

"Where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." NorthBay Healthcare Grp. – Hosp. Div. v. Blue Shield of Cal. Life & Health Ins., 342 F. Supp. 3d 980, 988-89 (N.D. Cal. 2018). The Arbitrator finds that claimant's UCL claim based upon the unfair prong mirrors his unlawful prong claim and therefore cannot survive.

3. Fair

The Arbitrator concludes that respondent's practices do not rise to the level of unfair business practices. In Bickoff v. Wells Fargo Bank N.A., the court held it was not unfair for a bank to foreclose on an overdue construction loan where it had never guaranteed permanent financing. No. 14CV1065 BEN (WVG), 2016 WL 3280439, at *15-16 (S.D. Cal. June 14, 2016), aff'd, 705 F. App'x 616 (9th Cir. 2017). In Harris v. Wells Fargo Bank N.A., it was not unfair for a bank to record a notice of default against secured real property at the same time as the borrower was preparing, but had not completed, a borrower's loan modification application. No. 516CV00645CASKKx, 2016 WL 3410161, at *4 (C.D. Cal. June 15, 2016), vacated on other grounds, No. EDCV 16-645 JGB (KKx), 2016 WL 11486587 (C.D. Cal. July 14, 2016) (vacating prior opinion following recusal of prior assigned judge under 28 U.S.C. § 455). In both those banking cases, the courts rejected the unfairness claims even though plaintiffs presented sympathetic arguments. Applying these and other precedent in this case, the Arbitrator finds that respondent's overdraft practices do not trigger UCL's unfair prong.

4. Avoidable

Under the most commonly applied balancing test, courts refuse to find a UCL unfair claim where the claimant could have avoided the consequences of respondent's conduct. Here, the Arbitrator finds that claimant could have avoided the imposition of overdraft fees. Claimant's bank statements reflected DCOS enrollment with a checkmark in the overdraft services row under the applicable account options. Hernandez T; Nelson Dep. at 62-64; see, e.g., R7-R20. Each monthly statement also listed a summary of overdraft fees assessed during that period as well as year-to-date. Hernandez T; R7-20. The statements also contained a section on how to avoid fees, respondent's website address for frequently asked questions about service fees, and a detailed three paragraph policy on how to report inaccuracies, errors, questions, or complaints. See R7-R20. The policy also advised customers that respondent will investigate complaints and promptly correct any errors. Id. Respondent also notified customers that it would refund any fees, even if correctly assessed, if its investigation lasted more than 10 business days so that customers had access to the disputed funds pending investigation. Id. The Arbitrator finds that claimant could have avoided many, if not all, of the overdraft fees at issue if he had examined his statements and contacted respondent to ascertain how best to avoid overdraft fees each month. Therefore, the Arbitrator concludes as a matter of law that claimant cannot sustain a UCL claim under the unfair prong.

46

5. Preemption

Claimant may not base an unfair prong UCL claim on matters preempted by federal law. See, e.g., Robinson v. Bank of Am., NA, 525 F. App'x 580 (9th Cir. 2013) (NBA preempted account holder's nondisclosure claims); Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712, 723-25 (9th Cir. 2012) (NBA preempted unfair but not fraudulent UCL claim to the extent "unfair" prong prohibited bank's "high-to-low" posting practices); Chae v. SLM Corp., 593 F.3d 936, 938, 943 (9th Cir. 2010) (Higher Education Act preempted UCL and CLRA claims alleging improper interest charges); Winebarger v. Pa. Higher Educ. Assistance Agency, 411 F. Supp. 3d 1070, 1089 (C.D. Cal. 2019) (20 U.S.C. § 1098g preempted UCL and CLRA claims based on failure to accurate disclosure); Newbeck v. Wash. Mut. Bank, No. C 09-1599 CW, 2010 WL 291821, at *4 (N.D. Cal. Jan. 19, 2010) (HOLA preempted UCL failure to disclose claim); Grant v. Aurora Loan Servs., 736 F. Supp. 2d 1257, 1275 (C.D. Cal. 2010) (HOLA and OTS regs preempted UCL claim relating to mortgages); Martinez v. Wells Fargo Bank, N.A., No. C-06-40-03327 RMW, 2007 WL 963965, at *6-8 (N.D. Cal. Mar. 30, 2007) (NBA preempted UCL as to fees for mortgage loan settlement services). Applying this precedent, the Arbitrator separately concludes as a matter of law that the national banking laws preempt California's UCL to the extent they conflict.

6. Abstention

Courts also proceed with caution in adjudicating unfairness claims under UCL and may apply judicial abstention in economic matters when the challenged business practice arises in a regulated industry and has not been prohibited. Basically, courts decline to do what the legislature has chosen to leave undone. See, e.g., Beasley v. Wells Fargo Bank, 235 Cal. App. 3d 1383, 1391 (1991). The Arbitrator exercises her discretion to exercise judicial abstention in this case. Claimant essentially objects to banks using the available balance method of determining overdraft fees. Regardless of the fairness or unfairness of that method, Congress has not prohibited it even though federal law heavily regulates the banking industry. Accordingly, the Arbitrator declines to tread where the legislative has chosen not to.

## CONCLUSION

Based on each of these independent grounds, the Arbitrator rules that claimant did not prove his second cause of action for violation of UCL. Specifically, the Arbitrator adjudicates the parties' submitted issues as follows:

- Did Wells Fargo's overdraft practices violate the unlawful prong of the UCL? *No.*
- Did Wells Fargo's overdraft practices violate the unfair prong of the UCL? *No.*
- Is Claimant entitled to damages for Wells Fargo's violations of state law? *No.*
- Is Wilson entitled to obtain injunctive relief for Wells Fargo's violations? *No.*
- Whether Wilson has proven that Wells Fargo committed an unfair practice in violation of California's UCL. *No.*
- If Wilson prevails on his claims, whether Wilson is entitled to "cascading damages." *Inapplicable.*
- Whether Wilson has demonstrated that he is entitled to public injunctive relief and, if so, what relief. *No.*

Issues to be Adjudicated from Claimant, dated 6/24/22; Respondent's Issues to be Adjudicated, dated 6/22/22.

47

## RESPONDENT'S DEFENSES

Respondent defended itself on the grounds of (1) lack of standing; (2) Reg. E compliance; (3) safe harbor protection; (4) industry practices; (5) estoppel; (6) laches; (7) UCL safe harbor; (8) statute of limitations; (9) failure to mitigate; and (10) UCL circumvention of safe harbor protection.

### Standing

For the reasons analyzed above, the Arbitrator rules that claimant has standing to assert his claims.

### Reg. E Compliance

For the reasons analyzed above, the Arbitrator concludes that respondent complied with Reg. E.

### SOL

The Arbitrator hereby incorporates her ruling on the statute of limitations defense as set forth in the SOL Order, dated 3/22/22.

### Failure to Mitigate

The Arbitrator hereby incorporates her ruling on the duty to mitigate as set forth in the Dispositive Motion Order, dated 6/18/22.

### Safe Harbor Protection

The Arbitrator hereby incorporates her ruling on the safe harbor's applicability as set forth in the Dispositive Motion Order, dated 6/18/22.

### UCL Safe Harbor

The Arbitrator declines to adjudicate this defense as moot.

### Industry Practices

The Arbitrator concludes that respondent did not sustain its burden of proof on this defense as it did not submit evidence of industry-wide practices.

### Estoppel

The Arbitrator declines to adjudicate this defense as moot.

### Laches

The Arbitrator declines to adjudicate this defense as moot.

### UCL Circumvention

48

**SER70**

The Arbitrator declines to adjudicate this defense as moot.

**REQUESTED REMEDIES**

Claimant requested disgorgement with interest, injunctive relief barring enrollment in its overdraft program without informed consent through an accurate opt-in and proper procedures, damages, civil penalties, order enjoining continuing wrongful conduct, costs, pre- and post-judgment interest, costs, and attorneys' fees. Respondent argued that, even if it violated Reg. E and or the UCL, claimant has limited available remedies.

The Arbitrator finds that respondent's current 2022 disclosure effective May 9, 2022 complies with its Reg. E duties. Accordingly, the Arbitrator declines to issue any form of public injunctive relief in this matter. The Arbitrator finds for respondent on all remaining requested remedies.

**FINAL AWARD**

I, Janice L. Sperow, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby AWARD as follows in this matter:

1. For respondent on the First Cause of Action;
2. For respondent on the Second Cause of Action;
3. For claimant on the issue of standing;
4. For claimant on the Regulation E safe harbor defense;
5. For respondent on the defense of failure to mitigate;
6. For respondent in part and claimant in part on the statute of limitations defense;
7. For claimant on the defense of industry practices;
8. The Arbitrator dismisses the defense of estoppel as moot;
9. The Arbitrator dismisses the defense of laches as moot;
10. The Arbitrator dismisses the defense of UCL safe harbor as moot;
11. The Arbitrator dismisses the defense of UCL circumvention of safe harbor protection as moot;
12. The Arbitrator declines to adjudicate all other defenses as moot;
13. For respondent on all requests for damages, statutory and non-statutory, economic and noneconomic;
14. For respondent on the request for declaratory judgment;
15. For respondent on the request for public injunctive relief;
16. For respondent on the request for private injunctive relief;
17. For respondent on the request for punitive damages;
18. For respondent on claimant's request for attorneys' fees and costs;
19. The Arbitrator denies the request for interest as moot; and
20. The Arbitrator denies the request for expert costs as moot.

The administrative fees and expenses of the American Arbitration Association totaling $3,150.00 and the compensation and expenses of the Arbitrator totaling $33,500.00 shall be borne as incurred.

Respondent is the prevailing party in this matter. All claims not expressly granted herein are hereby denied. This is a final award in this arbitration. This award resolves all issues between the parties and represents the final adjudication of all claims and defenses between the parties.

July 14, 2022
*/s/ Janice L. Sperow*
Janice L. Sperow, Arbitrator

50

# Exhibit H

Case: 23-55478, 08/11/2023, ID: 12772559, DktEntry: 15, Page 74 of 218



**McCUNE · WRIGHT · AREVALO**
**ATTORNEYS AT LAW**

April 25, 2022

*Delivery Type: Email*
SophiaParra@adr.org

Richard A. Nervig

ran@mccunewright.com
Phone: 909-557-1250

American Arbitration Association
*Attn: Sophia Parra*
45 E River Park Place West, Suite 308
Fresno, CA 93720

      **Re:**   **Arbitration Against Wells Fargo Bank, N.A.**

                **Related Case:** *Wilson v. Wells Fargo Bank, N.A.,*
                **AAA Case No. 01-21-0016-4036**

Dear Ms. Parra:

      As you know, our firm represents the following Claimants in arbitration cases against Wells Fargo Bank, NA.:

-                                                
  *(Case No. 01-22-0000-4726)*
- *(Case No. 01-22-0000-5138)*
- *(Case No. 01-22-0000-6147)*
- *(Case No. 01-22-0000-6470)*
- *(Case No. 01-22-0000-9017)*
- *(Case No. 01-22-0000-9034)*
- *(Case No. 01-22-0000-9849)*
- *(Case no. 01-22-0000-9868)*
- *(Case No. 01-22-0001-1831)*
- *(Case No. 01-22-0001-1836)*
- *(Case No. 01-22-0001-1851)*
- *(Case No. 01-22-0001-1944)*
- *(Case No. 01-22-0001-2073)*

---

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ▪   Phone: 909.557.1250    Fax: 909.557.1275   ▪   McCuneWright.com

**ORANGE COUNTY**
Irvine, CA

**INLAND EMPIRE - EAST**
San Bernardino, CA

**MIDWEST**
Edwardsville, IL

**EAST COAST**
Newark, NJ

SER74

Page 2 of 2
April 25, 2022

       Although not filed simultaneously with our recent multi case filing, we request that all of these cases be consolidated and otherwise subject to AAA's Supplementary Rules for Multiple Case Filings pursuant to Rule MC-1(c) thereto.

     .

                     Very truly yours,
                     MCCUNE WRIGHT AREVALO, LLP

                     */s/ Richard A. Nervig*
                     Richard A. Nervig

RAN/mt
cc:   Victoria Chandler *(VictoriaChandler@adr.org)*;
Joshua D. Davey, Esq. *(joshua.davey@troutman.com)*;
Jacob Franchek, Esq. *(jacob.franchek@troutman.com)*;
Michael Peretz, Esq. *(michael.peretz@troutman.com)*

# Exhibit J



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA
Telephone: (877) 528-0880
Fax: (855) 433-3046

July 12, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road
Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street
Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com


Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This acknowledges receipt of Demands for Arbitration for the matters in the enclosed case list and arbitration agreements providing for administration by the American Arbitration Association (AAA). These cases are now assigned to me for administration as the Consumers have met the filing requirements.

The **Consumer Arbitration Rules** and **Supplementary Rules for Multiple Case Filings** apply to these matters.

**Answer**

- This acknowledges receipt of Wells Fargo's Answer dated July 6, 2022. The Answer pertains to the cases outlined in the case list.
- Please reference the Rules if filing a counterclaim.

**Initial List of People Form**

- Please complete and return the enclosed Initial List of People Form by August 2, 2022. Instructions are provided on the Initial List form and on the enclosed reference sheet.

**SER77**

**Hearing Type and Locale of In-Person Hearing**

- We note the parties' arbitration agreement provides that:
  *"An arbitration will be held in the state whose laws govern your account."*
- If no disclosed claim or counterclaim exceeds $25,000, the matter shall be resolved by the Procedures for the Resolution of Disputes through Document Submission contained in the Consumer Arbitration Rules, unless a party asks for a hearing or the arbitrator decides that a hearing is necessary.

**CA CCP §1282.4**

- Your attention is directed to California Code of Civil Procedure Section 1282.4 regarding representation by an attorney not licensed to practice in the State of California. Please refer to the State Bar of California website if you need a certification form as described in the statute. Admissions requirements, Out of State Attorney Arbitration Counsel FAQ, and other information may be found at: The State Bar of California.

**The Costs of Arbitration effective November 1, 2020**

- Pursuant to section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the undersigned if you have any questions regarding the waiver of administrative fees.
- The costs for this case are detailed in the Consumer Rules Costs of Arbitration effective November 1, 2020, available on our website at www.adr.org.

**Amounts Paid or Due**

- This confirms the Filing Fees have been paid.

**Cybersecurity and Privacy**

- Please review the enclosed *AAA-ICDR® Best Practices Guide for Maintaining Cybersecurity and Privacy,* and *AAA-ICDR® Cybersecurity Checklist.*

**Small Claims Court Option**

- We draw your attention to R-9 of the Consumer Arbitration Rules. If a party's claim is within the jurisdiction of a small claims court, either party may choose to exercise the small claims option. If either party would like this matter decided by a small claims court, please send your written request to the case administrator and copy all other parties. If the parties disagree over whether the claim is within the jurisdiction of a small claims court, the case will proceed in arbitration and the arbitrator may make a final determination on whether the claim may proceed to small claims court.

**Next Administrative Step**

- This will acknowledge receipt of the parties' proposed issues for the Process Arbitrator. A Process Arbitrator will be appointed from the parties' submitted strike and rank lists.
- We will proceed with administration of the cases previously assigned to Sophia Parra.

Please review the enclosed Consumer Arbitration Reference Sheet for more information or view our website at www.adr.org/consumer.

The AAA appreciates the opportunity to assist you with your dispute resolution needs.

Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org


Supervisor Information: *Donna Martinez, Director of ADR Operations,(559)490-1881, DonnaMartinez@adr.org*

Enclosures

cc:     Ashley Hawthorne
        Alicia A. Baiardo, Esq.
        Michael Peretz, Esq.
        David C. Wright, Esq.
        Brandon Keshish
        Kyle Lawheed
        Kristina J. Catapang
        Joel S. Allen
        Emily J. Kirk, Esq.
        Jacob Franchek
        Richard D. McCune, Esq.
        Mary Katherine Grob, Esq.
        Chloe Lee
        Michelle Truong
        Bill Mayberry
        Jason Evans
        Amy Morrissey Turk
        Krystal Gollogly

# Exhibit K



Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

July 29, 2022

Richard A. Nervig, Esq.
McCune Wright Arevalo, LLP
18565 Jamboree Road, Suite 550
Irvine, CA 92612
Via Email to: ran@mccunewright.com

Joshua D. Davey, Esq.
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202
Via Email to: joshua.davey@troutman.com

Individual Consumers
-vs-
Wells Fargo & Co., Wells Fargo Bank, N.A.

Dear Parties:

This will confirm the appointment of Hon. Anita Rae Shapiro as the Process Arbitrator for the above-referenced matters.

As requested by the arbitrator, if either party or their counsel knows of any contact or conflict that may be relevant, they are to communicate this information to the American Arbitration Association (AAA) immediately.

Pursuant to the Supplementary Rules for Multiple Case filings, Rule MC-10(c), "Compensation of the Process Arbitrator will be at the rate set forth on the Process Arbitrator's Resume." Upon receipt of Hon. Shapiro's requested compensation deposit, an invoice will be provided to the business.

An Initial Conference Call will be held with the parties and Hon. Shapiro to discuss next steps and administrative issues. We ask that the parties review Rule MC-6 of the Supplementary Rules for Multiple Case Filings with regard to the Process Arbitrator. A copy of the Rules is attached for your convenience.

Hon. Shapiro is available to conduct the conference call on the following dates and times:

- August 8, 2022 - (9:00AM – 5:00PM)
- August 9, 2022 - (9:00AM – 5:00PM)
- August 10, 2022 - (9:00AM-10:30AM)
- August 12, 2022 - (9:00AM-12:00PM)
- August 22, 2022 - (9:00AM-12:00PM)
- August 23, 2022 - (9:00AM-11:00AM)
- August 24-26, 2022 - (9:00AM – 5:00PM)

All times presented are for Pacific Time.

Please provide your availability within the next two business days or by August 2, 2022.  If we do not receive a response, we will presume all options are acceptable and this hearing will be set.

A copy of this correspondence is being provided to Hon. Shapiro.


Sincerely,
/s/
Christina Negrete
Manager of ADR Services
Consumer Group Team
Direct Dial: (559) 475-6265
Email: consumergroupteam@adr.org
Fax: (855)433-3046

Supervisor Information: *Donna Martinez, Director of ADR Operations, (559) 490-1881,* DonnaMartinez@adr.org

Enclosure

cc:     Ashley Hawthorne
        Alicia A. Baiardo, Esq.
        Michael Peretz, Esq.
        David C. Wright, Esq.
        Brandon Keshish
        Kyle Lawheed
        Kristina J. Catapang
        Joel S. Allen
        Emily J. Kirk, Esq.
        Jacob Franchek
        Bill Mayberry
        Richard D. McCune, Esq.
        Mary Katherine Grob, Esq.
        Krystal Gollogly
        Chloe Lee
        Michelle Truong
        Amy Morrissey Turk, Esq.
        Jason Evans

# Exhibit L



AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road Suite 700
Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 04/22/2022 | **$150,225.00** |
| Case # | |
| 501 Individual v Wells Fargo & Co, Wells Fargo Bank, NA | |

# Invoice

Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 4/22/2022 | 02 (01-22-0001-6396) | Initial Filing Fee<br>**(500 cases X $300) (1 case X $225)** | **$150,225.00** | 4/22/2022 |

**Remarks**   Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**132727 Noel Road**
**Suite 700**
**Dallas, TX 75240**



AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road Suite 700
Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 05/06/2022 | **$19,125.00** |
| Case # ||
| 85 Individual v Wells Fargo & Co, Wells Fargo Bank, NA ||

# Invoice

Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 05/06/2022 | 02 (01-22-0001-6396) | Initial Filing Fee<br>**(85 cases X $225)** | **$19,125.00** | 05/06/2022 |

**Remarks**     Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**132727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

**SER85**

 **AMERICAN ARBITRATION ASSOCIATION**® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®    13727 Noel Road Suite 700 Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 05/18/2022 | **$21,600.00** |
| Case # | |
| 96 Individual v Wells Fargo & Co, Wells Fargo Bank, NA | |

# Invoice

Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 05/18/2022 | 02 (01-22-0001-6396) | Initial Filing Fee<br>**(96 cases X $225)** | **$21,600.00** | 05/18/2022 |

**Remarks**    Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

# SER86

 AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®    13727 Noel Road Suite 700
Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 06/23/2022 | **$139,725.00** |
| Case # | |
| 621 Individual v Wells Fargo & Co, Wells Fargo Bank, NA | |

# Invoice

Wells Fargo Bank, N.A.
301 South College Street
Charlotte, NC 28202
Matter Number: WF2022015425

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 06/23/2022 | 02 (01-22-0002-3711) | Initial Filing Fee<br>**(621 cases X $225)** | **$139,725.00** | UPON RECEIPT |

**Remarks**    Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

 **AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®  13727 Noel Road Suite 700 Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 7/18/2022 | **$85,350.00** |
| Case # | |
| 401 Individual Consumers v Wells Fargo | |

# Invoice

Wells Fargo & Co. Wells Fargo Bank, N.A. Attn:
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 7/18/2022 | 01-22-0002-7467 | Initial Administrative Fees (336 Cases x $225.00) | **$75,600.00** | 7/18/2022 |
| 7/18/2022 | 01-22-0002-7467 | Initial Administrative Fees (65 Cases x $150.00) | **$9,750.00** | 7/18/2022 |

**Remarks**   Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

 **AMERICAN ARBITRATION ASSOCIATION®** INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

13727 Noel Road Suite 700
Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 8/12/2022 | **$21,300.00** |
| Case # | |
| 142 Individual Consumers v Wells Fargo | |

# Invoice

Wells Fargo & Co. Wells Fargo Bank, N.A. Attn:
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 8/12/2022 | 01-22-0003-3796 | Initial Administrative Fees (142 Cases x $150.00)<br><br>Matter No. WF2022015425 | **$21,300.00** | 09/12/2022 |

**Remarks**    Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**



AMERICAN
ARBITRATION
ASSOCIATION®

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

13727 Noel Road Suite 700
Dallas TX 75240

| Statement Date | Amount Due |
|---|---|
| 10/07/2022 | **$37,350.00** |
| Case # | |
| 249 Individual Consumers v Wells Fargo | |

# Invoice

Wells Fargo & Co. Wells Fargo Bank, N.A. Attn:
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 10/7/2022 | 01-22-0004-1432 | Initial Administrative Fees (249 Cases x $150.00)<br><br>Matter No. WF2022015425 | **$37,350.00** | 11/7/2022 |

**Remarks**   Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

**SER90**



| Statement Date | Amount Due |
|---|---|
| 10/26/2022 | **$26,400.00** |
| Case # | |
| 176 Individual Consumers v Wells Fargo | |

13727 Noel Road Suite 700
Dallas TX 75240

# Invoice

Wells Fargo & Co. Wells Fargo Bank, N.A. Attn:
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202

| Date | Reference Number | Description | Balance | Due Date |
|---|---|---|---|---|
| 10/26/2022 | 01-22-0004-4563 | Initial Administrative Fees (176 Cases x $150.00)<br><br>Matter No. WF2022015425 | **$26,400.00** | 10/26/2022 |

**Remarks**   Please make check payable to the American Arbitration Association.

**EIN # 13-0429745**

Please notify me if you wish to pay online vie e-check or credit card and I will provide instructions for submitting payment through our website. Although it is not recommended at this time, if you must send a physical check, please send via a delivery service to the address below with this invoice included.

**American Arbitration Association**
**Attn: Finance**
**13727 Noel Road**
**Suite 700**
**Dallas, TX 75240**

**SER91**

Case 3:22-cv-01976-DMS-SBC Document 22-13 Filed 02/08/23 PageID.1219 Page 1 of 4

# Exhibit M

**Gollogly, Krystal Lynne**

| | |
|---|---|
| **From:** | Consumer Group Team <ConsumerGroupTeam@adr.org> |
| **Sent:** | Friday, February 3, 2023 12:04 PM |
| **To:** | Gollogly, Krystal Lynne; 'ran@mccunewright.com'; 'joshua.davey@troutman.com' |
| **Cc:** | 'rdm@mccunewright.com'; 'Mt@mccunewright.com'; 'kl@mccunewright.com'; 'kjc@mccunewright.com'; 'ejk@mccunewright.com'; 'dcw@mccunewright.com'; 'cl@mccunewright.com'; 'bk@mccunewright.com'; 'ah@mccunewright.com'; 'jacob.franchek@troutman.com'; Allen, Joel S.; 'Jason.Evans@troutman.com'; 'michael.peretz@troutman.com'; Baiardo, Alicia A.; 'bill.mayberry@troutman.com'; Turk, Amy Morrissey; 'mary.grob@troutman.com' |
| **Subject:** | RE: Individual Consumers v. Wells Fargo & Co., Wells Fargo Bank, N.A. |

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Dear Parties,

This will confirm receipt of the below request from Respondent.

All invoices noted below were paid by the due dates. There are no further outstanding invoices at this time.

Thank you,

Christina Negrete



**Consumer Group Team**

American Arbitration Association

T: 559 475 6265  E: ConsumerGroupTeam@adr.org

adr.org | icdr.org | aaamediation.org



The information in this transmittal (including attachments, if any) is privileged and/or confidential and is intended only for the recipient(s) listed above. Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal. Thank you.

**From:** Gollogly, Krystal Lynne <KGollogly@mcguirewoods.com>
**Sent:** Thursday, February 2, 2023 2:53 PM
**To:** Consumer Group Team <ConsumerGroupTeam@adr.org>
**Subject:** RE: Individual Consumers v. Wells Fargo & Co., Wells Fargo Bank, N.A.
**Importance:** High

**\*\*\* External E-Mail – Use Caution \*\*\***

1

Good afternoon, I wanted to follow-up on the status of the request below.

Regards,
Krystal


**Krystal Gollogly**
Paralegal
McGuireWoods LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
T:  +1 757 640 3721
F:  +1 757 640 3701
kgollogly@mcguirewoods.com
VCard | www.mcguirewoods.com

---

**From:** Gollogly, Krystal Lynne
**Sent:** Thursday, February 2, 2023 9:09 AM
**To:** Consumer Group Team <ConsumerGroupTeam@adr.org>
**Subject:** RE: Individual Consumers v. Wells Fargo & Co., Wells Fargo Bank, N.A.
**Importance:** High

Good morning,
Will you please provide the information requested below no later than 5:00pm Eastern today.

Regards,
Krystal

**Krystal Gollogly**
Paralegal
McGuireWoods LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
T:  +1 757 640 3721
F:  +1 757 640 3701
kgollogly@mcguirewoods.com
VCard | www.mcguirewoods.com

**SER94**

**From:** Gollogly, Krystal Lynne
**Sent:** Wednesday, February 1, 2023 11:13 AM
**To:** Consumer Group Team <ConsumerGroupTeam@adr.org>
**Subject:** Individual Consumers v. Wells Fargo & Co., Wells Fargo Bank, N.A.

