# Exhibit 3

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| INDIVIDUAL CONSUMERS, | ) **CLAIMANTS' RESPONSE TO** |
| | ) **RESPONDENT WELLS FARGO BANK** |
| | ) **N.A.'s MEMORANDUM REGARDING** |
| Claimants, | ) **CLAIMANTS' AUGUST 14, 2023** |
| | ) **SPREADSHEET OF DEMANDS** |
| | ) |
| v. | ) |
| | ) |
| | ) |
| WELLS FARGO BANK, N.A., | ) |
| | ) |
| | ) |
| Respondent. | ) |

_____

## I.    <u>INTRODUCTION</u>

There are two primary issues to address in this round of briefing: (1) Wells Fargo's mandated arbitration process and the issues arising from that process and (2) Claimants' Motion to Amend.[1] As to issue one, those Claimants who have presented claims under their initial demands and/or proposed amended demands are entitled to a hearing. To the extent certain Claimants are having difficulty substantiating their claims, it is a result of Wells Fargo's own

_____

[1] The Arbitrator stated during the August 15, 2023, teleconference with the parties that this briefing was limited to any questions or issues concerning Claimants' August 14, 2023 spreadsheet of demands, and that briefing may be later required pertaining to Claimants' Motion to Amend. However, Wells Fargo spent numerous pages of its brief attacking Claimants' Motion to Amend. Accordingly, Claimants address those arguments here but reserve the right to fully brief all issues pertaining to the Motion to Amend, to the extent not fully set forth herein.

1

refusal to provide Claimants with copies of their monthly account statements and account contracts – documents that Wells Fargo maintains in the normal course of business and that are not as easily accessible to customers as Wells Fargo has led the Process Arbitrator to believe. Wells Fargo's refusal to provide this basic information to its customers about their own accounts constitutes a direct violation of section 1034(c) of the Consumer Financial Protection Act ("CFPA"),[2] which requires large financial institutions to comply with information requests pertaining to consumer accounts. As such, Wells Fargo has manufactured its own problems by failing to comply with Claimants' basic information requests and the law.

As to the second issue, Wells Fargo has no viable basis to oppose Claimants' Motion to Amend other than its own conclusion – made without providing Claimants any form of due process – that the claims lack merit. But there is no basis in law, contract, AAA rules, equity, or anywhere else preventing Claimants from amending their initial demands to add additional claims against Wells Fargo. As such, Wells Fargo's arguments for denying Claimants' Motion to Amend are not only unsupported, but border on sheer lawlessness.

## II. PROCEDURAL HISTORY

### A. Proposed Amended Claims

On July 24, 2023, Claimants filed a motion with AAA to amend their initial arbitration demands (the "Motion"). As the Process Arbitrator knows, Claimants' initial demands focused on alleged violations of Regulation E. However, as Claimants continued to provide Counsel with additional information and documentation to further develop their claims, Claimants' Counsel discovered additional overdraft and non-sufficient funds ("NSF") fee practices affecting certain Claimants that were in violation of several other legal doctrines. Accordingly,

---

[2] 12 U.S.C. 5534(c)(1).

Claimants' Counsel proposed adding these additional claims and related causes of action to Claimants' demands (the "Proposed Amended Claims"). Claimants' Counsel also proposed amending the Process Arbitrator's October 27, 2022, and June 14, 2023, Orders (the "PA Orders") because those Orders only addressed evidence necessary to substantiate Regulation E violations, which would not be applicable to the newly proposed claims.[3]

### B. Spreadsheets Ordered by Process Arbitrator

On August 14, 2023, Claimants submitted a spreadsheet pursuant to the PA Orders containing information for 2,597 Claimants. The spreadsheet contained four categories. The first category included 208 Claimants who were able to obtain the documentation necessary to confirm each of the Process Arbitrator's requirements for substantiating a Regulation E claim including an affirmative opt-in, account number, and a qualifying transaction within the timeframe described in the June 14, 2023 Order. The second category included 1,418 Claimants who were able to confirm the account number and a qualifying transaction under Regulation E and/or one of the Proposed Amended Claims.[4] The third category included 966 Claimants who

---

[3] For example, proof of opt-in to DCOS is not needed to establish a claim for the improper assessment of more than one NSF fee on the same transaction item ("retry" claim). A retry claim isn't based on the same type of transactions as Regulation E. Retry transactions can only occur on ACH and check transactions, while Regulation E violations concern one-time debit card and ATM transactions. Thus, proof of opt-in to DCOS does not have any effect on a retry claim, nor is it based on the same legal theories/causes of action.