Good morning,

Wells Fargo seeks confirmation from AAA that the invoices dated April 22, 2022, May 6, 2022, May 18, 2022, June 23, 2022, July 18, 2022, August 12, 2022, October 7, 2022, and October 26, 2022, totaling $501,075.00, were paid on time and in full by Wells Fargo.

Wells Fargo also seeks confirmation that Wells Fargo has paid all invoices to date and does not have any outstanding unpaid invoices from the AAA.

Regards,

Krystal

**Krystal Gollogly**
Paralegal
McGuireWoods LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510-1655
T:  +1 757 640 3721
F:  +1 757 640 3701
kgollogly@mcguirewoods.com
VCard | www.mcguirewoods.com

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# Exhibit N



McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

## **AUTHORIZATION**

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last four years, all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP** at **odstatements@mccunewright.com.**

**Dated:** 07/26/2022

**Client:**

**Account Number:**        XXX...

**Address:**

**Email:**

3231 E. Guasti Road, Suite 100, Ontario, CA 91761    ▪    Phone: 909.557.1250    Fax: 909.557.1275    ▪    McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER97



## McCUNE · WRIGHT · AREVALO
### ATTORNEYS AT LAW

### **AUTHORIZATION**

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo, LLP** at **odstatements@mccunewright.com**.

**Dated:** _4/20/2022_        **Client:** ████████████████

                             **Account Number:** _99999999_

                             **Address:** ████████████████

                             **Email:** ████████████████

3281 E. Guasti Road, Suite 100, Ontario, CA 91761  ■  Phone: 909.557.1250  Fax: 909.557.1275  ■  McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER98



**McCUNE · WRIGHT · AREVALO**
**ATTORNEYS AT LAW**

## AUTHORIZATION

      I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years, all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP at** **odstatements@mccunewright.com.**

Dated: 05/16/2022

Client:

Account Number:      Not sure

Address:

Email:

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250  Fax: 909.557.1275   ■   McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
|---|---|---|---|
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER99



**McCUNE · WRIGHT · AREVALO**
**ATTORNEYS AT LAW**

## AUTHORIZATION

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo**, **LLP** at **odstatements@mccunewright.com.**

Dated: _2/19/2022_

Client: ███████████████

Account Number: N/A

Address: ███████████████

Email: ███████████████

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250   Fax: 909.557.1275   ■   McCuneWright.com

**ORANGE COUNTY**
Irvine, CA

**INLAND EMPIRE - EAST**
San Bernardino, CA

**MIDWEST**
Edwardsville, IL

**EAST COAST**
Newark, NJ

SER100



**McCUNE · WRIGHT · AREVALO**

ATTORNEYS AT LAW

## AUTHORIZATION

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years, all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP at odstatements@mccunewright.com.**

**Dated:** 05/20/2022

**Client:**

**Account Number:** claimant last name

**Address:**

**Email:**

3281 E. Guasti Road, Suite 100, Ontario, CA 91761  ■  Phone: 909.557.1250   Fax: 909.557.1275  ■  McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER101



McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

### AUTHORIZATION

    I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo**, LLP at **odstatements@mccunewright.com.**

Dated:   3/19/2022          Client:

                                  **Account Number:**  XXXXXXXXXXXXXXXX

                                    **Address:**

                                    **Email:**

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250   Fax: 909.557.1275   ■   McCuneWright.com

| **ORANGE COUNTY** | **INLAND EMPIRE - EAST** | **MIDWEST** | **EAST COAST** |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER102



McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

## **AUTHORIZATION**

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo**, LLP at **odstatements@mccunewright.com**.

**Dated:**  03/10/2022                    **Client:**

                                          **Account Number:** _____ Blank

                                          **Address:**

                                          **Email:**

3281 E. Guasti Road, Suite 100, Ontario, CA 91761        ■        Phone: 909.557.1250    Fax: 909.557.1275        ■        McCuneWright.com

**ORANGE COUNTY**
Irvine, CA

**INLAND EMPIRE - EAST**
San Bernardino, CA

**MIDWEST**
Edwardsville, IL

**EAST COAST**
Newark, NJ



McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

## __AUTHORIZATION__

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an
arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby
authorized and directed to produce *electronic copies* of my monthly account statements for the last
three years to **McCune Wright Arevalo, LLP at odstatements@mccunewright.com.**

Dated:  2/24/2022

**Client:** ███████████████

**Account Number:** Not giving my account

**Address:** ███████████

**Email:** █████████████

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250   Fax: 909.557.1275   ■   McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER104



## McCUNE · WRIGHT · AREVALO
### ATTORNEYS AT LAW

## <u>AUTHORIZATION</u>

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo**, **LLP** at **odstatements@mccunewright.com.**

Dated: _04/14/2022_     **Client:** ▮▮▮▮▮▮▮▮▮▮

**Account Number:** _i dont have one_

**Address:** ▮▮▮▮▮▮▮▮

**Email:** ▮▮▮▮▮▮▮▮

3281 E. Guasti Road, Suite 100, Ontario, CA 91761   ■   Phone: 909.557.1250    Fax: 909.557.1275   ■   McCuneWright.com

**ORANGE COUNTY**
Irvine, CA

**INLAND EMPIRE - EAST**
San Bernardino, CA

**MIDWEST**
Edwardsville, IL

**EAST COAST**
Newark, NJ



McCUNE · WRIGHT · AREVALO
**ATTORNEYS AT LAW**

## <u>AUTHORIZATION</u>

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an

arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees.  You are hereby

authorized and directed to produce *electronic copies* of my monthly account statements for the last

three years to **McCune Wright Arevalo**, **LLP at <u>odstatements@mccunewright.com</u>.**

Dated: __2/24/2022__

**Client:**

**Account Number:** None

**Address:**

**Email:**

3281 E. Guasti Road, Suite 100, Ontario, CA 91761 ■ Phone: 909.557.1250 Fax: 909.557.1275 ■ McCuneWright.com

**ORANGE COUNTY** Irvine, CA  |  **INLAND EMPIRE - EAST** San Bernardino, CA  |  **MIDWEST** Edwardsville, IL  |  **EAST COAST** Newark, NJ



**McCUNE · WRIGHT · AREVALO**
ATTORNEYS AT LAW

## <u>AUTHORIZATION</u>

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years, and all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP at** **odstatements@mccunewright.com.**

Dated: 05/11/2022

**Client:**

**Account Number:** 0000000000

**Address:**

**Email:**

3281 E. Guasti Road, Suite 100, Ontario, CA 91761  ■  Phone: 909.557.1250  Fax: 909.557.1275  ■  McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

The signed document can be validated at https://...om/Verify

SER107



McCUNE · WRIGHT · AREVALO
ATTORNEYS AT LAW

## AUTHORIZATION

I have retained the law firm of McCune Wright Arevalo, LLP to represent me in an arbitration against Wells Fargo Bank, N.A. for improperly assessed overdraft fees. You are hereby authorized and directed to produce *electronic copies* of my monthly account statements for the last three years, all opening account documents including without limitation all overdraft opt in agreements and documents to **McCune Wright Arevalo, LLP at** **odstatements@mccunewright.com.**

Dated: 06/06/2022       Client:

Account Number:           Idk
Address:

Email:

3281 E. Guasti Road, Suite 100, Ontario, CA 91761      ▪      Phone: 909.557.1250    Fax: 909.557.1275      ▪      McCuneWright.com

| ORANGE COUNTY | INLAND EMPIRE - EAST | MIDWEST | EAST COAST |
| Irvine, CA | San Bernardino, CA | Edwardsville, IL | Newark, NJ |

SER108

# Exhibit O

# Wells Fargo Way2Save® Checking

December 6, 2019 ■ Page 1 of 4





## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-TO-WELLS**  (1-800-869-3557)

*TTY:* 1-800-877-4833

*En español:* 1-877-727-2932

華語 1-800-288-2288   *(6 am to 7 pm PT, M-F)*

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Thank you for being a loyal Wells Fargo customer. We value your trust in our company and look forward to continuing to serve you with your financial needs.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.*

| | | | |
|---|---|---|---|
| Online Banking | ✓ | Direct Deposit | ☐ |
| Online Bill Pay | ✓ | Auto Transfer/Payment | ☐ |
| Online Statements | ✓ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | |
| My Spending Report | ✓ | Overdraft Service | ✓ |

# ☑ IMPORTANT ACCOUNT INFORMATION



We may change the statement period and monthly fee period assigned to your account without advance notification. If your account earns interest, these changes will not affect interest calculations, but they may affect the date we post interest to your account.

For all accounts except business analyzed checking, if the first new fee period created by our change is fewer than 25 days, the bank will automatically waive the monthly service fee for that period.

## Activity summary

| | |
|---|---|
| Beginning balance on 11/8 | $18.09 |
| Deposits/Additions | 2,539.25 |
| Withdrawals/Subtractions | - 2,280.29 |
| **Ending balance on 12/6** | **$277.05** |

Account number:

*California account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN):

(114)
Sheet Seq = 0009139
Sheet 00001 of 00002
CONFIDENTIAL

# SER110

WF-00000618



**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

## Transaction history



| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|-------------|-------------|---------------------|---------------------------|----------------------|
| 11/8 | | | 59.25 | | |
| 11/8 | | | | 47.49 | 29.85 |
| 11/12 | | Overdraft Fee for a Transaction Posted on 11/08 $47.49 Purchase Authori Zed on 11/08 Target T- 5680 Balboa San Dieg | | 35.00 | |
| 11/12 | | | 40.00 | | |
| 11/12 | | | | 35.85 | |
| 11/12 | | | | 79.00 | -80.00 |
| 11/15 | | | 400.00 | | 320.00 |
| 11/18 | | | | 39.95 | |
| 11/18 | | | | 49.00 | |
| 11/18 | | | | 1.00 | 230.05 |
| 11/19 | | | | 73.55 | 156.50 |
| 11/20 | | | 1,300.00 | | |
| 11/20 | | | | 9.68 | |
| 11/20 | | | | 1.00 | 1,445.82 |
| 11/21 | | | | 72.04 | 1,373.78 |
| 11/22 | | | | 100.00 | |
| 11/22 | | | | 150.00 | |
| 11/22 | | | | 129.00 | |
| 11/22 | | | | 125.00 | |
| 11/22 | | | | 215.00 | |
| 11/22 | | | | 3.00 | 651.78 |
| 11/25 | | | 200.00 | | |
| 11/25 | | | | 29.90 | |
| 11/25 | | | | 200.00 | |
| 11/25 | | | | 200.00 | 421.88 |
| 11/27 | | | | 88.28 | |
| 11/27 | | | | 7.06 | |
| 11/27 | | | | 7.32 | |

**SER111**

December 6, 2019 ■ Page 3 of 4

**WELLS FARGO**

---

### Transaction history  (continued)



| Date | Check Number | Description | Deposits/ Additions | Withdrawals/ Subtractions | Ending daily balance |
|------|-------|-------------|----------|-------------|--------|
| 11/27 | | | | | 44.62 |
| 11/27 | | | | 3.00 | 271.60 |
| 11/29 | | | | 9.23 | |
| 11/29 | | | | 19.63 | |
| 11/29 | | | | 49.70 | |
| 11/29 | | | | 290.34 | -97.30 |
| 12/2 | | Overdraft Fee for a Transaction Posted on 11/29 $290.34 American Gen Lif Ins Paym | | 35.00 | |
| 12/2 | | | 100.00 | | |
| 12/2 | | | 40.00 | | 7.70 |
| 12/4 | | | | 51.57 | -43.87 |
| 12/5 | | Overdraft Fee for a Transaction Posted on 12/04 $51.57 Purchase Authori Zed on 12/04 Vons #2040 San Dieg | | 35.00 | -78.87 |
| 12/6 | | | 400.00 | | |
| 12/6 | | | | 43.08 | |
| 12/6 | | | | 1.00 | 277.05 |
| **Ending balance on 12/6** | | | | | **277.05** |
| **Totals** | | | **$2,539.25** | **$2,280.29** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted.  If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Summary of Overdraft and Returned Item fee(s)

| | Total this statement period | Total year-to-date † |
|--|--------------------------|------------------|
| Total Overdraft Fees | $105.00 | $1,120.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

† Year-to-date total reflects fees assessed or reversed since first full statement period of current calendar year.

### Monthly service fee summary

For a complete list of fees and detailed account information, see the Wells Fargo Account Fee and Information Schedule and Account Agreement applicable to your account (EasyPay Card Terms and Conditions for prepaid cards) or talk to a banker. Go to wellsfargo.com/feefaq for a link to these documents, and answers to common monthly service fee questions.

| Fee period 11/08/2019 - 12/06/2019 | Standard monthly service fee $12.00 | You paid $0.00 |
|-----------------------------------|-------------------------------------|----------------|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Minimum daily balance | $2,000.00 | -$97.30 ☐ |
| · Total amount of qualifying direct deposits | $750.00 | $0.00 ☐ |
| · Total number of posted debit card purchases or posted debit card payments of bills in any combination | 10 | 17 ☑ |

JC/JC

**SER112**

December 6, 2019 ■ Page 4 of 4


WELLS FARGO

## Worksheet to balance your account

Follow the steps below to reconcile your statement balance with your account register balance. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.

**A** Enter the ending balance on this statement. $ \_\_\_\_

**B** List outstanding deposits and other credits to your account that do not appear on this statement. Enter the total in the column to the right.

| Description | Amount | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| Total | $ | |

+ $ \_\_\_\_

**C** Add **A** and **B** to calculate the subtotal.

= $ \_\_\_\_

**D** List outstanding checks, withdrawals, and other debits to your account that do not appear on this statement. Enter the total in the column to the right.

| Number/Description | Amount | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| Total | $ | |

- $ \_\_\_\_

**E** Subtract **D** from **C** to calculate the adjusted ending balance. This amount should be the same as the current balance shown in your register.

= $ \_\_\_\_

## General statement policies for Wells Fargo Bank

■ **To dispute or report inaccuracies in information we have furnished to a Consumer Reporting Agency about your accounts.** You have the right to dispute the accuracy of information that Wells Fargo Bank, N.A. has furnished to a consumer reporting agency by writing to us at Overdraft Collection and Recovery, P.O. Box 5058, Portland, OR 97208-5058. Please describe the specific information that is inaccurate or in dispute and the basis for the dispute along with supporting documentation. If you believe the information furnished is the result of identity theft, please provide us with an identity theft report.

■ **In case of errors or questions about your electronic transfers,** telephone us at the number printed on the front of this statement or write us at Wells Fargo Bank, P.O. Box 6995, Portland, OR 97228-6995 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation.

©2010 Wells Fargo Bank, N.A. All rights reserved NMLSR ID 399801

Member FDIC. EQUAL HOUSING LENDER

**SER113**

WF-00000621

# Exhibit P

| | |
|---|---|
| Document title: | Wells Fargo New Arbitrations \| McCune Wright Arevalo, LLP |
| Capture URL: | https://mccunewright.com/wells-fargo-new-arbitrations/ |
| Page loaded at (UTC): | Thu, 30 Jun 2022 20:12:25 GMT |
| Capture timestamp (UTC): | Thu, 30 Jun 2022 20:12:54 GMT |
| Capture tool: | v7.14.1 |
| Collection server IP: | 34.198.15.100 |
| Browser engine: | Chrome/96.0.4664.93 |
| Operating system: | Microsoft Windows NT 10.0.17763.0 (10.0.17763.0) |
| PDF length: | 7 |
| Capture ID: | 96e5a8af-a9e0-4e3f-aabb-2e109d809602 |
| User: | mcguirewoods |

# MWA Accepting 100,000 New Arbitrations Against Wells Fargo

## National law firm successfully secured more than $1,000 per client in Wells Fargo overdraft arbitrations

Wells Fargo thinks they can avoid legal ramifications for abusive overdraft practices by forcing arbitrations. McCune Wright Arevalo, LLP, is here to show them they're dead wrong. MWA has won in hundreds of arbitrations against Wells Fargo over unfair overdraft fees. Each successful arbitration secured the return of the client's fees as well as $1,000.00 in penalties. None of these awards went to attorneys' fees. Now, MWA is ready for more, taking on 100,000 new arbitrations against Wells Fargo. Any Wells Fargo customer who received an overdraft fee within the past 12 months can qualify. Ready to join MWA in the fight against financial injustice? Complete to form today become one of the 100,000 arbitrations bringing the fight to Wells Fargo.

**Are you ready to bring arbitrations against Wells Fargo for unfair**



# Are you ready to bring arbitrations against Wells Fargo for unfair overdraft fees?

First Name

Last Name

Phone

Email

— Practice Area —

— Are you a new client? —

Message

— How did you hear about us? —

**Send Message** ›

## $4 MILLION SETTLEMENT MASS TORTS

## $203 MILLION CLASS ACTION FINANCIAL SERVICES

## $75 MILLION CLASS ACTION MASS TORTS

## $200 MILLION CLASS ACTION

Document title: Wells Fargo New Arbitrations | McCune Wright Arevalo, LLP
Capture URL: https://mccunewright.com/wells-fargo-new-arbitrations/
Capture timestamp (UTC): Thu, 30 Jun 2022 20:12:54 GMT

**SER117**



**$200 MILLION
CLASS ACTION
PRODUCT LIABILITY**

# ATTORNEY ADVERTISING

McCune Wright Arevalo, LLP, is responsible for this solicitation. The information provided on this website is for general information purposes only. The information you obtain is not, nor is it intended to be, legal advice. Use of this website or submission of the online form does not create an attorney-client relationship.

Counsel Richard McCune is licensed to practice only in the state of California. The law firm of McCune Wright Arevalo, LLP, has attorneys licensed to practice law in AZ, CA, IL, MO, NJ, NY and PA. This information section is not intended to be a solicitation for services in states where it is forbidden for non-barred attorneys from advertising for services, and McCune Wright Arevalo, LLP, does not have attorneys barred in that state. McCune Wright Arevalo, LLP, is a national firm that brings lawsuits in a majority of the states. In states where one of its attorneys are not barred, it does so by filing the complaint along with local counsel barred in that state.

The results discussed do not guarantee, warrant, or predict the results in future cases

# Injustice: Welcome to Wells Fargo

McCune Wright Arevalo, LLP, (MWA) is fighting back against Wells Fargo's predatory overdraft practices that unjustly punish customers living paycheck-to-paycheck. Although Wells Fargo thought they'd get away with slimy, pocket-lining policies by implementing arbitration-only clauses in their account agreements that forbid consumers from bringing class actions, MWA won't let them hide from justice.

In June 2022, MWA – representing hundreds of clients who have been charged unfair overdraft fees in arbitrations against Wells Fargo – secured the return of **all overdraft fees charged within the past year plus a $1000.00 penalty** for every client. * The best part? All of that money went right into our clients' pockets with no charges for attorney's fees. And this is only the beginning.

*Results not guaranteed for all clients.

**a $1000.00 penalty** for every client. * The best part? All of that money went right into our clients' pockets with no charges for attorney's fees. And this is only the beginning.

*Results not guaranteed for all clients.

# MWA is Ready to Represent You.

We're committed to taking on 100,000 new clients in their overdraft arbitrations against Wells Fargo. You may qualify to join the movement towards justice if:

- You've been charged an overdraft fee on an ATM or debit card purchase in the past 12 months.
- You have an active Wells Fargo account.

That's it. That's all you need to take your money back from a corporation well-known for using underhanded tactics to boost their bottom line and increase bonuses for executives at the top.

 **Are you a victim of unfair overdraft fees? Join MWA in the fight for justice by completing the form above.**

[insert fees section]

# A Moment of Clarity or Just Empty Words?

On January 6, 2022, Wells Fargo ATMs in Irvine, California, displayed the word "INJUSTICE" on their welcome screens. Though we at MWA would like to think Wells Fargo used this as a moment for self-reflection on how their practices abuse their customers, we know, based on their history of scandals, that this corporation will only listen to its wallet.

Here's how MWA is attaining justice out of Wells Fargo's injustice beyond securing overdraft fees for our clients. Arbitrations brought by the consumer costs only $50.00 paid by the attorney while Wells Fargo pays a whopping $4,000.00, not including their attorneys' fees! In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.

Document title: Wells Fargo New Arbitrations | McCune Wright Arevalo, LLP
Capture URL: https://mccunewright.com/wells-fargo-new-arbitrations/
Capture timestamp (UTC): Thu, 30 Jun 2022 20:12:54 GMT

SER119

Page 4 of 6



...ping $4,000.00, not including their attorneys' fees! In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.



**Join MWA as we say "game on" to Wells Fargo's attempts to skirt accountability. Complete the form above to see if you qualify for an arbitration.**



## Are you ready to bring arbitrations against Wells Fargo for unfair overdraft fees?

First Name

Last Name

Phone

Email

— Practice Area —

— Are you a new client? —

Message

— How did you hear about us? —

**Send Message** ›





— How did you hear about us? —

**Send Message** ›

HOME          CASES          CONTACT US          PRIVACY POLICY



McCUNE • WRIGHT • AREVALO
ATTORNEYS AT LAW

  

**Main Office:**
(602) 926-7797
3281 East Guasti Road
Suite 100
Ontario, CA 91761

**Orange County Office:**
(714) 909-2326
18565 Jamboree Road
Suite 550
Irvine, CA 92612

**Inland Empire – East Office:**
(909) 443-1643
164 W. Hospitality Lane
Suite 109
San Bernardino, CA 92408

**Coachella Valley Office:**
(760) 892-5099
73255 El Paseo Suite 10
Palm Desert, CA 92260

**Midwest Office:**
(618) 424-4402
231 North Main Street
Suite 20
Edwardsville, IL 62025

**East Coast Office:**
(973) 737-9981
One Gateway Center
Suite 1500
Newark, NJ 07102

© 2022 McCune Wright Arevalo, LLP

The information on this website is for general information purposes only. Nothing on this site should be taken as legal advice for any individual case or situation. This information is not intended to create, and receipt or viewing does not constitute, an attorney-client relationship.

# Exhibit Q

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| **INDIVIDUAL CONSUMERS V. WELLS FARGO & CO., WELLS FARGO BANK, N.A.** | **WELLS FARGO BANK, N.A.'S MEMORANDUM IN SUPPORT OF REQUEST FOR CLAIMANTS TO PROVIDE BASIC INFORMATION ABOUT EACH DISPUTE PRIOR TO THE DEMAND PROCEEDING THROUGH THE ARBITRATION PROCESS** |

Pursuant to Process Arbitrator Hon. Anita Rae Shapiro's ("Process Arbitrator") request for briefing regarding filing requirements for Claimants' demands made during the August 24, 2022 initial conference call, Wells Fargo Bank, N.A. ("Wells Fargo") submits this Memorandum in Support of Request for Claimants to Provide Basic Information About Each Dispute Prior to the Demand Proceeding Through the Arbitration Process.

## I.   <u>INTRODUCTION</u>

As of today, Claimants' counsel has filed more than 2200 essentially identical demands for arbitration against Wells Fargo. Hundreds of these demands (the exact number is unknown as investigation into these Claims is ongoing) have been filed on behalf of individuals that have no legitimate or lawful claims against Wells Fargo, either because they have no account with Wells Fargo, were not enrolled in the Wells Fargo overdraft program at issue, or were assessed no overdraft fees during an actionable limitations period. These unlawful and non-compliant demands appear to be the result of counsel's false advertising and failure to conduct basic required investigations of the claims asserted. The consequence of this filing method is that Wells Fargo has paid hundreds of thousands of dollars in nonrefundable filing fees for claimants whose demands fail to provide the type of basic information required by AAA's Consumer Rules.

Page **1** of **22**

To protect the integrity of this Multiple Case Filing dispute, it is imperative that Claimants' counsel provide the basic information required by the AAA Consumer Rules. This information is necessary to put Wells Fargo on proper notice of the individual facts and state and statutory laws at issue in each demand so Wells Fargo can properly investigate the claims and prepare a defense. This request is consistent with counsel's obligation under Rules of Professional Responsibility to conduct a sufficient and diligent investigation before bringing a viable claim. Specifically, and as set forth further below, Wells Fargo requests that the Process Arbitrator enter an order requiring Claimants' counsel to amend its previously filed arbitration demands to include (a) the Claimant's Wells Fargo checking account number for the account issue, (b) sufficiently pled facts establishing that the Claimant was enrolled in the overdraft service at issue, (c) sufficiently pled facts establishing that the Claimant incurred overdraft fees in connection with transactions covered by Regulation E, (d) identification of the specific state law(s) under which Claimants assert claims (statutory or common law), and (e) specify the amount of money in dispute. Wells Fargo also requests that the Process Arbitrator order that any future demands filed by Claimants' counsel provide that same basic information and that the AAA's invoicing of fees and arbitrator compensation related to the demands or arbitrations shall be stayed until the underlying demands meet such requirements.

The Process Arbitrator has the authority to enter the requested order. Indeed, the AAA created the Supplementary Rules for Multiple Case Filings—and the Process Arbitrator role contained therein—to ensure that Multiple Case Filing disputes are completed as efficiently and economically as possible by providing the Process Arbitrator the express authority to make these exact types of determinations.

## II.   FACTUAL & PROCEDURAL BACKGROUND

**A.   McCune Wright Arevalo, LLP files suit against Wells Fargo on a class basis in federal court.**

On November 25, 2020, McCune Wright Arevalo, LLP ("McCune") filed a class action complaint on behalf of Mosanthony Wilson ("Wilson") and all others similarly situated, alleging that Wells Fargo violated the requirements of the Federal Electronic Funds Act ("EFTA"), its implementing regulation at 12 C.F.R. ¶ 1005.1, *et seq.* ("Regulation E") and California's Unfair Competition Law California Business & Professions Code § 17200, *et seq.* ("California UCL"). *See Wilson v. Wells Fargo & Co.*, No. 3:20-cv-02307-DMS-WVG, (S.D. Cal. filed Nov. 25, 2020), at ECF No. 1 ("Wilson Complaint").

When opening his account at Wells Fargo, however, Wilson agreed to resolve any dispute with Wells Fargo in arbitration with the American Arbitration Association ("AAA") (the "Arbitration Agreement"). *See id.* at ECF No. 21, Exh. C. The Arbitration Agreement further provided that Wilson and Wells Fargo would "not be entitled to join or consolidate disputes by or against others as a presentative or member of a class." *Id.* Accordingly, Wells Fargo moved to dismiss the Wilson Complaint and compel individual arbitration. *See id.* at ECF No. 21. On May 8, 2021, the Court granted Wells Fargo's motion to compel individual arbitration, ordering that the litigation be stayed to permit an arbitrator to decide the questions of arbitrability and then, if permissible, to arbitrate the substantive claims. *See id.* at ECF No. 25.