[4] While Claimants' Counsel refers to certain transactions as those that are "believed" to be qualifying, that belief is based on a good faith review of records provided by Claimants, although without the benefit of full account records maintained by Wells Fargo which would definitively confirm the transaction type. As such, the 283 Claimants listed as "qualifying" have a claim under Regulation E because the Claimants' documentation, which has been reviewed by Counsel, shows what appears to be a fee assessed on a one-time debit card or ATM transaction, which means that the customer was either opted-in to DCOS, or should have been opted-in but wasn't, either of which constitute Regulation E violations under Claimants' theories. Review of certain Claimants' documentation also showed other illegal fee practices beyond violations of Regulation E, such as charging more than one NSF fee for the same transaction item ("retry"

have had difficulty obtaining information about their accounts, including obtaining monthly statements to show opt-in status and/or qualifying Regulation E violations or qualifying transactions under the Proposed Amended Claims and with whom Counsel continues to work to obtain the necessary information. Finally, the fourth category included 5 Claimants voluntarily withdrawing their claims. On September 13, Claimants submitted an additional spreadsheet containing the same information for Claimants who served their arbitration demands prior to June 14, 2023, but for whom Wells Fargo has not paid administrative fees.[5]

Wells Fargo's continued assertion that Claimants' Counsel have filed frivolous claims is simply untrue and completely overlooks its own bad faith and failure to follow the law in this process. It knows from its own records that Claimants have not filed frivolous claims, yet it continues to make this false assertion while withholding the customer data it knows shows otherwise. Notably, the majority of Claimants have provided, or can provide, evidence of a fee on an at-issue transaction under the proposed amended complaint. But, most importantly,

---

transactions), as well as charging overdraft fees on transactions that are authorized on a positive balance but allegedly settle on a negative balance, known as Authorize Positive Settle Negative ("APSN") claims. These claims were not alleged in the initial demand, but Claimants seek leave to add them now. These are not unvetted claims, nor is it appropriate for Wells Fargo to challenge these allegations at the pleading stage of the arbitration. Wells Fargo is welcome to present its defenses to Claimants' allegations during the individual hearings on the merits of these claims, and after the parties exchange documentation as required by the arbitration rules. But, at the pleading stage, Claimants' allegations are presumed to be true until proven otherwise at the hearing. And if Claimants are permitted to amend their demands to add these additional claims, Claimants can add what are believed to be qualifying transactions supporting these additional claims, if determined necessary by the Process Arbitrator.

[5] The September 13 spreadsheet contained a total of 1,338 Claimants. It includes the same four categories as the August 14 spreadsheet, except for that the first category of the September 13 spreadsheet includes all Claimants with a fee on a Regulation E transaction. As such, there are 224 Claimants in the first category, which includes all Claimants with a Regulation E overdraft fee (whether "qualifying" or "not qualifying"), 504 in the second category with a qualifying fee under the Proposed Amended Claim, 605 in the third category, and 5 in the fourth category.

Claimants' Counsel have only determined 10 Claimants out of 3,955 have no qualifying fees even though those Claimants believed they had such fees at the time they contacted Counsel. Furthermore, simply because those Claimants listed in category three of the spreadsheets have been unable to access the documentation necessary to substantiate their claims per the PA Orders' requirements *does not mean those Claimants have no viable claim.* It simply means those Claimants believed they had qualifying transactions when they contacted Claimant's Counsel but have not been able to access the extra documentation required by the Process Administrator to specify qualifying fees which, per Claimants' Counsel's extensive experience litigating these claims in court, is not an unusual circumstance. (*See* Declaration of Richard McCune ("McCune Decl."), at ¶ 3). In fact, if a plaintiff doesn't have access to his or her account statements when filing a complaint in court, qualifying transactions are often not confirmed until discovery when the defendant then provides the plaintiff with his or her monthly account statements – something that Wells Fargo so far refuses to do. But the plaintiffs are not prohibited from bringing the case simply because they lack access to their account data. (McCune Decl., at ¶ 4; Declaration of Kristina J. Catapang ("Catapang Decl."), ¶¶ 6-10).

### C. <u>Current Status of Arbitration</u>

On August 15, 2023, the Process Arbitrator conferred with the parties and set a briefing schedule allowing Claimants to clarify the August 14, 2023, spreadsheet, including the "qualifying" and "non-qualifying" terminology pertaining to their Proposed Amended Claims. Claimants submitted their clarification on August 21, 2023. On September 22, 2023, Wells Fargo filed its response.

### D. <u>Current Status of Federal Case</u>

In December 2022, Claimants filed a federal court complaint with the district court not to

5

avoid arbitration as Wells Fargo insinuates, but in order to receive the arbitration process they were contractually promised. *See Mosley v. Wells Fargo & Co*., 2023 WL 3185790 (S.D. Cal. May 1, 2023). Although Wells Fargo alleges that there is no basis for this court action, that is not true, as the case is currently pending appeal before the Ninth Circuit and is set for oral argument in February of 2024. *Id.*

### III.     ARGUMENT

**A.   To The Extent Wells Fargo Complains About the Arbitration Process, It Is The Process Wells Fargo Imposed Upon Claimants, Not The Other Way Around**