On September 3, 2021, Wilson filed a demand for arbitration with the AAA according to the terms of the Arbitration Agreement. Notably, on July 14, 2022, after a hearing on the merits of Wilson's claims, Arbitrator Janice L. Sperow issued a Final Award with Findings of Fact & Conclusions of Law ("Wilson Final Award"), wherein she found that Wilson did not prove his claims for violation of Regulation E and violation of the California UCL and held that Wells Fargo

was the prevailing party in the matter. A true and correct copy of the Wilson Final Award is attached hereto as **Exhibit A.**

**B.    McCune begins filing identical individual arbitration demands against Wells Fargo. AAA determines the demands are subject to its Supplementary Rules for Multiple Case Filings.**

Shortly before and immediately after Wells Fargo filed its motion to compel in Wilson, McCune filed arbitration demands against Wells Fargo on behalf of 13 individual claimants. These 13 demands contained no specifics concerning the allegations, and instead simply repeated the following boilerplate sentence: "Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violations of [state consumer fraud statutes]."[1]

What does seem clear is that the allegations in the arbitration demands concern requirements for overdraft programs imposed by Regulation E. Specifically, Regulation E precludes financial institutions like Wells Fargo from assessing overdraft fees on certain debit card transactions that overdraw their checking accounts unless the bank provides the customer a disclosure that complies with the Requirements of Regulation E and gives the customer a "reasonable opportunity for the consumer to affirmatively consent" to be enrolled in an overdraft program. EFTA claims are subject to a one-year statute of limitations. 15 U.S.C. § 1693m(g). State law claims may have longer statutes of limitation.

Thus, in order to assert a viable Regulation E claim against Wells Fargo, a claimant must, at a minimum, have signed up for a checking account with Wells Fargo, agreed to participate in Wells Fargo's Debit Card Overdraft Service ("DCOS"), and been assessed an overdraft fee during an actionable limitations period.

---

[1] Some, but not all, of the 13 demands identified a particular state, but none identified a specific law.

On April 13, 2022, McCune filed 497 additional arbitration demands against Wells Fargo. The additional demands were virtually identical, and included the following, identical statement when required to "[s]pecify the amount of money in dispute": "Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs. The amount of overdraft fees improperly collected is in the possession of the Business."[2] Additionally, when required to briefly explain the dispute, McCune has provided the following, identical statement for every demand filed thus far: "Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto)."[3] Notably, in the identical "Statement of Claims" filed with each demand, McCune does not specify which state consumer fraud law or statutory section applies to the Claimant's arbitration, but simply states that the "Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws."[4]

On April 22, 2022, the AAA informed McCune and counsel for Wells Fargo via letter (the "April 22nd AAA Letter")[5] that the additional demands (which had grown to 501 demands by the date of the letter) would be subject to the AAA's Supplementary Rules for Multiple Case Filings ("Supplementary Rules").[6] On April 25, 2022, McCune sent a letter to the AAA requesting that

---

[2] As examples, Wells Fargo has attached true and correct copies of the demands of ███████ (the "███ Demand") and ███████ (the "███ Demand") as **Exhibits B and C**.
[3] *Compare* **Exhibit B** (███ Demand) *with* **Exhibit C** (███ Demand).
[4] *Compare* **Exhibit B** (███ Demand) at Exhibit A, ¶ 4 *with* **Exhibit C** (███ Demand), at Exhibit A, ¶ 4.
[5] A true and correct copy of the April 22nd AAA Letter is attached hereto as **Exhibit D**.
[6] A true and correct copy of the Supplementary Rules is attached hereto as **Exhibit E**.

the initial 13 arbitration demands filed against Wells Fargo be consolidated and otherwise subject to the Supplementary Rules (the "April 25th McCune Letter").[7]

On June 29, 2022, the AAA sent a letter to McCune and counsel for Wells Fargo confirming the prior day's Administrative Conference Call and requesting that the parties agree on one of seven AAA panelists to serve as Process Arbitrator or for the parties to provide a rank and strike list of the panelists (the "June 29th AAA Letter").[8] On July 12, 2022, the AAA informed the parties via letter that the AAA's Consumer Rules ("Consumer Rules") and Supplementary Rules apply to the arbitration demands filed by McCune (the "July 12th AAA Letter").[9]

On July 29, 2022, the AAA confirmed via letter the appointment of the Honorable Anita Rae Shapiro to serve as Process Arbitrator for this dispute (the "July 29th AAA Letter").[10]

## C. The Consumer Rules require demands to include basic information allowing the respondent to fully understand and investigate the dispute. The Supplementary Rules provide the Process Arbitrator authority to enforce the Consumer Rules to ensure economic and efficient adjudication of Multiple Case Filings.

In response to a wave of Supreme Court decisions affirming the enforceability of class action waivers in arbitration agreements, *e.g., Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018), plaintiffs' firms implemented a new strategy to circumvent representative action waivers in arbitration agreements entitled "mass arbitration." The term mass arbitration refers to a plaintiff's firm's use of the AAA's consumer or employment rules and filing fee procedures to file (or threaten to file after reaching out to discuss potential settlement) thousands of individual arbitration demands against the same entity. The consequence to the Company who created and administered the arbitration program at issue is to pay millions of dollars in initial administrative filing fees

---

[7] A true and correct copy of the April 25th McCune Letter is attached hereto as **Exhibit F**.
[8] A true and correct copy of the June 29th AAA Letter is attached hereto as **Exhibit G**.
[9] A true and correct copy of the July 12th AAA Letter is attached hereto as **Exhibit H**.
[10] A true and correct copy of the July 29th AAA Letter is attached hereto as **Exhibit I**.

before any ruling on the merits of the dispute had been litigated, much less resolved. This mass arbitration strategy has resulted in extensive litigation (including litigation between the AAA and entities that had contracted with its consumers and/or employers to use AAA as its arbitration provider),[11] as well as newly formed arbitration providers that would potentially become competition for the AAA.[12]

In response to mass arbitration, the AAA created the Supplementary Rules, which became effective on August 1, 2021. The Supplementary Rules were developed to "streamline the administration of large volume filings involving the same [or related] party, parties, and party representatives" for disputes where the AAA's employment or consumer fee schedules apply, and "are intended to provide parties and their representatives with an ***efficient and economical*** path toward the resolution of multiple individual disputes." *See* Supplementary Rules at Introduction (emphasis added). The AAA may apply the Supplementary Rules to any group of cases it deems "Multiple Case Filings," which is defined as "twenty-five or more similar Demands for Arbitrations filed against or on behalf of the same party or related parties, where representation of the parties is consistent or coordinated across the cases." *See id.* at MC-1(a), (b). The Supplementary Rules supplement any other AAA rules applicable to the disputes, and where inconsistencies exist among the Supplementary Rules and other AAA rules, the Supplementary Rules govern. *Id.* at MC-1(a).

---

[11] *See Family Dollar, Inc. v. Am. Arbitration Ass'n, Inc.*, No. 2:20-cv-00248-AWA-RJK, (E.D. Va. filed May 15, 2020) (Family Dollar filed suit against the AAA after it attempted to invoice Family Dollar for $2.5 million in administrative fees after one law firm sought to initiate 2,000 arbitrations with the AAA); *see also Uber Techs., Inc. v. Am. Arbitration Ass'n, Inc.*, No. 655549/21, (N.Y. filed Sept. 20, 2021) (Uber filed suit against the AAA after it sought to charge Uber nearly $100 million in non-refundable case management fees related to 31,573 consumer arbitration demands filed by one law firm against Uber).

[12] For example, New Era ADR ("New Era") "stepped in to fill the void" left by arbitration providers that did "not have any rules or procedures in place for mass individual arbitrations" by offering comprehensive rules and procedures to adjudicate mass arbitration campaigns "to conclusion, on the merits." *See Heckman v. Live Nation Entertainment, Inc.*, No. 2:22-cv-0047-GW-GJS (C.D. Cal. filed Jan. 4, 2022) at ECF No. 30-1, 8-9 (emphasis in original).

The Consumer Rules, thus, still govern these disputes to the extent there are not inconsistencies between them and the Supplementary Rules. The Consumer Rules provide that, to start an arbitration, a party shall file a demand for arbitration that must, among other things, "[b]riefly explain the dispute" and "[s]pecify the amount of money in dispute." *See* Consumer Rules at R-2(a)(1). Under the Consumer Rules, "demand" is defined as the "written document created by the claimant that informs respondent that it wishes to arbitrate a dispute" that "provides basic information about the dispute, the parties involved, and what the claimant wants as a result of the arbitration." *See id.* at Glossary of Terms. The Consumer Rules further provide that "[w]hen sending a Demand or an answer, the consumer and the business are encouraged to provide enough details to make the dispute clear to the arbitrator." Consumer Rules at R-2(f). Thus, in order to have a lawful demand under the Consumer Rules, the demand must provide "basic information about the dispute," including, at a minimum, a description of the dispute and the specific laws or statutory sections at issue sufficient to make the individual factual and legal issues clear to Wells Fargo and the arbitrator, and the specific amount of money in dispute.[13]

To ensure that the Multiple Case Filings do not run afoul of the Consumer Rules, and to ensure that any other administrative issues related to Multiple Case Filings are handled consistently, the Supplementary Rules provide for the appointment of a Process Arbitrator to make determinations on "administrative issues for all of the cases included in the Multiple Case Filing affected by such administrative issues." Supplementary Rules at MC-6(b). Specifically, the Supplementary Rules provide the Process Arbitrator the exclusive authority to make determinations related to "AAA filing requirements" and the "allocation of payment advances on

---

[13] The Arbitration Agreement Claimants entered with Wells Fargo includes a similar requirement, stating that arbitration will commence only after the submission of a "lawful demand" to the AAA. *See* **Exhibit B** (▮▮▮▮ Demand) at Ex. C, 35.

administrative fees, arbitrator compensation, and/or expenses." The Supplementary Rules also

provide the Process Arbitrator the authority to resolve "any other administrative issue arising out

of the nature of the Multiple Case Filings" at her discretion. *See* Supplementary Rules at MC-

6(d)(v); MC-6(f) ("The Process Arbitrator shall have the power to rule on the Process Arbitrator's

own jurisdiction and shall resolve any disputes over the applicability of this Section MC-6.").

Thus, because the Consumer Rules provide that an arbitration cannot commence until a demand

meeting the requirements under the Consumer Rules is filed, the Process Arbitrator's authority to

make decisions on the "AAA's filing requirements" specifically covers the issue of what must be

included in Claimants' demands before an arbitration commences.

**D.**     **While the parties and AAA work through the Supplementary Rules process, McCune continues to file arbitration demands on behalf of claimants gained through dubious advertisements, and without basic information necessary for Wells Fargo to properly investigate and defend against the claims.**

While the parties and the AAA worked through the processes required by the

Supplementary Rules, McCune continued to file hundreds of arbitration demands on behalf of

claimants who are allegedly customers of Wells Fargo.[14] As of September 6, 2022, there were

2,277 individual demands filed by McCune against Wells Fargo, with that number increasing on

an almost daily basis. McCune has also submitted an "authorization" form for many claimants for

whom it has filed a demand which purports to request the release of certain account documents.[15]

The authorizations submitted provide the date that the individual retained McCune to represent

them in arbitration against Wells Fargo, along with the claimant's name, address, email, and (on

---

[14] On May 6, 2022, the AAA sent a letter to the parties acknowledging receipt of an additional 85 demands filed by McCune. The AAA informed the parties via letter on four other occasions of its receipt of additional demands: May 18, 2022 (96 demands), June 23, 2022 (621 demands), July 18, 2022 (401 demands), and August 12, 2022 (142 demands).

[15] As examples, Wells Fargo has attached true and correct copies of the authorizations for ███████████ (the "███████ Authorization") and ███████████ (the "████ Authorization") as **Exhibits J and K**.

Page **9** of **22**

occasion) Wells Fargo account number.[16]

It appears that many Claimants found their way to McCune through advertising on McCune's website (and/or other forums with links to visit McCune's website). McCune's advertising has evolved over time, but at one point claimed the following:

- "National law firm successfully secured more than $1,000 per client in Wells Fargo overdraft arbitrations."
- "[McCune] has won in hundreds of arbitrations against Wells Fargo over unfair overdraft fees."
- "Each successful arbitration secured the return of the client's fees as well as $1,000.00 in penalties."
- "Any Wells Fargo customer who received an overdraft fee within the past 12 months can qualify."
- "In June 2022, [McCune] – representing hundreds of clients who have been charged unfair overdraft fees in arbitrations against Wells Fargo – secured the return of all overdraft fees charged within the past year plus a $1000.00 penalty for every client."

These statements were made on McCune's website discussing "Wells Fargo New Arbitrations" (https://mccunewright.com/wells-fargo-new-arbitrations/), which Wells Fargo captured on June 30, 2022 (the "June 30th McCune Advertisement Capture").[17]

***Each of these statements is demonstratively false***. McCune has never "successfully secured" any monetary judgment, won any arbitration (let alone "hundreds of" them), or "secured the return of all overdraft fees charged . . . plus a $1000.00 penalty" for any client in a "Wells Fargo overdraft arbitration" or otherwise. In fact, the only overdraft arbitration brought by McCune against Wells Fargo that has been fully adjudicated found that Wells Fargo was the "prevailing party" and provided no monetary award whatsoever for McCune's client.[18] Moreover, McCune's statement that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" is misleading, as Regulation E only applies to specific overdraft charges

---

[16] *See* **Exhibit J** (⬛⬛⬛ Authorization); **Exhibit K** (⬛⬛⬛ Authorization).
[17] A true and correct copy of the June 30th McCune Advertisement Capture is attached hereto as **Exhibit L**.
[18] *See* **Exhibit A** (Wilson Final Award).

Page **10** of 22

related to ATM and one-time debit card transactions—i.e., it does not cover overdrafts on checks or recurring withdrawals such as a mortgage or auto payment.

Additionally, McCune explains to its potential clients that each arbitration it files on a claimant's behalf forces Wells Fargo to pay "a whopping $4,000.00, not including their attorneys' fees!"[19] Thus, McCune explains, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts."[20] This statement is clearly intended to induce potential clients to sign up to file an arbitration against Wells Fargo for the sole purpose of harming the bank, regardless of whether or not the individual has a legitimate claim.

**E.     Wells Fargo has paid initial administrative filing fees of $437,325 for 1,845 arbitration demands filed thus far and will be required to pay over $6 million more in non-refundable case management fees and arbitrator compensation for arbitrations that likely have no merit.**

After the AAA determined that this dispute would be governed by the Supplementary Rules, it began invoicing Wells Fargo for the initial administrative filing fees associated with the demands filed by McCune. Thus far, the AAA has invoiced Wells Fargo on six separate occasions (April 22, 2022, May 6, 2022, May 18, 2022, June 23, 2022, July 18, 2022, and August 12, 2022) for a total amount of $437,325.00 in initial administrative filing fees for 1,846 arbitration demands. Wells Fargo has timely paid each invoice.

If McCune is not required to provide the basic information for these Claimant Demands as required by the AAA Rules (and, as a result, conduct an investigation into its clients' claims), Wells Fargo will be required to pay $1,400 in case management fees and at least $1,500 in arbitrator compensation for each individual arbitration. As currently alleged in the Demands, there

---

[19] *See* **Exhibit L** (June 30th McCune Advertisement Capture).
[20] *Id.*

is no way for Wells Fargo—or McCune—to know which and how many of its clients banked with Wells Fargo and opted into the Wells Fargo DCOS. Thus, Wells Fargo is set to be invoiced for approximately $6,600,000 in nonrefundable fees for arbitrations that may not have any merit. As shown by Wells Fargo's timely payments thus far, it intends to pay all fees associated with each individual arbitration in this Multiple Case Filing Dispute. However, as discussed in detail below, McCune should be required to investigate its clients' claims to insure their integrity and provide the basic information necessary for Wells Fargo to investigate and defend against the arbitrations prior to Wells Fargo incurring such costs.

**F.     Wells Fargo requests that McCune amend previous demands to provide specificity and McCune asks to brief the issue.**

On August 24, 2022, the Process Arbitrator held an initial conference call with McCune and counsel for Wells Fargo. During the call, Wells Fargo pointed out that Claimants' counsel's method of procuring clients and filing demands has likely resulted, thus far, in hundreds of demands being filed on behalf of individuals that have no legitimate or lawful claims against Wells Fargo. This has led Wells Fargo to pay hundreds of thousands of dollars in nonrefundable filing fees for claimants who filed demands. Wells Fargo maintains that if the filing requirements of AAA regarding the required content of "Demands" were properly satisfied prior to initiation of fees, such fees should not have been incurred for claimants who never banked with Wells Fargo, or who were never enrolled in the overdraft program at issue, or who were not assessed an overdraft fee during an actionable limitations period.

As a result, Wells Fargo raised the sufficiency of information provided in the Demands (both already filed and future filings) to the Process Arbitrator in the parties' initial call on August 24, 2022. The Process Arbitrator recognized that certain basic information regarding each claimants' individual disputes with Wells Fargo could be helpful to the efficient and economical

administration of all claims and opined that Claimants' current demands could be amended to meet a more specified filing requirement that includes information establishing legitimate claims. The Process Arbitrator further opined that she could Order future demands filed by Claimants' counsel to meet certain specificity requirements. Claimants' counsel requested briefing on the issue, arguing that the Process Arbitrator lacked the jurisdiction and authority to rule on filing requirements.

## III.     <u>ARGUMENT & AUTHORITIES</u>

**A.    Attorneys have the obligation to conduct a reasonable investigation before asserting a claim.**

Federal courts, the American Bar Association ("ABA"), and the AAA have all recognized the necessity for attorneys to perform a reasonable investigation into the facts at issue prior to asserting a claim. The central purpose of these rules is to deter baseless filings and streamline administration and procedures of courts and arbitration tribunals. *See, e.g., Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).

For example, Rule 11(b) of the Federal Rules of Civil Procedure provides that, by filing a pleading to a court, an attorney certifies "to the best of [the attorney's] knowledge, information, and belief, ***formed after an inquiry reasonable under the circumstances***:" (1) the pleading is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law; and (3) the factual contentions have evidentiary support. *See* Fed. R. Civ. P. 11(b). *Goldman v. Barrett*, 825 F. App'x 35, 37 (2d Cir. 2020) (holding that pursuant to Rule 11, "every attorney owes a duty to conduct a pre-litigation inquiry into the viability of a pleading that is objectively reasonable under the circumstances"). The Rule also provides that a court may impose sanctions on an attorney in violation of Rule 11(b). *See* Fed. R. Civ. P. 11(c)(1);

*see also Glaser v. City of San Diego*, 163 F.3d 606 (9th Cir. 1998) ("Sanctions are appropriate under Rule 11(b)(2) when a pleading which has been filed is objectively 'frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith.'"); *Collins v. Cheney*, No. 07-CV-0725S, 2007 WL 4300025, at *3 (W.D.N.Y. Dec. 3, 2007) ("In the face of the plaintiff's continuing propensity for filing frivolous and obviously baseless actions in this Court, it becomes necessary for the Court to impose appropriate sanctions pursuant to Rule 11 and the Court's inherent authority to fashion an appropriate sanction for conduct which abuses the judicial process.") (internal quotations omitted).

Similarly, ABA Model Rule of Professional Conduct 3.1, which has been adopted in some form by all 50 states, forbids a lawyer from bringing or asserting an issue "unless there is a basis in law and fact for doing so that is not frivolous." Model Rules of Prof'l Conduct R. 3.1 (Am. Bar Ass'n). Comments to the ABA's Model Rule 3.1 further provide that lawyers are required to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions" and that an action is frivolous "if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law." *See id.* at cmt. 2.

The AAA Consumer Rules contain a rule against frivolous filings similar to Rule 11 and in step with ABA Model Rule 3.1. Specifically, Rule 44(c) permits the arbitrator to allocate compensation, expenses, costs of arbitration, and administrative fees (which expressly include filing and hearing fees), to any party upon the arbitrator's determination that the party's claim was filed for purposes of harassment or is patently frivolous. *See* Consumer Rules at 44(c). Courts have held that the AAA's mechanism for reallocating fees is similar to the sanctions imposed by Rule

11(c). *See West v. Brookdale Senior Living Communities Inc.*, No. 3:13-CV-1567-HU, 2014 WL 2829751, at *12 (D. Or. June 20, 2014) ("[Reallocation of fees] under the AAA rules bears some resemblance to the grounds for imposing a Rule 11 sanction in federal district court."). Wells Fargo does not wish to get to the point of sanctions briefing but instead asks the Process Arbitrator to remedy the issue at hand by enforcing the AAA rules governing the required substance of demands.

Requiring counsel for Claimants to satisfy the requirements for filing a Demand under the AAA Consumer Arbitration and corresponding Supplementary Rules will assist in the efficient and economic administration of these Multiple Case Filings. Wells Fargo is not asking for any additional requirements under AAA rules. Wells Fargo is merely asking the Process Arbitrator to uphold the requirements for filing a Demand under applicable AAA rules to ensure (a) the required amount of due diligence is performed by Claimant's counsel before bringing a claim; and (b) the Respondent is on proper notice of the individual facts and state statutory laws at issue so that it can properly investigate those claims and prepare a defense.

**B.    To protect the integrity of the Multiple Case Filing process, it is imperative McCune provides the basic information required under AAA's Consumer Rules for each Claimant Demand.**

McCune's false and misleading advertising has, unsurprisingly, resulted in individuals authorizing McCune to file frivolous arbitrations on their behalf. It is imperative that the AAA perform its proper gate-keeping role to ensure such frivolous claims do not proceed at the outset of each claim. The Multiple Case Filing Demands filed against Wells Fargo fail to provide any basic information to support Claimants' individual disputes with the Company. The proper administration of Consumer Rules R-2 (a)(1) and R-2(f) and a fair reading of the definition of "Demand" set forth in the Consumer Rules can remedy this issue. Requiring McCune to satisfy the filing requirements of a Demand under AAA Rules is imperative to protect the integrity of the

Multiple Case Filing process so that the process is used for its intended purposes—and not as a strategy to harass and leverage settlement.

Indeed, there are "authorization" forms submitted by McCune that demonstrate the claimant has no Wells Fargo account and therefore has no claim, or at a minimum that McCune failed to conduct basic due diligence before submitting the demands to arbitration in an effort to force Wells Fargo to incur fees. For example, ███████ provided an authorization to McCune expressly stating that she does not have an account with Wells Fargo, and ███████ provided an authorization to McCune stating that she did not know her account number:





These exemplar authorizations, at a minimum, required McCune to further investigate whether these individuals have a legitimate, non-frivolous claim against Wells Fargo. Instead, McCune moved forward with filing demands on behalf of ███████ and ███████ despite the clear

---

[21] *See* **Exhibit K** (███ Authorization); **Exhibit J** (███ Authorization).

issues surrounding their authorizations.[22] These are just two examples—Wells Fargo's review has identified dozens of similar problems, as well as instances in which the authorization form contains a purported "account number" that Wells Fargo has been unable to match to any existing checking account.

McCune has not provided the basic information required for Wells Fargo and the merits arbitrator to fully understand and investigate the dispute. Again, that basic information would include: (a) the Claimant's Wells Fargo checking account number for the account issue; (b) sufficiently pled facts establishing that the Claimant was enrolled in DCOS; (c) sufficiently pled facts establishing that the Claimant was assessed an overdraft fee during an actionable limitations period;[23] (d) identification of the specific state law(s) under which Claimants assert claims (statutory and common law); and (e) specify the amount of money in dispute.

Instead of including this basic information, McCune has filed more than 2,277 identical demands which do not specify the amount in dispute, do not identify any overdraft fees which were allegedly incurred unlawfully, and which implicate the voluminous consumer fraud laws of many different states without identifying the specific state law at issue and which shows nothing changed but the Claimants' names and contact information. And McCune has affirmatively stated that more filings are forthcoming.

These frivolous, harassing demands are not an accident. In one of the few factual statements contained in McCune's advertising, McCune explained to its potential clients that each arbitration it files on a claimant's behalf forces Wells Fargo to pay "a whopping $4,000.00, not

---

[22] *See* **Exhibit C** (████ Demand); **Exhibit B** (████ Demand).
[23] *See* 15 U.S.C. § 1693m(g) ("Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.").

including their attorneys' fees!"[24] Thus, McCune explains, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts."[25]

> Here's how MWA is attaining justice out of Wells Fargo's injustice beyond securing overdraft fees for our clients. Arbitrations brought by the consumer costs only $50.00 paid by the attorney while Wells Fargo pays a whopping $4,000.00, not including their attorneys' fees! In short, bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where it hurts. Each of these thousands of arbitrations matters in holding Wells Fargo accountable.

In other words, ***McCune's expressed intent with these Multiple Case Filings is to harm Wells Fargo***. This clearly stated goal, along with McCune's misleading statement that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months can qualify" as a claimant,[26] rather than stating the proper standard that only individuals who enrolled in Well Fargo's DCOS can qualify, inevitably have led to the filing of claims that contain sparse factual and legal information that is insufficient to satisfy the filing requirements of AAA Rules.

Indeed, a preliminary review of the demands filed by McCune (which is ongoing) show that a number of claimants have never opened a Wells Fargo consumer checking account. Additionally, of the claimants that have opened a consumer checking account with Wells Fargo, many never agreed to participate in the Wells Fargo DCOS at issue. Importantly, whether a claimant has opted into Wells Fargo's DCOS can be answered by a cursory review of a claimant's bank statement, which specifies if the claimant is enrolled in the service.[27]

---

[24] *See* **Exhibit L** (June 30th McCune Advertisement Capture).
[25] *Id.*
[26] *See id.*
[27] As an example, Wells Fargo has attached a true and correct copy of a redacted bank statement as **Exhibit M**.