Claimants are consumers with individual arbitration demands against Wells Fargo. They commonly face a problem—low-value claims resulting from uniform conduct—for which federal courts have had a solution for several decades. Given the common pattern of conduct against them, Claimants under normal circumstances would have filed a class action complaint under Rule 23 for redress of their grievances. A class action would not have involved individual filing fees and would have ensured that damages for each class member would have been determined through the production of transactional data – a process that has been used in the numerous class action cases litigated by Claimants' Counsel when asserting the very same claims at issue here, as well as by Wells Fargo itself in related overdraft litigation. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138 (N.D. Cal. 2010) (where plaintiffs' expert, using the customer transactional data provided by Wells Fargo, was able to show "it is entirely practical to re-run the computerized data in storage for each class members' account and determine how many overdrafts were added…during the class period"); (McCune Decl., ¶¶ 2-3). That process would have been straight forward and efficient.  But Wells Fargo took away that option by imposing individual arbitration on its customers in its contract as the

6

sole available forum for dispute resolution. If there is anything that the parties agree upon, it is that there are numerous inherent procedural limitations and complications that arise in arbitration, and they expand exponentially when the arbitration runs headlong into the problem of high-volume, common, low-value claims. Claimants' Counsel assume that Wells Fargo opted to forgo the efficiency provided by Rule 23 in this circumstance because it provides consumers a chance to overcome the high-volume/low-value paradox, assuming that consumers would just give up pursuing their low value claims altogether. But they didn't. Instead, they followed Wells Fargo's contractual terms, filed individual arbitrations with AAA, and paid (or will pay) the necessary fees to ensure they have access to Wells Fargo's chosen forum for a hearing on the merits of their claims. Even if Wells Fargo could set aside basic concepts like fairness and due process, the existing contract simply offers no means of escape for Claimants or Wells Fargo when it comes to paying fees.

Which is why, at the end of the day, Wells Fargo's ad nauseum complaints about its obligation to pay administrative filing fees simply fail to resonate. *See* Resp. Mot. at 10 ("filing demands on behalf of thousands of individuals… in order to impose with millions of dollars in fees"); *see also* Resp. Mot. at 15 ("Wells Fargo has spent $501,075.00 in AAA administrative fees, incurred attorneys' fees and expenses, and expended an untold amounts of man hours[6]…")

---

[6] Counsel for Claimants have also expended numerous hours on hearings and motion practice as a direct result of Wells Fargo's refusal to arbitrate, which could have been avoided if Wells Fargo would have cooperated with Claimants by providing them with their monthly account statements – documents that they are legally entitled to obtain as customers (or easier yet, would have provided Claimants' Counsel with the transactional data for these customers which would identify each qualifying transaction for each Claimant). Providing account statements or transactional data would have streamlined the entire process of determining the universe of qualifying transactions at issue. But streamlining this process for cost and efficiency has never been Wells Fargo's goal no matter how loudly they scream. Instead, they have taken a scorched earth approach, making it next to impossible for many Claimants to access the information they need to substantiate their claims, thus causing additional costs and attorney hours to quickly add

If Wells Fargo didn't want to pay administrative filing fees, then the obvious resolution to the problem is not to insert an arbitration clause into its contracts. The court systems exist by public right, established by federal and state constitutions as the means of civil dispute resolution. They are funded by the government to provide a fair and neutral forum. But Wells Fargo's contract bars Claimants from this neutral venue, only to turn around and complain that it doesn't want to pay the administrative fees that pay the arbitrators, administrators, clerks, and staff necessary for the replacement adjudication process Wells Fargo has demanded. This Alice-in-Wonderland approach to dispute resolution ultimately illustrates why Claimants are so entrenched against an opponent whom they see as fundamentally undermining their right to any kind of dispute resolution process, much less a fair process.

These disputes are starting to regularly make their way to federal courts, and federal courts are recognizing the fundamental hypocrisy of large corporations like Wells Fargo who understand arbitration clauses not as a means of alternative dispute resolution but as a means of preventing disputes altogether. *See Wallrich v. Samsung Elecs. Am., Inc.,* No. 22 C 5506, 2023 WL 5935024, at *10 (N.D. Ill. Sept. 12, 2023) ("Samsung asserts that it declined to pay arbitral fees but stood ready to arbitrate"). Only a month ago, in *Wallrich*, the federal court heard a matter resulting from 49,986 individual claimants filing nearly identical demands against Samsung Electronics America, Inc. ("Samsung") with AAA. *Id.* at *3. Although AAA accepted the demands, Samsung refused to pay fees for the same reasons as Wells Fargo, insisting that the

---

up in a forum that otherwise touts efficiency and less expense compared to litigation. Put simply, all of this is a direct result of Wells Fargo's refusal to adhere to the procedural rules of arbitration, its own contractual terms, and legal obligations. Meanwhile Claimants' Counsel are simply focused on providing a forum for each of the Claimants to pursue their legal rights according to Wells Fargo's terms.

claims against it were "frivolous" and without merit, and therefore arguing it should be released from the paying the costs of the alternative justice system it contractually imposed upon consumers. *Id*. at *9. Unsurprisingly, the court had different ideas. After considering the parties' arguments, it explained that "Samsung declined to pay its share of the arbitration fees, not because of financial hardship, but because of its *own independent determination of deficiencies within Petitioners' claims*." *Id*. at *11[7] (emphasis added). Of course, a system of justice that rises and falls on one party's opinion of the claims is no system of justice at all. It is a canard. And the court saw right through Samsung's scam. "Samsung was surely thinking about money when it wrote its Terms & Conditions. The company may not have expected so many would seek arbitration against it, but neither should it be allowed to "blanch[ ] at the cost of the filing fees it agreed to pay in the arbitration clause." *Id*. at *13 (citing *Abernathy v. Doordash, Inc.,* 438 F.Supp. 3d 1062, 1068 (N.D. Cal. 2020) (describing the company's refusal to pay fees associated with its own-drafted arbitration clause as "hypocrisy" and "irony upon irony")).