**Account options**

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.*

| | | | |
|---|---|---|---|
| Online Banking | ☑ | Direct Deposit | ☐ |
| Online Bill Pay | ☑ | Auto Transfer/Payment | ☐ |
| Online Statements | ☑ | Overdraft Protection | ☐ |
| Mobile Banking | ☐ | Debit Card | |
| My Spending Report | ☑ | Overdraft Service | ☑ |

The bank statements further itemize every transaction, including identification of transactions covered by Regulation E (i.e., one-time debit card and ATM transactions) which resulted in an overdraft fee, and the dates of when such fees were incurred. *See id.* Moreover, McCune's current advertising specifically requests that individuals seeking to qualify as claimants for arbitration against Wells Fargo submit a Wells Fargo bank statement to McCune for review.[28] In other words, McCune can gather the information requested in this Memorandum by conducting basic due diligence into its clients' claims.[29] But McCune has not done so thus far, and it is already making this Multiple Case Filing dispute less efficient and less economical. To remedy this issue, McCune should not be permitted to continue filing demands for individuals without providing the basic information required for each Demand.

---

[28] *See Overdraft Fee Claims Against Wells Fargo*, https://mccunewright.com/overdraft-fee-claims-against-wells-fargo/ (last visited September 4, 2022) ("If you are a Wells Fargo customer who has been victimized by unfair overdraft fees, contact our team to see if you qualify to recover your money. To qualify quickly, submit your most current Wells Fargo bank statement to our team.").

[29] Notably, with the information currently being provided by McCune, Wells Fargo is forced to chase down the basic information it requests in this memorandum through multiple searches that cost inordinate amounts of time and money. Moreover, the results of those searches cannot provide Wells Fargo the information with any level of confidence as to its accuracy.

Page **19** of 22

**C. The Process Arbitrator has express authority to make determinations to address administrative issues to ensure the efficient and economic resolution of these disputes, and these Multiple Case Filings require such a determination.**

As discussed in detail above, the purpose of the Supplementary Rules is to provide an efficient and economical path toward the resolution of multiple individual disputes. To further that end, the Supplementary Rules provide the Process Arbitrator the unequivocal right to make determinations on any "administrative issue arising out of the nature of the Multiple Case Filing" including, specifically, AAA filing requirements and fee payments. *See* Supplementary Rules at MC-6(d)(i), (ii), (v). Thus, there is no question that the Process Arbitrator has authority to make determinations related to Claimants' filing requirements and Wells Fargo's fee payments.

Indeed, the issue at hand illustrates the importance of the Process Arbitrator's role in addressing administrative issues to ensure that Multiple Case Filings move toward an economical and efficient resolution. Specifically, Wells Fargo has paid hundreds of thousands of dollars in non-refundable administrative initial filing fees for demands related to the instant Multiple Case Filings—a cost that Wells Fargo acknowledges it has contractually obligated itself to pay by agreeing to administer its program under the AAA Consumer Rules and corresponding fee schedule.[30] But that obligation also requires AAA to perform its gate-keeping function and require Claimant to meet the basic information threshold of filing a Demand as defined by those same AAA rules so that Claimants without any basis to bring a claim are not improperly leveraged in a mass arbitration situation.

**D. The Process Arbitrator should require McCune to provide basic information in future demands and to amend the current demands to meet the same requirements, and should stay further invoicing of AAA fees until the information required under AAA rules for Demands has been met.**

Pursuant to the Process Arbitrator's express authority to make determinations on AAA

---

[30] As made clear by Wells Fargo's timely payments of all AAA fees invoiced thus far.

filing requirements and any other administrative issue arising out of the Multiple Case Filings, Wells Fargo requests that the Process Arbitrator enter an order requiring McCune to, by a certain specified date, amend the demands currently filed with the AAA to include, and ensure that any future demands include, the additional following information: (a) the Claimant's Wells Fargo checking account number for the account at issue, (b) sufficiently pled facts establishing that the Claimant was enrolled in DCOS, (c) sufficiently pled facts establishing that the Claimant incurred overdraft fees in connection with transactions covered by Regulation E, (d) identification of the specific state law(s) under which Claimants assert claims (statutory and common law), and (e) specify the amount of money in dispute.[31]

Additionally, Wells Fargo requests that, pursuant to her authority to make determinations related to the "allocation of payment advances on administrative fees, arbitrator compensation, and/or expenses," enter an order staying the AAA's invoicing of any fees or arbitration compensation related to the demands or arbitrations until the underlying demands (both currently filed and filed in the future) meet these specificity requirements.

## IV.   CONCLUSION

For the foregoing reasons, Wells Fargo respectfully requests that the Process Arbitrator enter an order: (i) requiring McCune to amend its previously filed arbitration demands to provide the basic information outlined above; (ii) requiring that all future demands filed by McCune provide the basic information outlined above; and (iii) staying the AAA's invoicing of fees and arbitrator compensation related to the demands or arbitrations until the underlying demands meet these specificity requirements (applicable to both current and future filings).

---

[31] During the August 24, 2022 initial conference call, the Process Arbitrator opined that requiring McCune to file a declaration from each claimant under the penalty of perjury which set forth this basic information would lead to a more efficient arbitration process. Wells Fargo agrees.

*/s/ Alicia A. Baiardo*
Alicia A. Baiardo
MCGUIREWOODS LLP
Two Embarcadero Center
Suite 1300
San Francisco, CA 94111
Tel: 415.844.1973
abaiardo@mcguirewoods.com

Amy M. Turk
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, VA 23510
Tel: 757.640.3711
aturk@mcguirewoods.com

Joel S. Allen
MCGUIREWOODS LLP
2000 McKinney Avenue
Suite 1400
Dallas, TX 75201
Tel: 214.932.6464
jallen@mcguirewoods.com

Joshua D. Davey
William C. Mayberry
Jason D. Evans
Michael C. Peretz
Mary K. Grob
Jacob R. Franchek
TROUTMAN PEPPER HAMILTON SANDERS LLP
301 S. College St., Ste. 3400
Charlotte, NC 28202
Tel: 704.916.1503
joshua.davey@troutman.com
bill.mayberry@troutman.com
Jason.Evans@troutman.com
michael.peretz@troutman.com
mary.grob@troutman.com
jacob.franchek@troutman.com

*Counsel for Defendant Wells Fargo Bank, N.A.*

# Exhibit B

AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| 1. Which party is sending in the filing documents? *(check one)* ☑ Consumer ☐ Business |
|---|

2. Briefly explain the dispute: Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto).

Related to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)

3. Specify the amount of money in dispute, if any: $ Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs.  The amount of overdraft fees improperly collected is in the possession of the Business.

4. State any other relief you are seeking:

☑ Attorney Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Other; explain:  Public injunctive relief order to discontinue opting in customers into overdraft coverage using a form and procedures that do not conform with Regulation E.

5. Identify the requested city and state for the hearing if an in-person hearing is held:

City: Cinnaminson                                State: NJ

6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed.

**Consumer:**

| Name: ███ | Consumer Account No.: xxxxxx |
|---|---|
| Address: ███ | | |

| City: ███ | State: ██ | Zip Code: ███ |
|---|---|---|
| Telephone: ███ | Fax: N/A | |
| Email Address: ███ | | |

**Consumer's Representative (if known):**

Name:  Richard A. Nervig and Kyle D. Lawheed

Firm:  McCune Wright Arevalo, LLP

Address: 3281 East Guasti Road, Suite 100

| City: Ontario | State: California | Zip Code: 91761 |
|---|---|---|
| Telephone: (909) 557-1250 | Fax: (909) 557-1275 | |

Email Address: ran@mccunewright.com; kl@mccunewright.com

**Business:**

Name:  Wells Fargo Bank, N.A.

Address: 101 North Phillips Avenue

| City: Sioux Falls | State: South Dakota | Zip Code: 57104 |
|---|---|---|
| Telephone: (606) 575-6900 | Fax: | |

Email Address:

AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

| Business' Representative (if known): | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |
| Date: July 27, 2022 | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;

- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and

- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

SER147

**AMERICAN ARBITRATION ASSOCIATION**

| ▮▮▮▮▮▮▮▮▮▮▮▮ , | AAA CASE NO. |
|---|---|
| Claimant, | **CLAIMANT'S STATEMENT OF CLAIMS** |
| v. | |
| WELLS FARGO BANK, N.A., | **[Relates to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)]** |
| Respondent. | |

**STATEMENT OF CLAIMS**

1.      Claimant, ▮▮▮▮▮▮▮ , seeks relief because Respondent, Wells Fargo Bank, N.A., has been wrongfully charged overdraft fees in violation of federal and state law. Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.*, ("Regulation E"), requires that before Respondent can charge any overdraft fees on one-time debit card and ATM transactions, it must (1) provide a complete, accurate, clear, and easily understandable disclosure of its overdraft services (opt-in disclosure agreement); (2) provide the disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of Claimant's agreement to opt into the financial institution's overdraft program; and (4) provide a recorded confirmation of Claimant's consent, including the right to later opt-out of the program. Regulation E also prevents financial institutions from tying other benefits to an opt-in decision or using pre-checked boxes for the "opt-in" option on the agreement. Finally, Regulation E prohibits financial institutions from aggressively marketing the benefits of Regulation E overdraft coverage. 15 U.S.C. §1693m gives Claimant a statutory private right of action to pursue claims for violating Regulation E. In doing so, Claimant may recover all actual damages sustained, statutory penalties of no less than $100 and no more than $1,000, and reasonable attorneys' fees and costs.

2.      Respondent provides its customers, including Claimant, with a Regulation E opt-in disclosure agreement purportedly describing its overdraft services, attached hereto as <u>Exhibit B</u>. But the disclosure agreement inaccurately describes the circumstances in which Respondent charges overdraft fees. Specifically, it describes a process of calculating overdrafts that uses the

**SER148**

account's actual balance (all money in the account at the time), but Respondent actually uses an internal bookkeeping account balance (*i.e.*, "available balance") that artificially decreases the balance and makes it more likely that an overdraft fee will be assessed. Respondent's use of the available balance to assess overdraft fees significantly increases the likelihood that its customers will incur overdraft fees, and its use is relevant and material to understanding Respondent's overdraft services.

3.    A financial institution must provide customers its opt-in disclosure agreement as a stand-alone document.[1] Information about overdrafts given in other documents does not discharge the obligations imposed by Regulation E. A financial institution that discloses that "An overdraft occurs when there is not enough money in your account to cover a transaction, but we pay it anyway" is disclosing a use of the actual balance to calculate overdrafts.[2] But Respondent's practice is to calculate overdrafts, and charge fees, based on the available balance.

4.    Respondent's actions as described above also constitute unfair and deceptive practices under the laws of the state of Claimant's residence. Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws.

5.    Claimant has been harmed by Respondent's actions. Claimant opted into Respondent's Regulation E overdraft program after receiving the inaccurate Regulation E opt-in disclosure agreement. And because Respondent did not satisfy Regulation E's requirements in its disclosure agreement, Respondent has wrongly assessed overdraft fees to Claimant on Regulation E transactions.

6.    At all relevant times, Respondent charged Claimant overdraft fees on one-time debit card and ATM transactions though Respondent obtained Claimant's consent by using an inaccurate disclosure not compliant with Regulation E. Claimant has held an account with Respondent at all times relevant to the allegations and is believed to have opted into its Regulation E overdraft program for one-time debit card and ATM transactions. Respondent has been assessed improper fees on one-time debit card and ATM transactions within the past year.

---

[1] *See Grenier v. Granite Credit Union*, No. 1:21-cv-00534, 2021 WL 5177709 (D.N.H. Nov. 8, 2021).
[2] *See Fludd, et al. v. S.* No. 2:20-CV-1959-BHH, 2021 WL 4691587 (D.S.C. Oct. 7, 2021);
*Smith v. Bank of Hawaii*, 2017 WL 3597522 (D. Haw. Apr. 13, 2017).

7.     Despite these facts, Respondent continues to market its Regulation E overdraft program and to "opt-in" customers like Claimant using the same (or a similar) non-compliant Regulation E disclosure agreement. Claimant seeks injunctive relief requiring Respondent to (1) withhold charging of additional overdraft or NSF fees until Plaintiff and others give consent after Respondent provides them with an accurate disclosure agreement and (2) provide an accurate disclosure agreement to future customers not yet enrolled in Respondent's Regulation E overdraft program.

WHEREFORE, Claimant requests an award for the following:

A.     For an order requiring Wells Fargo Bank, N.A. to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

B.     For injunctive relief barring Wells Fargo Bank, N.A. from enrolling individuals in its overdraft program without obtaining informed consent through an accurate Regulation E opt-in disclosure agreement;

C.     For monetary and/or actual damages;

D.     For statutory damages;

E.     For civil penalties;

F.     For an order enjoining the continued wrongful conduct alleged herein;

G.     For costs;

H.     For pre-judgment and post-judgment interest as provided by law; and

I.     For such other relief as the Arbitrator deems just and proper.


Dated: July 27, 2022                          /s/ Richard A. Nervig
                                              Richard A. Nervig
                                              Kyle D. Lawheed
                                              MCCUNE WRIGHT AREVALO, LLP
                                              3281 E. Guasti Road, Suite 100
                                              Ontario, CA 91761
                                              Tel. (909) 557-1250
                                              Email: ran@mccunewright.com
                                              kl@mccunewright.com
                                              *Attorneys for Claimant* ▮▮▮▮▮▮

# Exhibit C

AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

Complete this form to start arbitration under an arbitration agreement in a contract.

| 1. Which party is sending in the filing documents? *(check one)* | ☑ Consumer ☐ Business |
|---|---|

2. Briefly explain the dispute: Claimant seeks statutory damages and return of overdraft fees collected in violations of Regulation E of the federal Electronic Funds Transfer Act, and for violation of state consumer fraud laws that have also been violated as a result of Respondent's violations of Regulation E. Please see attached and incorporated herein Exhibits: A) Statement of Claims; B) Opt-in Disclosure Agreement; and C) Deposit Account Agreement (arbitration provision commencing at page 35 thereto).

Related to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)

3. Specify the amount of money in dispute, if any: $ Statutory damages of $1,000, return of all improperly collected overdrafts plus statutory attorneys' fees and costs. The amount of overdraft fees improperly collected is in the possession of the Business.

4. State any other relief you are seeking:

☑ Attorney Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Other; explain: Public injunctive relief order to discontinue opting in customers into overdraft coverage using a form and procedures that do not conform with Regulation E.

5. Identify the requested city and state for the hearing if an in-person hearing is held:

City: Fort Washington                          State: MD

6. Please provide contact information for both the Consumer and the Business. Attach additional sheets or forms as needed.

**Consumer:**

| Name: ███ |
|---|

| Address: ███ |
|---|

| City: ███ | State: ██ | Zip Code: ███ |
|---|---|---|

| Telephone: ███ | Fax: N/A |
|---|---|

| Email Address: ███ |
|---|

**Consumer's Representative (if known):**

| Name: Richard A. Nervig and Kyle D. Lawheed |
|---|

| Firm: McCune Wright Arevalo, LLP |
|---|

| Address: 3281 East Guasti Road, Suite 100 |
|---|

| City: Ontario | State: California | Zip Code: 91761 |
|---|---|---|

| Telephone: (909) 557-1250 | Fax: (909) 557-1275 |
|---|---|

| Email Address: ran@mccunewright.com; kl@mccunewright.com |
|---|

**Business:**

| Name: Wells Fargo Bank, N.A. |
|---|

| Address: 101 North Phillips Avenue |
|---|

| City: Sioux Falls | State: South Dakota | Zip Code: 57104 |
|---|---|---|

| Telephone: (606) 575-6900 | Fax: |
|---|---|

| Email Address: |
|---|

**SER152**

**AMERICAN ARBITRATION ASSOCIATION**®

**DEMAND FOR ARBITRATION**
**CONSUMER ARBITRATION RULES**

| Business' Representative (if known): | | |
|---|---|---|
| Name: | | |
| Firm: | | |
| Address: | | |
| City: | State: | Zip Code: |
| Telephone: | Fax: | |
| Email Address: | | |
| Date:  May 23, 2022 | | |

**7. Send a copy of this completed form to the AAA together with:**

- A clear, legible copy of the contract containing the parties' agreement to arbitrate disputes;

- The proper filing fee (filing fee information can be found in the Costs of Arbitration section of the Consumer Arbitration Rules); and

- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and any attachments to all parties and retain a copy of the form for your records.**

To file by mail, send the initial filing documents and the filing fee to: AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043.

To file online, visit **www.adr.org** and click on **File or Access Your Case** and follow directions. To avoid the creation of duplicate filings, the AAA requests that the filing documents and payment be submitted together. When filing electronically, no hard copies are required.

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

**SER153**

## AMERICAN ARBITRATION ASSOCIATION

████████████████ ,

Claimant,

v.

WELLS FARGO BANK, N.A.,

Respondent.

**AAA CASE NO.**

**CLAIMANT'S STATEMENT OF CLAIMS**

**[Relates to Wilson v. Wells Fargo Bank (Case No. 01-21-0016-4036)]**

## STATEMENT OF CLAIMS

1.    Claimant, ███████ , seeks relief because Respondent, Wells Fargo Bank, N.A., has been wrongfully charged overdraft fees in violation of federal and state law. Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq.*, ("Regulation E"), requires that before Respondent can charge any overdraft fees on one-time debit card and ATM transactions, it must (1) provide a complete, accurate, clear, and easily understandable disclosure of its overdraft services (opt-in disclosure agreement); (2) provide the disclosure as a stand-alone document not intertwined with other disclosures; (3) obtain verifiable affirmative consent of Claimant's agreement to opt into the financial institution's overdraft program; and (4) provide a recorded confirmation of Claimant's consent, including the right to later opt-out of the program. Regulation E also prevents financial institutions from tying other benefits to an opt-in decision or using pre-checked boxes for the "opt-in" option on the agreement. Finally, Regulation E prohibits financial institutions from aggressively marketing the benefits of Regulation E overdraft coverage. 15 U.S.C. §1693m gives Claimant a statutory private right of action to pursue claims for violating Regulation E. In doing so, Claimant may recover all actual damages sustained, statutory penalties of no less than $100 and no more than $1,000, and reasonable attorneys' fees and costs.

2.    Respondent provides its customers, including Claimant, with a Regulation E opt-in disclosure agreement purportedly describing its overdraft services, attached hereto as <u>Exhibit B</u>. But the disclosure agreement inaccurately describes the circumstances in which Respondent charges overdraft fees. Specifically, it describes a process of calculating overdrafts that uses the

account's actual balance (all money in the account at the time), but Respondent actually uses an internal bookkeeping account balance (*i.e.*, "available balance") that artificially decreases the balance and makes it more likely that an overdraft fee will be assessed. Respondent's use of the available balance to assess overdraft fees significantly increases the likelihood that its customers will incur overdraft fees, and its use is relevant and material to understanding Respondent's overdraft services.

3.      A financial institution must provide customers its opt-in disclosure agreement as a stand-alone document.[1] Information about overdrafts given in other documents does not discharge the obligations imposed by Regulation E. A financial institution that discloses that "An overdraft occurs when there is not enough money in your account to cover a transaction, but we pay it anyway" is disclosing a use of the actual balance to calculate overdrafts.[2] But Respondent's practice is to calculate overdrafts, and charge fees, based on the available balance.

4.      Respondent's actions as described above also constitute unfair and deceptive practices under the laws of the state of Claimant's residence. Claimant seeks actual damages, statutory damages, restitution, and all appropriate injunctive relief provided for by applicable state laws.

5.      Claimant has been harmed by Respondent's actions. Claimant opted into Respondent's Regulation E overdraft program after receiving the inaccurate Regulation E opt-in disclosure agreement. And because Respondent did not satisfy Regulation E's requirements in its disclosure agreement, Respondent has wrongly assessed overdraft fees to Claimant on Regulation E transactions.

6.      At all relevant times, Respondent charged Claimant overdraft fees on one-time debit card and ATM transactions though Respondent obtained Claimant's consent by using an inaccurate disclosure not compliant with Regulation E. Claimant has held an account with Respondent at all times relevant to the allegations and is believed to have opted into its Regulation E overdraft program for one-time debit card and ATM transactions. Respondent has been assessed improper fees on one-time debit card and ATM transactions within the past year.

---

[1] *See Grenier v. Granite Credit Union*, No. 1:21-cv-00534, 2021 WL 5177709 (D.N.H. Nov. 8, 2021).
[2] *See Fludd, et al. v. S.* No. 2:20-CV-1959-BHH, 2021 WL 4691587 (D.S.C. Oct. 7, 2021); *Smith v. Bank of Hawaii*, 2017 WL 3597522 (D. Haw. Apr. 13, 2017).

7.     Despite these facts, Respondent continues to market its Regulation E overdraft program and to "opt-in" customers like Claimant using the same (or a similar) non-compliant Regulation E disclosure agreement. Claimant seeks injunctive relief requiring Respondent to (1) withhold charging of additional overdraft or NSF fees until Plaintiff and others give consent after Respondent provides them with an accurate disclosure agreement and (2) provide an accurate disclosure agreement to future customers not yet enrolled in Respondent's Regulation E overdraft program.

WHEREFORE, Claimant requests an award for the following:

A.     For an order requiring Wells Fargo Bank, N.A. to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

B.     For injunctive relief barring Wells Fargo Bank, N.A. from enrolling individuals in its overdraft program without obtaining informed consent through an accurate Regulation E opt-in disclosure agreement;

C.     For monetary and/or actual damages;

D.     For statutory damages;

E.     For civil penalties;

F.     For an order enjoining the continued wrongful conduct alleged herein;

G.     For costs;

H.     For pre-judgment and post-judgment interest as provided by law; and

I.     For such other relief as the Arbitrator deems just and proper.


Dated: May 23, 2022                    /s/ Richard A. Nervig
                                       Richard A. Nervig
                                       Kyle D. Lawheed
                                       MCCUNE WRIGHT AREVALO, LLP
                                       3281 E. Guasti Road, Suite 100
                                       Ontario, CA 91761
                                       Tel. (909) 557-1250
                                       Email: ran@mccunewright.com
                                       kl@mccunewright.com
                                       *Attorneys for Claimant* ▮▮▮▮▮▮

1  **MCGUIREWOODS LLP**
Alicia A. Baiardo SBN #254228
2  abaiardo@mcguirewoods.com
Jenny Yi SBN #314540
3  jyi@mcguirewoods.com
Two Embarcadero Center, Suite 1300
4  San Francisco, CA 94111-3821
Telephone: 415.844.9944
5
Amy Morrissey Turk (*pro hac vice*)
6  VA SBN #44957
aturk@mcguirewoods.com
7  101 West Main Street, Suite 9000
Norfolk, VA 23510
8  Telephone: 757.640.3700

9  Joel S. Allen *(pro hac vice)*
TX SBN #00795069
10  jallen@mcguirewoods.com
Paul M. Chappell *(pro hac vice)*
11  TX SNB # 24097489
pchappell@mcguirewoods.com
12  2000 McKinney Ave, Suite 1400
Dallas, TX 75201
13  Telephone: 214.932.6400

14  [Additional counsel listed on last page]

15  *Attorneys for Defendants*
*Wells Fargo Bank, N.A. and Wells Fargo & Co.*
16

17              UNITED STATES DISTRICT COURT

18            SOUTHERN DISTRICT OF CALIFORNIA

19  ALEXANDRIA MOSELY, REJOYCE          | CASE NO. 3:22-cv-01976-DMS-AGS
    KEMP, BERENICE CISNEROS,
20  BRUCE PARKER, individually,         | The Hon. Dana M. Sabraw

21            Plaintiffs,               | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION**
22       vs.
23  WELLS FARGO & CO., WELLS            | Courtroom: 13A
    FARGO BANK, N.A., and DOES 1
24  through 5,                          | Hearing Date: March 3, 2023

25            Defendants.               | Complaint Filed: December 13, 2022
26
27
28

# **TABLE OF CONTENTS**

**Page(s)**

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | FACTUAL AND PROCEDURAL BACKGROUND | 2 |
| | A. Plaintiffs' Agreement to Arbitrate | 2 |
| | B. Plaintiffs' Arbitration Demands | 3 |
| | C. AAA Proceedings to Date | 4 |

1. MLG initiates a mass arbitration campaign against Wells Fargo .......... 4

2. MLG's failure to perform diligence, in conjunction with MLG's solicitations, result in demands being submitted on behalf of individuals with no legitimate claims against Wells Fargo .......... 6

3. AAA begins invoicing Wells Fargo for fees due pursuant to the Supplementary Rules, and Wells Fargo pays every invoice .......... 7

4. Due to MLG's failure to perform diligence and solicitations establishing an intent to harm, Wells Fargo seeks relief from the Process Arbitrator pursuant to the Supplementary Rules .......... 7

5. The Process Arbitrator partially grants Wells Fargo's request for relief .......... 8

D. Plaintiffs' Complaint .......... 9

E. The Court Already Determined that a Substantially Similar Dispute Between an Individual and Wells Fargo is Subject to Arbitration Based on Virtually Identical Arbitration Language .......... 11

III. ARGUMENTS & AUTHORITIES .......... 12

A. Legal Standard .......... 12

B. Plaintiffs' Arbitration Agreements are Valid and Enforceable and Encompass Their Disputes with Wells Fargo .......... 13

1. Plaintiffs' Arbitration Agreements are valid and enforceable .......... 13

2. Plaintiffs' Arbitration Agreements encompass Plaintiffs' dispute .......... 14

C. The Court Lacks Authority to Review or Enjoin the Pending AAA Proceeding .......... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page(s)

1.  The Court cannot review an interim arbitration order .............. 15

2.  The Court cannot review the procedural PA Order, and
    even if it could, doing so would constitute an unlawful
    collateral attack on the Process Arbitrator's ruling .................. 16

3.  The Court's review of the PA Order would constitute an
    unlawful advisory opinion ........................................................ 18

D.  Plaintiffs Do Not Seek Provisional and/or Ancillary Relief.............. 19

E.  Plaintiffs' Allegations Regarding AAA Proceeding are False and
    Cannot Provide Plaintiffs a Workaround to Their Arbitration
    Agreements ................................................................................ 21

IV.  CONCLUSION ...................................................................... 25

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

**SER159**

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*Adesa, Inc. v. Berkowitz*,
    No. 14-cv-04022-VC, 2014 WL 11531338 (N.D. Cal. Nov. 20,
    2014) ................................................................................................. 20

*Alers v. JPMorgan Chase Bank, N.A.*,
    No. 2:20-cv-08934-FLA(AGRx), 2021 WL 1306413 (C.D. Cal.
    Mar. 17, 2021), *aff'd sub nom.*, *Alers v. JPMorgan Chase Bank,
    N.A.*, No. 21-55325, 2021 WL 5860888 (9th Cir. Dec. 10, 2021) .................... 18

*Alexander v. Am. Arb. Ass'n*,
    No. C 01-1461-PJH, 2001 WL 868823 (N.D. Cal. July 27, 2001) .................... 18

*Berland v. Conclave, LLC*,
    No. 20-CV-00922-H-WVG, 2021 WL 461727 (S.D. Cal. Feb. 9,
    2021) ................................................................................................. 15