Wells Fargo chose this particular system of dispute resolution and imposed it upon its customers. It remains a source of great wonder as to what Wells Fargo could possibly complain about now given that fundamental fact. Indeed, Claimants do not even benefit from the payment

---

[7] The facts of that case are similar to the facts at issue here. AAA requested a spreadsheet of claims. *Id.* at *3. The court found that Samsung's subjective view of the claims as "frivolous" was not proper basis for refusing to arbitrate or pay filing fees. *See also Uber Techs., Inc. v. Am. Arb. Ass'n, Inc*., 204 A.D.3d 506, 510, 167 N.Y.S.3d 66, 70 (2022) ("while Uber is trying to avoid paying the arbitration fees associated with 31,000 nearly identical cases, it made the business decision to preclude class, collective, or representative claims in its arbitration agreement with its consumers, and AAA's fees are directly attributable to that decision"). As such, this corporate ploy is far from new, and should not be entertained.

of administrative fees, absent the benefit of finally receiving access to a venue where their claims can actually be heard.

**B. Claimants' Counsel Performed Due Diligence While Wells Fargo Continues to Thwart Basic Information Requests in Violation of Section 1034(c) of the CFPA**

Wells Fargo also falsely states that Claimants' Counsel failed to perform due diligence suggesting that "MLG submitted demands on behalf of at least 2,389 Claimants who MLG cannot establish *had a claim for which they sought relief under their original demands*" (Resp. Mot., at 14). This reasoning merely restates the point above: Wells Fargo's argument comes down to whether Claimants' claims have merit, which itself is the question that arbitration is supposed to resolve.

Moreover, Wells Fargo is simply wrong. Claimants' Counsel performed appropriate due diligence as to all clients. Counsel sought relevant information from their clients prior to filing each demand, and they provided what they could access. (Catapang Decl., ¶ 3). However, in this process, Wells Fargo has failed to meet its legal duty to provide the information to substantiate claims pursuant to section 1034(c) of the CFPA, which states that large banks and credit unions, "shall, in a timely manner, comply with a consumer request for information in the control or possession of [a large bank or credit union] concerning the consumer financial product or service that the consumer obtained from [the large bank or credit union], including supporting written documentation, concerning the account of the consumer." Under section 1034(c), large financial institutions must comply with consumer requests for information regarding their accounts, even if consumers do not expressly invoke that section.[8]

---

[8] 12 U.S.C. 5534(c)(1).

Just a few days ago, on October 11, 2023, the CFPB reinforced the significance of this provision by issuing an advisory opinion, making it clear that section 1034(c) covers consumer requests for information including "account information that appears on periodic statements or on online account portals, such as…the amount of the balance in a deposit account,…and information regarding transactions or payments involving an account" and "the terms and conditions of the account…"[9]  The reasoning: such information may be needed for consumers to "manage their accounts and resolve disputes with their bank or credit union, or with merchants or other third parties."[10] In addition, financial institutions are required to provide consumers with "supporting written documentation," which includes "written documents that will substantiate information" or that will "assist consumers with understanding or verifying information regarding their accounts."[11] This written documentation includes "information about past transactions on [a consumer's] account" including "copies of past periodic statements" and "information regarding the terms and conditions governing their account" such as "a copy of their account agreement (including a copy of the original signed agreement)."[12] Large financial institutions are required to produce information in their "control or possession", which includes "information that is known by its employees or that can be found in its records."[13] And as stated *supra*, Wells Fargo maintains information pertaining to consumer accounts, including statements and data, in the regular course of business.

---

[9] CFPB Advisory Opinion, October 11, 2023, *Consumer Information Requests to Large Banks and Credit Unions,* attached hereto as **Exhibit A**, at 6.
[10] *Id.*
[11] *Id.* at 7.
[12] *Id.*
[13] *Id.* at 8. Notably, "control" does not necessarily mean "physically possess", and includes "where it has a legal right, authority, or practical ability to obtain the information", meaning banks must provide information held by an affiliate or service provider.