*Bernal v. All Am. Inv. Realty, Inc.*,
    479 F. Supp. 2d 1291 (S.D. Fla. 2007) ................................................ 10, 21, 24

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) ............................................................... 13

*Coates v. First Guar. Bank*,
    No. 06-140-D-M2, 2007 WL 9706402 (M.D. La. Oct. 19, 2007) ................... 24

*Corey v. New York Stock Exch.*,
    691 F.2d 1205 (6th Cir. 1982) ............................................................... 18

*Dekker v. Vivint Solar, Inc.*,
    No. 20-16584, 2021 WL 4958856 (9th Cir. Oct. 26, 2021) ........................... 14

*DHL Services (Americas), Inc. v. Infinite Software Corp.*,
    502 F. Supp. 2d 1082 (C.D. Cal. 2007) .................................................... 20

*Fobare v. Weiss, Neuren & Neuren*,
    Nos. 99-CV-1539, 99-CV-1452, 99-CV-2007, 2000 WL 654969
    (N.D.N.Y. May 16, 2000) ...................................................................... 24

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-iii-

*Gavaldon v. StanChart Sec. Int'l, Inc.*,
    No. 12-cv-3016-LAB(MDD), 2014 WL 1292907 (S.D. Cal. Mar.
    28, 2014) ................................................................................................ 19

*Glass v. Kidder Peabody & Co.*,
    114 F.3d 446 (4th Cir. 1997) ................................................ 16, 17, 24

*Heavenseven GMBH v. Lovetuner, Inc.*,
    No. 2:22-cv-03464MEMF(SKx), 2022 WL 3636598 (C.D. Cal.
    Aug. 17, 2022) ........................................................................................ 14

*Hyosung (America) Inc. v. Tranax Technologies, Inc.*,
    No. C 10-0793, 2010 WL 1853764 (N.D. Cal. May 6, 2010) ........................ 15

*Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. Lunera Lighting,*
    *Inc.*,
    No. 18-cv-05091-EMC, 2018 WL 6199681
    (N.D. Cal. Nov. 28, 2018) ....................................................................... 20

*Johnson v. Dentsply Sirona Inc.*,
    No. 16-CV-0520, 2017 WL 4295420 (N.D. Okla. Sept. 27, 2017) .................. 15

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
    341 F.3d 987 (9th Cir. 2003) .................................................................. 17

*Lagstein v. Certain Underwriters at Lloyd's, London*,
    607 F.3d 634 (9th Cir. 2010) .................................................................. 17

*MacClelland v. Cellco P'ship*,
    No. 22-16020 (9th Cir. Nov. 28, 2022) ..................................................... 5

*Mesachi v. Postmates Inc.*,
    No. 3:20-CV-07028-WHO, 2021 WL 736270 (N.D. Cal. Jan. 8,
    2021) ...................................................................................................... 14

*Millmen Local 550, United Broth. of Carpenters and Joiners of Am.,*
    *AFL–CIO v. Wells Exterior Trim*,
    828 F.2d 1373 (9th Cir. 1987) ............................................................... 15

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ............................................................................. 12, 13

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

**SER161**

*Nghiem v. NEC Electronic, Inc.*,
25 F.3d 1437 (9th Cir. 1994), *cert. denied*, 513 U.S. 1044 (1994) ................... 14

*Nieves v. City of Cleveland*,
153 F. App'x 349 (6th Cir. 2005) ........................................................................ 24

*Pac. Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*,
935 F.2d 1019 (9th Cir. 1991) ............................................................................ 15

*Preston v. Ferrer*,
552 U.S. 346 (2008) ............................................................................................ 12

*Qualcomm, Inc. v. Motorola, Inc.*,
185 F.R.D. 285 (S.D. Cal. 1999) ........................................................................ 19

*Sanchez v. Elizondo*,
878 F.3d 1216 (9th Cir. 2018) ............................................................................ 17

*Shearson/Am. Express, Inc. v. McMahon*,
482 U.S. 220 (1987) ............................................................................................ 13

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ............................................................................ 19

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) .............................................................................. 20

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ...................................................................................... 15, 16

*Tizekker v. Bel-Air Bay Club LTD*,
No. 2:20-cv-03989-ODW(AFMx), 2021 WL 124495
(C.D. Cal. Jan. 13, 2021) ..................................................................... 16, 17, 19, 24

*Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*,
609 F.3d 975 (9th Cir. 2010) .............................................................................. 20

*U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*,
591 F.3d 1167 (9th Cir. 2010) ............................................................................ 17

*Wachovia Sec., LLC v. Wiegand*,
No. 07CV243-IEG(BLM), 2007 WL 9776732
(S.D. Cal. Apr. 16, 2007).................................................................................... 18

-v-

*Willis v. City of Oakland*,
231 F.R.D. 597 (N.D. Cal. 2005) .................................................................. 24

*Wilson v. Wells Fargo & Co.*,
No. 20-CV-2307-DMS-WVG, 2021 WL 1853587
(S.D. Cal. May 10, 2021) ........................................... 1, 2, 4, 5, 11, 23

*Wilson v. Wells Fargo & Co.*,
No. 3:20-cv-02307-DMS-WVG (S.D. Cal. filed Nov. 25, 2020) ...................... 11

*Wilson v. Wells Fargo & Co.*,
No. 3:20-cv-02307-RBM-WVG, 2022 WL 4125220
(S.D. Cal. Sept. 9, 2022)............................................................ 12, 13, 14

**Federal Statutes and Rules**

Federal Arbitration Act ("FAA") ................................................. *passim*

Electronic Fund Transfer Act ("EFTA").................................................. 4, 11

Fed. R. Civ. P. 11.......................................................................... 24

**California Statutes and Rules**

California Business & Professions Code
§ 17200 ......................................................................... 10, 11, 12

California Code of Civil Procedure
§ 128.7 ................................................................................. 9

**Other Authorities**

12 C.F.R. ¶ 1005.1 ........................................................................ 11

12 C.F.R. § 1005.17........................................................................ 6

FINRA Rule 12401 ........................................................................ 17

Supplementary Rule MC-6 .................................................................. 8

# I.   <u>INTRODUCTION</u>

Disappointed with how the underlying Multiple Case Filing ("MCF") before the American Arbitration Association ("AAA") is proceeding, McCune Law Group ("MLG") filed this Complaint against Defendants (collectively, "Wells Fargo") under the guise of a declaratory judgment action brought by four Plaintiffs. In reality, the Complaint is nothing more than a thinly-veiled attempt to forum shop around the contractually-agreed AAA adjudicatory process—a process this Court has already concluded must be followed under the arbitration agreement at issue here in a prior case involving similar claims. *See Wilson v. Wells Fargo & Co.*, No. 20-CV-2307-DMS-WVG, 2021 WL 1853587, at *2-3 (S.D. Cal. May 10, 2021).

The Complaint is replete with factual inaccuracies and brazenly seeks to attack an interim procedural order issued by a duly-appointed Process Arbitrator on October 27, 2022, following briefing and argument by both sides (the "PA Order"). In bringing the Complaint, MLG failed to attach the PA Order (and the underlying briefing) to the Complaint in what appears to be an effort to keep this Court in the dark concerning the procedural landscape.

It is important to note that MLG brings this Complaint on behalf of just four individuals ("Plaintiffs") of the 3,300+ they represent in the MCF and that AAA's PA Order—which spurred the filing of the Complaint—simply requires Plaintiffs and the other MCF claimants to provide basic information before AAA will continue to move individual arbitrations forward and assess non-refundable fees against Wells Fargo. Ironically, although MLG complains about the alleged burden imposed by the PA Order, Plaintiffs include in this Complaint the exact same basic information that would meet the PA Order and allow each claimant to arbitrate their individual claims. MLG has chosen to challenge the enforceability of the PA Order rather than provide such information for its 3,300+ clients.

Wells Fargo brings this Motion to Compel Arbitration because the four Plaintiffs agreed to arbitrate all claims they have against Wells Fargo, and the Federal

-1-

1  Arbitration Act ("FAA") thus requires their claims—including any disputes
2  regarding procedural administration— be heard in arbitration. Whether arbitration is
3  the proper forum is not in dispute. Plaintiffs admit they "do not attack the [FAA]"
4  and concede they entered into valid arbitration agreements. Compl. ¶ 11. Moreover,
5  Plaintiffs themselves initiated the arbitral process with AAA. Despite these actions
6  and admissions, Plaintiffs still bring this suit seeking to effectuate an end-run around
7  their agreements to arbitrate simply because they are unhappy with the PA Order.
8  The Court should have none of it. And, this Court previously compelled arbitration
9  of very similar claims under the same arbitration agreement in *Wilson*. *Wilson*, 2021
10 WL 1853587, at *2-3.

11      The PA Order is based in AAA's Supplementary Rules for Multiple Case
12 Filings ("Supplementary Rules"), which MLG and Plaintiffs agreed govern the
13 MCF. It requires MLG to provide basic information about the claims in keeping with
14 California state law requirements before any lawsuit is filed. The Complaint contends
15 that MLG shouldn't have to do even the *most basic* work to investigate its own
16 clients' claims because the parties agreed to arbitration, and seeks to leverage four
17 claimants to entirely invalidate Wells Fargo's arbitration agreement. This is not the
18 law. The Court should compel this case back to arbitration before AAA to decide
19 MLG's complaints on behalf of these four individuals, as required by Plaintiffs'
20 arbitration agreements and federal law.

21 **II.    FACTUAL AND PROCEDURAL BACKGROUND**

22      **A.    Plaintiffs' Agreement to Arbitrate.**

23      Each of the Plaintiffs have (or at one point had) a Wells Fargo checking
24 account (the "Account(s)") and agreed to participate in an optional overdraft program
25 offered by Wells Fargo for debit card and ATM transactions called Debit Card
26 Overdraft Service ("DCOS"). Compl. ¶¶ 16-19; *see also* Declaration of Jonathan
27 Gillespie ("Gillespie Decl.") at ¶¶ 2-5. When Plaintiffs opened their Accounts, they
28 received and agreed to be bound by the terms of Wells Fargo's Deposit Account

-2-

1  Agreement (the "Account Agreement(s)"). *See id.* at ¶¶ 2-5, Exs. A-B ("Account
2  Agreements").[1]

3      The Account Agreements govern the relationship between Plaintiffs and Wells
4  Fargo, and contain provisions requiring arbitration of disputes between the parties
5  (the "Arbitration Agreements"). Gillespie Decl. Exs. A-B (Account Agreements) at
6  35-37. The Arbitration Agreements require that any "dispute between [Plaintiffs] and
7  Wells Fargo," which is defined as "any unresolved disagreement between Wells
8  Fargo and you," including any "disagreement about this Arbitration Agreement's
9  meaning, application, or enforcement," is subject to arbitration. *Id.* at 35. The
10 Arbitration Agreements further provide that the "American Arbitration Association
11 (AAA) will administer each arbitration and the selection of arbitrators according to
12 AAA's Consumer Arbitration Rules" and that "neither Wells Fargo nor you will be
13 entitled to join or consolidate disputes by or against others as a representative or
14 member of a class, to act in any arbitration in the interests of the general public, or
15 to act as a private attorney general." *Id.*

16     **B.  Plaintiffs' Arbitration Demands**

17     Each of the four Plaintiffs submitted an arbitration demand against Wells
18 Fargo as part of MLG's mass arbitration campaign (collectively, "Plaintiffs'
19 Arbitration Demands"). Declaration of Alicia Baiardo ("Baiardo Decl.") at ¶¶ 3, 24,

20 _____

21 [1] Although the Complaint attaches the November 15, 2022 Deposit Account
22 Agreement, that is not the relevant agreement at issue. *See* Compl. at Ex. A. The
   Deposit Account Agreement in place at the time Plaintiffs Mosley, Cisneros, and
23 Parker submitted demands with AAA was the October 15, 2021 Deposit Account
   Agreement. Additionally, although all four Plaintiffs attached the October 15, 2021
24 Deposit Account Agreement as containing the controlling arbitration agreement
25 between the parties, the arbitration of Plaintiff Rejoyce Kemp would be subject to the
   May 9, 2022 Deposit Account Agreement which was in effect at the time she
26 submitted her demand. Gillespie Decl. ¶ 4, n. 1. As the arbitration agreement in both
27 are identical, Wells Fargo will refer to the language included in the account agreement
28 attached to Plaintiff Kemp's demand for purposes of this Motion.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

Exs. C-F. Plaintiffs Alexandra Mosley and Bruce Parker submitted their arbitration demands on April 11, 2022. *Id.* at ¶ 24. Plaintiff Rejoyce Kemp submitted her arbitration demand against Wells Fargo on July 19, 2022. *Id.* Plaintiff Berenice Cisneros submitted his arbitration demand against Wells Fargo on August 12, 2022. *Id.*

Plaintiffs' Arbitration Demands "seek statutory damages and return of overdraft fees collected in violation of Regulation E" and "for violation of state consumer fraud laws that have also been violated as a result of [Wells Fargo's] violations of Regulation E." Baiardo Decl. ¶ 3, Exs. C-F. The demands are virtually identical, include identical statements when required to briefly explain the dispute, and include virtually identical "Statement of Claims" that do not specify which state consumer fraud law or statutory section applies to Plaintiffs' arbitrations. *See id.* at ¶¶ 3, 24. Notably, Plaintiffs' Arbitration Demands allege a violation of Regulation E,[2] and no other claims.[3] *Id.* at Exs. C-F.

## C. AAA Proceedings to Date.

### 1. MLG initiates a mass arbitration campaign against Wells Fargo.

While MLG and Wells Fargo were engaged in the *Wilson* Arbitration, MLG

---

[2] Regulation E precludes financial institutions from assessing overdraft fees on certain debit card transactions unless the bank abides by its requirements. EFTA claims are subject to a one-year statute of limitations. 15 U.S.C. § 1693m(g). Some corresponding state laws have longer statutes of limitations. Thus, in order to assert a viable Regulation E claim against Wells Fargo, a claimant must, at a minimum, have signed up for a checking account with Wells Fargo, agreed to participate in the DCOS, and been assessed an overdraft fee during an actionable limitations period.

[3] In their Complaint, Plaintiffs discuss arbitrations where individuals assert a claim based on an authorized positive, settle negative ("APSN") theory and how establishing such claims requires information from Wells Fargo. Compl. ¶ 9. These allegations are irrelevant as the four Plaintiffs do not assert APSN claims, since their demands were filed before MLG started asserting this theory in September 2022, and only assert claims for violation of Regulation E. *See* Baiardo Decl. at Exs. C-F.

-4-

initiated a mass arbitration[4] campaign against Wells Fargo. Baiardo Decl. ¶ 3. AAA informed MLG and Wells Fargo via letter that the MCF would be subject to AAA's Supplementary Rules for Multiple Case Filings (the "Supplementary Rules").[5] *Id.* at ¶ 4, Ex. G. MLG responded to AAA by ***affirmatively requesting*** that certain demands filed against Wells Fargo "be consolidated and otherwise subject to the [Supplementary Rules]." *Id.* at ¶ 4, Ex. H. AAA then informed the parties that AAA's Consumer Rules ("Consumer Rules") and Supplementary Rules would apply to the arbitration demands filed by MLG, and appointed the Honorable Anita Rae Shapiro to serve as Process Arbitrator for the MCF. *Id.* at ¶ 6, Exs. J and K. At no point in time prior to the filing of this lawsuit did MLG object to the AAA's application of the Supplementary Rules. *Id.* at ¶ 6. MLG continues to file individual arbitration demands in tranches, even after the filing of this Complaint and Motion for

---

[4] A number of law firms have implemented a new strategy in response to class action waivers called "mass arbitration." Baiardo Decl. ¶ 3, n.1. Due to the fee structure of many arbitration agreements, there is the potential for abuse where the plaintiff-side law firm attempts to force high-dollar settlements from businesses that have nothing to do with the merits of the alleged claims, but instead are driven by the desire to avoid the costs the defendant must incur to pay for arbitration itself. *See id.* (citing Br. of the Chamber of Com. of the U.S. as *Amicus Curiae* in Supp. of Defs.-Appellants and Reversal at 9-18, *MacClelland v. Cellco P'ship*, No. 22-16020 (9th Cir. Nov. 28, 2022)).

[5] AAA created the Supplementary Rules, which became effective on August 1, 2021, in response to mass arbitrations. The Supplementary Rules were created to "streamline the administration of large volume filings involving the same [or related] party, parties, and party representatives" for disputes where AAA's employment or consumer fee schedules apply, and "are intended to provide parties and their representatives with an ***efficient and economical*** path toward the resolution of multiple individual disputes." Supplementary Rules at Introduction (emph. added). The Supplementary Rules provide for the appointment of a Process Arbitrator to make determinations on "administrative issues for all of the cases included in the Multiple Case Filing affected by such administrative issues," including filing requirements, fee payments, and any other issue arising out of the multiple case filing. *See id.* at MC-6(b), MC-6(d)(i), (ii), and (iii).

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

Preliminary Injunction, and as of February 1, 2023 filed a total of 3,365 demands—including the demands of the four Plaintiffs. *Id.* at ¶ 5.

### 2. MLG's failure to perform diligence, in conjunction with MLG's solicitations, result in demands being submitted on behalf of individuals with no legitimate claims against Wells Fargo.

Like Plaintiffs' Arbitration Demands, the demands filed as part of MLG's mass arbitration campaign were virtually identical and did not specify which state consumer fraud law or statutory section applied to the individual claimant's arbitration. *Id.* at ¶ 3. With some of its clients' arbitration demands, MLG also submitted an "authorization" form which purported to provide information about its clients' Wells Fargo accounts. *Id.* at ¶ 8. The authorizations established MLG's blatant failure to vet its clients' claims by, for example, claimants listing their Wells Fargo account numbers as: "i don't have one"; "Idk"; "xxxxxxxxxx"; "XXX…"; "Not giving my account"; "None"; "999999999"; "N/a"; "[claimant's last name]"; "Not sure"; "Blank"; .000000000". *Id.* at ¶ 8, Ex. N.

Additionally, MLG's solicitations to its potential clients indicated its intent to harm Wells Fargo, and not to seek clients with legitimate claims. *Id.* at ¶ 10. As part of MLG's advertising to find claimants, MLG claimed that "[a]ny Wells Fargo customer who received an overdraft fee within the past 12 months [could] qualify" to bring a Regulation E claim against Wells Fargo. *Id.* at ¶ 10, Ex. P. This is untrue and misstates the law.[6] Moreover, these solicitations then exposed their motivation by noting that each arbitration MLG files forces Wells Fargo to pay "a whopping $4,000.00, not including their attorneys' fees!" *Id.* Thus, MLG explained, "bringing hundreds of thousands of arbitrations, each resulting in thousands paid by Wells Fargo, means consumers can finally hit one of the world's largest corporations where

---

[6] Regulation E only applies to specific overdraft charges related to ATM and one-time debit card transactions, and does not cover overdrafts on checks or recurring withdrawals such as a mortgage or auto payment. *See* 12 C.F.R. § 1005.17.

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

1   it hurts." *Id.*

2       The advertisement also falsely stated in June 2022 that MLG, while
3   "representing hundreds of clients who have been charged unfair overdraft fees in
4   arbitrations against Wells Fargo," "secured the return of **all overdraft fees charged**
5   **within the past year plus a $1000.00 penalty** for every client." *Id.* at ¶ 10, Ex. P
6   (emph. added). But MLG *did not* secure any result for any of its clients in arbitration
7   against Wells Fargo in June 2022.  *Id.*

8           **3.    AAA begins invoicing Wells Fargo for fees due pursuant to
                    the Supplementary Rules, and Wells Fargo pays every
9                   invoice.**

10      After AAA determined the MCF would be governed by the Supplementary
11  Rules, it began invoicing Wells Fargo and Wells Fargo began paying for the initial
12  administrative filing fees associated with the arbitration demands. *Id.* at ¶ 7. Thus
13  far, AAA has invoiced Wells Fargo on eight separate occasions (April 22, 2022, May
14  6, 2022, May 18, 2022, June 23, 2022, July 18, 2022, August 12, 2022, October 7,
15  2022, and October 26, 2022) for a total amount of $501,075.00 in initial
16  administrative filing fees. *Id.* at ¶ 7, Ex. L. These fee payments include fees paid for
17  Plaintiffs' arbitrations. *Id.* Contrary to Plaintiffs' assertions, ***Wells Fargo has timely***
18  ***paid each and every invoice it has received from AAA.*** *See* Compl. ¶¶ 6, n.6, 88 *cf.*
19  Baiardo Decl. ¶ 7, Ex. M.

20          **4.    Due to MLG's failure to perform diligence and solicitations
                    establishing an intent to harm, Wells Fargo seeks relief from
21                  the Process Arbitrator pursuant to the Supplementary Rules.**

22      Soon after MLG began its mass arbitration campaign against Wells Fargo, it
23  became clear that MLG was not performing reasonable due diligence to confirm that
24  claimants were (1) Wells Fargo customers, (2) had enrolled in DCOS (a pre-requisite
25  to bringing their claims) or (3) had incurred any overdraft fees subject to Regulation
26  E. Baiardo Decl. ¶ 8, Ex. N. In fact, Wells Fargo's preliminary review of the demands
27  indicated that many claimants never even agreed to participate in the DCOS. *Id.* at

28

-7-

¶ 9.[7]

The Supplementary Rules provide the Process Arbitrator the jurisdiction to decide filing requirements in an MCF across all claims. As a result, Wells Fargo brought a motion pursuant to Supplementary Rule MC-6 asking that the Process Arbitrator require MLG to provide the requisite basic information in the demands it was filing so Wells Fargo could adequately defend itself. *See id.* at ¶¶ 11-13, Ex. Q. The motion was fully briefed and a hearing was held before the Process Arbitrator entered her decision. *Id.* at ¶¶ 13-15, Exs. R, S.

### 5. The Process Arbitrator partially grants Wells Fargo's request for relief.

On October 27, 2022, the Process Arbitrator entered the PA Order. *Id.* at ¶ 16, Ex. T. The PA Order granted in part and denied in part Wells Fargo's request. *Id.* It ordered each claimant to file and serve an amended demand for all claims filed before October 27, 2022—and required all demands filed thereafter to— "specifically plead, 1) each Claimant's Wells Fargo account number for the account at issue, 2) facts to establish each Claimant was enrolled in DCOS during the time period at issue and 3) facts sufficient to establish that each Claimant incurred overdraft fees in connection with transactions covered by Regulation E." *Id.* In other words, the PA Order simply requires MLG to confer with its clients and review their bank statements to confirm they have a legitimate claim against Wells Fargo, then amend the client's demand to include such information. *See id.* at ¶ 16, Ex. T.[8] The PA Order

---

[7] MLG tries to avoid its obligations by suggesting that certain information is solely within the purview of Wells Fargo. Compl. ¶ 9. However, whether a claimant has opted into the DCOS can be answered by a review of a claimant's bank statement, which specifies if the claimant is enrolled in the service. Baiardo Decl. ¶ 9, Ex. O. Indeed, Plaintiffs' Complaint establishes that MLG communicated with Plaintiffs and reviewed Plaintiffs' bank statements prior to filing this lawsuit. Compl. ¶¶ 16-19, 70-73.

[8] MLG complains that this requires it to submit "evidentiary proof" of its claimants'

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

**SER171**

then, on its own accord and without any underlying request from Wells Fargo, ordered that an attorney of record for claimants sign each amended claim as required by California Code of Civil Procedure section 128.7[9] or, in lieu of filing and serving a separate amended claim for each claimant, file one spreadsheet signed by an attorney of record for claimants including all the ordered information for each claimant. *Id.* The PA Order further held that the "invoicing of AAA fees is stayed for all Claims that have not already been invoiced and for all new Claims filed with AAA until the [specificity] requirements [ ] have been satisfied." *Id.* Wells Fargo has consistently stated its intent and willingness to move forward with individual arbitrations as soon as each claimant files an amended demand meeting the PA Order's requirements. *Id.* at ¶ 16, Ex. U. The Complaint conveniently ignores that fact.

The PA Order specifically stated that "***claimants are not ordered;*** 1) to file Amended Claims specifying which state laws have been violated or 2) allege the specific amount of overdraft fees each Claimant was wrongly charged." Baiardo Decl. at Ex. T. (emphasis added). Shortly after the PA Order was entered, MLG made clear that it would not abide by its terms and informed AAA of its intention to challenge the arbitration agreement in federal court. *Id.* at ¶ 17, Ex. V.

_____

claims, and that the information is solely in Wells Fargo's possession. Compl. ¶¶ 8, 79, 87. In reality, the PA Order simply requires basic information that MLG should have included in its initial filings to comply with AAA's demand filing requirements. *See* Baiardo Decl. at ¶ 16, Ex. Z. Indeed, MLG provided that information ***in this case*** about these four Plaintiffs. Compl. ¶¶ 16-19.

[9] While Plaintiffs assert that Wells Fargo "insisted that AAA impose California Code of Civil Procedure Section 128.7 standards on all claimants," that is not accurate. Baiardo Decl. at ¶ 13, Exs. Q, S (confirming AAA briefing and argument did not include such a request). Instead, the Process Arbitrator implemented the requirement on her own accord, likely because she felt it necessary given MLG's attempted abuse of the arbitration process.

-9-

**D.    Plaintiffs' Complaint.**

On December 13, 2022, on behalf of only the four Plaintiffs, MLG filed the complaint in this matter. *See* Dkt. #1 (the "Complaint"). The Complaint alleges Plaintiffs enrolled in DCOS and were charged an overdraft fee subject to Regulation E during an actionable limitations period. *Id.* at ¶¶ 16-19. The Complaint then alleges that Wells Fargo's practices related to its DCOS program violate Regulation E and that it enrolled Plaintiffs into DCOS through unlawful disclosures and practices. *See id.* at ¶¶ 48-75. Additionally, the Complaint alleges that Wells Fargo has breached the Arbitration Agreements due to AAA's entry of the PA Order. *Id.* at ¶¶ 83-91.

Plaintiffs claim that Wells Fargo breached the Arbitration Agreements by not providing them with a "quick and efficient means of resolving their claims." *See* Compl. ¶¶ 3, 7, 86. Plaintiffs base this claim on the following: (i) Wells Fargo allegedly refuses to pay fees to facilitate Plaintiffs' arbitrations (Compl. ¶ 88); (ii) the PA Order purportedly requires "an arbitrary stay of ***all*** individual arbitrations until ***all*** active claimants" meet the requirements of the PA Order (Compl. ¶¶ 81, 87); (iii) the information necessary for Plaintiffs to meet the PA Order's requirements is allegedly in Wells Fargo sole possession (Compl. ¶¶ 8, 79, 87); and (iv) "Wells Fargo ensures that consumers are not able to secure a hearing" due to "endless red tape, delay tactics, and burden" (Compl. ¶¶ 4-5, 86). As explained below [*see infra*, § III.E], each of these allegations is patently and demonstrably false.