The CFPB has further made it clear that financial institutions may not "impose conditions that unreasonably impede consumers' information requests."[14] Such unreasonable conditions include, *inter alia,* "requiring a consumer to pay a fee or charge to request account information" or "forcing consumers to endure excessively long wait times to make a request to a customer service representative, requiring consumers to submit the same request multiple times, requiring consumers to interact with a chatbot that does not understand or adequately respond to consumers' requests, or directing consumers to obtain information that the institution possesses from a third party instead."[15] As such, by refusing to comply with Claimants' basic requests for information pertaining to their own accounts, such as by failing to provide them with their monthly account statements, Wells Fargo has violated section 1034(c) of the CFPA in an effort to keep Claimants from arbitrating viable claims.

If Wells Fargo had simply provided Claimants with basic documentation related to their own accounts, the parties would not be in this situation. But Wells Fargo misled the Process Arbitrator to believe that information related to overdraft fees is easy to obtain by its customers. It's not. Many customers no longer have account documents lying around their homes so they either have to access them online or by reaching out directly to a branch. And while that sounds easy enough in principle, in reality many of these Claimants no longer have access to their accounts, are indigent, live far from a Wells Fargo branch, or don't have internet access (Catapang Decl., ¶ 4). Given the difficulty of procuring information in these situations, Claimants' Counsel asked Wells Fargo for the information that would have streamlined this process for customers and counsel. (*Id.,* ¶ 5). Claimants' Counsel sent Wells Fargo authorization

---

[14] *Id.* at 10.
[15] *Id.* at 10-12.

requests for numerous Claimants, which were fully completed with the Claimant's name, address, and account number. (*Id.,* ¶ 6). But Wells Fargo refused to comply.

Now, in a last-ditch resort to skew the facts, Wells Fargo claims that the authorization requests were insufficient and cites a few examples. (*See* Resp. Mot. at 4). But what Wells Fargo conveniently omits is that for the allegedly deficient authorizations where information was missing, Claimants' Counsel sent revised authorization requests with the complete information. (Catapang Decl., ¶ 7). Even after the updated authorization requests were sent with complete information, Wells Fargo represented that it would not be complying with any of the authorization requests because the parties had not yet submitted to the arbitration process. (*Id.,* ¶ 8, Ex. A). But whether or not the Claimants were in arbitration, litigation, or any other dispute resolution, they were entitled to this information about their own accounts and Wells Fargo has refused to provide it.

Even worse, it is also important to understand that Wells Fargo not only acted this way with Claimants' Counsel, but it also refused to provide the most basic account information directly to Claimants when they asked. (Catapang Decl., ¶ 9). In fact, it appears that Wells Fargo instructed personnel at branches to refuse requests from customers for statements and account information when they requested it in person at branches. (*Id.,* ¶ 10). As stated *supra,* such refusal to provide Claimants with their account information, including their account statements, violates section 1034(c) of the CFPA. This is precisely the kind of bad faith action that leads to disputes, as Claimants cannot assume anything but the worst from Wells Fargo's refusal to provide information that is within its custody and control. In light of these bad faith actions, Wells Fargo's crocodile tears for efficiency and fairness fall on deaf ears.

Wells Fargo's failure to provide this information is unprecedented. Claimants' Counsel have significant experience with litigating and arbitrating financial matters, and has routinely obtained cooperation from institutions understanding their duty to their customers regarding the production of account statements, overdraft forms, and transactional data, even from institutions with far fewer resources than Wells Fargo. (McCune Decl., ¶¶ 2-3). Wells Fargo cannot continue to play both sides of the coin: requiring Claimants to provide information it has access to, while refusing to provide that same information when requested and which it has an affirmative obligation to provide. Wells Fargo's tactic of shifting its own bad-faith to Claimants' Counsel at the expense of Claimants' rights should not be tolerated.

## C. __The Motion to Amend and Proposed Amended Claims__

Claimants' Counsel have an ethical obligation to zealously represent their clients. Wells Fargo contends that Claimants' Counsel have not performed due diligence because they have not complied with the PA Orders (Resp. Mot., at 15). But this is nothing more than a logical fallacy. Claimants' Counsel have a good-faith basis for bringing all of their claims, whether related to the PA Orders or not.

Namely, based on investigation and recent regulatory guidance, Claimants now assert that Wells Fargo engages in other illegal fee practices beyond violations of Regulation E, such as charging more than one NSF fee for the same transaction item ("retry" transactions), as well as charging overdraft fees on transactions that are authorized on a positive balance but allegedly settle on a negative balance (APSN transactions) in violation of Wells Fargo's contracts with

14

customers.  Moreover, the CFPB has recently issued guidance that such practices are inherently unfair.[16]

Based on such information and Claimants' Counsel's own investigation, Claimants have sought permission from the Process Arbitrator to pursue such claims by filing amended demands. As such, even if certain clients do not have a Regulation E claim under the PA Orders, they have other valid claims, and it is Claimants' Counsel's obligation to ensure their clients are able to have such claims heard. By stating that, "MLG is attempting to put the cart before the horse," Wells Fargo fails to grasp the fundamental premise that the claims have always been the horse. There is no extra step that needs to be taken outside of filing lawful demands with as few or as many claims as a claimant may have, whether related to the PA Orders or not. Claimants' Counsel have and continue to investigate claims, whether Regulation E or something else, and brings such claims in order to protect their clients' rights as they are ethically required to do. Any objection on the part of Wells Fargo undercuts the entire process of advocacy as it stands. If Wells Fargo is making the argument that Claimants' Counsel are not able to protect their clients' rights, whatever those rights may be, AAA would be judicious to not follow it over the precipice.