The Complaint asserts three causes of action. The first seeks a declaratory judgment from the Court finding that Wells Fargo has breached its arbitration agreement with Plaintiffs, that Plaintiffs are thus no longer bound by the agreement, and asks the Court to "issue appropriate injunctive relief staying or terminating the current arbitration proceedings." *See* Compl. at ¶¶ 90-91. The second seeks a declaratory judgment from the Court finding that Wells Fargo violated Regulation E and unlawfully charged Plaintiffs overdraft fees on relevant transactions in order to utilize that declaratory judgment to "streamline" the MCF. *Id.* at ¶¶ 14, 101. The

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

1   third asserts a claim for violation of California Business & Professions Code § 17200

2   related to Wells Fargo's alleged violations of Regulation E and also seeks relief to

3   invalidate Wells Fargo's arbitration provision. *Id.* at ¶¶ 104-111.

4           **E.**    **The Court Already Determined that a Substantially Similar**
                **Dispute Between an Individual and Wells Fargo is Subject to**

5                   **Arbitration Based on Virtually Identical Arbitration Language.**

6         As this Court is aware, on November 25, 2020, MLG filed a class action

7   complaint on behalf of Mosanthony Wilson ("Wilson") and all others similarly

8   situated, alleging that Wells Fargo violated the requirements of the Electronic Fund

9   Transfer Act ("EFTA"), its implementing regulation at 12 C.F.R. ¶ 1005.1, *et seq.*

10  ("Regulation E") and California Business & Professions Code § 17200, *et seq.*

11  ("California UCL"). *Wilson v. Wells Fargo & Co.*, No. 3:20-cv-02307-DMS-WVG,

12  (S.D. Cal. filed Nov. 25, 2020), at ECF No. 1; *see also* Baiardo Decl. at ¶ 2.

13        When opening his account at Wells Fargo, however, Wilson—like Plaintiffs

14  here—agreed to resolve any dispute with Wells Fargo individually in arbitration with

15  AAA (the "Wilson Arbitration Agreement"). *See* Baiardo Decl. at Ex. A. As with

16  Plaintiffs' Arbitration Agreements, the Wilson Arbitration Agreement provided for

17  arbitration of any "dispute" between Wells Fargo and Wilson, defined "dispute" as

18  "any unresolved disagreement between Wells Fargo and you" which "may also

19  include a disagreement about this Arbitration Agreement's meaning, application, or

20  enforcement," and provided that "Wells Fargo and you each agrees to waive the right

21  to a jury trial or a trial in front of a judge in a public court." *Id.*

22        Accordingly, Wells Fargo moved to compel individual arbitration. *See id.* at ¶

23  2, Ex. A. On May 8, 2021, the Court granted Wells Fargo's motion to compel,

24  ordering that the litigation be stayed to permit an arbitrator to decide the questions

25  of arbitrability and then, if permissible, to arbitrate the substantive claims. *Wilson*,

26  2021 WL 1853587, at *2-4. In doing so, the Court found that the parties agreed to

27  arbitrate gateway issues of arbitrability. *Id.* at *3.

28        Thereafter, the case was resolved in arbitration, and on July 14, 2022, after a

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

hearing on the merits of Wilson's claims, Arbitrator Janice L. Sperow issued a Final Award with Findings of Fact & Conclusions of Law. Baiardo Decl. at ¶ 2, Ex. B. Therein, Arbitrator Sperow found that Wilson did not prove his claims for violation of Regulation E because Wells Fargo's disclosures were adequate, dismissed his companion claim for violation of the California UCL and held that Wells Fargo was the prevailing party in the matter. *See id.* On September 9, 2022, the Court granted Wells Fargo's motion and confirmed the Wilson Final Award with no opposition from Wilson or MLG. *See Wilson v. Wells Fargo & Co.*, No. 3:20-cv-02307-RBM-WVG, 2022 WL 4125220, at *1-3 (S.D. Cal. Sept. 9, 2022); *see also* Baiardo Decl. at ¶ 2.

## III. ARGUMENTS & AUTHORITIES

Plaintiffs agreed to arbitrate any disputes with Wells Fargo, and, in fact, initiated the arbitration process with AAA. Conceding that the Arbitration Agreements are valid and enforceable and knowing that their claims are encompassed by their Arbitration Agreements, Plaintiffs instead attack an interim procedural order issued by the MCF's Process Arbitrator and allege that the order establishes that Wells Fargo "won't let Plaintiffs' claims proceed with the meaningful arbitration Wells Fargo promised." Compl. at ¶ 11. Plaintiffs' attack of the PA Order fails both procedurally and substantively. Accordingly, Plaintiffs' claims must be compelled to arbitration.

### A. Legal Standard.

The FAA provides that an agreement to submit disputes to arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" 9 U.S.C. § 2. The FAA embraces a strong public policy in favor of arbitration, and it is the intent of Congress "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Preston v. Ferrer*, 552 U.S. 346, syllabus (2008) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)). Thus, the FAA

-12-

requires that courts enforce valid arbitration agreements "in the manner provided for in [the parties'] agreement." 9 U.S.C. §§ 2, 4. The FAA "leaves no place for the exercise of discretion . . . but instead mandates that . . . courts **shall** direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citation omitted) (emphasis added). Accordingly, courts must resolve any doubts concerning arbitrability in favor of arbitration, and may only invalidate an arbitration agreement under general contract principles that would warrant the "revocation of any contract." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).

Accordingly, the role of the Court in applying the FAA is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the FAA requires the Court to enforce the arbitration agreement in accordance with its terms." *Chiron*, 207 F.3d at 1130 (citation omitted). Further, the FAA mandates that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

**B.** **Plaintiffs' Arbitration Agreements are Valid and Enforceable and Encompass Their Disputes with Wells Fargo.**

Plaintiffs' Arbitration Agreements are valid and enforceable, and they encompass the entirety of this dispute. *See* Compl. ¶ 11 ("Plaintiffs do not attack the Federal Arbitration Act or the legality of the arbitration language on its face, and do not deny agreeing to arbitration."). Accordingly, the Court must compel this dispute to arbitration.

**1.** **Plaintiffs' Arbitration Agreements are valid and enforceable.**

Plaintiffs entered into valid agreements to arbitrate their claims against Wells Fargo when they entered into their Account Agreements. Compl. ¶ 11; *see also*

-13-

Gillespie Decl. at ¶¶ 2-5, Exs. A-B at 35-37; *Wilson*, 2022 WL 4125220, at \*2-3. Plaintiffs further submitted to AAA's authority by submitting their demands. *See, e.g.*, *Nghiem v. NEC Electronic, Inc.*, 25 F.3d 1437, 1440 (9th Cir. 1994), *cert. denied*, 513 U.S. 1044 (1994) ("Once a claimant submits to the authority of the arbitrator and pursues arbitration, he cannot suddenly change his mind and assert lack of authority."); *Heavenseven GMBH v. Lovetuner, Inc.*, No. 2:22-cv-03464MEMF(SKx), 2022 WL 3636598, at \*5 (C.D. Cal. Aug. 17, 2022) (holding that voluntary initiation of arbitration can be interpreted as waiver of any objection a party may have had over the authority of the arbitrator).

## 2. Plaintiffs' Arbitration Agreements encompass Plaintiffs' dispute.

Plaintiffs bring three claims (two for declaratory relief and one for violation of the UCL) based upon their argument that Wells Fargo breached the Arbitration Agreements by not providing them a "quick and efficient means of resolving their claims." *See* Compl. ¶¶ 3, 7, 86. Notwithstanding the veracity of that allegation [*infra*, § III.E], Plaintiffs agreed that any dispute—which includes this one—must be adjudicated through arbitration. Gillespie Decl. at Exs. A-B at 34 (any unresolved disagreement between Plaintiffs and Wells Fargo, including a disagreement about the Arbitration Agreements' "meaning, application, or enforcement" must be decided in arbitration). Thus, the dispute must also be compelled to arbitration. *See, e.g., Wilson*, 2022 WL 4125220, at \*2-3*; Dekker v. Vivint Solar, Inc.*, No. 20-16584, 2021 WL 4958856, at \*1-2 (9th Cir. Oct. 26, 2021) (finding claim within the scope of delegation clause of parties' arbitration agreement and requiring district court to reinstate its order compelling arbitration); *see also Mesachi v. Postmates Inc.*, No. 3:20-CV-07028-WHO, 2021 WL 736270, at \*5 (N.D. Cal. Jan. 8, 2021) (compelling arbitration where delegation provision of arbitration agreement provided arbitrator exclusive jurisdiction over "interpretation, applicability, enforceability, or formation" of the agreement where plaintiff requested that the court

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

**SER177**

1  answer questions about whether the agreement remained in force even when plaintiff
2  alleged "concerning" conduct by defendant).

   **C.**     **The Court Lacks Authority to Review or Enjoin the Pending AAA**
3          **Proceeding.**
4
           **1.**     **The Court cannot review an interim arbitration order.**

5          The Court lacks authority to review or enjoin the pending AAA proceeding,
6  including the PA Order. Ninth Circuit law is clear and establishes that for an
7  arbitration award to be subject to judicial review, it must be final and binding.
8  *Berland v. Conclave, LLC*, No. 20-CV-00922-H-WVG, 2021 WL 461727, at *5
9  (S.D. Cal. Feb. 9, 2021) (citing *Millmen Local 550, United Broth. of Carpenters and*
10 *Joiners of Am., AFL–CIO v. Wells Exterior Trim*, 828 F.2d 1373, 1375 (9th Cir.
11 1987)). In fact, "because of the Congressional policy favoring arbitration when
12 agreed to by the parties, judicial review of non-final arbitration awards should be
13 indulged, if at all, only in the most extreme circumstances." *See id.* (citing *Pac.*
14 *Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.*, 935 F.2d 1019, 1022 (9th Cir.
15 1991)) (internal quotations omitted).

16         Courts have found two categories of such "extreme circumstances." The first
17 is an interim award that fully disposes of at least one claim in the dispute, where
18 confirmation of the partial award "will not affect any further proceedings before the
19 arbitrator." *Hyosung (America) Inc. v. Tranax Technologies, Inc.*, No. C 10-0793,
20 2010 WL 1853764, at *2 (N.D. Cal. May 6, 2010) (finding interim award was subject
21 to confirmation where it determined liability and the amount respondent owed the
22 claimant). The second is a temporary equitable order calculated to preserve assets or
23 performance needed to make a potential final award meaningful. *Berland*, 2021 WL
24 461727, at *5-8. The PA Order does not fall into either category. Instead, it is a
25 "procedural decision" and "preliminary ruling" requiring that certain information be
26 included in a demand prior to the individual arbitration moving forward. *Johnson v.*
27 *Dentsply Sirona Inc.*, No. 16-CV-0520, 2017 WL 4295420, at *6 (N.D. Okla. Sept.
28

-15-

27, 2017) (quoting from *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 692-93 (2010) (Ginsburg, J., dissenting)) (holding that these types of awards are not subject to judicial review; Baiardo Decl. at ¶ 16, Ex. T. Accordingly, the Court cannot review the PA Order, and Plaintiffs' dispute must be compelled to arbitration.

**2.   The Court cannot review the procedural PA Order, and even if it could, doing so would constitute an unlawful collateral attack on the Process Arbitrator's ruling.**

First and foremost, as discussed above, the PA Order is an interim order not subject to the Court's review. Moreover, courts have held that "it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement." *Stolt-Nielsen*, 559 U.S. at 684-85. To that end, federal courts have routinely held that parties seeking clarification of an arbitrator's procedural order must do so in arbitration, and that courts have no authority to intervene in an arbitration except for determining whether a final award should be vacated or modified under the FAA. *Glass v. Kidder Peabody & Co.*, 114 F.3d 446, 454 (4th Cir. 1997) (holding that substantive and procedural issues in arbitration are for the arbitrator to decide and that "there exists no authority, statutory or case law, which empowers the district court to intervene in the arbitration.") (internal quotes omitted); *see also Tizekker v. Bel-Air Bay Club LTD*, No. 2:20-cv-03989-ODW(AFMx), 2021 WL 124495, at *4 (C.D. Cal. Jan. 13, 2021) (holding that any clarification or direction from a court regarding an arbitrator's order would amount to an unlawful advisory opinion).

Here, the PA Order is unquestionably a procedural order that gives effect to the parties' agreement by requiring that Plaintiffs—and other MCF claimants—have an actual dispute with Wells Fargo before moving forward with their individual arbitration. Baiardo Decl. at ¶ 16, Ex. T. Specifically, the parties agreed to individually arbitrate any disputes in front of AAA. Gillespie Decl. at Exs. A-B at 35. MLG affirmatively requested and AAA determined the Supplementary Rules

-16-

applied to the MCF (including these 4 named Plaintiffs), and appointed the Process Arbitrator. Baiardo Decl. at ¶¶ 4-6, Exs. G, H, J, K. MLG agreed that the Supplementary Rules applied, and stated its clients' intent to abide by all AAA rules. *Id.* at ¶¶ 4, 18, Ex. X. The Process Arbitrator then issued a determination on matters within the specific authority of the Supplementary Rules. *Id.* at ¶ 16, Ex. T; *see also* Supplementary Rules at MC-6(d)(i), (ii), (v). Notably, the Supplementary Rules expressly provide that the Process Arbitrator is authorized to make determinations concerning the "AAA filing requirements," which is what the PA Order concerns. *See* Supplementary Rules at MC-6(d)(i).[10] Accordingly, the PA Order is a procedural ruling authorized by the Arbitration Agreements and the Supplementary Rules for which this Court has no authority to review, clarify, or intervene. *See Glass*, 114 F.3d at 454; *see also Tizekker*, 2021 WL 124495, at \*4.

Nonetheless, even if the PA Order was a final award that could be

---

[10] Notably, Plaintiffs have not moved to vacate the PA Order. Nor could they as they cannot meet their "heavy burden" under the FAA to establish that the PA Order is "completely irrational or exhibits a manifest disregard for the law." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003); *U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1177 (9th Cir. 2010). Here, under no standard could the PA Order be perceived as "completely irrational" or in "manifest disregard of the law," as it was based entirely on the Process Arbitrator's express authority in the Supplementary Rules. *See Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 643 (9th Cir. 2010) (holding that the narrow standard of review for arbitration awards applies to the arbitrator's interpretation of matters of procedure as well as matters of substance and holding arbitration panel's plausible interpretation of AAA rules required finding that district court erred in vacating judgment based on allegation that arbitration panel exceeded its authority); *see also Sanchez v. Elizondo*, 878 F.3d 1216, 1223 (9th Cir. 2018) (rejecting request to vacate award based on arbitrator's supposed misapplication of a relevant rule: "Undoubtedly, reasonable judges and arbitrators could interpret the [FINRA] rules differently from the way that the [arbitrator] did in this case. Indeed, the district court did so. But this was error. It was not the province of the district court, nor is it the province of this court, to determine whether the arbitrator committed an error, even a serious error, in interpreting FINRA Rule 12401.").

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

appropriately reviewed by the Court (which it is not, by any metric), Plaintiffs would not be allowed to collaterally attack the ruling as they attempt to do through their Complaint. "An arbitration award constitutes a final judgment with the same force and effect as a judgment following a civil action." *Alers v. JPMorgan Chase Bank, N.A.*, No. 2:20-cv-08934-FLA(AGRx), 2021 WL 1306413, at *5 (C.D. Cal. Mar. 17, 2021), *aff'd sub nom.*, *Alers v. JPMorgan Chase Bank, N.A.*, No. 21-55325, 2021 WL 5860888 (9th Cir. Dec. 10, 2021). The FAA provides the exclusive remedy for challenging an arbitration award. *Alexander v. Am. Arb. Ass'n*, No. C 01-1461-PJH, 2001 WL 868823, at *4 (N.D. Cal. July 27, 2001) (citing *Corey v. New York Stock Exch.*, 691 F.2d 1205, 1211 (6th Cir. 1982)). A party may not otherwise collaterally attack an arbitration award in a subsequent proceeding. *See Alers*, 2021 WL 1306413, at *5 (citing *Wachovia Sec., LLC v. Wiegand*, No. 07CV243-IEG(BLM), 2007 WL 9776732, at *4 (S.D. Cal. Apr. 16, 2007)).

Here, like the plaintiffs in *Alers*, rather than seeking to vacate the PA Order, Plaintiffs filed suit asserting the same issues they had taken to arbitration after consenting to the agreement by initiating their earlier arbitrations. *See Alers*, 2021 WL 1306413, at *5. When confronted with a party seeking to collaterally attack an arbitration award, courts either enter judgment against the attacking party or treat the subsequent proceeding as a motion to vacate the arbitration and apply the highly deferential standard of review under the FAA. *See id.* at *5 (citing *Wachovia Sec.*, 2007 WL 9776732, at *4 n.9 (collecting cases)). Wells Fargo requests the Court reject Plaintiffs' attempt to collaterally attack the PA Order and compel Plaintiffs back to arbitration. However, as discussed below, even if the Court treats Plaintiffs' collateral attack as a motion to vacate the PA Order, the FAA would still require that Plaintiffs be compelled back to arbitration.

### 3. The Court's review of the PA Order would constitute an unlawful advisory opinion.

Plaintiffs ask the Court to issue an opinion directing AAA, the Process

-18-

Arbitrator, and/or a subsequent merits arbitrator how to rule on certain issues that are unequivocally delegated to arbitration. *Compare* Compl. ¶¶ 83-91, 92-102 *with supra* § III.B. Federal courts, however, cannot render an opinion regarding an arbitrator's power or direct the arbitrator to act in a particular way because doing so would amount to an advisory opinion. *See Gavaldon v. StanChart Sec. Int'l, Inc*., No. 12-cv-3016-LAB(MDD), 2014 WL 1292907, at \*6 (S.D. Cal. Mar. 28, 2014) (holding that an arbitration panel ordinarily makes procedural decisions and predicting what AAA will or should decide would amount to an advisory opinion); *Tizekker*, 2021 WL 124495, at \*4 (denying "Plaintiffs' meritless request for an advisory opinion providing needless clarity and direction to the arbitrator") (internal quotations omitted). Accordingly, the Court does not have authority to enter an order regarding Plaintiffs' claims, and Plaintiffs' request that the Court do so must be rejected.

### D. Plaintiffs Do Not Seek Provisional and/or Ancillary Relief.

Under the FAA, a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Plaintiffs attempt to get around the arbitration agreement by claiming they seek "provisional and ancillary" relief under the arbitration clause's language permitting Plaintiffs or Wells Fargo to "[o]btain provisional or ancillary remedies such as injunctive relief, attachment, garnishment, or appointment of a receiver by a court of competent jurisdiction." Compl. ¶¶ 11, 85 (citing Arbitration Agreements at 36). Plaintiffs, however, are not seeking provisional or ancillary relief; they are instead improperly seeking resolution of the substance of the dispute they are required to arbitrate. Essentially, Plaintiffs and MLG want a "redo" because they do not like the Process Arbitrator's ruling.

The Ninth Circuit has recognized that a provisional remedy "is a 'device for preserving the status quo and preventing the irreparable loss of rights before judgment.'" *Qualcomm, Inc. v. Motorola, Inc*., 185 F.R.D. 285, 287-88 (S.D. Cal.

**SER182**

1999) (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Indeed, according to the Ninth Circuit, "a district court may issue [provisional or ancillary relief] on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process—provided of course, that the requirements for granting [provisional or ancillary relief] are otherwise satisfied." *Toyo Tire Holdings of Ams., Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010). Plaintiffs, however, are not seeking to preserve the status quo or prevent irreparable loss of rights before judgment—instead, they are unhappy with the PA Order and seeking a decision from this Court to finally decide the dispute instead of going through the arbitration process as required. Such attempts to circumvent arbitration have been denied. *See generally* Compl.

For example, in *Adesa, Inc. v. Berkowitz*, the court denied a similar attempt to circumvent arbitration by the plaintiff, who was trying to prevent former employees from using its confidential information through injunctive relief. No. 14-cv-04022-VC, 2014 WL 11531338, at *1 (N.D. Cal. Nov. 20, 2014). In denying the request, the court held that the plaintiff was not seeking a temporary restraining order or preliminary injunction to prevent the former employees from using or disclosing certain information while an arbitrator adjudicates their right to use or disclose that information; it instead sought an order from the court that would finally decide the dispute. *Id.* at *2. Moreover, the Ninth Circuit's *Simula* Rule holds that once a dispute has been submitted to arbitration, "it is improper for a district court to grant preliminary relief where *provisional relief is available from an arbitral tribunal.*" *Jiaxing Super Lighting Elec. Appliance Co., Ltd. v. Lunera Lighting, Inc.*, No. 18-cv-05091-EMC, 2018 WL 6199681, at *1 (N.D. Cal. Nov. 28, 2018) (citations omitted) (emphasis original); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725-26 (9th Cir. 1999) (same); *DHL Services (Americas), Inc. v. Infinite Software Corp.*, 502 F. Supp. 2d 1082, 1083-84 (C.D. Cal. 2007) (holding that where a party claimed that the *Simula* rule could not apply because AAA's arbitration rules allowed

-20-

1  parties to seek "interim measures" in a court of law, it was "best not to carve out
2  interim relief from the issues the arbitrator [would] decide" because once the claim
3  had been submitted to arbitration, the court could not entertain requests for
4  provisional relief).

5  　　　Plaintiffs do not seek provisional, ancillary, and/or injunctive relief to preserve
6  the status quo, but rather seek that relief to avoid the PA Order and arbitration as a
7  whole by requesting this Court to decide issues that are squarely encompassed by the
8  Arbitration Agreements that must be arbitrated. Accordingly, Plaintiffs' attempt to
9  skirt around the FAA through the Arbitration Agreements' provision allowing for
10  them to seek provisional or ancillary relief should be denied.

11  　　　**E.　　Plaintiffs' Allegations Regarding the AAA Proceeding are False**
12  　　　　　　**and Cannot Provide Plaintiffs a Workaround to Their Arbitration**
　　　　　　　**Agreements.**

13  　　　As discussed above, Plaintiffs contend that Wells Fargo breached the
14  Arbitration Agreements because: (i) Wells Fargo allegedly refuses to pay fees to
15  facilitate Plaintiffs' arbitrations [Compl. ¶ 88]; (ii) the PA Order supposedly requires
16  "an arbitrary stay of *all* individual arbitrations until *all* active claimants" meet the
17  requirements of the PA Order [Compl. ¶¶ 81, 87]; (iii) the information necessary for
18  Plaintiffs to meet the PA Order's requirements is purportedly in Wells Fargo's sole
19  possession [Compl. ¶¶ 8, 79, 87]; and (iv) "Wells Fargo ensures that consumers are
20  [allegedly] not able to secure a hearing" due to "endless red tape, delay tactics, and
21  burden" [Compl. ¶¶ 4-5, 86]. Each of these allegations is false.

22  　　　First, Plaintiffs' claim that Wells Fargo has refused to pay AAA fees is
23  objectively inaccurate. Wells Fargo has paid every invoice it has received from AAA.
24  Baiardo Decl. at ¶ 7, Ex. M. AAA decided not to issue further invoices to Wells
25  Fargo because of MLG's decision to flout the PA Order. *See id.* at ¶¶ 16, 19, 20, Exs.
26  T, Y, BB.

27  　　　Second, MLG's claim that all arbitrations are stayed until all active claimants
28  meet the PA Order's requirements is likewise wrong. The PA Order only requires

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO COMPEL ARBITRATION

any Claimant that wants to proceed provide an amended demand consistent with the requirements of the PA Order prior to that claimant's individual arbitration moving forward. Baiardo Decl. at ¶ 16, Ex. T. Indeed, the parties discussed whether MLG would withdraw any claims in light of the Order and the Process Arbitrator suggested the spreadsheet as a simpler method for handling all the claims filed to date. *Id*. at ¶ 15. Neither the Process Arbitrator, AAA, nor Wells Fargo has *ever* insinuated that the PA Order requires that all claimants amend their demands before any claimant's arbitration can move forward. *See id.* at ¶ 16. Indeed, MLG never offered this tortured interpretation of the PA Order prior to the filing of this Complaint. *Id.* Further, Wells Fargo has stated its desire and intent to move forward with any individual arbitration where the claimant has submitted a demand meeting the requirements of the PA Order. *Id.* at ¶ 16, Ex. U. Put simply, Plaintiffs can proceed anytime they like, provided that they comply with the PA Order.

Third, MLG's allegations that the information needed for Plaintiffs to abide by the PA Order is in Wells Fargo's possession is demonstrably incorrect. Notably, whether a claimant has opted into Wells Fargo's DCOS can be answered by a cursory review of a claimant's bank statement, which specifies if the claimant is enrolled in the service. Baiardo Decl. at ¶ 9, Ex. O. Each bank statement contains a box showing the below:



*Id.* at Ex. O (emphasis added). These statements itemize every transaction, including

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

transactions covered by Regulation E (*i.e.*, one-time debit card and ATM transactions) which resulted in an overdraft fee. *See id.* Moreover, MLG's advertising specifically requests that individuals seeking to qualify as claimants for arbitration against Wells Fargo submit a Wells Fargo bank statement to MLG for review.[11] Thus, MLG could have reviewed its clients' submitted bank statements prior to submitting arbitration demands on their behalf to ensure that the claimants had legitimate, non-frivolous claims against Wells Fargo like they did in this federal filing where MLG included the information. This is the same information necessary for each of the four Plaintiffs to move forward in their arbitrations. *See* Compl. ¶¶ 16-19 (stating precise dates as to when Plaintiffs were charged overdraft fees for ATM and/or one-time debit transactions, establishing that MLG was able to review Plaintiffs' bank statements prior to filing the Complaint). If MLG would have—as it is required to do—submitted this same information in amended demands with AAA, Plaintiffs' arbitrations would already be moving through the arbitration process. *See* Baiardo Decl. at Ex. T (PA Order).