## 1.  <u>There is No Limit on the Number of Claims that May be Brought</u>

Respondent suggests that "the Proposed Amended Claim is based on MLG's 'belief' that Claimants could be entitled to arbitrate under one of *seven*[17] potential claims listed in the

---

[16] CFBP Consent Decree, December 20, 2022, attached hereto as **Exhibit B;** CFPB Consent Decree, July 10, 2023, attached hereto as **Exhibit C**; CFPB Supervisory Highlights Junk Fees Update Special Edition, October 2023, attached hereto as **Exhibit D.**

[17] In any case, Claimants are not alleging to arbitrate under "one of seven potential claims." As stated *infra,* each individual Claimant would specify which specific fees they were charged pursuant to which specific legal theories. As such, Wells Fargo's suggestion of a "potpourri" of claims without factual support is inaccurate and should be ignored.

Proposed Amended Claim…It wants to bring as many claims as possible without regard for whether Claimants actually have a dispute with Wells Fargo—and without alleging any basic facts whatsoever in support of such alleged claims." (Resp. Mot. at 15). This reasoning is flawed for several key reasons.

First, at the pleading stage, Claimants are required to present "general factual assertions of injury and harm." *Triple AAA Ass'n for Child. with Developmental Disabilities v. Del Taco Inc.,* No. 06CV2199 DMS (WMC), 2007 WL 9776739, at *4 (S.D. Cal. Feb. 26, 2007). Claimants do just that with the Proposed Amended Claims, which states factual allegations pertaining to Wells Fargo's allegedly illegal practices and the damages sought. In addition, each Claimant who files under the Proposed Amended Claim would specify good-faith proof of the allegedly illegal fee, the same way that is being requested under the PA Orders. However, if arbitration is going to present Claimants with an ever-moving target rooted in the respondent's tolerance for arbitration, then arbitration is not a viable dispute resolution mechanism at all.

Second, there is no rule or law placing a limit on the number of claims or causes of action that a claimant may pursue, nor has any court ever granted a motion to dismiss on that basis. This is just more of Wells Fargo having its cake and eating it too, not willing to directly permit Claimants to bring their claims in court, but insisting on Rule 12 level protections (and beyond). At the end of the day, Wells Fargo doesn't actually want to arbitrate claims, as demonstrated by its consideration of the entire process as manipulable with rules whose only guiding principle is to advantage Wells Fargo.

Moreover, if anything defeats the premise of a fair hearing, it is that Wells Fargo can prevent claimant from pursuing claims against it simply because it does not like the idea of having to defend against them. *See Smith v. Campbell & Facciolla, Inc*., 202 Cal. App. 2d 134,

135 (Ct. App. 1962); *see also Haworth v. Superior Ct.,* 50 Cal. 4th 372, 395, (2010) (dis. opn. of Werdegar, J.) (the arbitration system must have "sufficient integrity that parties can be confident they will receive a fair hearing"). If that is the rule, then the question is probably destined more for societal resolution in any event.

Of course, the parties are still litigating this case with the appeal to the Ninth Circuit, and there is still the possibility that Claimants will get their day in court. If there is anywhere that it should matter that Wells Fargo cites no case law, rule, or any other authority supporting its objections to Claimants' amendments, it is here. Accordingly, Claimants urge AAA to do the right thing and give Claimants the hearings to which they are entitled.

### 2.  The AAA Consumer Rules Liberally Permit Amendment of Claims

Of all the places to find an absence of support for Wells Fargo's position, the AAA Consumer Rules is the most likely, precisely because the whole point of arbitration is to provide claimants maximum flexibility to present their claims.  Because of the underlying consumer-friendly policy inherent in the AAA rules, they allow claimants to amend demands for different or additional claims based on subsequently discovered information, even if not part of the original demand. *See Blaker v. Credit One Ban*k, *N.A*., No. 18-CV-2108-CAB-JMA, 2018 WL 5307470, at *1 (S.D. Cal. Oct. 26, 2018) ("plaintiffs filed an amended claim with the AAA that *added a cause of action* for violations of the federal Telephone Consumer Protection Act") (emphasis added); *Intuit Inc. v. 9,933 Individuals,* No. B308417, 2021 WL 3204816, at *2–3 (Cal. Ct. App. July 29, 2021) (mass arbitration facilitated under the AAA Consumer Rules permitted claimants to amend all of their demands almost a year after original demands were filed). Amending demands is routine and contemplated by the rules. Wells Fargo's suggestions otherwise are simply invented out of whole cloth.