Finally, Plaintiffs' claim that Wells Fargo's customers are not able to secure a hearing due to red tape, citing to Wells Fargo's defense of the arbitration in *Wilson*. Compl. ¶¶ 4-5. But the time it took from the date Mr. Wilson filed his demand for arbitration through the date the arbitrator entered the Wilson Final Award was 314 days. Baiardo Decl. at ¶ 2, n.1. In contrast, the median time it takes for contract cases filed in this district to reach verdict is over three years.[12] Not only does MLG ignore

---

[11] *See Overdraft Fee Claims Against Wells Fargo*, https://mccunewright.com/overdraft-fee-claims-against-wells-fargo/ (last visited February 3, 2023) ("If you are a Wells Fargo customer who has been victimized by unfair overdraft fees, contact our team to see if you qualify to recover your money. To qualify quickly, submit your most current Wells Fargo bank statement to our team.").

[12] *See* United States District Court, S.D. California Outcome Litigation Analytics, WESTLAW, https://1.next.westlaw.com/Analytics/Profiler?docGUID=1797&content

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

the fact that it—*not* Wells Fargo—has caused any alleged delay by filing this distracting lawsuit and refusing to proceed with the arbitrations under the terms of the PA Order, but it also fails to account for the fact each of Plaintiffs' arbitrations would be on pace to be resolved well before the average contract case in this district if MLG simply submitted amended demands with AAA to provide the same information it has provided in the Complaint.

At bottom, MLG's request to skirt around the PA Order is little more than an attempt to sidestep a simple procedural requirement by the Process Arbitrator to provide basic information and force MLG to actually confer with its supposed clients and perform minimal due diligence prior to asserting a claim.[13] Moreover, if MLG wishes to seek clarification on any of these alleged issues, it must request clarification from the Process Arbitrator, not this Court. *Glass*, 114 F.3d at 454 (4th Cir. 1997) (holding that substantive and procedural issues in arbitration are for the

---

Type=court&view=partyOutcomeReport&dataOrchGUID=6302a9ce6a8c4e108c20 5d2b81bd0d0f&transitionType=LegalLitigation&contextData=(sc.Default)#/court/1 797/partyOutcomeReport (filter case type by "Contracts", outcome by "Verdict", and click "Time to outcome") (last visited Feb. 2, 2023).

[13] MLG has an ethical obligation to vet claims before they are filed, and courts have sanctioned attorneys for "send[ing] out form complaints without undertaking a reasonable inquiry into their validity with respect to a particular client." *Fobare v. Weiss, Neuren & Neuren*, Nos. 99-CV-1539, 99-CV-1452, 99-CV-2007, 2000 WL 654969, at *1 (N.D.N.Y. May 16, 2000); *see also, e.g.*, *Nieves v. City of Cleveland*, 153 F. App'x 349, 353 (6th Cir. 2005) (affirming Rule 11 sanctions where lawyer "did not do any reasonable investigation to establish the truth of [his client's] claims, but only blindly relied on his client's accusations"); *Bernal v. All Am. Inv. Realty, Inc.*, 479 F. Supp. 2d 1291, 1327 (S.D. Fla. 2007) (sanctioning lawyer who "simply, and solely, relied on the word of his client," without conducting a "reasonable investigation"); *Willis v. City of Oakland*, 231 F.R.D. 597, 599 (N.D. Cal. 2005) (sanctioning plaintiffs' lawyers in part because of "inadequate investigation," which consisted almost entirely of a "single interview with plaintiffs"); *see also Coates v. First Guar. Bank*, No. 06-140-D-M2, 2007 WL 9706402, at *4 (M.D. La. Oct. 19, 2007) ("blind reliance upon information provided by one's client is seldom a sufficient inquiry").

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL ARBITRATION

SER187

1  arbitrator to decide and that "there exists no authority, statutory or case law, which
2  empowers the district court to intervene in the arbitration") (internal quotes omitted);
3  *see also Tizekker*, 2021 WL 124495, at *4 (holding that any clarification or direction
4  from a court regarding an arbitrator's order would amount to an unlawful advisory
5  opinion).

6  **IV.   CONCLUSION**

7      Wells Fargo respectfully requests the Court grant its Motion to Compel
8  Arbitration for all the foregoing reasons and stay the case pending completion of
9  each Plaintiff's arbitration, on an individual basis, with Wells Fargo, or in the
10 alternative dismiss this case without prejudice.  The parties agreed to arbitrate their
11 disputes, and this dispute quite plainly falls within Plaintiffs' arbitration agreements.

12 DATED: February 3, 2023              **MCGUIREWOODS LLP**

14                          By: */s/ Alicia A. Baiardo*
                                _____
15                              Alicia A. Baiardo
                                Amy Morrissey Turk *(pro hac vice)*
16                              Joel S. Allen *(pro hac vice)*
                                Jenny Yi
17                              Paul M. Chappell *(pro hac vice)*

18                              **TROUTMAN PEPPER
                                HAMILTON SANDERS LLP**
19                              Jessica R. Lohr (SBN #302348)
                                jessica.lohr@troutman.com
20                              11682 El Camino Real, Suite 400
                                San Diego, CA 92130
21                              Telephone: 858-509-6044

22                              Jason D. Evans *(pro hac vice)*
                                NC SBN #27808
23                              jason.evans@troutman.com
                                Joshua D. Davey *(pro hac vice)*
24                              NC  SBN #35246
                                joshua.davey@troutman.com
25                              301 S. College St., 34th Floor
                                Charlotte, NC 28202
26                              Telephone: 704-998-4050

27                              *Attorneys for Defendants Wells Fargo &
                                Co. and Wells Fargo Bank. N.A.*
28

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2023 I electronically filed the foregoing document entitled **DEFENDANTS' MOTION TO COMPEL ARBITRATION** with the Clerk of the Court for the United States District Court, Southern District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

*/s/ Alicia A. Baiardo*
Alicia A. Baiardo

1   Richard D. McCune, CA Bar No. 132124
    rdm@mccunewright.com
2   Steven A. Haskins, CA Bar No. 238865
    sah@mccunewright.com
3   Valerie Savran, CA Bar No. 334190
    vls@mccunewright.com
4   Richard A. Nervig, CA Bar No. 226449
    ran@mccunewright.com
5   **MCCUNE LAW GROUP, APC**
    3281 E. Guasti Road, Suite 100
6   Ontario, California 91761
    Telephone:  (909) 557-1250
7   Facsimile:   (909) 557-1275

8   Emily J. Kirk, IL Bar No. 6275282*
    ejk@mccunewright.com
9   **MCCUNE LAW GROUP, APC**
    231 N. Main Street, Suite 20
10  Edwardsville, IL 62025
    Telephone:  (618) 307-6116
11  Facsimile:   (618) 307-6161
    * Admitted Pro Hac Vice
12
13  *Attorneys for Plaintiffs*

14

15          **IN THE UNITED STATES DISTRICT COURT**

16        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

17

18  ALEXANDRIA MOSELY,            Case No. 3:22-cv-01976-DMS-AGS
    REJOYCE KEMP, BERENICE
19  CISNEROS, BRUCE PARKER,        Hon. Dana M. Sabraw
    individually,
20                                 **NOTICE OF MOTION AND**
                                   **PLAINTIFFS' MOTION FOR**
21          Plaintiffs,            **PRELIMINARY INJUNCTION**

22      v.                         **[Filed concurrently with Memorandum**
                                   **Points and Authorities; Declaration of**
23                                 **Richard D. McCune; Exhibits; and**
    WELLS FARGO & CO., WELLS       **Proposed Order]**
24  FARGO BANK, N.A., and DOES 1
    through 5,                     Hearing Date: February 10, 2023
25                                 Time: 1:30 p.m.
            Defendants.            Courtroom: 13A
26
27                                 Complaint Filed: 12/13/2022

28

-1-

Notice of Motion and Plaintiffs' Motion For Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE THAT, on February 10, 2023 at 1:30 p.m., in

3    Courtroom 13A of the above-mentioned courthouse located at 333 West

4    Broadway, San Diego, CA 92101, Plaintiffs Alexandria Mosley,[1] Rejoyce Kemp,

5    Berenice Cisneros, and Bruce Parker ("Plaintiffs"), will and hereby do move this

6    Court, pursuant to Local Rule 7.1 and Federal Rule of Civil Procedure 65, for the

7    issuance of a preliminary injunction on the First Cause of Action of Plaintiffs'

8    Complaint (Dkt. No. 1).  Specifically, Plaintiffs seek a preliminary injunction

9    enjoining enforcement of Arbitrator Shapiro's October 27, 2022 Order (the

10   "October 2022 Order" or "Order") described in the Complaint, which blocks

11   Plaintiffs from obtaining the arbitration they were promised in their contractual

12   agreement with Wells Fargo.

13         In the alternative, Plaintiffs request that this Court stay arbitration altogether,

14   pending a hearing on the merits to decide if Defendants (collectively, "Wells

15   Fargo" or "Defendants") have violated their agreement with Plaintiffs.

16         This Motion is based on this Notice of Motion, the concurrently filed

17   Memorandum of Points and Authorities, the Declaration of Richard D. McCune in

18   support thereof and accompanying exhibits, the pleadings and papers on file in this

19   matter, and such other evidence as the Court may consider at the hearing.

20

21   Dated: January 10, 2023              Respectfully Submitted,

22                                        */s/ Richard D. McCune*
23                                        Richard D. McCune, CA Bar No. 132124
                                          rdm@mccunewright.com
24                                        Steven A. Haskins, CA Bar No. 238865
                                          sah@mccunewright.com
25                                        Valerie Savran, CA Bar No. 334190
                                          vls@mccunewright.com
26                                        Richard A. Nervig, CA Bar No. 226449
                                          ran@mccunewright.com
27
─────────────────────
28   [1] Identified in error as Alexandria Mosely in the Complaint.

-2-

Notice of Motion and Plaintiffs' Motion For Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER191**

1

**MCCUNE LAW GROUP, APC**
3281 E. Guasti Road, Suite 100

2

Ontario, California 91761
Telephone:  (909) 557-1250

3

Facsimile: (909) 557-1275

4

Emily J. Kirk, IL Bar No. 6275282*

5

ejk@mccunewright.com
**MCCUNE LAW GROUP, APC**

6

231 N. Main Street, Suite 20
Edwardsville, IL 62025

7

Telephone: (618) 307-6116
Facsimile: (618) 307-6161

8

* Admitted *Pro Hac Vice*

9

Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

Notice of Motion and Plaintiffs' Motion For Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing document to be filed on January 10, 2023, with the Clerk of the Court for the United States District Court for the Southern District of California using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

*/s/ Richard D. McCune*

Richard D. McCune

Notice of Motion and Plaintiffs' Motion For Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER193**

1  Richard D. McCune, CA Bar No. 132124
   rdm@mccunewright.com
2  Steven A. Haskins, CA Bar No. 238865
   sah@mccunewright.com
3  Valerie Savran, CA Bar No. 334190
   vls@mccunewright.com
4  Richard A. Nervig, CA Bar No. 226449
   ran@mccunewright.com
5  **MCCUNE LAW GROUP**
   3281 E. Guasti Road, Suite 100
6  Ontario, California 91761
   Telephone:  (909) 557-1250
7  Facsimile:  (909) 557-1275

8  Emily J. Kirk, IL Bar No. 6275282*
   ejk@mccunewright.com
9  **MCCUNE LAW GROUP**
   231 N. Main Street, Suite 20
10 Edwardsville, IL 62025
   Telephone:  (618) 307-6116
11 Facsimile:  (618) 307-6161
   * Admitted *Pro Hac Vice*
12

13 *Attorneys for Plaintiffs*

14

15            **IN THE UNITED STATES DISTRICT COURT**

16          **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

17

18 ALEXANDRIA MOSELY, REJOYCE      Case No. 3:22-cv-01976-DMS-AGS
   KEMP, BERENICE CISNEROS,
19 BRUCE PARKER, individually,      Hon. Dana M. Sabraw

20            Plaintiffs,          **MEMORANDUM OF POINTS AND**
                                   **AUTHORITIES IN SUPPORT OF**
21      v.                         **PLAINTIFFS' MOTION FOR**
                                   **PRELIMINARY INJUNCTION**
22
                                   **[Filed concurrently with Notice of Motion;**
23 WELLS FARGO & CO., WELLS         **Declaration of Richard D. McCune;**
   FARGO BANK, N.A., and DOES 1    **Exhibits; and Proposed Order]**
24 through 5,
                                   Hearing Date: February 10, 2023
25            Defendants.          Time: 1:30 p.m.
                                   Courtroom: 13A
26

27                                 Complaint Filed: 12/13/2022

28

---

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

# TABLE OF CONTENTS

Page

I   INTRODUCTION ...................................................................1

II  FACTUAL BACKGROUND ...................................................2

   A.  Defendants Compelled Arbitration in a Putative Class Action Lawsuit Involving Similar Claims Before This Court .................................2

   B.  Plaintiffs' Arbitration Claims .................................3

III  JURISDICTION AND VENUE ...............................................8

IV  LEGAL STANDARD ...............................................................8

V  ARGUMENT ...........................................................................9

   A.  Plaintiffs are Likely to Succeed on the Merits ...............9

     1.  The Order Imposes an Illegal Pleading Standard That Renders Arbitration Illusory ...............................9

     2.  The Arbitrator Exceeds Her Powers by Preventing Arbitration .........12

   B.  Plaintiffs Have Been Irreparably Harmed By Wells Fargo's Actions ..........13

   C.  The Balance of Equities Tips in Plaintiffs' Favor .......................15

   D.  An Injunction is in the Public Interest .........................16

VI  CONCLUSION .......................................................................17

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER195**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alascom, Inc. v. ITT N. Elec. Co.*,
  727 F.2d 1419 (9th Cir. 1984)................................................................14, 15

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)..........................................................................9

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
  42 F.3d 1421 (3d Cir. 1994)............................................................................17

*Assoc. Gen. Contractors of Calif., Inc. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991).........................................................................9

*Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*,,
  No. 3:16-CV-2470, 2017 WL 11573353 (M.D. Pa. Aug. 17, 2017)...........17

*Bernhardt v. L.A. Cty.*,
  339 F.3d 920 (9th Cir. 2003)..........................................................................17

*Bussen v. Westpark Cap. Fin. Servs., LLC*,
  2022 WL 2913830 (Cal. Ct. App. July 25, 2022)............................................4

*Dayton Area Visually Impaired Persons, Inc. v. Fisher*,
  70 F.3d 1474 (6th Cir. 1995)............................................................................9

*Dotson v. Amgen, Inc.*,
  181 Cal. App. 4th 975 (2010) .........................................................................17

*Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*,
  46 F. Supp. 3d 327 (S.D.N.Y. 2014)..............................................................13

*Eurolines Shipping Co. v. Metal Transp. Corp.*,
  491 F. Supp. 590 (S.D.N.Y. 1980)..................................................................12

*Finastra USA Corp. v. Zepecki*,
  2018 WL 1989508 (N.D. Cal. Mar. 9, 2018)..................................................15

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
  512 F.3d 1112 (9th Cir. 2008)........................................................................18

*Goldie's Bookstore, Inc. v. Superior Court*,
  739 F.2d 466 (9th Cir. 1984)..........................................................................14

*Halligan v. Piper Jaffray, Inc.*,
  148 F.3d 197 (2d Cir. 1998)...........................................................................13

*Home Ins. Co. v. RHA/PA Nursing Homes, Inc.*,
  127 F. Supp. 2d 482 (S.D.N.Y. 2001)............................................................13

- ii -

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER196

**TABLE OF AUTHORITIES, Cont.**

Page(s)

*Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc.*,
2009 WL 805813 (E.D. Cal. Mar. 26, 2009) ............................................14

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993)........................................................................16

*Island Creek Coal Sales Co. v. City of Gainesville, Fla.*,
729 F.2d 1046 (6th Cir. 1984)..................................................................13

*Jones v. Deutsche Bank AG*,
2007 WL 1456041 (N.D. Cal. May 17, 2007) ..........................................14

*MacClelland v. Cellco P'ship*,
2022 WL 2390997 (N.D. Cal. July 1, 2022).............................................11

*Macquarie Holdings USA Inc. v. Rode*,
2012 WL 12882417 (C.D. Cal. Jan. 17, 2012) ...................................15, 16

*Medina v. Found. Rsrv. Ins. Co.*,
1997-NMSC-027, 123 N.M. 380 ...............................................................4

*Mendez v. Sony Computer Ent. Am., LLC*,
2021 WL 5702153 (D. Idaho Dec. 1, 2021) ..............................................4

*Morgan Stanley & Co., LLC v. Couch*,
134 F. Supp. 3d 1215 (E.D. Cal. 2015).....................................................15

*New England Power Co. v. Asiatic Petroleum Corp.*,
456 F.2d 183 (1st Cir. 1972).....................................................................15

*Oxford Health Plans*,
569 U.S. .....................................................................................................13

*Ragsdale v. Wilshire Com. Cap. LLC*,
2021 WL 4699526 (C.D. Cal. Apr. 30, 2021) ..........................................10

*Regents of Univ. of California v. Am. Broad. Companies, Inc.*,
747 F.2d 511 (9th Cir. 1984).....................................................................17

*Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
944 F.2d 597 (9th Cir. 1991).....................................................................14

*Rondeau v. Mosinee Paper Corp.*,
422 U.S. 49 (1975)......................................................................................8

*Siemens Bldg. Techs., Inc. v. Camacho*,
168 F. Supp. 2d 425 (E.D. Pa. 2001) ........................................................17

- iii -

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER197**

## TABLE OF AUTHORITIES, Cont.

Page(s)

*Steiner v. Apple Computer, Inc.*,
  2008 WL 1925197 (N.D. Cal. Apr. 29, 2008) ................................................14

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010)................................................................................12, 13

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009)......................................................................16

*Ward v. Est. of Goossen*,
  2014 WL 7273911 (N.D. Cal. Dec. 22, 2014)........................................15, 17

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982).....................................................................................17

*Winig v. Cingular Wireless LLC*,
  2006 WL 3201047 (N.D. Cal. Nov. 6, 2006) ................................................14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).....................................................................................9, 16

*Yakus v. United States*,
  321 U.S. 414 (1944).......................................................................................9


**Statutes**

15 U.S.C. § 1693m.............................................................................................8
28 U.S.C. § 1331................................................................................................8
28 U.S.C. § 1367(a) ...........................................................................................8
28 U.S.C. § 2201................................................................................................8


**Rules**

Federal Rule of Civil Procedure 65(a) ...............................................................9


**Regulations**

12 C.F.R. §§ 1005 .............................................................................................2

**SER198**

# I    INTRODUCTION

Plaintiffs Alexandria Mosley,[1] Rejoyce Kemp, Berenice Cisneros, and Bruce Parker ("Plaintiffs") submitted their legal claims against Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendants") to arbitration with the American Arbitration Association ("AAA") on the premise that Wells Fargo would participate as promised in a forum intended to provide an efficient and quick resolution to their claim. But Wells Fargo had no intention of submitting to arbitration, or any other forum as promised, even in a case where only a small percentage of consumers have asserted their claims. Wells Fargo's arbitration agreement is the legal equivalent of a Potemkin Village. To the outside world, it masquerades as a place for consumers to preserve their rights. But nothing exists behind the façade.

Plaintiffs' last resort is this Court. Every day that arbitration is delayed further violates Plaintiffs' rights to resolve their claims, both as a matter of due process and fundamental contract. And if Wells Fargo gets its way, delay will become a permanent bar to arbitration, just as Wells Fargo has always intended. Plaintiffs ask the Court to restore their rights.

To that end, Plaintiffs seek a preliminary injunction barring Wells Fargo and AAA from enforcing the edicts[2] that have halted their arbitrations. In short, Plaintiffs seek the arbitration process Wells Fargo promised them. In the alternative, Plaintiffs request a total stay of arbitration proceedings pending a hearing on whether Defendants have violated their arbitration agreement with Plaintiffs, which would release Plaintiffs from the arbitration agreement and allow them to proceed in court more quickly and efficiently than the promised arbitration in any event. Either way, Plaintiffs must be

---

[1] Ms. Mosley was errantly called Alexandria "Mosely" in the Complaint.

[2] The order most egregiously blocking progress is an order issued by Process Arbitrator Anita Mae Shapiro in October 2022 (the "AAA Process Order"). It is attached as Exhibit G to the Declaration of Richard D. McCune ("McCune Decl.").

---

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

permitted to pursue their claims in some forum, somewhere, and they have been denied that right up through now.

## II     FACTUAL BACKGROUND

**A.     Defendants Compelled Arbitration in a Putative Class Action Lawsuit Involving Similar Claims Before This Court**

Prior to the filing of the current Plaintiffs' claims in arbitration, on November 25, 2020, Plaintiffs' counsel filed a putative class action on behalf of a similarly wronged consumer against Defendants for violation of the Electronic Fund Transfer Act, 12 C.F.R. §§ 1005, *et seq.* ("Regulation E"), and violation of California's Unfair Competition Law ("UCL") in the United States District Court for the Southern District of California. (Declaration of Richard D. McCune ("McCune Decl."), ¶ 2, Ex. A).

Defendants filed a motion to compel that plaintiff's claims to arbitration. (McCune Decl., ¶ 3, Ex. B). In its motion, Defendants insisted that arbitration was the proper forum for the resolution of plaintiff's claims. (*Id.*) Specifically, Defendants cited the Federal Arbitration Act ("FAA"), stating that "the FAA embraces a strong public policy in favor of arbitration," including that arbitrations should proceed as "quickly and easily as possible." (*Id.*)

This Court granted Defendants' motion to compel in that case as to both of plaintiff's claims, and further ordered that the arbitrator would decide questions of arbitrability. *Id.* Defendants postured as though arbitration would be both efficient and quick, and that the arbitration would proceed in accordance with the contract's terms, which stated that arbitration would be "beneficial" because it would provide "a legally binding decision in a more streamlined, cost-effective manner than a typical court case."

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER200**

(McCune Decl., Ex. D, p. 35.)[3] However, it is clear that Defendants always intended to force consumers into arbitration as a self-serving tactic, with no intention of actually arbitrating. The private and confidential nature of arbitration, devoid of judicial oversight, is the perfect forum in which Defendants can continue to perpetuate the same consumer abuses they have been involved in for years.[4]

## B. Plaintiffs' Arbitration Claims

When a customer opens a new checking account at Wells Fargo, he or she agrees to the terms of Wells Fargo's Deposit Account Agreement ("Agreement"), which contains an arbitration clause. (McCune Decl., ¶ 5, Ex. D). Plaintiffs did not only open accounts with Wells Fargo; each was also enrolled in Wells Fargo's Regulation E overdraft program, which permitted Wells Fargo to charge expensive fees when it covered overdrafts on one-time debit card and ATM transactions. Plaintiffs contend that Wells Fargo violated Regulation E and illegally and improperly took money from their accounts under the pretext of lawfully assessing an overdraft fee.

Each Plaintiff submitted an individual arbitration demand detailing Wells Fargo's alleged violations of Regulation E of the Federal Electronic Fund Transfer Act, state unfair competition laws, and/or the Agreement's terms. (McCune Decl., ¶ 7). Each demand was filed consistent with AAA's Consumer Arbitration Rules, specifically Rule 2, which requires that a demand (1) briefly explain the dispute; (2) list the names and addresses of the consumer and the business, and, if known, the names of any representatives of the consumer and the business; (3) specify the amount of money in

---

[3] As Defendants laid out in their motion, "the role of the Court in applying the FAA is limited to determining whether a valid agreement to arbitrate exists, and whether the agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the FAA requires the Court to enforce the arbitration agreement *in accordance with its terms*." (McCune Decl., Ex. B) (emphasis added).

[4] Defendants' many financial abuses have been brought to light in recent years, proving Defendants are well accustomed to employing unscrupulous practices at the expense of consumers. (McCune Decl., ¶ 4, Ex. C).

---

## SER201

1    dispute, if applicable; (4) identify the requested location for the hearing if an in-person

2    hearing is requested; and (5) state the claimant's desired relief. (AAA Consumer

3    Arbitration Rules, R-2(a)(1), Amended and Effective September 1, 2014). Each demand

4    was compliant: it contained a brief description of the dispute, named the parties,

5    specified the matters in dispute, requested an in-person hearing, and relayed the relief

6    each Plaintiff seeks. (*Id.*, Ex. E).[5]

7        Because Plaintiffs' claims are based on uniform policies and documents Wells

8    Fargo has followed and used for years, millions of consumers likely have similar claims.

9    (*Id.*, ¶ 8). Since the beginning of 2022, Plaintiffs are four of about 3,000 individuals who

10   have served arbitration demands to Wells Fargo. (*Id.*) McCune Law Group represents

11   many of these Claimants in arbitration, as in this lawsuit. (*Id.*)

12       Plaintiffs' arbitration demands were fully compliant with the Agreement and

13   AAA's Consumer Arbitration Rules. In response to their demands, Plaintiffs also

14   received confirmatory emails stating that AAA had received their demands and

15   arbitration proceedings would commence. (McCune Decl., ¶ 9, Ex. F).[6]

16       The arbitration agreement requires consumers to waive all rights to participate in a

17   class or other collective action. (*Id.*, Ex. D, p. 35.) Thus, each arbitration hearing must be

18   individual in nature—meaning that in cases alleging fault with Wells Fargo's uniform

19

20

21   [5] *See, e.g., Bussen v. Westpark Cap. Fin. Servs., LLC*, No. B304977, 2022 WL 2913830,
     at *6 (Cal. Ct. App. July 25, 2022) (noting the more general pleading requirements under
22   AAA Consumer Arbitration Rules, Rule 2). *See also Mendez v. Sony Computer Ent.
     Am., LLC*, No. 1:20-CV-00588-DCN, 2021 WL 5702153, at *2 (D. Idaho Dec. 1, 2021),
23   reconsideration denied, No. 1:20-CV-00588-DCN, 2022 WL 2179961 (D. Idaho June
     15, 2022) (finding that a demand must only meet the requirements set out in Consumer
24   Arbitration Rule 2); *Medina v. Found. Rsrv. Ins. Co.*, 1997-NMSC-027, ¶ 9, 123 N.M.
     380, 382 (finding that "[a]rbitration is a special statutory proceeding which requires
25   application of procedural rules that may conflict with the more general rules of civil
     procedure").

26
     [6] Plaintiffs received "AAA Initiation Letters" acknowledging AAA's receipt of their
27   demands and that their demands met the filing requirements. Each letter contained an
     attached "case list" of the individual demands that had been properly filed as of that
28   date, and the letters corresponding to Plaintiffs' and other Claimants' who filed prior to
     that date claims are included.