Indeed, not only is the premise of amending claims unremarkable in arbitration, it is a right liberally granted even in the very federal courts Wells Fargo attempted to avoid by imposing the arbitration clause in the first place. Virtually every court in the nation permits a liberal amendment of claims to amend a claim or add additional claims. *See* Fed. R. Civ. P 15(a). *See also Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (leave to amend claims is to be freely granted when justice requires, even if no request to amend the pleading was made); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir. 2000) (the underlying purpose of Rule 15 is to facilitate a decision on the merits, rather than on pleadings or technicalities). To take this right away from Claimants here in this forum—merely on Wells Fargo's say-so—would be fundamentally unfair.

### 3. <u>Leave to Amend is Expressly Permitted Under the Applicable Contract</u>

What is more, Wells Fargo drafted this concept directly into the very contract it imposed upon Claimants. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (recognizing that arbitration is a "matter of contract," and thus the parties' agreement to arbitrate controls "the specific procedures that govern the initiation of an arbitration proceeding."); *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co*., 925 F.2d 1136, 1140 (9th Cir. 1991) (finding that "an arbitrator's jurisdiction is rooted in the agreement of the parties."). Here, Claimants entered into Wells Fargo's Deposit Account Agreement, which states, "[e]ither Wells Fargo or you may submit a dispute to binding arbitration *at any time*, *regardless of whether a lawsuit or other proceeding has previously begun*."[18] (emphasis added). Even Wells Fargo's arbitration provision permits Claimants to file

---

[18] Wells Fargo Deposit Account Agreement, attached hereto as **Exhibit E,** at 35.

any dispute, including new or amended claims, at *any time*, even after an arbitration proceeding has commenced. To block this amendment, Wells Fargo has abandoned plain language, basic rule of law, and all reason. It is hard to understand why AAA would permit Wells Fargo to do this.

### 4. Wells Fargo Fails to Identify any Prejudice Precluding Amendment

Wells Fargo spends a lot of time attempting to convince the Process Arbitrator that its own subjective opinion about the claims, whether amended or not, is somehow a proper basis for whether to permit them to proceed. It's enough that Wells Fargo imposed arbitration on Claimants and even more that Claimants have been frozen in this interminable process for a year and a half with no substantive progress. But it is yet something else that Wells Fargo thinks it can act as judge, jury, and executioner. Whatever expense of time and money Wells Fargo claims is not prejudicial, because the expenses discussed here—the fees that must be paid to ensure that an arbitration process even exists as contractually promised—are inherent. *See Leadertex, Inc. v. Morganton Dyeing & Finishing Corp*., 67 F.3d 20, 26 (2d Cir. 1995) (finding that expense and delay which are inherent in the adjudication process, without more, do not constitute prejudice). Wells Fargo freely elected to pay the expenses when it unilaterally opted for arbitration. Nothing more is needed.

And what is more, Wells Fargo makes all these demands despite the fact that no discovery or merits-based motion practice has occurred. *GAR Disability Advocs., LLC v. Taylor*, 365 F. Supp. 3d 522, 533 (D.N.J. 2019). Wells Fargo has not shown any undue prejudice in its ability to defend itself against Claimants' allegations. *Id.* It simply has decided it does not want to. But that is not the standard in any adjudicative forum.

As such, for all of the foregoing reasons, Claimants' Motion to Amend should be granted.

**D. <u>Sanctions are Improper as Wells Fargo Fails to Demonstrate Claimants' Demands are Frivolous or Harassing</u>**

Furthering the vindictiveness of its arbitration strategy, Wells Fargo now demands "sanctions" on the basis that it is somehow being harassed "into paying its administration fees to resolve these claims and that they are "frivolous" because Claimants have not performed due diligence. (Resp. Mot. at 14). Punishing Claimants for seeking resolution of their claims in the forum Wells Fargo required is another impressive twist of the knife.

Nor is the fact that Claimants cannot provide documents as Wells Fargo demands a basis for sanctions, particularly when Wells Fargo already has all the information in its possession. *Hurd v. Ralphs Grocery Co.,* 824 F.2d 806, 811 (9th Cir.1987); *Flying A Ranch, Inc. v. Bd. of Cnty. Comm'rs for Fremont Cnty.*, 156 Idaho 449, 454 (2014). Again, this runs fundamentally counter to the premise of consumer arbitration, which often proceeds without documents and discovery altogether. Claimants attempted to engage Wells Fargo in a fact-finding process and were rebuffed—now Wells Fargo expects to be rewarded for not cooperating. It is hard not to point out that Wells Fargo's argument is just relentlessly, unceasingly self-serving. Claimants are treated as if they do not even exist, merely because Wells Fargo wishes they didn't.

And still, there is more. Wells Fargo not only wants to block Claimants' amended claims, but sanction them merely for trying. To say this would be precedent setting is a vast understatement. The premise attacks the very core principles of arbitration as a means of dispute resolution. Granting sanctions for this reason would leave little doubt that Wells Fargo not only makes, but enforces the rules. *Evanston Ins. Co. v. Footprints Behav. Interventions, Inc*., No. SACV20682JVSKESX, 2023 WL 4317198, at *11 (C.D. Cal. May 24, 2023) (subjective dissatisfaction with claims is not proper basis for awarding sanctions); *see also Ayvazian v.*

*Moore L. Grp.*, No. 2:12-CV-01506-ODW, 2012 WL 2411181, at *2 (C.D. Cal. June 26, 2012) (finding that sanctions do not operate to chill an attorney's ability to pursue all possible factual and legal theories at the pleading phase, and are only imposed where claims are "patently unmeritorious").