-4-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER202**

conduct, tens of thousands (if not hundreds of thousands, or even millions) of individual arbitrations may become necessary. There must be enough arbitrators to handle them all, and those arbitrators must be compensated. Wells Fargo took on the responsibility of paying these fees as part of the Agreement. (McCune Decl., Ex. D, p. 35.)[7] And Plaintiffs relied on these promises when they demanded arbitration. Wells Fargo is one of America's largest banks, with over 70 million customers—the nearly 3,000 arbitration claimants to date represent an immaterial minority—and all have been subjected to the same conduct as Plaintiffs.

In light of these claims, AAA has since appointed Anita Rae Shapiro as the Process Arbitrator overseeing coordination of the individual demands served to Wells Fargo. (McCune Decl., ¶ 10). On October 27, 2022, the Process Arbitrator issued an Order applying to all current and future claims. (*Id.*, ¶ 11). Since the Process Arbitrator's appointment, the arbitration has ground to a halt. (*Id.*, ¶ 12). Wells Fargo refuses to pay the necessary fees to adequately staff the arbitrations, though it agreed to do so in the Agreement. (*Id.*) Only two arbitrators have been appointed for two individual claims, leaving nearly 3,000 claims without any promise of remedy. (*Id.*) What is more, the arbitrations have been ordered not to proceed unless **all Claimants**, including Plaintiffs, amend their demands to include evidentiary proof of Wells Fargo's wrongdoing. (*Id.*) Put another way, Plaintiffs will never get their promised hearing unless all 3,000

_____

[7] The Agreement states "[Wells Fargo] will pay any costs that are required to be paid by us under the arbitration administrator's rules and procedures, and subject to applicable law…" Likewise, the AAA Consumer Arbitration Rules require that outside of the filing fee, all costs of a consumer arbitration, including arbitrator expenses, should be borne by the business. *See* AAA Consumer Arbitration Rules, Costs of Arbitration, p. 33, Amended and Effective September 1, 2014, available at: Consumer_Rules_Web_2.pdf (adr.org) (last visited Dec. 17, 2022).

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER203**

1   claimants (or more, as more claims are made) submit demands that satisfy the arbitrary

2   pleading rules that AAA has now established for Wells Fargo alone.[8] (*Id.*)

3       In other words, Wells Fargo was advocating for the complete halt of these

4   arbitrations on the one hand, even as it was supposedly offering a forum for efficiently

5   resolving these claims on the other. Now, while being barred from grouping their claims

6   in a class action (in court or arbitration), they must wait as 3,000 individual claimants,

7   whom Plaintiffs do not control, are required to produce evidentiary proof beyond

8   anything that would be required in a court filing, to even advance their case to the

9   appointment of an arbitrator.[9]

10      Wells Fargo then digs deeper into bad faith by making it impossible for Plaintiffs

11  and other Claimants to satisfy the requirements supposedly necessary to restart the

12  arbitration process. Plaintiffs require information from Wells Fargo to determine the

13  scope of their claims. (McCune Decl., ¶ 13). This information is regularly exchanged in

14  discovery, but AAA is requiring Plaintiffs to provide it up front to meet its arbitrarily

15  imposed pleading standards. (*Id.*) The problem: Wells Fargo refuses to share the

16  information with Plaintiffs—even information about Plaintiffs' own accounts—***citing***

17  ***the proceedings Wells Fargo has itself stalled***. (*Id.*)

18      For instance, Claimants bringing Regulation E claims, at a minimum, need access

19  to their agreements and monthly statements to determine the full scope of alleged

20  wrongdoing and damages. (*Id*. ¶ 14). While some Claimants may have this information,

21  most do not, requiring financial institutions to provide it during discovery. (*Id.*) But here,

22

23

24  [8] The arbitrary pleading standards dictated by the Order include that *all claims* must
include "1) Claimant's Wells Fargo account number for the account at issue, 2) facts to
25  establish each Claimant was enrolled in DCOS during the time period at issue and 3)
facts sufficient to establish that each Claimant incurred overdraft fees in connection with
26  transactions covered by Regulation E." (McCune Decl., Ex. G).

27  [9] The Order ultimately states that "the invoicing of AAA fees is stayed for *all Claims*
that have not already been invoiced *and for all new Claims filed with AAA* until the
28  requirements in paragraph two have been satisfied." (McCune Decl., Ex. G) (emphasis
added).

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

Plaintiffs (and thousands of others) cannot obtain the information they need to satisfy the arbitrary pleading standard imposed upon them, yet must now plead this information before Wells Fargo will engage with them. (*Id.*)  And worse, Wells Fargo is holding some claims, such as those based on the APSN theory, hostage completely, by requiring Claimants with Regulation E claims to satisfy the newly imposed pleading standards before other, unrelated claims can go forward.[10] (*Id.*) But when APSN claims are at issue, most of the unlawful transactions cannot be determined without information solely in Wells Fargo's possession. That fact is one reason that the Consumer Financial Protection Bureau recently singled out APSN transactions as particularly egregious, and Wells Fargo has signed a consent order to repay a small percentage of those claims.[11] Wells Fargo's arbitration practices thus reinforce the reasons its overdraft fees are so egregious in the first place –internal data and documents must be produced and then analyzed by an expert to uncover the wrongdoing.  In a world where arbitration is an actual dispute resolution method, resolving claims like these might be uniquely suited to arbitration because of the possibility for targeted and informal discovery. In return for

---

[10] Notably, some Claimants have Regulation E claims, some have APSN claims, and some have both. (McCune Decl., ¶ 15). While all of these claims relate to Well Fargo's assessment of overdraft fees, they are different claims. (*Id.*) APSN claims are brought under a breach of contract theory and result from Wells Fargo assessing overdraft fees to customers on transactions that are approved on a positive available balance, but later post on a negative balance resulting in a fee. (*Id.*) Claimants allege that Wells Fargo's assessment of overdraft fees under this circumstance is improper per the terms of the Agreement. (*Id.*) This claim has nothing to do with the assessment of fees under Regulation E. (*Id.*) In fact, APSN Claimants may not even be opted-in to Regulation E overdraft coverage (*Id.*) Yet, AAA will not permit these claims to move forward until other Claimants provide evidence of a Regulation E violation. (*Id*, Ex. G.) Moreover, APSN Claimants will never be able to provide the evidentiary support AAA is requiring because the only party with access to APSN damages is Wells Fargo. (*Id.*, ¶ 15). Claimants have no way through statements or customer account access to see which transactions Wells Fargo approved on a positive balance, yet settled on a negative balance. (*Id.*) Wells Fargo's transactional data must be reviewed for this determination. (*Id.*) Normally, this information is provided during discovery. (*Id.*) Here, AAA is requiring evidentiary information up front, but is not requiring Wells Fargo to produce it, essentially barring APSN claims from moving forward. (*Id.*)

[11] *See* https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-na-2022_consent-order_2022-12.pdf (last visited January 8, 2023).

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

waiving class rights, Claimants obtain information about their claims through informal processes. But the result of Wells Fargo's intransigence is that Plaintiffs effectively lack any forum for their claims.

## III  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, 28 U.S.C. § 1367(a), and 28 U.S.C. § 2201. Furthermore, while the arbitration agreement generally demands that the parties resolve their claims in arbitration, it also provides that "Wells Fargo or you each can exercise any lawful rights or use other available remedies to . . . Obtain provisional or ancillary remedies such as injunctive relief …." (Wells Fargo Deposit Account Agreement ("Account Agreement"), Ex. D, p. 36.) Plaintiffs here seek injunctive relief, not monetary damages.

Venue is proper here because Wells Fargo transacts business, the parties entered into contracts, and Wells Fargo executed the unlawful policies and practices which are the subject of this action, in this District.

## IV  LEGAL STANDARD

An injunction is an equitable remedy and should issue when a threat of irreparable harm combines with the inadequacy of money damages. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975). The court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v. United States*, 321 U.S. 414, 440 (1944). A plaintiff seeking a preliminary injunction must establish (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

These four considerations are "factors to be balanced, not prerequisites that must be met." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1480 (6th Cir. 1995). In the Ninth Circuit, the *Winter* factors are evaluated on a sliding scale: "serious questions going to the merits, and a balance of hardships that tips sharply

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). These formulations are not different tests but represent two points on a sliding scale, upon which the degree of irreparable harm increases as the probability of success on the merits decreases. *Assoc. Gen. Contractors of Calif., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991).

# V    ARGUMENT

Plaintiffs have satisfied the elements for a preliminary injunction under Federal Rule of Civil Procedure 65(a), as detailed below. They are entitled to a preliminary injunction because: (1) they are likely to succeed on the merits of their claims; (2) they will suffer irreparable injury if the injunction is denied; (3) the harm Plaintiffs will suffer outweighs any harms granting the injunction may cause Wells Fargo; and (4) granting the injunction is in the public interest.

## A.    Plaintiffs are Likely to Succeed on the Merits

The parties' Agreement provides that either party "can exercise any lawful rights or use other available remedies" to "obtain provisional or ancillary remedies such as injunctive relief…" (Wells Fargo Deposit Account Agreement ("Account Agreement"), Ex. D, p. 36.) This Court is thus an appropriate forum for obtaining this remedy. *See Ragsdale v. Wilshire Com. Cap. LLC*, No. CV 21-00549 PA (ASX), 2021 WL 4699526, at *4 (C.D. Cal. Apr. 30, 2021) (finding that where a contract containing an arbitration provision allows for a party to pursue injunctive relief in court, an injunctive claim is proper).

### 1.    The Order Imposes an Illegal Pleading Standard That Renders Arbitration Illusory

Plaintiffs demonstrate a likelihood of success on the merits because they cannot proceed with arbitration given the artificial constrictions placed upon them. Requiring additional pleading standards and tying the progress of Plaintiffs' claims to the pleadings

-9-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER207

of thousands of other individuals is facially unfair—the imposed pleading standards exist in no other forum, and for good reason.[12] They effectively turn every individual with a claim into a class representative—consolidating the proceedings over Wells Fargo's own putative objections. And with these upside-down rules in place, Plaintiffs have no recourse for Wells Fargo's obstruction. Whatever Plaintiffs bargained for, it wasn't for Wells Fargo to prevent their access to a proper forum. The denial of Plaintiffs' rights to the bargained-for forum alone is sufficient to demonstrate a likelihood of success on the merits.

Likewise, Wells Fargo promised that arbitration would be "beneficial" because it would provide "a legally binding decision in a more streamlined, cost-effective manner than a typical court case." (McCune Decl., Ex. D, p. 35.) Wells Fargo promised that if "you have a dispute with us, we hope to resolve it as quickly and easily as possible." (*Id.*) But in practice, it uses the arbitration agreement as a sword and a shield; the clause forces consumers into arbitration, while simultaneously preventing them from arbitrating.

Courts look askance at similar circumstances. In *MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC, 2022 WL 2390997, at *1 (N.D. Cal. July 1, 2022) Plaintiffs alleged that Verizon engaged in false advertising by failing to disclose an "Administrative Charge" for wireless services in an adhesion contract. They also alleged that applicable dispute resolution provisions were unconscionable, and thus unenforceable. *Id.* at *2. The court reasoned that an arbitration demand protocol "requiring the consumers who retain counsel willing to represent them in cases such as this to wait months, more likely years *before they can even submit* a demand for arbitration" was unreasonably favorable to Verizon. *Id.* at *12 (emphasis added). The court further noted that Verizon's *self-serving* demand protocol was inconsistent with

---

[12] These standards don't even exist elsewhere within AAA.

-10-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

AAA's own rules, declaring that Verizon's protocol "has little in common with the Supplementary Rules. It is one thing to set up a bellwether system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution via ADR. It is another to *formally bar the timely adjudication* of cases…" *Id.* at *14 (emphasis added).

Plaintiffs here agreed to a contract of adhesion, arbitration provision included, when opening their accounts. But as in *MacClelland*, Plaintiffs cannot obtain the promised arbitration. Their claims are frozen, stuck indefinitely in purgatory, and unable to move forward. Moreover, they are in that state because AAA and Wells Fargo created these unilaterally applicable rules under AAA's Supplementary Rules for Multiple Case Filings ("Supplementary Rules"). The Supplementary Rules were implemented on August 1, 2021, after each Plaintiff opened their account. While Plaintiffs were told that the arbitration would be conducted under AAA's rules, Wells Fargo never told consumers that they would be subject to the loss of substantive rights such as any arbitration hearing at all. Indeed, consumers were never told that the AAA rules could be changed, even though they were told that Wells Fargo could change the account agreement and would provide notice of those changes. And, of course, Wells Fargo never advised consumers that AAA rules could be unilaterally changed so that if even as few as 25 of Wells Fargo's 70 million customers filed arbitrations regarding the same common conduct, their rights were subject to Wells Fargo holding them hostage and a AAA-appointed process administrator grinding all pending arbitrations to a halt. Plaintiffs (and other consumers) not only did not agree to any of this, but they could have never known what they were agreeing to.

In fact, the Agreement never contemplated such onerous conditions, and the benefits resulting from this arrangement can only benefit Wells Fargo. As such, Wells Fargo should be enjoined from blocking the arbitration process, or, in the alternative, this Court should stay the arbitration proceedings so it can decide the proper contractual forum on the merits.

-11-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER209

As such, Plaintiffs are likely to succeed in showing that Wells Fargo violates the Agreement by failing to provide them with the promised arbitrations.

### 2. The Arbitrator Exceeds Her Powers by Preventing Arbitration

The Federal Arbitration Act (Title 9 of the United States Code) governs any dispute brought in arbitration. (Ex. D, p. 35.) As an alternative ground for an injunction, one of the grounds for vacating an arbitration award is "where the arbitrators exceeded their powers…"[13] The Supreme Court has clarified that this burden is met "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

In *Stolt-Nielsen*, the Supreme Court found that the arbitration panel imposed its own policy choice and thus exceeded its powers. *Id.* at 677. Deciding whether the contract allowed for class arbitration in the absence of express consent, the panel did not consider the FAA, maritime law, or New York law, but rather "proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." *Id.* at 673-74. The court ultimately confirmed that an arbitrator's role is "to interpret and enforce a contract, not to make public policy." *Id.* at 672; *see also Oxford Health Plans*, 569 U.S. at 569–70 (finding that a court can overturn the arbitrator's determination under §10(a)(4) only when the arbitrator exceeded his contractually delegated authority by issuing an award based on his own policy determinations).

---

[13] Arbitration awards are generally challenged after the arbitration is completed and a final award issued. But here, Plaintiffs cannot access the arbitral forum. Thus, in every practical way there has been a final resolution warranting intervention. *See Eurolines Shipping Co. v. Metal Transp. Corp.*, 491 F. Supp. 590, 592 (S.D.N.Y. 1980) (finding that an 'interim' award that finally and definitively disposes of a separate independent issue may be confirmed 'notwithstanding the absence of an award that finally disposes of all the claims that were submitted to arbitration.'").

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

In another case, the Sixth Circuit upheld the district court's confirmation of an interim award where it would prevent a party from terminating a contract, preserving the status quo pending an arbitration proceeding with AAA. *See Island Creek Coal Sales Co. v. City of Gainesville, Fla*., 729 F.2d 1046, 1047 (6th Cir. 1984). The court agreed with the lower court's finding that "the interim award dispose[d] of one self-contained issue, namely, whether the City [was] required to perform the contract during the pendency of the arbitration proceedings. Th[is] issue is a separate, discrete, independent, severable issue." *Id.* at 1049; *see also The Home Ins. Co. v. RHA/PA Nursing Homes, Inc.,* 127 F. Supp. 2d 482, 487–88 (S.D.N.Y. 2001)(arbitral award providing interim relief was final because it entitled party to possession of sum pending final arbitration on merits); *Ecopetrol S.A. v. Offshore Expl. & Prod. LLC*, 46 F. Supp. 3d 327, 337 (S.D.N.Y. 2014) (finding that "interim arbitral awards thus required specific action, resolved the rights and obligations of the parties with respect to the interim period at issue, and did so without in any way affecting future decisions of the arbitral panel. Accordingly, the interim arbitral awards are final").

Here, Plaintiffs' rights are imperiled because they have been denied their promised forum. *See Halligan v. Piper Jaffray, Inc*., 148 F.3d 197, 204 (2d Cir. 1998) (holding that manifest disregard existed where "arbitrators were correctly advised of the applicable legal principles…and they ignored the law…"). They have been prevented from pursuing their claims in disregard of all applicable law, rules, and the underlying Agreement. Plaintiffs cannot receive the alleged benefits of arbitration without *actually arbitrating their claims.* Unless the Court intervenes, the arbitration agreement will be not only illusory, it will bar Plaintiffs' claims altogether. This cannot be.

## B.    Plaintiffs Have Been Irreparably Harmed By Wells Fargo's Actions

Irreparable harm is the single most important prerequisite for a preliminary injunction. *See Inspection Mgmt. Sys., Inc. v. Open Door Inspections, Inc*., No. 209-CV-00023-MCE-GGH, 2009 WL 805813, at *3 (E.D. Cal. Mar. 26, 2009). The definition of irreparable harm is notably imprecise but most often equates to injury irreducible to

-13-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER211

money damages. *See, e.g. Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 603 (9th Cir. 1991) ("It is true that economic injury alone does not support a finding of irreparable harm, *because such injury can be remedied by a damage award.*") (emphasis added); *see also Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984)("Mere financial injury ... will not constitute irreparable harm *if adequate compensatory relief will be available in the course of litigation.*") (emphasis added).

The likelihood of irreparable harm is significant here. Even if Wells Fargo's relents on its roadblock, no monetary value can compensate Plaintiffs for the loss of time and delay they have suffered. *See Steiner v. Apple Computer, Inc.,* 2008 WL 1925197, *5 (N.D. Cal. Apr. 29, 2008) (finding that loss of substantial time constitutes irreparable harm); *see also Winig v. Cingular Wireless LLC,* No. C06-4297 MMC, 2006 WL 3201047, at *2 (N.D. Cal. Nov. 6, 2006) (finding that a party's prolonged delay constitutes irreparable harm); *Jones v. Deutsche Bank AG*, No. C 04 05357 JW, 2007 WL 1456041, at *2 (N.D. Cal. May 17, 2007) (same).

Irreparable harm also exists where a party is deprived of the agreed-upon means for resolving disputes. *Alascom, Inc. v. ITT N. Elec. Co.*, 727 F.2d 1419, 1422 (9th Cir. 1984). In *Alascom*, the court found irreparable harm where a party would have been forced to "undergo the expense and delay of a trial before being able to appeal," and as a result, "the advantages of arbitration—speed and economy—are lost forever." *Id.*; *see also New England Power Co. v. Asiatic Petroleum Corp.,* 456 F.2d 183, 186 (1st Cir. 1972) (finding that denial of arbitration process "effectively deprives at least one of the parties to the dispute of one of the principal objects for which he has contracted–that is, a relatively expeditious and inexpensive preliminary resolution of any controversy…") (emphasis added); *Finastra USA Corp. v. Zepecki,* No. 18-CV-00725-WHO, 2018 WL 1989508, at *5 (N.D. Cal. Mar. 9, 2018) (finding irreparable harm in arbitration where party will "lose its bargained for right."); *Ward v. Est. of Goossen,* No. 14-CV-03510-TEH, 2014 WL 7273911, at *4 (N.D. Cal. Dec. 22, 2014) (finding irreparable harm

-14-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

because the defendants would otherwise be deprived of "the speed, economy, and specialized nature of the arbitration procedure…"). Here, Plaintiffs have been denied the right to arbitrate their claims and thus denied the benefit of their bargain.

Courts have also found irreparable harm where an individual must arbitrate claims in a manner inconsistent with the parties' agreements. In *Macquarie Holdings USA Inc. v. Rode*, No. CV1200093DMGCWX, 2012 WL 12882417, at *1 (C.D. Cal. Jan. 17, 2012), Macquarie sought to enjoin its opponent from proceeding in arbitration with the Financial Industry Regulatory Authority ("FINRA"), a forum to which it did not agree. The court determined that requiring Macquarie to arbitrate in a manner inconsistent with the parties' contract would "completely deprive Macquarie of the benefit of its bargain," and thus, held that Macquarie satisfied the irreparable harm standard. *Id*. at *4; *see also Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, n.21 (E.D. Cal. 2015) (collecting cases) ("[M]ost, if not all courts hold that being required to arbitrate a dispute that the parties did not agree to arbitrate is *per se* irreparable harm.").[14]

Plaintiffs are ready and willing to arbitrate, but Wells Fargo only stonewalls. If the arbitration cannot proceed as promised, then Plaintiffs should be free to resolve the claim in another forum. Either way, this element weighs in favor issuing the injunction now.

**C.    The Balance of Equities Tips in Plaintiffs' Favor**

Where the harm a plaintiff would suffer absent injunctive relief outweighs the harm the defendant would suffer if the injunction issues, injunctive relief is appropriate. *See Winter*, 555 U.S. at 33. A court must "balance the interests of all parties and weigh the damage to each" in determining how to balance the equities. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). In addition, "the relative size and strength

---

[14] Of course, Plaintiffs recognize that their situation is distinguishable, in that they are demanding an arbitration Wells Fargo is hellbent on preventing. But factual differences aside, the underlying premise is the same: the unfair enforcement, or denial, of a contractual dispute resolution forum constitutes irreparable harm.

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER213**

1   of each enterprise may be pertinent to this inquiry." *Int'l Jensen, Inc. v. Metrosound*
2   *U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

3           The balance of hardships tips strongly in Plaintiffs' favor here because they are
4   unable to resolve their claims pursuant to the agreed-upon procedure. And Wells Fargo
5   would suffer no undue hardship if the injunction issues because it agreed to arbitration,
6   including the accompanying costs. *See Macquarie*, 2012 WL 12882417, at *4 (finding a
7   party's loss of time to be irreparable, and also that the balance of equities tipped in that
8   party's favor because the loss of time outweighed any negligible harm to the other
9   party). This element weighs in favor of the preliminary injunction.

10  **D.      An Injunction is in the Public Interest**

11          The public interest inquiry addresses the impact of the requested injunction on
12  non-parties. It embodies the Supreme Court's direction that, "in exercising their sound
13  discretion, courts of equity should pay particular regard for the public consequences in
14  employing the extraordinary remedy of injunction." *Bernhardt v. L.A. Cty.*, 339 F.3d
15  920, 931–32 (9th Cir. 2003) (internal quotation marks and citation omitted) (citing
16  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Furthermore, where the
17  movant demonstrates a likelihood of success on the merits and irreparable injury, public
18  interest will nearly always "favor" the movant. *See Am. Tel. & Tel. Co. v. Winback &*
19  *Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994).

20          Individual consumers like Plaintiffs, who naturally possess unequal bargaining
21  power, should not be punished by the very process corporations force them into using.
22  *See Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975, 983 (2010); *see also Ward*, 2014 WL
23  7273911, at *5 (N.D. Cal. Dec. 22, 2014) (finding that "[t]he policy underlying the FAA
24  is to promote judicial efficiency and economy."). If Plaintiffs are going to be
25  contractually required to arbitrate, then they should be permitted to arbitrate. But if
26  Plaintiffs are not permitted to arbitrate, as is the case here, there exists no other forum
27  for resolving their claims. *See Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d
28  425, 427 (E.D. Pa. 2001) (finding "it is in the public interest to enforce valid contractual

-16-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

**SER214**

1  obligations…") It is furthermore always in the public interest to protect the legal rights

2  of consumers. *See Regents of Univ. of California v. Am. Broad. Companies, Inc*., 747

3  F.2d 511, 521 (9th Cir. 1984)

4  Moreover, this litigation alone demonstrates the likely expenditure of time and

5  resources that will occur if Plaintiffs are not free to arbitrate their claims. This also

6  weighs in favor of the public interest. *See Audi of Am., Inc. v. Bronsberg & Hughes*

7  *Pontiac, Inc.,* No. 3:16-CV-2470, 2017 WL 11573353, at *4 (M.D. Pa. Aug. 17, 2017)

8  (finding that "there is a great public interest in the efficient use of judicial resources").

9  And Plaintiffs are not alone in being stonewalled. 3,000 other individuals are

10  currently in the same position. Meanwhile, Wells Fargo has millions of other customers

11  subject to similar claims because its conduct is uniform to all of its customers. *See*

12  *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir.

13  2008) (holding that the court could consider similarly situated non-parties in considering

14  the public interest). This element also weighs in favor of granting the injunction.

**VI   CONCLUSION**

15  The premise that consumer arbitration is the future of dispute resolution has long

16  passed into cliché, but it will be no more than a fiction if consumers seeking to press

17  their claims in arbitration find the door barred prior to entry. If that becomes the case,

18  multi-billion-dollar corporate actors will constitute a law unto themselves, a disastrous

19  outcome to contemplate. Perhaps Wells Fargo is an outlier among corporations of its

20  size and bringing it alone to heel will be enough. Those are questions for another day.

21  For now, it is enough that the Court require Wells Fargo to make its promises of

22  arbitration match the reality Plaintiffs face. To that end, Plaintiffs ask the Court to grant

23  their motion for a preliminary injunction

24  

25  //

26  //

27  //

28  

-17-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER215

Dated: January 10, 2023          Respectfully Submitted,

                                 **MCCUNE LAW GROUP, APC**

                                 _/s/ Richard D. McCune_
                                 Richard D. McCune, CA Bar No. 132124
                                 rdm@mccunewright.com
                                 Steven A. Haskins, CA State Bar No. 238865
                                 sah@mccunewright.com
                                 Valerie Savran, CA State Bar No. 334190
                                 vls@mccunewright.com
                                 Richard A. Nervig, CA State Bar No. 226449
                                 ran@mccunewright.com
                                 **MCCUNE LAW GROUP, APC**
                                 3281 East Guasti Road, Suite 100
                                 Ontario, CA 91761
                                 Telephone: (909) 557-1250
                                 Facsimile: (909) 557-1275

                                 Emily J. Kirk, IL Bar No. 6275282*
                                 ejk@mccunewright.com
                                 **MCCUNE LAW GROUP**
                                 231 N. Main Street, Suite 20
                                 Edwardsville, IL 62025
                                 Telephone: (618) 307-6116
                                 Facsimile: (618) 307-6161
                                 *Admitted _Pro Hac Vice_

                                 Attorneys for Plaintiffs

---

-18-

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

# CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing document to be filed on January 10, 2023, with the Clerk of the Court for the United States District Court for the Southern District of California using the Court's electronic filing system, which will send a notice of electronic filing to all attorneys appearing in this matter.

/s/ Richard D. McCune
Richard D. McCune

Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction
Case No. 3:22-cv-01976-DMS-AGS

SER217

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2023, the foregoing was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

<u>/s/ Matthew A. Fitzgerald</u>
Matthew A. Fitzgerald

*Counsel for Appellees Wells Fargo &
Company and Wells Fargo Bank, N.A.*