    E.  **<u>Wells Fargo's Requests Violate Due Process</u>**

       Sticking with the judge, jury, and executioner theme, Wells Fargo demands dismissal for any claim that does not provide the information required by the PA Orders. (Resp. Mot. at 16) (requesting that "the 3,493 Claimants in the "Amended Claims Cases" and "Cases Still Working On" tabs of the August 14 and September 13 Spreadsheets should be dismissed").

       In addition to all the other reasons described above demonstrating that this demand is specious, denying Claimants the ability to amend their claims and obtain basic account information to substantiate their claims, then going so far as requesting dismissal of their claims altogether, conflicts with AAA's Consumer Due Process Protocol Principle 13, which provides that "[n]o party should ever be denied the right to a fundamentally-fair due process due to an inability to *obtain information material to a dispute*."[19] (emphasis added). This principle is not only sound—given the supposedly informal and alternative nature of arbitration—it is particularly unfair where Wells Fargo already possesses the evidence needed to substantiate Claimants' claims but refuses to provide it to the Claimants, then lawlessly suggests on that basis that their claims be dismissed. Denying Claimants' rights to pursue their claims would be a *de facto* denial of due process and their right to a fair hearing.

       Moreover, pursuant to the AAA Consumer Rules, Rule 22, "[i]f any party asks or if the arbitrator decides on his or her own, keeping in mind that arbitration must remain a fast and

---

[19] *See* AAA Consumer Due Process Protocol, attached hereto as **Exhibit F.**

economical process, the arbitrator may direct 1) specific documents and other information to be shared between the consumer and business." R-22. As such, at the very least, the Process Arbitrator should require Wells Fargo to comply with basic requests for information to allow Claimants to further investigate their claims, such as requiring Wells Fargo to provide Claimants' with their account statements. However, dismissing claims altogether at the pleading stage simply because further investigation is required, as Wells Fargo requests, is directly contradicted by the Consumer Rules and due process.

The Consumer Rules further provide that each party "has the right to be heard and is given a fair opportunity to present its case." *See* AAA Consumer Arbitration Rules, R-32. If Claimants are barred from bringing any other claims that fall outside the scope of the PA Orders at Wells Fargo's one-sided command, they would have no other venue to have those claims vindicated. *See New England Power Co. v. Asiatic Petroleum Corp.,* 456 F.2d 183, 186 (1st Cir. 1972).

As such, Wells Fargo's embargo of all other claims it deems unworthy subverts the arbitration process and should not be entertained.

## IV.     CONCLUSION

There is no legal basis for granting Wells Fargo's request to dismiss claims. If the Process Arbitrator were to dismiss these claims because Claimants do not have access to information which Wells Fargo is obligated by law to provide, or the claims involve legal theories that Wells Fargo deems unworthy, which are the only two arguments Wells Fargo advances, it would truly render arbitration a one-sided sham. Further, to dismiss thousands of Claimants at Wells Fargo's command would mark a dark day in the history of any adjudicative process.

Arbitration is far from a perfect system. But the procedural limitations of arbitration as well as the inherent administrative costs involved do not justify a bar to claims. This is not the first instance of numerous arbitration demands being filed against a corporate entity, nor will it be the last. However, the Process Arbitrator has the capacity to ensure that the process maintains its dignity, and that Claimants are given an opportunity to have their claims fairly arbitrated, regardless of what the outcome on the merits may be.

As such, first, Claimants respectfully request that the Arbitrator compel Wells Fargo to comply with basic requests for information in order to allow Claimants' Counsel to further assess their clients' claims. Wells Fargo is in the best position to provide this information, and has an affirmative legal obligation to provide such information which it has in its possession and control pursuant to section 1034(c) of the CFPA.

Second, Claimants respectfully request that the Process Arbitrator immediately assign merits arbitrators to all Claimants in category one of the spreadsheets. For all other Claimants in categories two and three, they should be permitted to amend their claims after receiving the requested information from Wells Fargo pursuant to the  parties' contract, the AAA Consumer Rules, section 1034(c) of the CFPA, and all other applicable law.

Dated: October 13, 2023        **McCune Law Group, APC**

      *s/ Richard D. McCune*
Richard D. McCune, Esq.
rdm@mccunewright.com
Steven A. Haskins, Esq.
sah@mccunewright.com
Emily J. Kirk, Esq.
ejk@mccunewright.com
Valerie L. Savran, Esq.

23

vls@mccunewright.com
McCune Law Group, APC
3281 E. Guasti Rd., Suite 100
Ontario, CA 91761
Tel. (909) 345-8110

***Counsel for Claimant(s)***